**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| DBSD NORTH AMERICA, INC., *et al.*,[1] | ) Case No. 09-13061 (REG) |
|  | ) |
| Debtors. | ) Joint Administration Requested |
|  | ) |

### DECLARATION OF MICHAEL P. CORKERY
### (A) IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND
### FIRST DAY MOTIONS AND (B) PURSUANT TO LOCAL RULE 1007-2

I, Michael P. Corkery, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746:

1. I am the Acting Chief Executive Officer, Executive Vice President, and Chief Financial Officer of DBSD North America, Inc. ("DBSD NA"), a corporation organized under the laws of the State of Delaware and one of the debtors (the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"). In this capacity, I am generally familiar with the Debtors' day-to-day operations, businesses, financial affairs, and books and records.[2] I am over the age of 18 and competent to testify.

2. Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules"), I submit this declaration (this "Declaration") to provide a

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: DBSD North America, Inc. (6404); 3421554 Canada Inc. (6404); DBSD Satellite Management, LLC (3242); DBSD Satellite North America Limited (6400); DBSD Satellite Services G.P. (0437); DBSD Satellite Services Limited (8189); DBSD Services Limited (0168); New DBSD Satellite Services G.P. (4044); and SSG UK Limited (6399). The service address for each of the Debtors is 11700 Plaza America Drive, Suite 1010, Reston, Virginia 20190.

[2] I also serve as Acting Chief Executive Officer, Executive Vice President, and Chief Financial Officer of DBSD NA's parent, ICO Global Communications (Holdings) Limited ("ICO Global").

summary overview of the Debtors and their related non-Debtor companies (collectively, "DBSD"), explain the circumstances leading to the commencement of the Chapter 11 Cases, and set forth the factual background supporting the Debtors' voluntary chapter 11 petitions and "first day" motions (each, a "First Day Motion" and together, the "First Day Motions").

3.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' business, operations, and finances, information gathered from my review of relevant documents, and information supplied to me by other members of the Debtors' management and the Debtors' advisors.  I am authorized to submit this Declaration on behalf of the Debtors and, if called upon to testify, I could and would testify competently to the facts set forth herein.

## Preliminary Statement

4.      The Debtors are a development-stage enterprise formed in 2004 to design and develop an integrated mobile satellite and terrestrial services network (the "Satellite System") to deliver wireless satellite communications services to mass-market consumers.  The Satellite System is designed to provide ubiquitous wireless communications coverage anywhere in North America, including areas where traditional cellular service is currently unavailable or unreliable. To date, the Debtors have made significant progress in developing the Satellite System, including launching their geosynchronous earth orbit satellite (the "DBSD-G1 Satellite")[3] and obtaining regulatory approval and frequency bands for the Satellite System and in these respects are well ahead of competing satellite communications operators.  Accordingly, I believe the Debtors are well-positioned to implement the final stages of their business plan.

---

[3]     The DBSD-G1 Satellite is in "geosynchronous orbit," such that the satellite essentially is always at the same longitudinal position with respect to the Earth, although its latitude may vary.

K&E 14419338.23

5.     At this time, however, the Debtors are still a development-stage enterprise and, as such, do not yet have significant operations from which to generate revenues or cash flow.  As a result, like other development-stage companies, the Debtors have funded their working capital requirements, expenditures, research and development, and general corporate purposes using proceeds (a) raised from outside investors, (b) drawn from their existing credit facility, (c) generated from the issuance of convertible notes, and (d) earned from their investments.

6.     Until recently, the foregoing income sources have provided the funding needed to maintain continued operations.  However, as this Court is no doubt well-aware, the recent and unprecedented financial crisis affecting the banking system and financial markets, and current uncertainties in the global economic environment, have resulted in a tightening in the credit markets, a low level of liquidity in global financial markets, and extreme volatility in credit, equity, and fixed income markets.  These conditions have made it increasingly difficult for the Debtors to raise additional money to fund operations and anticipated capital expenditures and have depressed the value of the Debtors' assets.  Further, the recent credit market crisis— including downgrades in the credit ratings of bond issuers and bond insurers—has lowered the success rate for auctions of certain student-loan-backed auction-rate securities acquired by the Debtors in early 2008.  Because of the current conditions in the global financial markets, these ARS (as defined herein) have experienced multiple failed auctions as the amount of securities submitted for sale has exceeded the amount of purchase orders.  Therefore, the ARS likely cannot be liquidated at their par value until: (a) a successful auction occurs; (b) the issuers of the ARS call the ARS at par; (c) a liquid market develops for these ARS; or (d) settlements by financial institutions that underwrote the ARS become effective.  These issues with the ARS have further deteriorated the Debtors' liquidity.

K&E 14419338.23

7.      In light of current market conditions and trends in general, and the near-term outlook for DBSD NA in particular, the Debtors' cash on hand, investment proceeds, and cash reserves will not be sufficient to meet the capital requirements necessary for the Debtors to implement the final stages of their business plan and satisfy their substantial debt obligations currently scheduled to mature on May 15 and August 15, 2009.  In light of the foregoing (and as discussed in greater detail herein), the Debtors have made the difficult but prudent decision to commence the Chapter 11 Cases to recapitalize their debt to bring it into alignment with present and future operating prospects, ensure liquidity sufficient to continue operations through the implementation of the final stages of their business plan, and address their pending debt maturities.

8.      To familiarize the Court with the Debtors and the relief they will seek on the first day of the Chapter 11 Cases, this Declaration is organized as follows:  Part I describes the Debtors' history and current corporate and capital structure; Part II describes the events leading to and precipitating the need to commence the Chapter 11 Cases; Part III sets forth the relevant facts in support of each First Day Motion; and set forth on <u>Exhibit A</u> and <u>Exhibit B</u> attached hereto and incorporated by reference herein is the additional information required pursuant to Local Rule 1007-2 relating to, among other things, the Debtors' business, employees, and assets, and the parties in interest in the Chapter 11 Cases.

## Part I
### Corporate History and Structure, Business Operations and Capital Structure

**A.      History and Current Corporate Structure**

9.      DBSD NA is a 99.8% owned subsidiary of non-Debtor ICO Global Communications (Holdings) Limited ("<u>ICO Global</u>"), a publicly traded satellite communications company based in Reston, Virginia.  ICO Global and its predecessor entities have operated in the

4

relatively new and challenging satellite communications industry for over 14 years—since being spun out of Inmarsat. In 1995, ICO Global's predecessor, a Cayman Islands-registered private company also named ICO Global Communication (Holdings) Limited ("Old ICO"), was established by a group of strategic investors—made up primarily of telecommunications and technology companies—to develop and operate a high-performance, cost-effective global mobile telecommunications system through a network of 17 wholly-owned direct and indirect subsidiaries located throughout the United Kingdom, Bermuda, Singapore, the Netherlands, and the United States.

10.     It is my understanding that following certain unsuccessful efforts to secure additional financing commitments, Old ICO commenced voluntary chapter 11 cases in the United States Bankruptcy Court for the District of Delaware on August 27, 1999. Pursuant to Old ICO's chapter 11 plan, ICO Global (incorporated in Delaware in 2000 to facilitate the acquisition of Old ICO upon emergence) acquired substantially all of the assets and assumed certain liabilities of Old ICO.

11.     Following the reorganization and acquisition of Old ICO, ICO Global turned its focus to developing its U.S. mobile satellite service business. One of ICO Global's key strategies was to address the limitations inherent in satellite services that existed at that point.

12.     Satellites are highly effective at providing service over a wide area. But obtaining satellite service in urban areas and indoors is difficult because of signal blockages resulting from buildings and other terrain. In addition, while satellites are very effective at distributing the same signal to many users, they suffer from capacity limitations if called upon to carry many different data streams simultaneously. To address these issues, ICO Global and others in the industry successfully lobbied the Federal Communications Commission (the "FCC") to

promulgate new rules to permit the integration of an "ancillary terrestrial component" ("ATC") into U.S. mobile satellite service networks. ATC allows certain satellite operators such as ICO to transmit signals on their spectrum using terrestrial towers, as a cell phone tower does, in addition to satellite transmission. Through the hybrid satellite-terrestrial system made possible by ATC, communications companies can deliver the positive attributes of both satellite and terrestrial systems to mass market consumers and serve a variety of market needs, including public safety. In December 2004, to pursue the opportunities presented by this new regulatory regime, ICO Global formed DBSD NA to develop the Satellite System. DBSD NA and its direct and indirect subsidiaries—the Debtors in the Chapter 11 Cases—conduct all of ICO Global's North American operations. ICO Global is not a Debtor in the Chapter 11 Cases.

Current Corporate Structure



**B.      The Debtors' Business Operations**

(i)      General Background

13.      The Debtors are a next-generation mobile satellite service operator authorized to offer ubiquitous satellite-terrestrial services throughout the United States using the DBSD-G1 Satellite.  The Debtors conduct the majority of their operations in North America.

14.      The Debtors' principal offices are located in Reston, Virginia, with other operations in Bellevue, Washington, Lafayette and El Segundo, California, and Las Vegas, Nevada.  The Debtors employ approximately 50 employees who provide strategy, legal and regulatory, specialized engineering, and back office services.

(ii)      The Satellite System

15.      The Satellite System has been in development since 2004.  The Debtors designed the Satellite System flexibly to facilitate integration with a wide-range of technology partners, and they have obtained authorization from the FCC to provide this wide-variety of interactive mobile satellite services with a service footprint covering the United States, Puerto Rico, and the U.S. Virgin Islands.[4]  In January 2009, the Debtors cleared the key remaining regulatory hurdle by obtaining the FCC's approval, subject to certain gating criteria, to offer ATC services in conjunction with satellite services.

(iii)      Industry Growth and Strategic Partners

16.      The wireless communications sector has been among the strongest growth sectors in the communications industry in recent years.  It has also been a sector marked by rapid change and development.  Consumers increasingly communicate with a variety of electronic devices,

---

[4]      This authorization is subject to the FCC's ruling on a pending Sprint Nextel challenge to the grant of the Debtors' ATC authorization.

K&E 14419338.23

and content providers increasingly seek to reach consumers with different mobile applications. Additionally, due to the increase in wireless traffic, expanding usage of wireless voice services, and accelerating adoption of mobile video, data, and other high-bandwidth applications, the Debtors anticipate that existing and potential wireless service providers will need to significantly enhance their network capacity. Moreover, certain recent advancements in satellite technology have allowed for greater connectivity and capability to end-user devices that previously had not been possible. Indeed, mass-market manufacturers should be able to develop devices (e.g., car kits with antennas, cellular phones, notebook computer network interface cards, and other data modems and antennas) in a cost-effective manner to take advantage of the benefits of the Debtors' Satellite System.

17. To develop market share and capitalize on these opportunities, the Debtors have been working closely with several industry-leading vendors, including proven leaders in satellite, consumer electronics, and mobile video solutions. In addition, because the commencement of the full-scale commercial Satellite System will require substantial additional capital, the Debtors have been exploring opportunities to offer their services to, or with, certain strategic service providers who have the ability to integrate the Debtors' satellite and terrestrial services with services already offered to their existing customer bases.

18. The Debtors have entered into agreements with an array of leading vendors to develop more fully technologies to permit video and data multicasting and voice and data interactivity from the satellite, as well as integrated services for the terrestrial segment. For example, through agreements with Qualcomm Incorporated, the Debtors have developed a limited number of mobile phone-like devices capable of making voice calls and sending data to and from the DBSD G-1 Satellite and are developing and integrating satellite and cellular

8

communication technology into select multimode mobile baseband chips, which will enable manufacturers of cellular devices to build mobile devices able to access the Debtors' band capabilities and, thus, provide ubiquitous mobile communications coverage across North America, including in areas where traditional cellular service is currently unavailable or unreliable.

19.     The Debtors' business model involves enabling the Satellite System primarily to mass-market consumers for a fee, but the Debtors may be able to generate further revenue from fees charged to third parties who want to market their brand or advertise their goods or services through the Debtors' network.  In particular, the interactive capability of the network, combined with geographic positioning information, offers attractive growth opportunities for innovative advertising.

## C.     Balance Sheet and Capitalization

20.     As of March 31, 2009, the aggregate book value of the Debtors' assets was approximately $630 million.   As of the commencement of the Chapter 11 Cases (the "Petition Date"), the Debtors had total outstanding liabilities in the aggregate principal amount of approximately $813 million, consisting primarily of approximately $46 million in secured bank debt (including accrued but unpaid interest) and approximately $740 million of senior secured notes (including accrued but unpaid interest).

(i)     Prepetition Facility

21.     On March 27, 2008, DBSD NA obtained a $40 million revolving credit facility (the "Prepetition Facility") to provide the cash flow necessary to sustain operations during 2008, evidenced by that certain Amended and Restated Revolving Credit Agreement dated as of April 7, 2008 (as amended, supplemented, or modified from time to time, the "Prepetition Credit Agreement"), by and among DBSD NA, as borrower, each of DBSD NA's

subsidiaries, as guarantors, Wells Fargo Bank, N.A., as successor administrative agent (the "Agent"), the financial institutions and other persons from time to time lenders party thereto (the "Prepetition Lenders"), and The Bank of New York Mellon (f/k/a The Bank of New York), as collateral agent.

22.    The Debtors' obligations under the Prepetition Facility (the "Prepetition Facility Obligations") are secured by a first-priority security interest in substantially all of the assets of the Debtors and by a first-priority pledge by ICO Global of the equity of DBSD NA (subject to certain exceptions).  The Prepetition Facility Obligations bore an initial interest rate of 12.5% *per annum* payable annually (plus 2% during an Event of Default, as defined in the Prepetition Credit Agreement) and matured on May 1, 2009.

23.    On April 3, 2009 and April 30, 2009, the Debtors entered into forbearance agreements with the Prepetition Lenders (the "Prepetition Facility Forbearance Agreements"), pursuant to which the Agent and the Prepetition Lenders agreed to forbear, through May 1, 2009 and May 15, 2009, respectively, from exercising certain rights and remedies against the Debtors with respect to specified defaults under the Prepetition Credit Agreement arising from ICO Global's failure to produce audited financial statements without a going-concern qualification and the Debtors' failure to repay the Prepetition Facility in full on the May 1, 2009 maturity date.  In addition, the Prepetition Facility Forbearance Agreements provided for an aggregate fee of 2% of the outstanding principal under the Prepetition Credit Agreement and an increase of the interest rate to 16% *per annum* (after giving effect to the default rate) effective May 1, 2009.  The Debtors further agreed to use all of the proceeds received from any sale or disposition of ARS or any net cash proceeds from any asset sale, debt issuance, or equity issuance of DBSD NA equity to repay the obligations under the Prepetition Credit Agreement

K&E 14419338.23

and to use commercially reasonably efforts to obtain an ARS margin facility and to replace the Prepetition Credit Agreement. Finally, under the Prepetition Facility Forbearance Agreements, the Debtors agreed, in connection with any insolvency proceeding with respect to DBSD NA and its subsidiaries, not to challenge or seek to invalidate any of the outstanding obligations under the Prepetition Credit Agreement or to subordinate or re-characterize any claim of the collateral agent or any Prepetition Lender against the Debtors.

(ii)     Senior Notes Due August 2009

24.     In August 2005, DBSD NA issued $650 million in aggregate principal amount of 7.5% convertible senior secured notes (the "Senior Notes"), due August 15, 2009, pursuant to the Indenture dated as of August 15, 2005, among DBSD NA, the Debtors as guarantors, and The Bank of New York (n/k/a The Bank of New York Mellon) as trustee (the "Indenture Trustee"), as supplemented by the Supplemental Indenture No. 1 thereto dated as of November 30, 2005, among DBSD NA, the guarantors party thereto, and the Indenture Trustee and the Supplemental Indenture No. 2 thereto dated as of December 22, 2006, among DBSD NA, the guarantors party thereto, and the Indenture Trustee (such Indenture, as so supplemented and amended, the "Indenture"). The Senior Notes are secured by a second-priority security interest in substantially all of the assets of the Debtors and by a second-priority pledge by ICO Global of the equity of DBSD NA (subject to certain exceptions). DBSD NA issued the Senior Notes to fund the development of the Satellite System and other operating expenses.

25.     The Senior Notes mature on August 15, 2009, and bear interest at a rate of 7.5% per year, payable semi-annually in arrears in cash on February 15 and August 15. Subject to certain exceptions, for the period from August 16, 2007 through August 15, 2009, DBSD NA has the option of paying accrued interest due with additional Senior Notes in lieu of cash at an increased interest rate of 8.5% *per annum*. DBSD NA elected to make its February 15, 2008,

K&E 14419338.23

August 15, 2008, and February 15, 2009 interest payments in the form of additional Senior Notes. Therefore, the rate used to accrue interest on the outstanding Senior Notes has been adjusted to 8.5% *per annum*, effective August 16, 2007. If the Debtors were to make any future interest payments in the form of additional Senior Notes, that would result in approximately $767.6 million due at maturity.

26. The Indenture contains a conversion feature that allows holders of the Senior Notes (the "Senior Noteholders") to convert their Senior Notes into shares of DBSD NA's common stock at any time in their discretion. Additionally, the Senior Notes would automatically convert into shares of the DSBD NA's common stock upon a qualifying private offering or sale, a qualifying public offering of DBSD NA's common stock, or upon written consent of Senior Noteholders owning two-thirds of the Senior Notes. At present, non-Debtor ICO Global holds over 99% of the capital stock of DBSD NA. If all of the Senior Notes were converted, however, such ownership interest would be reduced to approximately 52%.

27. On April 30, 2009, the Debtors entered into a forbearance agreement with the Senior Noteholders (the "Senior Notes Forbearance Agreement," together with the Prepetition Facility Forbearance Agreements, the "Forbearance Agreements"), pursuant to which, the Senior Noteholders agreed to forbear, through May 15, 2009, from exercising their rights and remedies against the Debtors with respect to specified defaults under the Indenture arising from the failure of the Debtors to repay the Prepetition Facility and other obligations on the maturity date of the Prepetition Facility. In addition, pursuant to the Senior Notes Forbearance Agreement, DBSD NA agreed not to sell any ARS without the prior consent of the Senior Noteholders unless the sale would result in gross proceeds to DBSD NA of not less than the par or stated value of such ARS. Finally, under the Senior Notes Forbearance Agreement, the Debtors agreed, in

K&E 14419338.23

connection with any insolvency proceeding with respect to DBSD NA and its subsidiaries, not to challenge or seek to invalidate any of the outstanding obligations under the Senior Notes or to subordinate or re-characterize any claim of the trustee or any Senior Noteholder against the Debtors.

     (iii)    Collateral Trust Agreement

28.    Pursuant to the Collateral Trust Agreement dated as of August 15, 2005, among ICO Global, the Debtors, and The Bank of New York, as collateral agent and as trustee under the Indenture (as amended, supplemented, or modified from time to time, the "Collateral Trust Agreement"), the liens securing the Debtors' obligations under the Indenture are junior in priority to the liens securing the Prepetition Facility Obligations. By the Collateral Trust Agreement Joinder dated as of April 7, 2008, the Agent became a party to the Collateral Trust Agreement.

     (iv)    Auction Rate Securities

29.    As part of their financing strategy, during the first quarter of 2008, the Debtors used the proceeds from the sale and maturity of certain of their investments, cash, and cash equivalents to purchase approximately $98 million of student-loan-backed auction-rate securities consisting of variable rate bonds with maturities ranging from 24 to 39 years, for which the interest rates are reset through a Dutch auction each month (the "ARS"). As of March 31, 2009, the ARS held by the Debtors had an aggregate par value of approximately $74.4 million and a fair market value of approximately $59.8 million.

30.    On November 14, 2008, the Debtors entered into a settlement agreement (the "UBS Settlement") with UBS Financial Services, Inc. ("UBS") whereby UBS agreed to repurchase certain "eligible" ARS (the "Eligible ARS") that UBS sold to the Debtors prior to February 13, 2008. Under the terms of the UBS Settlement, at the Debtors' option, the Debtors

are able to require UBS to repurchase Eligible ARS from the Debtors at par value from June 30, 2010 through July 2, 2012. Conversely, UBS has the right, at its discretion, to purchase such Eligible ARS at any time until July 2, 2012, so long as the Debtors receive payment at par value. The UBS Settlement also allows the Debtors to borrow against the value of the ARS as long as they enter into a margin agreement with UBS, but both the Prepetition Facility and the Indenture restrict the Debtors' ability to enter into such an agreement. The Debtors have asked the Prepetition Lenders and the Senior Noteholders to remove their liens on the ARS and to permit the Debtors to borrow against the value of the ARS and negotiations are ongoing. Although the Prepetition Lenders and certain of the Senior Noteholders have agreed to remove their liens, the Debtors must obtain consent from 100% of such lenders to borrow against the value of the ARS under the UBS Settlement.

### Part II
### Events Leading to the Chapter 11 Cases

31.     As with many companies, start-up or otherwise, recent turmoil in the credit markets and the financial services industry has negatively affected the Debtors' financial condition and liquidity. The credit markets and the financial services industry have experienced a period of unprecedented turmoil characterized by the bankruptcy, failure, collapse, and distressed sale of various companies, including financial institutions, and an unprecedented level of intervention from the United States government. While the ultimate outcome of these events cannot be predicted, such events have had a material adverse effect on the Debtors' ability to (a) refinance their existing Prepetition Facility Obligations and Senior Notes or otherwise complete a recapitalization transaction outside of the bankruptcy forum, (b) realize the anticipated value of their investment securities, and (c) raise future financing for working capital, capital expenditures, and debt service requirements.

14

32.     In addition to these macroeconomic factors, other conditions have converged to hasten the decline of the Debtors' financial condition and lack of liquidity that has precipitated the filing of the Chapter 11 Cases, the most notable of which are described below.

## A.     Unanticipated Illiquidity of Investment Securities

33.     Historically, the monthly ARS auctions provided a liquid market for the ARS owned by the Debtors.  As a result of the impact of the current conditions in the global financial markets, however, multiple ARS auctions have failed.  Although some of the Debtors' ARS exposure was reduced as a result of the UBS Settlement, neither the Prepetition Lenders nor the Senior Noteholders have agreed to allow the Debtors to enter into a margin agreement to borrow against the ARS.  The Debtors have sold certain ARS in the open market, but certain provisions of the Forbearance Agreements required that the proceeds of any further sales must be used to repay the Prepetition Facility Obligations rather than to fund operating expenses.  Thus, the Debtors do not have the liquidity they expected from the sale of the ARS.

## B.     Maturity and Forbearance Expiration for the Prepetition Facility

34.     As noted above, the Debtors were not able to satisfy the Prepetition Facility Obligations on the May 1, 2009 maturity date, and the most recent forbearance period granted under the Prepetition Facility Forbearance Agreements expires on May 15, 2009.  Due to the illiquidity of the ARS, among other reasons, the Debtors are not in a position to satisfy the Prepetition Facility Obligations in full at this time.  In addition, the Debtors are facing the imminent maturity of the Senior Notes, and the Debtors' inability to satisfy the Prepetition Facility Obligations on the maturity date constituted an event of default under the Indenture.  As indicated above, the Senior Noteholders and the Debtors entered the Senior Notes Forbearance Agreement, under which the Senior Noteholders agreed to forbear exercising their rights and remedies against the Debtors, but that forbearance period expires May 15, 2009 as well.  The

K&E 14419338.23

Debtors will not be able to repay the Senior Notes upon the expiration of the forbearance period or on the maturity date.

35. Importantly, because the Prepetition Facility and the Senior Notes are secured by first-priority and second-priority security interests in substantially all of the assets of the Debtors and by first-priority and second-priority pledges, respectively, by ICO Global of DBSD NA's capital stock, the occurrence of certain events of default under the Prepetition Facility or the Indenture may have enabled the Prepetition Lenders and the Senior Noteholders to exercise rights over some or all of the Debtors' assets or the capital stock of the Debtors.

**C.     Notices of Default Under Key Supplier Contract**

36. The Debtors entered into contracts with Space Systems/Loral, Inc. ("Loral," and the contracts, as amended, supplemented, or modified from time to time, the "Loral Contract") to design, develop, manufacture, test, and deliver the DBSD-G1 Satellite, as well as certain ground-based systems related to its operation. The DBSD-G1 Satellite was delivered in February 2008 and launched successfully on April 14, 2008. The Debtors are obligated to make installment payments to Loral in accordance with terms of the Loral Contract.

37. On or around April 8, 2009, the Debtors received written notice from Loral relating to certain alleged payment defaults under the Loral Contract. In particular, an aggregate payment of $5.1 million was allegedly due and payable to Loral on April 2, 2009. Loral asserts that it is entitled to terminate the Loral Contract as of May 7, 2009 and exercise other rights and remedies enumerated therein pursuant to the terms of the Loral Contract because the Debtors did not cure the payment default (i.e., remit the full payment of the $5.1 million allegedly owed to Loral). Loral has not terminated the Loral Contract to date, and the Debtors are currently in negotiations with Loral.

K&E 14419338.23

**D.      Decision to Commence the Chapter 11 Cases**

38.      Due to the effect of the financial crisis on the Debtors' liquidity and the imminent maturities of the Prepetition Facility and the Senior Notes, the Debtors devoted substantial effort to generating additional liquidity and restructuring their debt obligations out of court.  Initiatives included entering into the UBS Settlement to reduce the impact on the Debtors of the unexpected illiquidity of the ARS, seeking additional financing and capital from existing and new sources, and negotiating with potential strategic partners regarding business combinations to increase enterprise value and potentially attract new financing or capital infusions.

39.      In addition, the Debtors entered into the Forbearance Agreements in connection with the Prepetition Facility and the Indenture and made numerous proposals to an ad hoc committee of the Senior Noteholders to restructure the Debtors' obligations under the Indenture. Although the Debtors were successful with respect to the UBS Settlement and made substantial progress with potential strategic partners and with respect to restructuring their obligations under the Indenture, ultimately, the Debtors were unable to finalize either and unable to secure an appropriate further forbearance from the Prepetition Lenders and the Senior Noteholders.

40.      Prior to filing, however, the Debtors entered into a Support Agreement with certain members of the ad hoc committee of the Senior Noteholders (collectively, the "Consenting Holders") regarding the terms of a consensual restructuring (the "Support Agreement").  The Support Agreement obligates the Consenting Holders to, among other things, vote to support a plan of reorganization consistent with the terms set forth in the Support Agreement and that certain term sheet annexed to the Support Agreement as Exhibit A (the "Term Sheet").  A copy of the Support Agreement with the Term Sheet attached thereto is attached hereto as Exhibit C.  The Debtors have committed, as a condition to the Support

17

Agreement, to file a plan of reorganization and a disclosure statement within 15 days of the Petition Date.

41.     The Term Sheet—the terms of which are incorporated into the Support Agreement—provides, among other things, that upon the consummation of a plan of reorganization: (a) the Senior Notes will convert into 94.9919% of the new common stock in Reorganized DBSD (the "New Common Stock"); and (b) ICO Global will receive (i) shares of common stock equal to 5.0% of the New Common Stock and (ii) warrants to acquire 10.0% of the New Common Stock, in exchange for the consideration provided by ICO Global to the Debtors, including certain operational transition services.  Overall, the restructuring proposed by the Term Sheet would reduce the Debtors' total indebtedness by approximately $740 million.

42.     The Debtors commenced the Chapter 11 Cases to prevent the Prepetition Lenders and certain Senior Noteholders from seeking to foreclose on the Debtors' stock and assets, which the Debtors believe have an aggregate going concern value in excess of the aggregate obligations under the Prepetition Facility and the Indenture.  During the Chapter 11 Cases, the Debtors plan to continue their efforts to reach a consensual deal with all their constituents to effectuate the restructuring set forth in the Term Sheet incorporated into the Support Agreement.

**Part III**
**Requests for Relief**

43.     The Debtors have filed or will file a number of motions and applications in the Chapter 11 Cases seeking orders granting various forms of relief.  I believe the relief requested is necessary to enable the Debtors to operate with minimal disruption during the pendency of the

Chapter 11 Cases. A description of the relief requested and the facts supporting each of the pleadings is set forth below.[5]

## A. Joint Administration Motion

44. As described above, the nine Debtors in the Chapter 11 Cases are: 3421554 Canada Inc.; DBSD North America, Inc.; DBSD Satellite Management, LLC; DBSD Satellite North America Limited; DBSD Satellite Services G.P.; DBSD Satellite Services Limited; DBSD Services Limited; New DBSD Satellite Services G.P.; and SSG UK Limited. The Debtors operate as an integrated business with common ownership and control. To the best of my knowledge, the joint administration of the Chapter 11 Cases will not adversely affect the Debtors' respective constituencies and will not harm parties in interest. Rather, all of these parties will benefit from the cost reductions associated with the joint administration of the Chapter 11 Cases.

## B. Cash Management Motion

(i) The Debtors' Existing Cash Management System and Bank Accounts

45. In the ordinary course of business, and as is common with a business of this kind, the Debtors utilize an integrated cash management system that provides well-established mechanisms for the concentration, management, disbursement, and investment of funds used in the Debtors' operations (the "Cash Management System"). Such systems provide numerous benefits, including the ability to: (a) quickly create status reports on the location and amount of funds, thereby allowing management to track and control corporate funds; (b) ensure cash availability; and (c) reduce administrative costs by facilitating the efficient movement of funds.

---

[5] All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the relevant motion or application.

46.     As of the Petition Date, the Cash Management System included various bank accounts (collectively, the "Bank Accounts") with Jefferies & Company, Inc. ("Jefferies"), UBS, and Bank of America, N.A. ("Bank of America," together with Jefferies and UBS, the "Banks") used in the ordinary course of the Debtors' business.  The Debtors utilize a number of methods for disbursing funds, including, without limitation: (a) written check; (b) debit; (c) wire transfer; and (d) automatic clearing house transfer ("ACH Transfer").

47.     The Debtors' main operating accounts are as follows:

a.      Portfolio Accounts:  The Debtors maintain an account at Jefferies and an account at UBS (the "Portfolio Accounts") that hold auction rate securities (the "ARS").

b.      Investment Accounts:   The Debtors maintain two stand-alone investment accounts at Bank of America.

c.      Concentration/Disbursement Account:   The Debtors maintain a cash concentration and disbursement account at Bank of America (the "Concentration Account").   This account serves as the collection point for all funds moved into and through the Cash Management System.  The Debtors replenish the Concentration Account with proceeds from sales of ARS held in the Portfolio Accounts.  In addition, the Debtors pay certain accounts payable, payroll, taxes, and other expenses from this account.   The Concentration Account generally carries a balance beyond its monthly obligations.

d.      Disbursement Accounts:   The Debtors pay certain accounts payable, payroll, taxes, and other expenses from two accounts held at Bank of America (the "Disbursement Accounts").  The Debtors replenish the Disbursement Accounts with amounts from the Concentration Account as needed.

48.     The Debtors have utilized their Cash Management System and maintained each of the Bank Accounts substantially in its current basic structure for a number of years as a mainstay of their ordinary course and essential business practices.   During the Chapter 11 Cases, I understand that the Debtors will ensure that all postpetition transfers and transactions are documented in their books and records to the same extent as prior to the commencement of the

Chapter 11 Cases and are readily ascertainable from their books and records documenting transfers and transactions.

(ii)    The Debtors' Existing Business Forms

49.    In the ordinary course of business, the Debtors use a variety of business forms, including checks. To minimize delay and expenses to their estates and to avoid unnecessarily confusing their employees and trade partners by ordering and using new business forms, the Debtors will use their reasonable efforts to stamp, label, or print "Debtor in Possession" on all outgoing checks within five business days after the Petition Date and will order new business forms with a "Debtor in Possession" designation once their existing stocks are depleted.

(iii)    The Debtors' Intercompany Transactions and Resulting Intercompany Claims

50.    In connection with the daily operation of the Cash Management System, the Debtors and certain non-Debtor affiliates utilize a cost allocation system, through which expenses initially paid by a Debtor or a non-Debtor affiliate for the benefit of other Debtors or non-Debtor affiliates are allocated to the appropriate entities in proportion to the benefits received by such entities (the "Intercompany Transactions"). As a result of the Intercompany Transactions, intercompany receivables and payables are created in the ordinary course of business (the "Intercompany Claims"). Because the Debtors electronically track all fund transfers, they are able to easily and accurately trace and account for all Intercompany Transactions.

51.    Discontinuing the Intercompany Transactions would disrupt the Debtors' Cash Management System and related administrative controls to the detriment of the Debtors' estates, their creditors, and other parties in interest. Indeed, the Intercompany Transactions provide the only mechanism for payment of expenses incurred by the Debtors that do not have bank accounts. By allowing the Debtors to continue Intercompany Transactions and providing

21

administrative priority to postpetition Intercompany Claims, the Court will ensure that (a) the Debtors without bank accounts can continue operating, (b) no Debtor or non-Debtor affiliate permanently funds the operations of other Debtors or non-Debtor affiliates, and (c) each entity utilizing funds flowing through the Cash Management System continues to bear ultimate repayment responsibility for such ordinary course transactions.

**C.      Wages and Benefits Motion**

(i)      Prepetition Wages, Expenses, and Employee Benefits

a.      Wages, Salaries, and Other Compensation

52.      The Debtors pay the employees on a bi-weekly basis, including wages, salaries, and overtime compensation, as applicable. On average, the Debtors' gross payroll totals approximately $350,000 per period. The Debtors' most recent payroll was paid on May 15, 2009, and the Debtors do not believe any amounts are currently outstanding on account of unpaid prepetition wages, salaries, or overtime compensation ("Unpaid Compensation"). To the extent any such Unpaid Compensation is outstanding, the Debtors request immediate authority to pay Unpaid Compensation, subject to a cap of $10,950 per employee.

53.      The Debtors may, from time to time, be required to deduct certain amounts from paychecks, including, without limitation, (a) garnishments, child support, service charges, and similar deductions, and (b) other pre- and after-tax deductions payable pursuant to certain of the employee benefit plans discussed in the Motion (including 401(k) contributions, legally ordered deductions, and other miscellaneous deductions) (the "Deductions"). After taking such Deductions from a given employee's gross pay, the Debtors remit these Deductions to the appropriate third-party recipients. In the event that the Debtors have taken certain such Deductions and have not yet forwarded such Deductions to the appropriate third-party recipients as of the Petition Date, the Debtors seek authority to forward such prepetition Deductions (and to

22

continue to forward Deductions on a postpetition basis whether or not related to the prepetition period) to the applicable third-party recipients in the ordinary course of business and consistent with past practice.

54.     In addition to the Deductions, federal and state laws require the Debtors to withhold certain amounts related to federal, state, and local income taxes, as well as Social Security and Medicare taxes, for remittance to the appropriate federal, state, and local taxing authority (the "Withheld Amounts").  Further, federal and state laws require the Debtors to deduct additional amounts for federal and state unemployment insurance (the "Employer Payroll Taxes," and, together with the Withheld Amounts, the "Payroll Taxes").  In the aggregate, the Payroll Taxes, including both the employee and employer portions, total approximately $25,000 per bi-weekly pay period.  As of the Petition Date, the Debtors do not believe they owe more then a *de minimis* amount on account of prepetition Payroll Taxes.

b.     Reimbursable Expenses

55.     In the ordinary course of business, the Debtors reimburse employees (as well as members of the Debtors' boards of directors) for certain expenses incurred in the scope of their employment (or board service) and on behalf of the Debtors (the "Reimbursable Expenses").  These Reimbursable Expenses include airfare, surface transportation, rental cars or mileage on personal vehicles, conference registration fees, meals and lodging, business entertainment, parking, telephone expenses, computer and internet expenses, and miscellaneous foreign-travel expenses, such as immunizations and foreign transaction fees.  Based upon historical figures, the Debtors estimate they owe less than $15,000 on account of prepetition Reimbursable Expenses as of the Petition Date.

K&E 14419338.23

c. Employee Benefits

56. In the ordinary course of business, the Debtors maintain various employment benefit plans and policies, including, without limitation, health care, dental and vision plans, workers' compensation benefits, vacation time and other paid leaves of absence, 401(k) retirement savings plans, short- and long-term disability insurance, life insurance, and accidental death and dismemberment insurance (the "Employee Benefit Program").

57. Health Care Insurance. All full-time employees are eligible to receive medical insurance on behalf of themselves and their dependents (the "Health Care Plan"). The following is a brief summary of each Health Care Plan:

a. Medical Plan. The Debtors offer employees medical (including prescription drug coverage) and vision insurance through Anthem Blue Cross and Blue Shield (the "Medical and Vision Plan"). The Medical and Vision Plan is 100% employer-paid. The Debtors pay approximately $90,000 per month, in advance, on account of the Medical and Vision Plan. As of the Petition Date, the Debtors do not believe they owe any prepetition amounts on account of Medical and Vision Plan obligations.

b. Dental Plan. MetLife, Inc. administers the Debtors' dental plan. The Debtors pay approximately $9,200 per month, in advance, to administer the Dental Plan. The Dental Plan is 100% employer-paid. As of the Petition Date, the Debtors do not believe they owe any prepetition amounts on account of Dental Plan obligations.

58. Life, Disability, and Accident Insurance. The Debtors provide all employees with short-term disability, long-term disability, term life, and accidental death and dismemberment insurance coverage through Unum Life Insurance Company of America (the "Additional Insurance"). This coverage costs the Debtors approximately $10,000 per month, paid in advance. To the best of the Debtors' knowledge, no payments are outstanding on account of the Additional Insurance as of the Petition Date.

59.     <u>Vacation</u>.  The Debtors provide paid vacation time, accrued on a monthly basis, to their employees beginning after one full month of service (the "<u>Vacation Time</u>").  The amount of Vacation Time available to a particular employee is generally determined by the employee's length of service and employee grade.  Unused Vacation Time can be carried over each year subject to an aggregate 25-day cap.  If an employee leaves the Debtors' employ, whether voluntarily or involuntarily, any accrued and unused Vacation Time is paid to the employee in the final paycheck.  As of the Petition Date, the Debtors' employees have accrued approximately $431,000 on account of unused Vacation Time.  This amount, however, is not a current cash payment obligation as employees only are entitled to be paid for accrued and unused Vacation Time if an employee leaves the Debtors' employ.  The Debtors request authority to honor the employees' Vacation Time subject to the limitation that no employee will receive more than $10,950 in the aggregate on account of Unpaid Compensation and unused prepetition Vacation Time.

60.     <u>Sick Leave</u>.  Employees do not accrue or receive payments for sick leave.  Such leave is used on an as-needed basis and requires a doctor's note for absences of more than three consecutive days.  The Debtors request the authority to continue their sick leave policy in the ordinary course of business.

61.     <u>Short-Term Leave</u>.  In addition, in the ordinary course of business, employees may be eligible for paid short-term leave for illness, injury, or other emergency situations (the "<u>Short-Term Leave</u>").  The amount of Short-Term Leave available varies by type of employee and length of employment.  The Debtors do not accrue Short-Term Leave for their employees and such leave is not reflected as a liability on the Debtors' balance sheet.  The Debtors request the authority to continue their short-term leave policy in the ordinary course of business.

K&E 14419338.23

62.     <u>Leaves of Absence</u>.  The Debtors also allow their employees to take certain other leaves of absence for personal reasons, many of which are required by law, in the ordinary course of business, including maternity leave, paternity leave, and jury duty (the "<u>Leaves of Absence</u>").  The Debtors do not accrue Leaves of Absence for their employees and do not reflect Leaves of Absence as a liability on their balance sheet.  The Debtors request the authority to continue their personal leave policy in the ordinary course of business.

63.     <u>Retirement Savings Plan</u>.  The Debtors maintain a retirement savings plan for the benefit of all eligible employees meeting the requirements of section 401(k) of the Internal Revenue Code (the "<u>401(k) Plan</u>").  Substantially all of the employees currently participate in the 401(k) Plan, and the aggregate  bi-weekly amount withheld from employee paychecks for 401(k) contributions is approximately $31,510.  In addition, the Debtors have established an employer contribution to each employee's 401(k) account equal to 3% of that employee's base monthly salaries (the "<u>Employer Contribution</u>").  The Debtors pay approximately $40,000 per month on account of the Employer Contribution.  Moreover, the Debtors pay Fidelity Management Trust Company a quarterly fee of approximately $2,000 to administer the 401(k) Plan.  The Debtors request the authority to continue the 401(k) Plan and the Employer Contribution in the ordinary course of business.

(ii)     Workers' Compensation Program

64.     The Debtors provide workers' compensation benefits to their employees as required under state law (the "<u>Workers' Compensation Program</u>").  CNA Financial Corporation ("<u>CNA</u>") currently administers and pays the Debtors' workers' compensation claims, subject to a $1,000,000 coverage limit per accident for bodily injury and a $1,000,000 total company cap for bodily injury caused by disease.  The aggregate annual premium under the CNA policy is approximately $40,000 and is payable by ICO Global pursuant to a premium financing

agreement that requires payment of 25% of the premium up front and payment of the remaining 75% of the premium in nine equal monthly installments. The Debtors' share of the premium is allocated to the Debtors on a quarterly basis. This year's coverage commenced on January 1, 2009 and extends until January 1, 2010. The Debtors believe that there are no workers' compensation claims pending as of the Petition Date.

**D.    Insurance Motion**

65.    In the ordinary course of business, the Debtors maintain a satellite launch and in-orbit insurance policy (the "Satellite Policy"). In addition, their ultimate parent, non-Debtor ICO Global, maintains a number of insurance policies (the "Other Policies" and, together with the Satellite Policy, the "Policies") that cover ICO Global, its other subsidiaries, and the Debtors for property liability, general liability, business automobile, directors and officers' liability, employment practices liability and professional liability, inland marine, and international liability.

66.    Debtor DBSD Satellite Services G.P. is the named insured under the Satellite Policy, which is provided by a consortium of 24 insurers through Marsh USA Inc. ("Marsh"). The current Satellite Policy covers the period from April 14, 2009 to April 14, 2010. The Satellite Policy has a limit of $240 million and an annual premium of approximately $4,429,067, which was due on April 14, 2009. Because the Debtors finance the premiums for the Satellite Policy, the annual premium is payable in four equal quarterly installments of approximately $1,107,278. The first premium payment of $1,107,278 was due on May 14, 2009 and paid on May 7, 2009. The Broker's Fee for the Satellite Policy is $275,000, which was due in mid-May and paid on May 13, 2009.

67.    A schedule of all of the Policies with their terms and annual premiums is attached as Exhibit C to the Motion. The Debtors pay the premiums and insurance broker fees for the

27

Satellite Policy.   As for the Other Policies, ICO Global pays the premiums and broker fees, and the Debtors reimburse ICO Global for their allocated share on a quarterly basis.

**E.      Utilities Motion**

(i)      The Utility Providers

68.      The Debtors use electricity, voice services, data services, and other utility services in the ordinary course of business.  Approximately seven utility providers (as such term is used in section 366 of the Bankruptcy Code, the "Utility Providers") provide these services through approximately ten accounts.    A list of the Utility Providers that the Debtors identified who rendered services to the Debtors as of the Petition Date (the "Utility Service List") is attached to the Motion as Exhibit A-1.  On average, the Debtors spend approximately $34,500 each month for utility services.  I do not believe the Debtors owe any past due amounts to the Utility Providers.

69.      Uninterrupted utility services are essential to the Debtors' ongoing operations and, therefore, to the success of their reorganization.  Indeed, any interruption of utility services, even for a brief period of time, would negatively affect the Debtors' operations, including their ability to track and control their satellite currently in orbit, seriously jeopardizing the Debtors' reorganization efforts and, ultimately, creditor recoveries.  Therefore, it is critical that utility services continue uninterrupted during the Chapter 11 Cases.

(ii)     The Proposed Adequate Assurance

70.      I expect that the Debtors' cash on hand will be sufficient to pay postpetition obligations related to their utility service during the Chapter 11 Cases, and I understand that the Debtors intend to pay postpetition obligations owed to the Utility Providers in a timely manner. Nevertheless, to provide additional assurance of payment for future services to the Utility Providers, the Debtors propose to deposit an amount equal to the estimated aggregate cost for

28

two weeks of utility service, calculated as a historical average over the past 12 months (the "Adequate Assurance Deposit"), into a newly created, segregated, interest-bearing account (the "Adequate Assurance Deposit Account") for Utility Providers.

## F.     Notice and Claims Agent Retention Application

71.    The Debtors propose to engage The Garden City Group, Inc. to act as the Debtors' notice and claims agent, because this is an effective and efficient manner of providing notice to as many as a thousand creditors and parties in interest of the filing of the Debtors' Chapter 11 Cases and other developments in the Chapter 11 Cases, and of addressing other similar duties during the Chapter 11 Cases.

## G.     Cash Collateral Motion

72.    The Debtors propose certain relief pertaining to the use of cash collateral.  For additional information, please see the Declaration of Michael P. Corkery in Support of Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Use Cash Collateral, (B) Granting Adequate Protection to Prepetition Secured Parties, and (c) Scheduling Final Hearing filed on this same date.

## H.     Certain "Second Day" Motions

(i)     Case Management

73.    The Debtors understand that the Court has instituted certain case management procedures that may be supplemented upon request.  The Debtors plan to propose certain additional notice, hearing, and other case management procedures in the Chapter 11 Cases designed to reduce administrative costs and further reduce administrative burdens for the Debtors, the Court, and all parties in interest.  By way of example, I believe that authorizing service on all parties by electronic mail, except where they certify that they are unable to accept such service, will be efficient and save the estates significant time and expense.

29

(ii)    Interim Compensation

74.    The Debtors propose that the monthly payment of compensation and reimbursement of expenses of separately retained chapter 11 professionals be structured pursuant to procedures that, I believe, will enable the Debtors to monitor closely the costs of administration, maintain a level cash flow availability, and implement efficient cash management procedures.  Moreover, these procedures will allow the Court and key parties in interest to insure the reasonableness and necessity of the compensation and reimbursement sought pursuant to such procedures.

(iii)    Taxes and Fees Motion

75.    In the ordinary course of business, the Debtors pay use taxes relating to the purchase of certain satellite equipment (the "Use Taxes"), annual state franchise taxes (the "Franchise Taxes"), state property taxes (the "Property Taxes" and, together with the Use Taxes and Franchise Taxes, the "Taxes"), and permit and license fees, as well as regulatory fees and taxes, to various regulatory agencies and authorities (the "Fees").  The Debtors estimate that they owe approximately $455,000 on account of such prepetition Taxes and Fees.

a.    State Use Taxes

76.    In the ordinary course of business, the Debtors purchase equipment necessary to the Debtors' business operations.  In lieu of the Debtors paying or incurring sales or excise taxes in connection with these purchases, applicable state taxing authorities require the Debtors to pay Use Taxes on the equipment.  For example, the Debtors recently purchased certain satellite equipment for use in the State of Nevada, and the Debtors estimate Use Taxes totaling approximately $250,000 will be payable in respect of this purchase.

K&E 14419338.23

b. State Franchise Tax

77. States generally require the payment of Franchise Taxes by all corporations incorporated therein. The Debtors pay such taxes, typically on a quarterly basis, in the ordinary course of business. For example, DBSD NA, a Delaware corporation and Debtor in the Chapter 11 Cases, incurs annual Delaware Franchise Taxes of $165,000, payable in four installments. Each year, a payment of $66,000 becomes due on June 1st, and three additional payments, each in the amount of $33,000, become due on September 11th, December 1st, and March 1st. As of the Petition Date, the Debtors estimate that they have accrued Franchise Taxes of approximately $44,000 in connection with the $66,000 installment payment that will be due on June 1, 2009.

c. State Property Taxes

78. Under applicable law, state and local governments in jurisdictions where the Debtors' operations are located, including Nevada, North Carolina, and Virginia, are granted the authority to levy property taxes against real and personal property. The Debtors generally do not own real property but typically pay Property Taxes on their personal property in the ordinary course of business as such taxes are invoiced. The Debtors estimate that, as of the Petition Date, they have accrued approximately $42,000 in unpaid Property Taxes.

d. Fees

79. Section 9 of the Communications Act of 1934 empowers the FCC to "assess and collect regulatory fees to recover the costs of . . . enforcement activities, policy and rulemaking activities, user information services, and international activities." 47 U.S.C. § 159(a)(1). As a satellite communications company, the Debtors are subject to regulation and oversight by the FCC and, as such, incur such "regulatory fees" in the ordinary course of business (the "FCC Fees"). Because the Debtors have not yet commenced operations, their annual FCC Fees are

31

approximately $975 and are due in September. The Debtors estimate that, as of the Petition Date, they have accrued prepetition FCC Fees totaling approximately $650.

80.     In addition to the FCC Fees, the Debtors, in the ordinary course of business, incur miscellaneous fees and taxes owing to various regulatory agencies to remain in good standing with such agencies or to obtain various permits or licenses required to carry on business in a particular state or locality. I believe these amounts are *de minimis* and am not aware of any prepetition amounts outstanding.

**I.      Professional Retention Applications and Related Motions**

(i)      Kirkland & Ellis LLP Retention Application

81.     The Debtors seek to retain Kirkland & Ellis LLP ("K&E") as their attorneys because K&E has extensive experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code. K&E has been working with DBSD since approximately February 2009 with respect to various restructuring and other related matters.

(ii)     Jefferies & Company, Inc. Retention Application

82.     The Debtors seek to retain Jefferies & Company, Inc. ("Jefferies") as their financial advisor and investment banker because, among other things, Jefferies has extensive experience and an excellent reputation in providing high quality financial advisory and investment banking services to debtors and creditors in bankruptcy reorganizations and other restructurings. Jefferies has been working with DBSD since July 2008 with respect to various restructuring and other related matters.

(iii)    Ordinary Course Professionals Motion

83.     The Debtors employ certain attorneys in the ordinary course of their business (the "OCPs"). The OCPs provide legal services for the Debtors in a variety of matters unrelated to

the Chapter 11 Cases. The OCPs have substantial background knowledge, expertise, and familiarity with the Debtors and their operations. Although the Debtors anticipate that the OCPs will want to continue to represent the Debtors on an ongoing basis, they may not do so if the Debtors cannot pay them on a regular basis. In light of the number of OCPs and the significant costs associated with the preparation of employment applications for professionals who will receive relatively modest fees, it would be impractical and inefficient for the Debtors and their legal advisors to prepare and submit individual applications and proposed retention orders for each OCP.

84.     Although some of the OCPs may hold relatively small unsecured claims against the Debtors in connection with prepetition services rendered to the Debtors, the Debtors do not believe that any of the OCPs have an interest materially adverse to the Debtors, their creditors, or other parties in interest. In any event, the OCP Procedures require each OCP to file a Declaration of Disinterestedness (as defined herein) to be eligible for compensation. Moreover, by this Motion, the Debtors are not requesting authority to pay prepetition amounts owed to OCPs.

85.     I believe that without the background knowledge, expertise, and familiarity that the OCPs have relative to the Debtors, their operations, and their legal issues, the Debtors would incur additional and unnecessary expenses in educating replacement professionals. Moreover, I believe that the Debtors' estates and their creditors are best served by avoiding any disruption in the professional services that are required for the day-to-day operation of the Debtors' businesses.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 15, 2009

Respectfully submitted,

_____

Michael P. Corkery
Acting Chief Executive Officer, Executive
Vice President and Chief Financial Officer,
DBSD North America, Inc.

**EXHIBITS TO THE FIRST DAY DECLARATION
PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2**

The following <u>Exhibit A</u> and <u>Exhibit B</u> to the Declaration of Michael P. Corkery (A) in Support of Debtors' Chapter 11 Petitions and First Day Motions and (B) Pursuant to Local Rule 1007-2 (the "<u>First Day Declaration</u>") are submitted pursuant to and in satisfaction of the requirements of Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "<u>Local Rules</u>") and incorporated by reference as though fully set forth in the First Day Declaration. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

<u>**EXHIBIT A(1)**</u>

**Debtors' Business and Circumstances Leading to the Chapter 11 Cases**

Pursuant to Local Rule 1007-2(a)(1), Parts I and II of the First Day Declaration describe the nature of the Debtors' business and the circumstances leading to the commencement of the Debtors' Chapter 11 Cases.

K&E 14419502.

## EXHIBIT A(2)

### Committees Organized Prepetition

Pursuant to Local Rule 1007-2(a)(3), the following provides the names and addresses of the members of, and attorneys for, any committee organized prior to the order for relief in the Debtors' Chapter 11 Cases, a brief description of the circumstances surrounding the committee's formation, and the date of formation.

| | |
|---|---|
| **Committee**: | Ad Hoc Noteholder Committee |

**Members**:

Aristeia Capital LLC
136 Madison Avenue
3rd Floor
New York, New York 10016

Canyon Partners
2000 Avenue of the Stars
11th Floor
Los Angeles, California 90067

Goldentree Credit Opportunities
300 Park Avenue
25th Floor
New York, New York 10022

Goldman Sachs & Co.
30 Hudson Street
Floor 4
Jersey City, New Jersey 07302- 4600

Och-Ziff Capital Management Group LLC
9 West 57th Street
New York, New York  10019

Plainfield Asset Management LLC
55 Railroad Avenue
Plaza Level
Greenwich, Connecticut 06830

Raptor Global Portfolio
c/o Tudor Investment Corporation
1275 King Street
Greenwich, Connecticut 06831

**Attorneys**:

Milbank, Tweed, Hadley & McCloy LLP
1 Chase Manhattan Plaza
New York, New York 10005-1413
Attn:  Dennis F. Dunne
- and -
International Square Building
Suite 1100
Washington, DC  20006-5417
Attn:  Andrew M. Leblanc

**Description**:

This committee was formed to engage in negotiations regarding restructuring the Debtors' obligations under the Indenture.

**Approximate Date Formed**:

February 2009

3

## EXHIBIT A(3)

## Unsecured Claims[1]

In conjunction with the filing of their petitions, the Debtors filed a motion requesting, among other things, authority to file a consolidated list of the fifty largest unsecured creditors (the "Consolidated List") in lieu of separate lists of each Debtor's twenty largest unsecured creditors. Pursuant to Local Rule 1007-2(a)(4), the following provides the Consolidated List, which is based on the Debtors' books and records as of April 22, 2009. The Consolidated List of creditors has been prepared in accordance with Bankruptcy Rule 1007(d) and does not include (a) persons who come within the definition of "insider" set forth in section 101(31) of the Bankruptcy Code or (b) secured creditors unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the 50 largest unsecured claims.

| | Creditor | Contact Information | Claim Amount | Indicate if claim is contingent ("C"), unliquidated ("U"), disputed ("D") or subject to setoff [2] |
|---|---|---|---|---|
| 1. | Space Systems/Loral | 3825 Fabian Way<br>Palo Alto, California 90245<br>Telephone: (650) 852-6217<br>Facsimile: (650) 852-5377<br>Attn: Tim O'Meara, Contracts Manager | $5,211,563.01 | C, U, D |
| 2. | Hughes Network Systems, LLC | 11717 Exploration Lane<br>Germantown, Maryland 20876<br>Telephone: (301) 601-7444<br>Facsimile: (301) 428-5588<br>Attn: John Grimes, Sr. Director, Contracts | $1,849,950.00 | C, U, D |
| 3. | Alcatel-Lucent | 600-700 Mountain Avenue<br>Murray Hill, New Jersey 07974-2008<br>Telephone: (972) 801-2622<br>Facsimile: (720) 482-6005<br>Attn: Diana-Lee Mary | $1,465,750.00 | C, U, D |

---

[1] The information herein is not and shall not constitute an admission of liability by, nor is it binding on, the Debtors, and nothing herein shall affect the Debtors' right to challenge the amount or characterization of any claim at a later date.

[2] Any and all of these claims may be subject to setoff.

4

| | Creditor | Contact Information | Claim Amount | Indicate if claim is contingent ("C"), unliquidated ("U"), disputed ("D") or subject to setoff [2] |
|---|---|---|---|---|
| 4. | Deloitte & Touche LLP | P.O. Box  7247-6446<br>Philadelphia, Pennsylvania 19170-6446<br>Telephone: (206) 965-7299<br>Facsimile: (215) 569-2441<br>Attn: Emily Rollins, Partner | $503,924.00 | C, U, D |
| 5. | Delphi Corporation | Division One Corporate Center<br>Kokomo, Indiana 46904-9005<br>Telephone:<br>  Vice President: (765) 451-9722<br>  Finance Manager: (248) 813-1211<br>Facsimile: (765) 451-5426<br>Attn: Vice President and Finance Manager | $492,752.75 | C, U, D |
| 6. | QUALCOMM Incorporated | 5775 Morehouse Drive<br>San Diego, California 92121<br>Telephone: (858) 651-4593<br>Facsimile: (858) 658-2503<br>Attn: Jessica Wong<br>File No. 56220 | $300,000.00 | C, U, D |
| 7. | Holme Roberts & Owen LLP | P.O. Box 1618<br>Denver, Colorado 80201-1618<br>Telephone: (303) 861-7000<br>Facsimile: (303) 866-0200<br>Attn: Garth Jensen, Partner | $168,924.50 | C, U, D |
| 8. | Intelsat Corporation | P.O. Box 7247-8912<br>Philadelphia, Pennsylvania 19170-8912<br>Telephone: (202) 944-6800<br>Facsimile: (202) 944-7440<br>Attn: General Counsel | $90,000.00 | C, U, D |
| 9. | Ernst & Young LLP | Dept. 6793<br>725 South Figueroa Street<br>Los Angeles, California 90084-6793<br>Telephone: (206) 654-7782<br>Facsimile: (213) 977 3729<br>Attn: Theresa Fortney | $84,520.00 | C, U, D |
| 10. | SES AMERICOM | P.O. Box 642350<br>Pittsburgh, Pennsylvania 15264-2350<br>Telephone: (703) 610-1015<br>Facsimile: (703) 610-1029<br>Attn: Steve Barr or Sophie Gerber | $75,925.00 | C, U, D |

K&E 14419502.

| | Creditor | Contact Information | Claim Amount | Indicate if claim is contingent ("C"), unliquidated ("U"), disputed ("D") or subject to setoff [2] |
|---|---|---|---|---|
| 11. | Business Growth Implementation Associates | 6 Pellan Crest<br>Ottawa, Ontario, Canada K2K1J5<br>Telephone: (613) 729-7250<br>Facsimile: (613) 254-8729<br>Attn: Accounts Receivable | $45,000.00 | C, U, D |
| 12. | Global Technology Associates | P.O. Box 8881<br>Reston, Virginia 20195<br>Telephone: (703) 476-8999<br>Facsimile: (703) 880-6656<br>Attn: Michelle Thurston | $40,181.31 | C, U, D |
| 13. | Morrison & Foerster LLP | 425 Market Street<br>San Francisco, California 94160-2497<br>Telephone: (202) 887-1510<br>Facsimile: (202) 887-0763<br>Attn: Cheryl Tritt, Partner<br>File No. 72497 | $31,982.63 | C, U, D |
| 14. | Davis Graham & Stubbs LLP | 1550 17th Street<br>Suite 500<br>Denver, Colorado 80202<br>Telephone: (303) 892-9400<br>Facsimile: (303) 893-1379<br>Attn: Ruthie Hall | $27,026.82 | C, U, D |
| 15. | XO Communications | 13865 Sunrise Valley Drive<br>Herndon, Virginia 20171<br>Telephone: (206) 315-5023<br>Facsimile: (206) 315-5050<br>Attn: Steve Leffingwell<br>File 50550 | $25,907.70 | C, U, D |
| 16. | NAGRAVISION | Route de Geneve 22<br>1033 Cheseaux s<br>Lausanne, Switzerland<br>Telephone: 41 21 732 03 11<br>Facsimile: 41 21 732 01 00<br>Attn: Pierre Poy | $25,000.00 | C, U, D |
| 17. | Comsearch | Janelia Technology Park<br>19700 Janelia Farm Boulevard<br>Ashburn, Virginia 20147<br>Telephone: (703) 726-5500<br>Facsimile: (703) 726-5600<br>Attn: Legal Department | $17,617.00 | C, U, D |
| 18. | Wireless Strategy, LLC | P.O. Box 169<br>McLean, Virginia 22101-0169<br>Telephone: (703) 906-7516<br>Facsimile: (703) 506-0041<br>Attn: Doug Hyslop, Partner | $16,062.50 | C, U, D |

K&E 14419502.

| | Creditor | Contact Information | Claim Amount | Indicate if claim is contingent ("C"), unliquidated ("U"), disputed ("D") or subject to setoff [2] |
|---|---|---|---|---|
| 19. | Internap Network Services Corporation | 250 Williams Street<br>Suite E100<br>Atlanta, Georgia 30303<br>Telephone: (206) 269-4382<br>Facsimile: (206) 254-6192<br>Attn: Andrew Songer | $15,178.98 | C, U, D |
| 20. | Janiel Eggleston | 3808 41st Avenue NE<br>Seattle, Washington 98105<br>Telephone: (206) 612-9641<br>Facsimile: Unknown<br>Attn: Janiel Eggleston | $12,875.00 | C, U, D |
| 21. | Broadview Consulting | 1504 102nd Avenue NE<br>Bellevue, Washington 98004<br>Telephone: (425) 455-5438 x104<br>Facsimile: (425) 454-6264<br>Attn: Thuy Shimizu | $12,560.00 | C, U, D |
| 22. | EXPWAY | 1610 Hollingsworth Drive<br>Mountain View, California 94040<br>Telephone: (650) 814-7865<br>Facsimile: (650) 618-0402<br>Attn: Xavier Wartelle | $12,150.00 | C, U, D |
| 23. | Two Degrees, LLC | P.O. Box 84904<br>Seattle, Washington 98124-6204<br>Telephone: (206) 438-5740<br>Facsimile: (206) 438-5686<br>Attn: Legal Department | $11,662.00 | C, U, D |
| 24. | Stanton Communications, Inc. | 1150 Connecticut Avenue NW<br>Washington, DC 20036<br>Telephone: (202) 223-4933<br>Facsimile: (202) 223-1375<br>Attn: Amy Calhoun, Managing Director | $11,107.58 | C, U, D |
| 25. | Cooley Godward Kronish LLP | 101 California Street<br>5th Floor<br>San Francisco, California 94111-5800<br>Telephone: (703) 456-8581<br>Facsimile: (703) 456-8100<br>Attn: Ken Krisko, Partner | $10,061.80 | C, U, D |
| 26. | Quantum | 201 26 Viale P eA Pirelli, 6<br>Milano, Italy<br>Telephone: 02 36 57 04 00<br>Facsimile: 02 99 98 97 80<br>Attn: Giuseppe Alfonsi | $8,400.00 | C, U, D |

K&E 14419502.

| | Creditor | Contact Information | Claim Amount | Indicate if claim is contingent ("C"), unliquidated ("U"), disputed ("D") or subject to setoff [2] |
|---|---|---|---|---|
| 27. | Archer Consulting LLC | 3515 Silverado Drive<br>Carson City, Nevada 89705<br>Telephone: (310) 658-0082<br>Facsimile: (775) 267-5740<br>Attn: Steve Archer | $7,520.21 | C, U, D |
| 28. | FedEx | 3875 Airways Boulevard<br>Mod. H-3<br>Memphis, Tennessee 38116-4634<br>Telephone: (800) 622-1147<br>Facsimile: (901) 345-8375<br>Attn: Legal Office | $6,995.26 | C, U, D |
| 29. | Electro Rent Corporation | 6060 Sepulveda Boulevard<br>Van Nuys, California 91411<br>Telephone: (800) 688-1111<br>Facsimile: (818) 374-7399<br>Attn: Tony Ricotta, Account Manager | $6,290.45 | C, U, D |
| 30. | Verizon Wireless | P.O. Box 3397<br>Bloomington, Illinois 61702<br>Telephone: (800) 555-8879<br>Facsimile: (309) 820-7044<br>Attn: Bankruptcy Administration | $5,478.70 | C, U, D |
| 31. | Wildcat Systems LLC | 13295 Illinois Street<br>Suite 303<br>Carmel, Indiana 46032<br>Telephone: (317) 607-6385<br>Facsimile: Unknown<br>Attn: Travis Jones<br>(email: tjones@wildcatsystems.com) | $5,000.00 | C, U, D |
| 32. | AT&T Mobility | 5565 Glenn Ridge Connector<br>Atlanta, Georgia 30349<br>Telephone: (404) 236-6000<br>Facsimile: (404) 236-5575<br>Attn: Small Business AR | $4,016.17 | C, U, D |
| 33. | Sarbox Solutions | 601 108th Avenue NE<br>Bellevue, Washington 98004<br>Telephone: (425) 943-6882<br>Facsimile: Unknown<br>Attn: Steve Yount | $3,817.50 | C, U, D |
| 34. | TR Security | 1400 Timberwolf Drive<br>Frederick, Maryland 21703<br>Telephone: (301) 560-6487<br>Facsimile: Unknown<br>Attn: Accounts Receivable | $3,750.00 | C, U, D |

K&E 14419502.

| | Creditor | Contact Information | Claim Amount | Indicate if claim is contingent ("C"), unliquidated ("U"), disputed ("D") or subject to setoff [2] |
|---|---|---|---|---|
| 35. | Kinetics Marketing & Communications | 24 Greenridge Road<br>Lutherville, Maryland 21093<br>Telephone: (410) 379-0158<br>Facsimile: (410) 379-6668<br>Attn: Patricia Tait, Director | $3,000.00 | C, U, D |
| 36. | Professional Products, Inc. | 9116 Gaither Road<br>Gaithersburg, Maryland 20877-1422<br>Telephone: (240) 864-4000<br>Facsimile: (240) 864-0014<br>Attn: Accounts Receivable | $2,805.17 | C, U, D |
| 37. | Huron Consulting Group | 4795 Paysphere Circle<br>Chicago, Illinois 60674<br>Telephone: (202) 585-6840<br>Facsimile: (202) 585-6801<br>Attn: Matt Medlin | $2,780.00 | C, U, D |
| 38. | EMBARQ | Corporate Headquarters<br>5454 W. 110th Street<br>Overland Park, Kansas 66211<br>Telephone: (877) 436-2277<br>Facsimile: (866) 867-2205<br>Attn: Legal Department | $2,503.87 | C, U, D |
| 39. | Vintage Filings, LLC | 150 W. 46th Street<br>6th Floor<br>New York, New York 10036<br>Telephone: (212) 730-4302<br>Facsimile: (646) 349-9655<br>Attn: lbrown@vfilings.com | $2,260.00 | C, U, D |
| 40. | Davis Wright Tremaine LLP | 2300 Wells Fargo Center<br>Portland, Oregon 97201<br>Telephone: (206) 622-3150<br>Facsimile: (206) 757-7700<br>Attn: Julie Weston, Partner | $1,936.00 | C, U, D |
| 41. | KONIKA MINOLTA | 5800 Foremost Drive SE<br>Grand Rapids, Michigan 49546<br>Phone: (800) 227-2948<br>Facsimile: (616) 285-7108<br>Attn: Konica Minolta Graphic Imaging U.S.A., Inc. | $1,283.67 | C, U, D |
| 42. | Pillsbury Winthrop Shaw Pittman LLP | 50 Fremont Street<br>San Francisco, California 94160-2391<br>Telephone: (415) 983-1000<br>Facsimile: (415) 983-1200<br>Attn: Michael Ratzlaff | $1,273.27 | C, U, D |

9

| | Creditor | Contact Information | Claim Amount | Indicate if claim is contingent ("C"), unliquidated ("U"), disputed ("D") or subject to setoff [2] |
|---|---|---|---|---|
| 43. | Purple Onion Catering Company | 12450 Fair Lakes Circle<br>Suite 150<br>Fairfax, Virginia 22033<br>Telephone: (703) 631-7466<br>Facsimile: (703) 222-1963<br>Attn: Rich Kalfian | $1,131.59 | C, U, D |
| 44. | Corporation Services Company | P.O. Box 13397<br>Philadelphia, Pennsylvania 19101-3397<br>Telephone: (800) 927-9800<br>Facsimile: (302) 636-5454<br>Attn: Accounts Receivable | $750.00 | C, U, D |
| 45. | WYLDE Consulting | 353 NW 76th Street<br>Seattle, Washington 98117<br>Telephone: (206) 605-1270<br>Facsimile: Unknown<br>Attn: Lionel Tamez | $750.00 | C, U, D |
| 46. | Speakeasy, Inc. | 1201 Western Avenue<br>7th Floor<br>Seattle, Washington 98101<br>Telephone: (206) 728-9770<br>Facsimile: (206) 728-1500<br>Attn: Legal Department | $614.40 | C, U, D |
| 47. | Staples Business Advantage | Staples, Inc.<br>500 Staples Dr<br>Framingham, Massachusetts 01702<br>Telephone: (508) 253-5000<br>Facsimile: (508) 253-8989<br>Attn: General Counsel | $578.45 | C, U, D |
| 48. | Nevada Dept. of Taxation | 1550 E. College Parkway<br>Suite 115<br>Carson City, Nevada 89706<br>Telephone: (775) 684-2000<br>Facsimile: (775) 684-2020<br>Attn: Dino DiCianno | $343.30 | C, U, D |
| 49. | Automatic Data Processing, Inc. | 5355 Orangethorpe Avenue<br>La Palma, California 90623<br>Telephone: (425) 908-3800<br>Facsimile: Unknown<br>Attn: Customer Service | $315.21 | C, U, D |
| 50. | Muzak | P.O. Box 71070<br>Charlotte, North Carolina 28272-1070<br>Telephone: (866) 689-2504<br>Facsimile: (803) 396-3136<br>Attn: Customer Service | $239.40 | C, U, D |

K&E 14419502.

# EXHIBIT A(4)

## Secured Claims[3]

Pursuant to Local Rule 1007-2(a)(5), the following is a list of creditors holding the five largest secured claims against the Debtors on a consolidated basis. The five largest secured creditors are certain holders of the Debtors' Notes. The Bank of New York (n/k/a The Bank of New York Mellon) is the Indenture Trustee for the Notes.

| | Creditor | Contact Information | Amount | Collateral Description & Value[4] | Disputed[5] |
|---|---|---|---|---|---|
| 1. | Highland Restoration Capital Partners LP | 13455 Noel Road Suite 800 Dallas, Texas 75240 Telephone: (972) 419-2532 Facsimile: (972) 628-4155 Attn: Niles Chura | $103,155,000 | Second priority security interest in substantially all assets of DSBD North America, Inc. ("DSBD NA") and all of its present and future subsidiaries, including a first priority pledge of DSBD NA's stock. | No |
| 2. | Harbinger Capital Partners Master Fund 1, Ltd. | c/o Harbinger Capital Partners LLC, 555 Madison Avenue FL 16, New York, New York 10022 | $99,479,000 | Second priority security interest in substantially all assets of DSBD North America, Inc. ("DSBD NA") and all of its present and future subsidiaries, including a first priority pledge of DSBD NA's stock. | No |
| 3. | Plainfield Special Situations Master Fund Ltd. | Plainfield Asset Management LLC 55 Railroad Avenue Plaza Level Greenwich, Connecticut 06830 Telephone: (203) 769-4848 Facsimile: (203) 302-1779 Attn: Cynthia Fuentes | $75,524,000 | Second priority security interest in substantially all assets of DSBD NA and all of its present and future subsidiaries, including a first priority pledge of DSBD NA's stock. | No |

---

[3] The information herein is not and shall not constitute an admission of liability by, nor is it binding on, the Debtors, and nothing herein shall affect the Debtors' right to challenge the amount or characterization of any claim at a later date.

[4] The Prepetition Facility Lenders have approximately $46,000,000 in aggregate amount of first priority security interests in the same assets.

[5] Any and all of these claims may be subject to setoff.

K&E 14419502.

| | Creditor | Contact Information | Amount | Collateral Description & Value[4] | Disputed[5] |
|---|---|---|---|---|---|
| 4. | Oz Master Fund, Ltd. | Goldman Sachs (Cayman) Trust Ltd. Harbour Center 2nd Floor Georgetown, Cayman Islands Telephone: (212) 790-0169 Facsimile: (345) 949-6773 Attn: Daniel Och | $67,979,000 | Second priority security interest in substantially all assets of DSBD NA and all of its present and future subsidiaries, including a first priority pledge of DSBD NA's stock. | No |
| 5. | Goldman, Sachs & Co. | 30 Hudson Street Floor 4 Jersey City, New Jersey 07302-4600 Telephone: (212) 902-3323 Facsimile: (212) 428-9563 Attn: David B. Ludwig | $65,090,615 | Second priority security interest in substantially all assets of DSBD NA and all of its present and future subsidiaries, including a first priority pledge of DSBD NA's stock. | No |

K&E 14419502.

## EXHIBIT A(5)

### Summary of the Debtors' Assets and Liabilities

Pursuant to Local Rule 1007-2(a)(6), the latest available financial data is provided below. Total assets and liabilities are estimates on a consolidated basis and are current as of March 31, 2009.

**Total Assets (Book Value)**:     $627,000,000
**Total Liabilities**:     $813,000,000

K&E 14419502.

## EXHIBIT A(6)

### Debtors' Property Held By Third-Parties

Pursuant to Local Rule 1007-2(a)(8), the following lists the Debtors' property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, or secured creditor, or agent for any such entity, giving the name, address, and telephone number of each such entity and the court in which any proceeding relating thereto is pending.

| Property | Entity Holding Property |
|---|---|
| Auction-rate securities | Jefferies & Company, Inc.<br>520 Madison Avenue<br>12th Floor<br>New York, New York  10022-4213<br>Telephone: (212) 284-1795<br>Attn: Richard Morrison |
| Auction-rate securities | UBS Financial Services Inc.<br>One N. Wacker Drive<br>Suite 2500<br>Chicago, Illinois 60606<br>Telephone: (800) 372-1795<br>Attn: Louis Paster |
| Stock certificates of subsidiaries | The Bank of New York, as Indenture Trustee<br>101 Barclay Street<br>8 Floor West<br>New York, New York 10286<br>Telephone: (800) 275-2048 |
| Various security deposits | Certain of the Debtors' lessors, utility companies, regulatory agencies, and others. |

K&E 14419502.

## EXHIBIT A(7)

### Debtors' Facilities

Pursuant to Local Rule 1007-2(a)(9), the following lists the location of the premises leased or held under other arrangements from which the Debtors operate their business. The Debtors do not own any real property.

| Description | Location(s) |
|---|---|
| Communications Tower | 1013-1/2 Schieffelin Road, Apex, North Carolina 28356 |
| Communications Tower | 110 Aeroglide Drive, Cary, North Carolina 27511 |
| Communications Tower | 143 W. Franklin Street, Chapel Hill, North Carolina 27514 |
| Communications Towers | 917 E. NC Hwy 54, Durham, North Carolina 27713<br>5313 New Mount Moriah Road, Durham, North Carolina 27707<br>3306 Rose of Sharon Road, Durham, North Carolina 27712<br>300 W. Morgan Street, Durham, North Carolina 27701<br>5004 S. Miami Boulevard, Durham, North Carolina 27703 |
| Communications Tower | 414 Aviation Parkway, Morrisville, North Carolina 27560 |
| Communications Towers | 6211 Holly Springs Road, Raleigh, North Carolina 27606<br>150 Fayetteville Street, Raleigh, North Carolina 27603<br>4812 Six Forks Road, Raleigh, North Carolina 27609<br>8317 Honeycutt Road, Raleigh, North Carolina 27615<br>9220 Fairbanks Drive, Raleigh, North Carolina 27613 |
| Communications Towers | 301 Fremont Street, Las Vegas, Nevada 89101<br>3700 W. Flamingo Road, Las Vegas, Nevada 89103 |
| Offices | 1 Aerojet Way, Suite 200, North Las Vegas, Nevada 89101 |
| Offices | 225 108th Avenue NE, Suite 370, Bellevue, Washington 98004 |
| Offices | 3468 Mt. Diablo Boulevard, Suite B-115, Lafayette, California 94549 |
| Offices | 222 North Sepulveda Boulevard, Suite 1770, El Segundo, California 90245 |
| Offices | 11700 Plaza America Drive, Suite 1010, Reston, Virginia 20190 |

K&E 14419502.

## EXHIBIT A(8)

## Location of Substantial Assets, Books and Records, and Non-U.S. Assets

Pursuant to Local Rule 1007-2(a)(10), the following provides the location of the Debtors' substantial assets, books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

**Substantial Assets**: The Debtors maintain bank accounts at the following institutions:
- Jefferies & Company, Inc.
  Attn: Richard Morrison
  520 Madison Avenue, 12th Floor, New York, New York 10022-4213
- UBS Financial Services Inc.
  Attn: Louis Paster
  1 North Wacker Drive, Suite 2500, Chicago, Illinois 60606
- Bank of America, N.A.
  Attn: Debbie Veenhuizen
  1655 Grant Street, Building A, 10th Floor, Concord, California 94520
- Bank of America, N.A.
  Attn: Debbie Veenhuizen
  800 Fifth Avenue, Seattle, Washington 98104

In addition, the Debtors have equipment and inventory at their facilities in El Segundo, California, Kirkland, Washington, and Lafayette, California at the addresses listed below.

**Books and Records**: The Debtors' books and records are kept at the following locations:
- 11700 Plaza America Drive, Suite 1010, Reston, Virginia 20190
- 222 N. Sepulveda Boulevard, El Segundo, California 90245
- 2300 Carillon Point, Kirkland, Washington 98033
- 3468 Mt. Diablo Boulevard, Suite 11-B, Lafayette, California 98033
- 5300 Commerce Court West, 199 Bay Street, Toronto M5L 1B9, Canada
- Walker House, 87 Mary St, Georgetown, Grand Cayman KY1-9001 Cayman Islands
- 269 Argyll Avenue, Slough, Berkshire, United Kingdom

**Non-U.S. Assets**: The Debtors maintain a bank account at the Bank of America in London, United Kingdom with a balance of approximately $204,000, as of May 14, 2009. In addition, the Debtors own the DBSD-G1 Satellite, a geosynchronous earth orbit satellite, which was launched in April 2008.

16

**EXHIBIT A(9)**

**Pending Litigation**

Pursuant to Local Rule 1007-2(a)(11), the following lists actions and proceedings, pending or threatened, against the Debtors or their properties where a judgment against the Debtors or a seizure of their property may be imminent.

- There are no imminent judgments against or seizures of property from the Debtors. Below is a list of the Debtors' significant pending litigation:

| Action or Proceeding | Status |
|---|---|
| Sprint Nextel Corporation v. New ICO Satellite Services G.P. (n/k/a New DBSD Satellite Services G.P.) and Terrestar Networks, Inc. <br><br> Case No. 08-00651, E.D. Virginia | Filed 06/25/08; removed from court's active docket pending further FCC action. |

K&E 14419502.

## EXHIBIT A(10)

## Senior Management

Pursuant to Local Rule 1007-2(a)(12), the following provides the names of the individuals who comprise the Debtors' existing senior management, their tenure, and a brief summary of their responsibilities and relevant experience.

| Officer & Responsibilities | Relevant Experience | Tenure |
|---|---|---|
| **David Bagley** <br> Senior Vice President, Corporate Development | Mr. Bagley has over 20 years of experience in the telecommunications industry. From June 2000 to June 2001, he was Vice President of Business Development for IPWireless, where he was in charge of spectrum acquisition, strategic partnering and regulatory affairs. Mr. Bagley spent four years at AirTouch and Vodafone, which acquired AirTouch in 1999. He held various corporate development positions working on transactions throughout the world. His most recent position was head of Corporate Development for the Americas for Vodafone. Prior to AirTouch, Mr. Bagley spent eight years at SBC Communications in finance and Corporate Development positions. <br><br> Mr. Bagley holds a Bachelor's degree in Accounting and Economics from Pacific University and a Master's degree in International Management from Thunderbird Graduate School of International Management. | 2002 to present |
| **Michael P. Corkery** <br> Acting Chief Executive Officer, Executive Vice President, and Chief Financial Officer | Mr. Corkery served as Chief Financial Officer of CURRENT Group, LLC from January 2006 until November 2007. From August 2002 until August 2005, Mr. Corkery was vice president of operations finance for Nextel Communications, Inc., where he led operations finance and was responsible for all decision support, financial planning, and analysis activities. He previously worked for Berliner Communications, Inc., XO Communications, Inc., and AT&T Wireless Services in similar capacities. <br><br> Mr. Corkery holds a Bachelor's degree in accounting from St. Bonaventure University and received an Executive Leadership Development certification from the McDonough School of Business at Georgetown University. | 2007 to present |

K&E 14419502.

| Officer & Responsibilities | Relevant Experience | Tenure |
|---|---|---|
| **Robert S. Day Jr.** Senior Vice President, Space Systems | Mr. Day has over 27 years of telecommunications industry experience. Mr. Day is responsible for the design, procurement, deployment, and operation of the DBSD North America space segment. The space segment includes the DBSD North America satellite, launch vehicle, gateway, satellite control center, and satellite operations. His areas of expertise include satellite design, integration, test, launch, operations, and system engineering.<br><br>Prior to joining DBSD NA, he was the Vice President of Space Technology for Teledesic LLC. Mr. Day also spent 19 years at Hughes Space and Communications where he provided system engineering leadership or served as program manager for several major geosynchronous satellite programs. He led the integration, test, and launch team for the first HS601 satellite, and served as the Deputy Business Unit Leader for Spacecraft Design and Production at Hughes Space and Communications.<br><br>Mr. Day holds a Bachelor's degree in General Engineering from the University of Illinois, a Master's degree in Mechanical Engineering from UCLA, and a certificate in Astronautical Engineering from UCLA. | 2002 to present |
| **John L. Flynn** Executive Vice President, General Counsel, and Corporate Secretary | From July 2003 until April 2006, Mr. Flynn was a member of Wilmer Cutler Pickering Hale and Dorr LLP, where his practice focused primarily on communications and intellectual property law. From November 2000 until January 2003, Mr. Flynn was Vice President and Deputy General Counsel of Commerce One, Inc., a software company, where he co-managed the legal department and advised DBSD NA on corporate, regulatory and litigation matters. Mr. Flynn also served as General Counsel and Vice President of Government Affairs of rStar Broadband Networks, Inc. and, before that, was an associate at Munger, Tolles & Olson. Mr. Flynn began his legal career by serving as a law clerk to Judge Edward R. Becker on the U.S. Court of Appeals for the Third Circuit and then to Justices Byron R. White and John Paul Stevens on the U.S. Supreme Court.<br><br>Mr. Flynn graduated from Stanford University with a Bachelor's degree in Political Science, with distinction, and a Master's degree in International Policy Studies, and he holds his law degree, magna cum laude, from the Georgetown University Law Center. | 2006 to present |
| **Craig Jorgens** President | Mr. Jorgens has over 17 years of experience in the telecommunications industry. From 2000 until joining DBSD NA, he was a principal in the telecommunications group at the private equity firm of Texas Pacific Group. From 1992 to 2000, he was Executive Director of Corporate Development at AirTouch Communications, one of the world's largest wireless operators, where he was responsible for mergers and acquisitions and new business development both domestically and internationally. He also has experience in management consulting and investment banking.<br><br>Mr. Jorgens is a graduate of Harvey Mudd College and graduated from Carnegie Mellon's Graduate School of Industrial Administration. | 2002 to present |

K&E 14419502.

| Officer & Responsibilities | Relevant Experience | Tenure |
|---|---|---|
| **Suzanne Hutchings Malloy**<br>Senior Vice President, Regulatory Affairs | Ms. Malloy has over 17 years of experience in the telecommunications industry. Prior to joining DBSD NA and until 2002, Ms. Malloy served as Senior Regulatory Counsel for Teledesic LLC, where she directed the company's licensing and regulatory efforts among various industry and regulatory constituencies, including the FCC, the U.S. State Department, and the International Telecommunication Union. Ms. Malloy's work has included securing regulatory approval for new hybrid satellite-terrestrial networks, obtaining domestic spectrum assignments, helping maintain spectrum assets, and advocating for the companies and their subsidiaries in major rulemaking and adjudicatory proceedings before the FCC. She has also served on numerous U.S. delegations to regional and international spectrum management treaty conferences. She has also worked as an Attorney-Advisor at the FCC, where she participated in country-to-country treaty negotiations, World Trade Organization multilateral negotiations, and rulemaking proceedings before the FCC as a satellite industry expert.<br><br>Ms. Malloy holds a Bachelor of Arts degree in History from Davidson College and is a graduate of Harvard Law School. | 2002 to present |

K&E 14419502.

## EXHIBIT B(1) - B(2)

## Payroll

Pursuant to Local Rule 1007-2(b), the following estimates the consolidated amount of payroll for the Debtors' employees; officers, directors, and stockholders; and financial and business consultants for the 30-day period following the Petition Date.

| Group | Estimated Amount |
|---|---|
| Employees (not including officers, directors, and stockholders) | $450,000 |
| Officers, directors, and stockholders | $232,000 |
| Financial and business consultants (not including attorneys, accountants, or auditors) | $200,000[6] |

---

[6] This amount represents the monthly fees of Jefferies & Company, Inc., the Debtors' proposed investment banker and financial advisor, subject to Court approval of the retention.

K&E 14419502.

## EXHIBIT B(3)

## Estimated Financial Data for 30-Day Period Postpetition

Pursuant to Local Rule 1007-2(b)(3), the following provides the estimated aggregated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid (other than professional fees) for the 30-day period following the Petition Date.

| Description | Estimated Amount |
|---|---|
| Cash Receipts | $0 |
| Cash Disbursements | $2,100,000 |
| Net Cash Loss | $2,100,000 |
| Unpaid Obligations (excluding professional fees) | $13,000,000 |
| Unpaid Receivables (excluding professional fees) | $0 |

K&E 14419502.

## **EXHIBIT C**

<u>**SUPPORT AGREEMENT**</u>

This SUPPORT AGREEMENT (the "<u>Agreement</u>") is made and entered into as of May 14, 2009 by and among the following parties:

(a)   DBSD North America, Inc., a Delaware corporation (formerly known as ICO North America, Inc., "<u>DBSD</u>");

(b)   ICO Global Communications (Holdings) Limited, a Delaware corporation ("<u>ICO Global</u>" and together with DBSD and the Guarantors (as defined below), the "<u>ICO Parties</u>");

(c)   each of the guarantors (the "<u>Guarantors</u>") party to the Indenture dated August 15, 2005 (as amended to date, the "<u>Indenture</u>"), among DBSD, the Guarantors and The Bank of New York (now known as The Bank of New York Mellon), as Trustee (the "<u>Trustee</u>"); and

(d)   each of the undersigned holders (together the "<u>Participating Holders</u>", and together with the ICO Parties, the "<u>Parties</u>"), which entities are beneficial owners (each, a "<u>Holder</u>") of the 7.5% Convertible Senior Secured Notes due 2009 (the "<u>Notes</u>"), issued by DBSD pursuant to the Indenture.

<u>RECITALS</u>

WHEREAS, DBSD has determined that a prompt restructuring of its existing working capital facility and the outstanding Notes would be in the best interests of its creditors and stockholders;

WHEREAS, DBSD and the Participating Holders have engaged in good faith negotiations with the objective of reaching an agreement for a financial restructuring of DBSD, including the indebtedness outstanding under the Notes;

WHEREAS, DBSD and certain of the Participating Holders have entered into the Forbearance Agreement, dated as of April 30, 2009 (the "<u>Forbearance Agreement</u>");

WHEREAS, DBSD, the Guarantors, certain Lenders named therein, Jefferies Finance LLC and The Bank of New York Mellon have entered into the Second Forbearance Agreement, dated as of April 30, 2009 (the "<u>Second Forbearance Agreement</u>" and together with the Forbearance Agreement, the "<u>Forbearance Agreements</u>");

WHEREAS, DBSD, ICO Global and the Participating Holders now desire to implement a financial restructuring of DBSD (the "<u>Restructuring</u>") on the terms and conditions set forth herein and in the term sheet attached hereto as <u>Exhibit A</u>, (the "<u>Term Sheet</u>");

WHEREAS, each Party has reviewed, or has had the opportunity to review, the Term Sheet and this Agreement with the assistance of professional legal advisors of its own choosing;

2

WHEREAS, the Parties intend to consummate the Restructuring on the terms and conditions set forth in this Agreement and in the Term Sheet through a chapter 11 plan of reorganization (the "Pre-Arranged Plan") which will be filed on or as soon as practicable after the date that the chapter 11 cases (the "Chapter 11 Cases") of DBSD and the Guarantors are commenced under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended, the "Bankruptcy Code"), and the solicitation for acceptances thereof will commence as soon as practicable following the commencement of the Chapter 11 Cases; and

WHEREAS, to expedite and support the implementation of the Restructuring, each of the Participating Holders is prepared to commit, on the terms and subject to the conditions of this Agreement and applicable law, if and when lawfully solicited, to vote, or cause to be voted, all of its Notes and any additional Notes of which such Participating Holder (or a client account over which such Participating Holder has discretion) is or at any time on or prior to the Outside Date (as defined below) becomes, the record or beneficial holder of (collectively, the "Held Notes"), to accept the Pre-Arranged Plan.

NOW THEREFORE, in consideration of the promises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

1.      Term Sheet.  The Term Sheet is incorporated by reference herein and is made part of this Agreement as if fully set forth herein.  The general terms and conditions of the Restructuring are set forth in the Term Sheet; provided, however, that (i) the Term Sheet is supplemented by the terms and conditions of this Agreement, (ii) to the extent there is a conflict between the Term Sheet and this Agreement, the terms and provisions of this Agreement will govern, and (iii) to the extent there is a conflict between the Term Sheet or this Agreement and the Restructuring Documents (as defined below), the terms and provisions of the Restructuring Documents shall govern.

2.      Means for Effectuating the Restructuring.  DBSD shall effectuate the Restructuring through commencement of the Chapter 11 Cases and seek confirmation of the Pre-Arranged Plan.  DBSD shall file petitions for relief under chapter 11 of the Bankruptcy Code (collectively, the "Petitions") for DBSD and the Guarantors (collectively, the "Debtors") commencing the Chapter 11 Cases no later than 11:00 a.m. (prevailing New York City Time) on May 15, 2009 (such date and time, the "Petition Date").  The Pre-Arranged Plan and a disclosure statement that complies with section 1125 of the Bankruptcy Code (the "Disclosure Statement") shall be filed as soon as practicable, but in no event later than fifteen (15) days, after the commencement of the Chapter 11 Cases.  The Debtors shall use their reasonable best efforts to ensure that (i) approval of the Disclosure Statement will occur within fifty (50) days of the Petition Date, (ii) confirmation of the Pre-Arranged Plan will occur within ninety (90) days after the Petition Date, and (iii) the effective date of the Pre-Arranged Plan will be no later than the earlier of (x) one hundred and five (105) days after the Petition Date and (y) the thirteenth (13th) day following the entry of an order confirming the Pre-Arranged Plan; provided, that if any FCC Approval is required, the deadline for such effective date shall be extended to the date that is three (3) business days after receipt of the FCC Approval, but not later than the Outside Date (as defined below).  For purposes of this Agreement, (i) the "Outside Date" shall mean the date that is the

3

four (4) month anniversary of the date of the FCC Filing (as defined below); provided, however, that such date may be extended by the Participating Holders if the FCC Filing is still pending review at the FCC; and (ii) "FCC Approval" shall mean such regulatory approvals or consents required to be obtained from the Federal Communications Commission (the "FCC") or any other federal regulatory entity, the failure of which to obtain would have a material adverse effect on DBSD.

3.     Preparation of Restructuring Documents.  Promptly upon execution of this Agreement, representatives of DBSD, ICO Global and the Participating Holders, together with their respective counsel, shall negotiate in good faith to prepare all definitive documentation related to the Restructuring, including, without limitation, the Registration Rights Agreement, the Stockholders Agreement, the Charter Documents and the Releases (each as described in the Term Sheet), all of which shall contain provisions consistent with the Term Sheet and this Agreement and such other provisions as are mutually acceptable to DBSD, ICO Global and the Participating Holders (collectively, the "Restructuring Documents").

4.     DBSD and ICO Global Undertakings.  DBSD and ICO Global each hereby agrees to use its reasonable best efforts to, as applicable, take all actions reasonably necessary to effectuate and consummate the Restructuring and implement all steps necessary to obtain an order of the Bankruptcy Court confirming the Pre-Arranged Plan and not take any actions inconsistent with the Restructuring, in each case, as expeditiously as practicable; provided, however, that nothing in this Agreement or the Term Sheet shall obligate ICO Global or its affiliates (other than DBSD and the Guarantors) to advance cash, working capital or other assets to DBSD or any Participating Holder.

5.     Third Party Approvals.  The Parties shall use their reasonable best efforts to obtain all regulatory, governmental, administrative, and third party approvals of the Restructuring, including, without limitation, if required under applicable law, the approval from the FCC to the application for consent to the change of control of the FCC licenses issued to DBSD.

6.     Participating Holder Undertaking.  Each of the Participating Holders agrees that unless and until such time as this Agreement has expired and subject to the conditions that (a) the terms of any applicable agreements implementing the Restructuring embody the terms set forth in the Term Sheet and this Agreement and such other additional provisions, not inconsistent with the terms hereof and thereof, as are mutually agreed upon by the Participating Holders, ICO Global and DBSD, (b) all pertinent documents, including, without limitation, all the Restructuring Documents are in form and substance reasonably satisfactory to the Participating Holders, (c) no Agreement Termination Event shall have occurred that has not been waived in writing by each Participating Holder, and (d) no Company Termination Event shall have occurred that has not been waived by an ICO Waiver (as defined below), it shall:  (x) use its reasonable best efforts to, as applicable, take all actions relating to itself reasonably necessary to effectuate and consummate the Restructuring and not take any acts inconsistent with the Restructuring, in each case, as expeditiously as practicable; and (y) when lawfully solicited, vote, or cause to be voted the Held Notes to accept the Pre-Arranged Plan.  For the avoidance of doubt, it is noted that any reference herein to a consent, approval, agreement or any similar action with respect to or on

4

behalf of the Participating Holders shall mean the consent, approval, agreement or similar action of each Participating Holder.

7.    Expiration of Agreement.

(a)    This Agreement shall expire automatically without any further required action or notice upon the occurrence of any Company Termination Event (but only, in the case of an event described in clauses (i) or (ii) of the definition of "Company Termination Event", with respect to the Participating Holder or Participating Holders who have breached any material covenant or provision as set forth in such clause (i) or as to which any representation or warranty is untrue as set forth in such clause (ii) until such time as this Agreement ceases to remain in effect with respect to Participating Holders representing less than fifty percent (50%) of the outstanding principal amount of Held Notes, until which time it shall apply to the remaining Participating Holders) or any Agreement Termination Event, unless the occurrence of such Agreement Termination Event is waived in writing by each Participating Holder or the occurrence of such Company Termination Event is waived in writing by the ICO Party or ICO Parties, as the case may be, directly affected by the event (an "ICO Waiver").   Upon the expiration of this Agreement (except in connection with the occurrence of a Company Termination Event) any and all acceptances in favor of the Pre-Arranged Plan by the Participating Holders prior to such expiration shall be deemed, for all purposes, to be null and void and shall not be considered or otherwise used in any manner by DBSD in connection with this Agreement and the Term Sheet.

(b)    An "Agreement Termination Event" shall mean any of the following:

(i)    Participating Holders shall not have entered into this Agreement prior to the Petition Date representing, or this Agreement ceases to remain in effect at such date with respect to Participating Holders representing, more than fifty percent (50%) of the outstanding principal amount of Notes;

(ii)    (A) Either of the ICO Parties shall have breached any material covenant or provision of this Agreement, (B) the Participating Holders shall have delivered written notice to DBSD of any such breach, and (C) such breach remains uncured for a period of five (5) business days;

(iii)    (A) Any representation or warranty in this Agreement made by an ICO Party shall have been untrue in any material respect when made or shall have become untrue in any material respect, (B) the Participating Holders shall have delivered written notice to DBSD of any such breach, and (C) such breach remains uncured for a period of five (5) business days;

(iv)    (A) Any material term or condition of any of the Restructuring Documents shall be (whether due to an order of the Bankruptcy Court or otherwise) materially different and adverse to the Participating Holders than as agreed by the Participating Holders and the ICO Parties except to the extent such materially different and adverse term or condition is agreed by each Participating Holder, (B) the Participating Holders shall have delivered written notice to DBSD of any such event, and (C) such event remains uncured for a period of five (5) business days;

5

(v)     There shall have been issued or reinstated any suspension order or similar order by a court or other governmental body of competent jurisdiction that materially adversely affects the benefits intended to be received by the Participating Holders hereunder, or prevents DBSD from consummating the transactions contemplated by this Agreement, and (A) such proceeding or order was issued or reinstated at the request or with the acquiescence of DBSD or any of its affiliates or (B) in all other circumstances, such order is not stayed, reversed, or vacated within fifteen (15) days after such issuance or reinstatement;

(vi)     There shall have been issued any order, decree, or ruling by any court or governmental body having jurisdiction restraining or enjoining the consummation of or rendering illegal the transactions contemplated by this Agreement and (A) such proceeding or order was issued at the request or with the acquiescence of DBSD or its affiliates or (B) in all other circumstances, such order is not stayed, reversed, or vacated within fifteen (15) days after such issuance;

(vii)     ICO Global shall have failed to file by 8:00 a.m. (prevailing New York City Time) on the fourth (4th) business day after ICO Global's counsel's receipt of executed signature pages to this Agreement from Holders representing, in the aggregate, more than fifty percent (50%) of the principal amount of Notes outstanding, a Form 8-K with the Securities and Exchange Commission to which this Agreement (including all exhibits) (with such redactions as may be reasonably requested by counsel to the Participating Holders) and the Term Sheet are attached.  The Parties agree that, in the event that ICO Global fails to file the Form 8-K in accordance with this provision, one or more of the Participating Holders may publicly disclose this Agreement and all of its exhibits; provided, however, that such disclosure shall be limited to disclosing the text of this Agreement and all exhibits and no such disclosure by the Participating Holders shall cure or waive such failure of ICO Global to make such filing.  ICO Global hereby (a) waives any claims against any such Participating Holder and (b) agrees to hold all such Participating Holders harmless against any claims, in each case, solely arising as a result of such disclosure by such Participating Holders in compliance with this Agreement;

(viii)     Unless DBSD and the Participating Holders agree otherwise:

A.     The Restructuring has not been approved by DBSD's Board of Directors prior to the filing of the Petitions;

B.     The Petitions shall not have been filed on or before the Petition Date;

C.     An application to obtain the FCC Approval for the transfer of control to the Holders (the "FCC Filing") shall not have been filed with the FCC within three (3) business days after the Pre-Arranged Plan has been confirmed; provided, however, that if the Holders have not provided DBSD all information about the Holders reasonably requested by DBSD to be included in the FCC Filing at that time, such time period shall be extended by an additional ten (10) days;

6

D.     The Pre-Arranged Plan and the Disclosure Statement shall not have been filed within fifteen (15) days after the Petition Date;

E.     The Disclosure Statement shall not have been approved within fifty (50) days after the Petition Date;

F.     The Pre-Arranged Plan shall not have been confirmed within ninety (90) days after the Petition Date;

G.     The Pre-Arranged Plan and the transactions contemplated therein shall not have been consummated on or before one hundred and five (105) days after the Petition Date; provided, that if any FCC Approval is required, such date shall be extended to the earlier of three (3) business date following receipt of the FCC Approval and the Outside Date; and

H.     Upon the written consent of ICO Global, DBSD, and the Participating Holders;

(ix)     The Bankruptcy Court shall have granted relief that is inconsistent with the Pre-Arranged Plan and adverse, in any material respect, to the Participating Holders, including, without limitation, the termination, annulment, or modification of the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any material assets of DBSD;

(x)     A trustee or examiner with enlarged powers shall have been appointed under sections 1104 or 1105 of the Bankruptcy Code for service in the Chapter 11 Cases; and

(xi)     One or more of the Chapter 11 Cases shall have been converted to a case under chapter 7 of the Bankruptcy Code or otherwise dismissed.

(c)     A "Company Termination Event" shall mean any of the following:

(i)     (A) A Participating Holder shall have breached any material covenant or provision of this Agreement; (B) DBSD shall have delivered written notice to the Participating Holders of any such breach; and (C) any such breach remains uncured for a period of five (5) business days;

(ii)     (A) Any representation or warranty in this Agreement made by a Participating Holder shall have been untrue in any material respect when made or shall have become untrue in any material respect, (B) DBSD shall have delivered written notice to the Participating Holders of any such breach, and (C) such breach remains uncured for a period of five (5) business days;

(iii)     (A) Any material term or condition of any of the Restructuring Documents shall be (whether due to an order of the Bankruptcy Court or otherwise) materially different and adverse to ICO Global or DBSD than as agreed by the Participating Holders, ICO Global and DBSD except to the extent such materially different and adverse term or condition is agreed by

7

ICO Global and DBSD, (B) DBSD shall have delivered written notice to the Participating Holder of any such event, and (C) such event remains uncured for a period of five (5) business days; and

(iv)    There shall have been issued any order, decree, or ruling by any court or governmental body having jurisdiction restraining or enjoining the consummation of or rendering illegal the transactions contemplated by this Agreement.

8.    Representations and Warranties.

(a)    Each Party represents and warrants to the other Parties that (a) it is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its formation; (b) its execution, delivery, and performance of this Agreement are within the power and authority of such party and have been duly authorized by such party and that no other approval or authorization is required; (c) this Agreement has been duly executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable in accordance with the terms hereof, subject to bankruptcy, insolvency, fraudulent conveyance, and similar laws affecting the rights or remedies of creditors generally; and (d) none of the execution and delivery of this Agreement or compliance with the terms and provisions hereof will violate, conflict with, or result in a breach of, its certificate of incorporation or bylaws or other constitutive document, any applicable law or regulation, any order, writ, injunction, or decree of any court or governmental authority or agency, or any agreement or instrument to which it is a party or by which it is bound or to which it is subject.

(b)    Each of the Participating Holders further represents and warrants to DBSD, as to itself, that, as of the date hereof, the amounts set forth next to its name on Schedule 1 attached hereto constitute the amounts of all Held Notes with respect to such Participating Holder.

9.    Restriction on Transfer.

(a)    The Participating Holders may sell, transfer, or dispose of any of their Notes as provided for in the Indenture; provided, however, that the transferee thereof (each such transferee, a "Transferee") must, as an acknowledgment to be bound to the terms hereof and the Term Sheet, simultaneously with the transfer execute a counterpart signature page to this Agreement and deliver such counterpart signature to DBSD, in which case it shall be deemed to be a Participating Holder for all purposes herein from and after the date on which such counterpart signature page is executed.  Any transfer of Notes that is not done in compliance with this Section 9(a) shall be deemed *void ab initio*.

(b)    Notwithstanding anything to the contrary herein, the Participating Holders shall be entitled to take any action necessary to consummate a transfer of the Held Notes; provided, that it shall obtain the Transferee's acknowledgment of the terms hereof, as described in Section 9(a) hereof.

10.    Public Disclosures.  Each ICO Party will submit to counsel for the Participating Holders for prior review all press releases and public filings regarding, in any way, the Restructuring, this Agreement, and any amendment to the terms of the Restructuring and/or this Agreement.  Except

as required by law (as determined by outside counsel to such ICO Party), no ICO Party shall (a) use the name of any Participating Holder in any public manner without such Participating Holder's prior written consent or (b) disclose to any person (including, for the avoidance of doubt, any other Participating Holder but specifically excluding legal, accounting and financial advisors to the ICO Parties who have a need to know such information in order to render their advisory services to the ICO Parties and who are bound by confidentiality restrictions regarding the disclosure and use of such information) the principal amount or percentage of any Notes or any other securities of DBSD or any of their respective subsidiaries held by any Participating Holder; provided, however, that the ICO Parties shall be permitted to disclose at any time the aggregate principal amount of and aggregate percentage of Notes that are Held Notes. Notwithstanding anything to the contrary herein, the terms and conditions set forth in this Section shall survive any termination of this Agreement.

11.     Impact of Appointment to Creditors' Committee.  Notwithstanding anything herein to the contrary, if any Participating Holder is appointed to and serves on an official committee of creditors in the Chapter 11 Cases, (a) the terms of this Agreement shall not be construed so as to limit such Participating Holder's exercise (in its sole discretion) of its fiduciary duties to any person arising from its service on such committee, and any such exercise (in the sole discretion of such Participating Holder) of such fiduciary duties shall not be deemed to constitute a breach of the terms of this Agreement, and (b) if such appointment to the official committee of creditors is on account of the Held Notes, such holder may at its discretion terminate this Agreement as to itself by providing written notice to DBSD and counsel to the Participating Holders.

12.     Governing Law; Jurisdiction.

(a)     This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to any conflicts of law provision which would require the application of the law of any other jurisdiction (except for Sections 5-1401 and 5-1402 of the General Obligations Law of the State of New York).  By its execution and delivery of this Agreement, each of the parties hereto hereby irrevocably and unconditionally agrees for itself that any legal action, suit, or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in any federal or state court of competent jurisdiction in the District of New York.

(b)     By execution and delivery of this Agreement, each of the Parties irrevocably accepts and submits itself to the nonexclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding.  Notwithstanding the foregoing consent to New York jurisdiction, upon the commencement of the Chapter 11 Cases, each of the Parties hereby agrees that the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement.

13.     Specific Performance.  It is understood and agreed by each of the Parties hereto that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach.

9

14.     Reservation of Rights.  This Agreement and all transactions contemplated herein are part of a proposed settlement of disputes among the Parties hereto.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of each of the Participating Holders to protect and preserve its rights, remedies and interests, including, without limitation, its claims against DBSD or its full participation in the Chapter 11 Cases.  If the transactions contemplated herein are not consummated, or if this Agreement is terminated, the Parties fully reserve any and all of their rights.  Pursuant to Rule 408 of the Federal Rules of Evidence and any applicable state rules of evidence, this Agreement shall not be admitted into evidence in any proceeding other than a proceeding to enforce its terms.

15.     Fees and Expenses.  DBSD shall pay the fees and expenses of the Participating Holders in connection with the Restructuring, including the advisors to the Participating Holders, who shall be selected by the Participating Holders.  Upon the commencement of the Chapter 11 Cases, DBSD shall, in advance of the filing or filings therefore, pay all accrued and unpaid fees and expenses of UBS Securities LLC and Milbank, Tweed, Hadley & McCloy LLP through the date immediately preceding the anticipated filing date, and provide a customary retainer to such advisors.

16.     Headings.  The headings of the sections, paragraphs, and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereto.

17.     Successors and Assigns.  This Agreement is intended to bind and inure to the benefit of the parties and their respective successors, assigns, heirs, executors, administrators, and representatives; provided, however, that nothing in this Section 17 shall be deemed to permit sales, assignments, or transfers other than in accordance with Section 9 hereof.  The agreements, representations and obligations of the Parties are, in all respects, ratable and several and neither joint nor joint and several.

18.     Notice.  Notices given under this agreement shall be to:

            If to DBSD:

                        DBSD North America, Inc.
                        11700 Plaza America Drive, Suite 1010
                        Reston, Virginia 20190
                        Attention:    John L. Flynn, General Counsel
                        Telephone:  (703) 964-1400
                        Facsimile:    (703) 964-1401

With a copy (which copy shall not constitute notice) to:

       Kirkland & Ellis LLP
       300 North LaSalle
       Chicago, Illinois  60654
       Attention:     James H.M. Sprayregen
                     Marc J. Carmel
       Telephone:    (312) 862-2000
       Facsimile:     (312) 862-2200

       and:

       Davis Wright Tremaine LLP
       1201 Third Avenue
       Seattle, Washington 98101
       Attention:     Julie Weston
                     Sarah English Tune
       Telephone:    (206) 622-3150
       Facsimile:     (206) 757-7161

<u>If to ICO Global</u>:

       ICO Global Communications (Holdings) Limited
       11700 Plaza America Drive, Suite 1010
       Reston, Virginia 20190
       Attention:
       Telephone:    (703) 964-1400
       Facsimile:     (703) 964-1401

With a copy (which copy shall not constitute notice) to:

       Morrison & Foerster LLP
       425 Market Street
       San Francisco, California, 94105
       Attention:     Robert Townsend
       Telephone:    (415) 268-7080
       Facsimile:     (415) 268-7522

<u>If to Any Participating Holder</u>:

       To the names and addresses set forth on the signature pages hereto.

11

With a copy (which copy shall not constitute notice) to:

Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP
1 Chase Manhattan Plaza
New York, New York  10005
Attention:     Thomas C. Janson
Telephone:    (212) 530-5000
Facsimile:     (212) 530-5219

19.    <u>Prior Negotiations</u>.  Except as set forth in the Forbearance Agreement and those certain Confidentiality Agreements entered into by DBSD and certain Holders on April 24, 2009, this Agreement and <u>Exhibit A</u> supersede all prior negotiations with respect to the subject matter hereof.

20.    <u>Consideration</u>.  It is hereby acknowledged by the Parties that, other than the agreements, covenants, representations, and warranties set forth herein and in the Term Sheet and to be included in the Restructuring Documents, no consideration shall be due or paid to the Holders for their agreement to vote to accept the Pre-Arranged Plan in accordance with the terms and conditions of this Agreement.

21.    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same Agreement.

22.    <u>No Third Party Beneficiaries</u>.  Unless expressly stated herein, this Agreement shall be solely for the benefit of the parties hereto and no other person or entity.

23.    <u>No Solicitation; Representation by Counsel</u>.  This Agreement is not and shall not be deemed to be a solicitation for votes in favor of the Pre-Arranged Plan in the Chapter 11 Cases.  Each of the Participating Holders' votes with respect to the Pre-Arranged Plan will not be solicited until such Participating Holder has received the Disclosure Statement.  Each Party acknowledges that it has had an opportunity to receive information from DBSD, and that it has been represented by counsel in connection with this Agreement and the transactions contemplated hereby.  The provisions of this Agreement shall be interpreted in a reasonable manner to effectuate the intent of the Parties.

24.    <u>Severability</u>.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.  The provisions of this Agreement shall be interpreted in a reasonable manner to effect the intent of the Parties hereto.

25.    <u>Amendment, Waiver or Modification</u>.  Except as otherwise expressly set forth herein, this Agreement (including all of its exhibits) and each of its terms and conditions may not be amended, waived or modified in any aspect except in a writing executed by DBSD and the Participating Holders.

NY1:#3510156

DWT 12847612v12 0069251-000010

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

13

**IN WITNESS WHEREOF**, each of the parties hereto has caused this Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

ICO GLOBAL COMMUNICATIONS (HOLDINGS) , INC.

By: _____
Name: Michael P. Corkery
Title: Acting CEO, SVP / CFO

DBSD NORTH AMERICA, INC.

By: _____
Name: Michael P. Corkery
Title: Acting Chief Executive Officer, Executive
Vice President & Chief Financial Officer

DBSD SATELLITE MANAGEMENT LLC

By: DBSD North America, Inc., its sole member

By: _____
Name: Michael P. Corkery
Title: Acting Chief Executive Officer, Executive
Vice President & Chief Financial Officer

DBSD SATELLITE NORTH AMERICA LIMITED

By: _____
Name: Stephen M. De Wees
Title: Director

DBSD SATELLITE SERVICES G.P.

By: DBSD Services Limited, a general partner

By: _____
Name: Stephen M. De Wees
Title: Director

[Support Agreement]

NEW DBSD SATELLITE SERVICES G.P.

By: DBSD Satellite Services G.P., a general partner
By: DBSD Services Limited, a general partner

By: _____
Name: Stephen M. De Wees
Title: Director

DBSD SERVICES LIMITED

By: _____
Name: Stephen M. De Wees
Title: Director

DBSD SATELLITE SERVICES LIMITED

By: _____
Name: Stephen M. De Wees
Title: Director

SSG UK LIMITED

By: _____
Name: Stephen M. De Wees
Title: Director

3421554 CANADA INC.

By: _____
Name: Stephen M. De Wees
Title: Director

**THIS TERM SHEET IS FOR DISCUSSION PURPOSES ONLY AND IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS WITH RESPECT TO ANY RESTRUCTURING OR PLAN OF REORGANIZATION OR AN OFFER OR SOLICITATION FOR THE SALE OF SECURITIES OF ANY KIND.**

*PRELIMINARY INDICATION OF TERMS*
*FOR PROPOSED RESTRUCTURING OF DBSD NORTH AMERICA, INC.*

May 14, 2009

This term sheet ("<u>Term Sheet</u>") describes certain of the principal terms of a proposed restructuring (the "<u>Restructuring</u>") for DBSD North America, Inc. (formerly known as ICO North America, Inc., "<u>DBSD</u>").  DBSD is currently a 99.84% owned subsidiary of ICO Global Communications (Holdings) Limited ("<u>ICO Global</u>" or the "<u>Existing Stockholder</u>").  As described in greater detail herein, the Restructuring shall be consummated through a "Pre-Arranged" chapter 11 Plan of Reorganization (the "<u>Pre-Arranged Plan</u>") pursuant to voluntary chapter 11 petitions for relief to be filed with the United States Bankruptcy Court of the Southern District of New York (the "<u>Bankruptcy Court</u>").  This Term Sheet has been produced for discussion and settlement purposes only.  It is subject to the parties' agreement that it shall not be used as evidence in any litigation and is subject to the provisions of Rule 408 of the Federal Rules of Evidence and other similar applicable rules under federal and state law.

This Term Sheet and the proposals contained herein are subject to, among other conditions, the completion of appropriate legal, financial and other due diligence by the Principal Holders (as defined below) and their legal and financial advisors.  As used herein, the term "<u>Holders</u>" refers to holders of DBSD's outstanding 7.5% Convertible Senior Secured Notes due 2009 (the "<u>Notes</u>"), and the term "<u>Principal Holders</u>" refers to those Holders set forth on <u>Attachment 1</u>, who have engaged in discussions with DBSD and ICO Global with respect to the Restructuring over time, which discussions are reflected in this Term Sheet.

| | |
|---|---|
| **The Restructuring** | The Restructuring set forth in this Term Sheet is intended to be effected through the Pre-Arranged Plan, pursuant to which the Holders, as a class, shall receive shares of common stock of the restructured DBSD (the "<u>Common Stock</u>") representing, in the aggregate, 94.9919% of the Common Stock to be outstanding immediately following the Restructuring, subject only to dilution by the issuance of the Warrants (as defined below). |
| **Implementation of the Restructuring** | DBSD, ICO Global and the Principal Holders shall mutually agree upon the definitive documentation required for the Restructuring (the "<u>Definitive Restructuring Documents</u>"), which shall reflect the terms and conditions set forth herein and such other terms and conditions as shall be acceptable to the Principal Holders, ICO Global and DBSD. |
| | DBSD shall solicit acceptances of a Plan of Reorganization on the terms set forth herein and such other terms as are mutually acceptable to the Principal Holders, ICO Global and DBSD. Such Pre-Arranged Plan shall be approved pursuant to section 1129 of the Bankruptcy Code with respect to all classes of claims and interests. |
| **Other Equity Interests in DBSD** | All options, warrants, and other agreements or rights to acquire DBSD equity interests (including any arising under or in connection with any employment agreement or any incentive plan or any benefit plan or the like) existing prior to the consummation of the Restructuring, shall be cancelled upon the consummation of the Restructuring without any further action or the payment of any consideration. |
| | In connection with the Restructuring, the Existing Stockholder shall receive (i) shares of Common Stock equal to 5.0% of the shares of Common Stock in DBSD to be outstanding immediately following the Restructuring, and (ii) warrants (the "<u>Warrants</u>") to acquire 10.00% of the Common Stock (after taking into account the Common Stock outstanding immediately following the Restructuring). The other shareholders in DBSD shall hold shares of Common Stock following the Restructuring equal to 0.0081% of the Common Stock. |
| | The Warrants shall have an exercise price of $0.01 per share, and shall be exercisable only upon a Valuation Event. The Warrants shall be issued in three tranches and shall be identical except as set forth below: |

      (i)     Warrants representing 5.00% of the Common Stock shall be exercisable if the aggregate Equity Valuation upon a Valuation Event is equal to or greater than $1.0 billion; <u>plus</u>

(ii) Warrants representing 2.50% of the Common Stock shall be exercisable if the aggregate Equity Valuation upon a Valuation Event is equal to or greater than $1.5 billion; plus

(iii) Warrants representing 2.50% of the Common Stock shall be exercisable if the aggregate Equity Valuation upon a Valuation Event is equal to or greater than $2.0 billion.

In the event that the Warrants are extended as described below so that they are exercisable after the second anniversary of the consummation of the Restructuring, the relevant valuation thresholds set forth above shall be increased at the rate of 30% per annum (or portion thereof) beginning on the second anniversary of the consummation of the Restructuring.

The Warrants shall expire on the second anniversary of the consummation of the Restructuring (the "Warrant Term"); provided, that:

(i) if DBSD enters into binding definitive documents (which have been approved by the new board) for the consummation of a Valuation Event prior to the second anniversary of the consummation of the Restructuring, then the Warrant Term shall be extended until the earlier of (a) the closing of such Valuation Event and (b) the termination or abandonment of such Valuation Event (but only with respect to such Valuation Event);

(ii) if DBSD shall have entered into a binding definitive agreement for the consummation of a business combination (which has been approved by the new board of DBSD) with the company that has been identified to the Principal Holders in writing on the date hereof (the "Identified Company") within twelve months of the consummation of the Restructuring, then the Warrant Term shall be extended until the later of (a) the third anniversary of the consummation of the Restructuring, (b) the closing of the transaction with the Identified Company, and (c) the termination or abandonment of the transaction with the Identified Company (but only with respect to such transaction if the event in

clauses (b) or (c) is after such third anniversary);

(iii)    if the Warrant Term has been extended until the third anniversary of the consummation of the Restructuring and DBSD enters into binding definitive documents with respect to a Valuation Event during such time, then the Warrant Term shall be extended until the earlier of (a) the closing of such Valuation Event and (b) the termination or abandonment of such Valuation Event (but only with respect to such Valuation Event).

The Warrants shall provide for appropriate adjustments in the event of stock splits, stock recombination, conversion of the Common Stock into other securities or other similar events.  The Warrants shall be non-transferable and shall contain terms and conditions acceptable to the Principal Holders, ICO Global and DBSD.

"Valuation Event" means a Sale Event, a Public Merger Event, a Qualified Offering, a Liquidation Event or an Asset Sale Event.

"Sale Event" means the cash acquisition by any person of a controlling interest in DBSD.

"Public Merger Event" means any merger, business combination or acquisition involving DBSD, or all or substantially all of the assets of DBSD, where the surviving company or acquiror is a public reporting company and the consideration paid to the stockholders of DBSD consists of equity securities that are listed on a United States national securities exchange.

"Qualified Offering" means a bona fide underwritten public offering by a nationally recognized investment banking firm registered under the Securities Act (i) that results in gross proceeds to DBSD of not less than $150 million; and (ii) following which the Common Stock is listed on a United States national securities exchange.

"Liquidation Event" means the dissolution or liquidation of DBSD.

"Asset Sale Event" means the sale, for cash, of all or substantially all of the assets of DBSD and its subsidiaries, on a consolidated basis.

"Equity Valuation" means the aggregate value for the number of shares of Common Stock outstanding immediately following the Restructuring (appropriately adjusted for stock splits, recombinations and similar events) (the "Original Shares") based on (i) in the case of a Sale Event, the actual value per share received in respect of the Original Shares as a result of the Sale Event; (ii) in the case of a Public Merger Event, the per share VWAP of the equity securities received in such transaction in respect of the Original Shares during

any Reference Period following such Public Merger Event and ending prior to the expiration date of the Warrants; (iii) in the case of a Qualified Offering, the per share VWAP of the Original Shares during any Reference Period following the Qualified Offering and ending prior to the expiration date of the Warrants; (iv) in the case of an Asset Sale Event, the per share value of the Original Shares, after reduction for all liabilities (including contingent liabilities) of DBSD, of the consideration received by DBSD as a result of the sale; and (v) in the case of a Liquidation Event, the per share value of the consideration received by DBSD Stockholders in respect of the Original Shares as a result of the Liquidation Event; in each case increased by the aggregate value of any dividends or distributions made to DBSD stockholders from the date of the consummation of the Restructuring until the Valuation Event.

"Reference Period" means, any period of 40 consecutive trading days during which (a) the equity securities in question during each such day have a daily trading volume not less than $13 million, (b) no Holder is subject to any lock-up or similar agreement which has not fully expired or been terminated, (c) no holder is subject to any "black out" or other trading restriction imposed by the issuer (including as a result of being affiliated with any director or having received any information from DBSD) and (d) the issuer has maintained the effectiveness of a shelf registration enabling all of the Holders to freely transfer shares of Common Stock under the Securities Act of 1933, as amended (the "Securities Act").

| | |
|---|---|
| **Treatment of Other Classes of Claims** | The obligations owed to other creditors of DBSD not specifically addressed herein ("Other Creditors") will remain outstanding under their current terms; provided, that DBSD and the Principal Holders shall mutually agree upon the treatment for the Other Creditors. |
| **Treatment of Auction Rate Securities** | DBSD shall not sell, transfer, liquidate or otherwise monetize (collectively, a "Sale") any Auction Rate Security (as defined in the Forbearance Agreement) without the prior consent of the Principal Holders unless such Sale results in gross proceeds to DBSD of not less than the par or stated value of such Auction Rate Security, provided, however, that DBSD may pledge any Auction Rate Security issued by UBS as collateral to UBS pursuant to the terms of the UBS Facility (as defined in the Forbearance Agreement), and the Principal Holders agree to take such other action reasonably necessary to effect their consent to the action set forth in the foregoing proviso. |

| | |
|---|---|
| **Working Capital** | DBSD's working capital needs are to be met based on best market option/capital raising options. The existing working capital facility may be refinanced in whole or in part by an affiliate of ICO Global, but (i) the terms and conditions of any such refinancing must be acceptable to the Principal Holders and (ii) all Holders must be offered a pro rata right to participate in any such refinanced working capital facility. |
| **Board of Directors of Restructured DBSD** | The Board of Directors of DBSD shall be comprised of five to ten members, with one member being designated by the Existing Stockholder, and the remaining members being designated by the Holders in their sole discretion on terms to be negotiated among the Holders. |
| | Each new Board member shall be entitled to execute a D&O Indemnification Agreement in form reasonably acceptable to such member and DBSD upon his or her appointment. |
| **Transition Services** | The provision of transition services by DBSD to ICO Global and vice versa to be formalized in a transition services agreement. The agreement shall provide for appropriate transition periods and that all third party services shall be passed through at cost. |
| **Registration Rights Agreement** | DBSD shall execute a registration rights agreement in form and substance mutually acceptable to the Principal Holders and the Existing Stockholder upon consummation of the Restructuring. |
| **Stockholders' Agreement** | A Stockholders' Agreement in form and substance mutually acceptable to the Principal Holders and the Existing Stockholder shall have been executed by DBSD, the Holders and the Existing Stockholder on or prior to the consummation of the Restructuring. The Stockholder Agreement will provide that the Holders will agree to vote their respective shares against any proposed reverse stock split, merger or recapitalization that results in a "squeeze out" or cancellation of any Warrants or Common Stock held by the Existing Stockholder unless such transaction provides for the receipt of consideration of the same type and amount, on a per share basis, by all outstanding shares of Common Stock of DBSD (it being understood that any such transaction may provide for per share consideration below any of the valuation thresholds for the exercise for the Warrants, in which case the holders of the Warrants would not be entitled to exercise the Warrants in connection with any such transaction). |

| | |
|---|---|
| **Agreements with "Insiders"** | Any and all agreements with any insider, except for those specifically agreed to in writing by the Principal Holders, shall be terminated on or before the consummation of the Restructuring and all accrued but unpaid amounts owing to them (except for unpaid salary and amounts owing pursuant to any then existing employment agreements) shall be waived upon consummation of the Restructuring. |
| **Drag/Tag Rights/Preemptive Rights in the Stockholders Agreement** | The Existing Stockholder will have customary tag-along rights with respect to certain sales by the Holders. The Holders will have customary drag-along right to cause the Existing Stockholder to participate in certain sales by the Holders. |
| | The Holders and the Existing Stockholder will have preemptive rights with respect to the issuance of new equity securities of DBSD (subject to customary carve-outs). |
| **Charter Documents** | All charter documents for DBSD to be satisfactory to DBSD, ICO Global and the Principal Holders. |
| **Mechanics** | The parties shall agree upon the precise mechanics for implementing each of the transactions contemplated by the Restructuring and the Pre-Arranged Plan. |
| **Documentation** | All documentation prepared in connection with the Restructuring, including without limitation, the Definitive Restructuring Documents, and any documents, motions, pleadings, orders or the like prepared or filed in connection with the chapter 11 cases shall be in form and substance satisfactory to the Principal Holders, ICO Global and DBSD. |
| **Releases** | The Holders shall provide a release to the Existing Stockholder and existing directors and officers and their respective affiliates and advisors. DBSD and its affiliates, including ICO Global, shall execute a release of any claims they may have against the Holders, their respective officers and directors and their respective affiliates and advisors. |
| **Tax Issues** | Parties to discuss methods to preserve value of available NOLs and other tax considerations. |

| | |
|---|---|
| **Fees & Expenses** | DBSD shall pay the fees and expenses of the Holders in connection with the Restructuring, including the advisors to the Holders, who shall be selected by the Principal Holders.  DBSD shall, in advance of any chapter 11 filings, pay all invoiced accrued and unpaid fees and expenses of UBS and Milbank Tweed through the date immediately preceding the anticipated filing date, and provide a customary retainer to such advisors. |
| **Strategic Discussions** | To the extent that DBSD or ICO Global have discussions with any third party concerning any business combination or other strategic transaction involving DBSD or any significant portion of its assets (a "Strategic Transaction"), the Principal Holders' advisors, specifically UBS and Milbank Tweed, shall be entitled to participate in any such discussions, subject to required confidentiality arrangements (which shall provide that the advisors may receive information and participate in such discussions if they enter into a customary confidentiality arrangement).  Neither DBSD nor ICO Global shall enter into any binding agreement or commitment with respect to any Strategic Transaction, including any agreement or commitment obligating DBSD to pay or reimburse expenses, break-up fees or other fees without the prior consent of the Principal Holders. |
| **No Waiver** | Nothing herein shall affect in any way, nor be deemed a waiver of, any of the rights of DBSD or any Holder under the indenture for the Notes or any other document or under applicable law.  Nothing herein is intended to waive, limit, or restrict the ability of any of the foregoing parties, in whatever capacity, to protect and preserve their rights, remedies and interests against DBSD or any third party, whether under the indenture for the Notes, any other document or applicable law. |

**Principal Holders**

GOLDENTREE

GOLDMAN SACHS & CO

OCH-ZIFF CAPITAL MANAGEMENT GROUP

PLAINFIELD ASSET MANAGEMENT

RAPTOR GROUP

HIGHLAND CAPITAL MANAGEMENT