UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

―――――――――――――――――――――――――

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| DBSD NORTH AMERICA, INC., *et al.*, | ) |  |
|  | ) | Case No. 09-13061 (REG) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |

―――――――――――――――――――――――――

BENCH DECISION[1] ON DEBTORS' OBJECTION
TO PROOFS OF CLAIM FILED BY SPRINT
NEXTEL CORPORATION

APPEARANCES:

K&L GATES LLP
*Counsel to Sprint Nextel Corporation*
Hearst Tower, 47th Floor
214 North Tryon Street
Charlotte, North Carolina  28202
By:    John H. Culver III, Esq.
         Felton E. Parrish, Esq.
         Eric Moser, Esq.

KIRKLAND & ELLIS LLP
*Attorneys for the Debtors and Debtors in Possession*
Citigroup Center
153 East 53rd Street
New York, New York  10022-4611
By:    James H.M. Sprayregen, P.C., Esq.
         Christopher J. Marcus, Esq.

-and-

―――――――――――――――――――――――

[1]    I use bench decisions to lay out in writing decisions that are too long, or too important, to dictate in open court, but where the circumstances do not permit more leisurely drafting or more extensive or polished discussion. Because they often start as scripts for decisions to be dictated in open court, they typically have less in the way of citations and footnotes, and have a more conversational tone.

KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois  60654
By:    Marc J. Carmel, Esq.
        Sienna R. Singer, Esq.

-and-

KIRKLAND & ELLIS LLP
655 Fifteenth Street N.W.
Washington, D.C.  20005
By:    Jeffrey Bossert Clark, Esq.

NEIGER LLP
*Proposed Conflicts Counsel to the Official*
*Committee of Unsecured Creditors*
111 John Street, Suite 800
New York, New York  10038
By:    Edward E. Neiger, Esq.
        Karl Schaffer, Esq.
        Mark Taub, Esq.

PREET BHARARA
*United States Attorney for the*
*  Southern District of New York*
*Counsel to the Federal Communications Commission*
86 Chambers Street
New York, New York  10007
By:    Benjamin H. Torrance, Esq.

BEFORE:    ROBERT E. GERBER
            UNITED STATES BANKRUPTCY JUDGE

In this contested matter under the umbrella of the jointly administered chapter 11

cases of DBSD North America, Inc. (**"DBSD"**) and its affiliates, Sprint Nextel

Corporation (**"Sprint"**) asserts claims (the **"Sprint Claims"**) against each of the separate

Debtors in this case, based on contentions of joint and several liability.  The Debtors

object to those claims, insofar as they are asserted against Debtor entities other than New

DBSD Satellite Services G.P. (**"New Satellite Services"**).

In response, Sprint invokes the doctrine of primary jurisdiction and asks me to abstain from determining the matter of claims allowance, in favor of referring the joint and several liability issue to the Federal Communications Commission (the **"FCC"**).

Sprint filed a motion to withdraw the reference under 28 U.S.C. § 157(d), seeking to have the District Court determine whether a primary jurisdiction referral of the joint and several liability issue to the FCC was warranted. However, consistent with Fed.R.Bankr.P. 5011(c),[2] I declined to stay the claims allowance proceedings in this Court pending the District Court's determination of the withdrawal of the reference motion, and in any event, shortly before this decision was finalized, the District Court determined that the reference would not be withdrawn.

On the threshold issue of whether the FCC has primary jurisdiction and is therefore the proper authority to determine the allowance of claim issue, I rule that the FCC does not have primary jurisdiction. On the merits, I find that the Debtors other than New Satellite Services are not jointly and severally liable for any reimbursement obligations to Sprint. As described more fully below:

(1) Determining the right of a party to assert a claim against a debtor is a classic function of the Bankruptcy Court, and the non-governmental nature of the creditor and the private nature of the liability to be determined presents issues different from the government's concerns vis-à-vis spectrum allocation in this

---

[2]    Fed.R.Bankr.P. 5011(c) provides, in relevant part:

> The filing of a motion for withdrawal of a case or proceeding or for abstention pursuant to 28 U.S.C. § 1334(c) shall not stay the administration of the case or any proceeding therein before the bankruptcy judge except that the bankruptcy judge may stay, on such terms and conditions as are proper, proceedings pending disposition of the motion.

case.  Therefore, I do not defer to the FCC to determine the joint and several liability issue;

(2)  In the absence of any current FCC order or regulation providing for joint and several liability for reimbursement obligations for band-clearing, any future determination on the issue by the FCC would be done through rulemaking (which could only have a prospective effect) and not adjudication—having no legally cognizable bearing on the presently existing rights of Sprint to assert claims against any of the Debtors under the theory of joint and several liability; and

(3)  As no current FCC rule or regulation imposes joint and several liability on corporate affiliates of a licensee for reimbursement costs for band-clearing, and no facts have been presented to warrant disregarding the common law rule that parents are not liable for the obligations of their subsidiaries, there is no basis on which to impose liability on any of the Debtors in this case other than New Satellite Services.

My Findings of Fact and Conclusions of Law in connection with these determinations follow.

<u>Findings of Fact</u>[3]

In or around 2004, Sprint entered into an arrangement with the FCC in which Sprint obtained the right to use the spectrum in the 2 GHz band.  Around the same time, the FCC issued the order *Improving Public Safety Communications in the 800 MHz Band; Consolidating the 800 and 900 MHz Industrial/Land Transportation and Business*

---

[3]    Pursuant to the parties' agreement and the provisions of Case Management Order #1, all of the facts (but not necessarily arguments and conclusions) in the declarations submitted to me have been taken as true.

*Pool Channels*[4] (the **"800 MHz Order"**).  Pursuant to the 800 MHz Order, Sprint is

authorized and obligated to relocate Broadcast Auxiliary Service (**"BAS"**) licensees from

the 1990-2025 MHz spectrum band, in order to promote more efficient use of the

spectrum and to permit the entry of new services, including Mobile-Satellite Service

(**"MSS"**).   Also pursuant to the 800 MHz Order, MSS operators that subsequently enter

the spectrum band being cleared by Sprint are obligated to reimburse Sprint for their pro

rata share of Sprint's cost of clearing the spectrum band.  At this point, three operators

share or will share the 2 GHz band:  Sprint, New Satellite Services, and Terrestar

Networks, Inc. (**"Terrestar"**).

     The right to use that 2 GHz band will be very valuable.  The FCC valued Sprint's

interest in the spectrum it would receive at $4.86 billion.[5]  Once the band-clearing is

complete, Sprint is required to make a "true-up" or "anti-windfall" payment to the United

States Treasury of roughly $2.8 billion (the **"$2.8 Billion True-Up"**), representing the

difference in value between the 800 MHz and the 2 GHz bands.  Under this arrangement,

Sprint is permitted to deduct from the $2.8 Billion True-Up that Sprint must pay the

Government any costs that Sprint bears in clearing the 800 MHz band.  Alternatively,

Sprint is permitted, under certain circumstances, to seek reimbursement from other MSS

entrants for their pro rata share of eligible band-clearing costs, in lieu of receiving a credit

---

[4]     Report and Order, Fifth Report and Order, Fourth Memorandum Opinion and Order, and Order, 19 FCC Rcd 14969 (2004).

[5]     *See Improving Public Safety Communications in the 800 MHz Band, Report and Order and Order and Further Notice of Proposed Rulemaking*, WT Docket No. 02-55 and ET Docket Nos. 00-258 and 95-18, FCC 09-49 (2009) (the **"June 12th Order"**) at ¶ 67.

against the $2.8 Billion True-Up.[6]  In the June 12 Order, the FCC elaborates that Sprint may obtain cost sharing from "entrants when those licensees 'enter the band.'"[7]

New Satellite Services is one such MSS entrant, and one of the two licensees other than Sprint.  Prior to the filing of this case, Sprint commenced an action against New Satellite Services in the Eastern District of Virginia for reimbursement of such band-clearing expenses described above (the **"Reimbursement Litigation"**).  But Sprint did not assert claims in the Reimbursement Litigation against any of New Satellite Services' corporate affiliates under the theory of joint and several liability.  Upon motion in that litigation, the District Court referred certain issues to the FCC on the ground that the FCC would have primary jurisdiction.  Sprint's subsequent request that the FCC issue a declaratory order finding New Satellite Services liable for the amounts claimed in the lawsuit also did not include claims based on joint and several liability.

The Reimbursement Litigation has been stayed in the Virginia District Court pending the FCC's decision on those issues.  In the June 12 Order, the FCC declined to resolve Sprint's request for a declaratory order (an adjudicative function) and proposed a new additional *rule* related to the reimbursement obligation.  The FCC has tentatively, but only tentatively, concluded, among other things, that MSS entrants must reimburse Sprint when they "enter the band"[8]—a different question.  But the relevant FCC orders did not mention "joint and several liability" or a synonym for that expression, and the FCC did not expressly define what "entrants" means.  That left open the possibility for

---

[6]    *See* 800 MHz Order at ¶ 261 ("[T]he first entrant may seek reimbursement from subsequently entering licensees for a proportional share of the first entrant's costs in clearing BAS spectrum, on a *pro rata* basis according to the amount of spectrum each licensee is assigned.").

[7]    *See* June 12 Order at ¶ 82.

[8]    June 12 Order at ¶ 82.

the dispute we have here:  between Sprint and the Debtors as to whether "entrants" simply means the licensees who would now have the rights to use the 2 GHz band—i.e. Sprint, New Satellite Services, and Terrestar—or means each of the individual companies in those three corporations' corporate families with any role in satellite operations.

In its most recent comments in response to the June 12 Order,[9] Sprint asserted that the reimbursement obligation of Terrestar and New Satellite Services to Sprint should be shared by the affiliates and parents of those entities.  Sprint has conceded in proceedings before me that "there is nothing in the [FCC] orders that say that there is joint and several liability."[10]  But on the theory that "entrants" is subject to a broad definition including corporate affiliates, Sprint argues here that all of the Debtors are jointly and severally liable for any reimbursement obligation that is owed to Sprint (the **"Reimbursement Claim"**).  Sprint argues that the terms "entrants" and "operators" in the June 12 Order must mean more than New Satellite Services itself, because New Satellite Services cannot operate an entire system of ancillary terrestrial component devices without support from other Debtor affiliates.

Accordingly, on June 25, 2009, Sprint filed nine identical proofs of claim against each of the Debtors in the amount of approximately $211 million each.  Though these claims would be asserted separately against each of the estates, the claims together would amount to approximately $1.9 billion.  That is so even though the aggregate amount expended to date by Sprint in clearing the band appears to have been between $550 and $600 million; only 57% of that would have to be shared by the other MSS entrants New Satellite Services and Terrestar, and the New Satellite Services share of that would be no

---

[9]      Taking comments is an element of rulemaking under applicable administrative law.

[10]     *See* 8/30/09 Hr'g Tr., at 49:12-13.

more than $300 million.  It appears that Sprint is including in its claim asserted

reimbursement entitlements for sums it has not yet spent, it if ever will.  It also appears

that Sprint has not taken into account its ability to offset sums spent clearing the 2GHz

band against the $2.8 billion it owes the Government pursuant to the $2.8 Billion True-

Up or Payment.

Sprint asks me to defer further consideration of the Debtors' objection its claims

pending the FCC's determination of Sprint's contentions.  At the August 20 hearing on a

variety of issues in these chapter 11 cases (Sprint's motions for temporary allowance of

claims for voting purposes and for a stay pending the withdrawal of the reference motion,

and the Debtors' objection to Sprint's claims,) the FCC (represented by the local U.S.

Attorney's Office) attended.  Near the conclusion of argument, the FCC entered the

dispute on the claims allowance matter before me (having failed to file a brief or any

other papers before the hearing), siding with Sprint on the primary jurisdiction issue.

I permitted the FCC to submit a late brief on its primary jurisdiction contentions,

and it did so.  In that brief, filed after the August 20 hearing, the FCC contended that it

should have primary jurisdiction over the issue of joint and several liability, and stated

that it intended to decide the issues now before me as part of a rulemaking proceeding.[11]

It is significant, in my view, that in addressing the issue of joint and several liability, the

FCC would proceed by *rulemaking*, rather than through an adjudicative process.

---

[11]     *See* FCC Br. at 15 ("the Commission currently intends to handle it as part of the ongoing
         rulemaking proceeding"); *id.* at 15-16 (deciding the matter could be "accomplished either as part
         of the final rule or as a separate order within the *rulemaking proceeding* clarifying the existing
         rules and orders") (emphasis added in each case).

Discussion

I.

Claims Allowance Function

As a preliminary matter, we start with the recognition that determination of the Debtors' liability to Sprint involves a classic function of the Bankruptcy Court—the determination of the allowance of a creditor's claims against a debtor. Because the determination requires so basic a Bankruptcy Court function, and indeed is a core matter, in order for me to abstain from making that determination, there must be some reason that a Bankruptcy Court cannot decide this particular issue of claims allowance, as Bankruptcy Courts routinely do.

II.

Primary Jurisdiction

"No fixed formula exists for applying the doctrine of primary jurisdiction."[12] While analysis is on a case-by-case basis, the Second Circuit's inquiry generally has focused on four factors:

> (1) whether the question at issue is within the conventional experience of judges or whether the question involves technical or policy considerations within the agency's particular field of expertise;
>
> (2) whether the question at issue is particularly within the agency's discretion;
>
> (3) whether there is a substantial danger of inconsistent rulings; and

---

[12] *United States v. W. Pac. R.R. Co.,* 352 U.S. 59, 64 (1956) ("**Western Pacific**"); *Ellis v. Tribune Television Co.*, 443 F.3d 71, 82 (2d Cir. 2006) ("***Ellis***") (quoting *Western Pacific*).

(4) whether a prior application to the agency has been made.[13]

"The court must also balance the advantages of applying the doctrine against the potential costs resulting from complications and delay in the administrative proceedings."[14]  Here the four factors articulated by the Circuit in *Ellis* and *National Communications Association,* and the advantages-costs balancing also required under those cases, require *this Court* to determine the joint and several liability issue, making primary jurisdiction referral inappropriate here.

1. *Within Conventional Experience of Judges*

The first factor is whether the question at issue is within the conventional experience of judges, or rather involves technical or policy considerations within the agency's particular field of expertise.  Here the "question at issue" is, of course, whether claims should be allowed in a bankruptcy case against various of the debtors, based on contentions that they are liable under contentions of joint and several liability, including Sprint arguments that the word "entrants" as used in the FCC's earlier orders means all of the entrants' corporate affiliates.

The issue of joint and several liability doesn't go to spectrum allocation, the extent to which existing spectrum occupants can be pushed out, or the amount entrants must pay for the right to utilize the spectrum.  Assuming, as I do, that issues of this character would be beyond most judges' conventional experience or expertise, issues of that character are not what I'd be required to decide.

---

[13]     *See Ellis,* 443 F.3d at 82-83 (2d Cir. 2006); *Nat'l Communic'ns Ass'n v. AT&T Co.*, 46 F.3d 220, 222 (2d Cir. 1995) ("***National Communications Association***").

[14]     *National Communications Association*, 46 F.3d at 223; *Ellis,* 443 F.3d at 83 (in each case citing *Ricci v. Chicago Mercantile Exchange*, 409 U.S. 289, 321 (1973) (Justices Marshall, Douglas, Stewart and Powell, dissenting).

Matters of construction of the language appearing in statutes, regulations and

orders are well within the conventional experience of judges.  And indeed, construing

such language is a routine and commonplace aspect of the jobs we judges do.  Deciding

questions as to what the FCC previously said; whether that gave rise to claims against

various debtors in these chapter 11 cases; and whether other bases in law exist for

imposing joint and several liability falls well within the traditional functions of a

Bankruptcy Judge.

2.  *Particularly Within Agency's Discretion*

The second factor asks the court to consider whether the question at issue is

particularly within the agency's discretion.  Here it is not.  Significantly, the FCC doesn't

suggest that it would be engaging in an *adjudication* as to the meaning of one or more of

its earlier orders.  Rather, it would be engaging in *rulemaking*—a fundamentally different

undertaking—which could add to the universe of entities that might have liability to

Sprint.  Presumably, deciding whether to enact new rules is indeed an appropriate matter

for agency discretion, and I wouldn't be so presumptuous as to tell the FCC what it

should do with respect to any new rules it might wish to enact for the future.  But the

question at issue here isn't with respect to what the FCC might enact for the future, but

what it *already had provided,* and how I should decide a claims allowance matter now

before me.

The FCC couldn't retroactively add or change the rules to impose joint and

several liability on parties if they did not have such liability as of the time that matters.

The "time that matters" is the Filing Date. [15]  To retroactively change any of the Debtors'

liability would violate the Debtors' administrative law right to adequate notice,[16] and,

more fundamentally here, would run contrary to fundamental principles under the

Bankruptcy Code.[17]  The positions of Sprint and the FCC are particularly problematic, as

matters of both bankruptcy and administrative law, when they propose that the FCC, by

its rulemaking in the future, could and should interject itself into the claims allowance

process, where claims are determined as of the Filing Date.[18]

Sprint maintains that it only seeks the FCC's interpretation of existing FCC rules

and orders, and that it is not asking the FCC to change the rules under the FCC's

rulemaking authority.  However, the FCC has unambiguously stated that it will proceed

under its rulemaking authority,[19] and as Sprint has acknowledged, the FCC's existing

orders do not address joint and several liability.  What Sprint and the FCC are actually

proposing, then, is that by rulemaking, one or more *new* rules addressing joint and several

liability might be put into effect—whether under the rubric of "clarifying" a rule that said

nothing of the kind, or (perhaps less disingenuously) by creating new rights and

liabilities.  As previously noted, any new rulemaking could not affect Sprint's claims

---

[15]     *See* Bankruptcy Code section 502(b) (with exceptions not relevant here, if objection to a claim is
made, "the court, after notice and a hearing, shall determine the amount of such claim in lawful
currency of the United States *as of the date of the filing of the petition*") (emphasis added).

[16]     *See, e.g.,  Satellite Broad Co. v. FCC*, 824 F.2d 1, 3 (D.C. Cir. 1987) ("Traditional concepts of due
process incorporated into administrative law preclude an agency from penalizing a private party
for violating a rule without first providing adequate notice of the substance of the rule.").  To
make the Debtors retroactively liable for claims totaling over $1 billion based on after the fact
rulemaking would suffer from that same infirmity.

[17]     *See* n.15 *supra*.

[18]     *See Jahn v. 1-800-FLOWERS.com, Inc*., 284 F.3d 807, 810 (7th Cir. 2002) ("No statute authorizes
the [FCC] to adopt regulations with retroactive effect . . . ."), *cert. denied*, 537 U.S. 882 (2002).

[19]     *See* n.11 *supra*.

against the Debtors, as those claims must be determined "as of the date of the filing of the petition."[20]

### 3. *Substantial Danger of Inconsistent Rulings*

The third factor is whether there exists a substantial danger of inconsistent rulings. Here there is no such danger. The Creditors' Committee correctly observes that there is no danger of inconsistent rulings on the issue of joint and several liability, as the FCC has not spoken on that matter, and any future rulemaking on the topic could have no bearing on the case before the Court. The possibility of a future rulemaking is an insufficient ground to prevent a Bankruptcy Court from doing what it is statutorily charged to do—which includes, among other things, determining creditors' entitlements to the allowance of claims, and taking other steps to conduct a chapter 11 case in a timely and efficient manner.

### 4. *Prior Application to Agency*

The fourth factor is whether a prior application to the agency has been made. But Sprint first raised the issue of joint and several liability with the FCC in its comments to the FCC's proposed rulemaking at a time when the issue was already before this Court. If there were an adjudicative proceeding already before the FCC when the Debtors' chapter 11 cases were filed, I might well give serious consideration to deferring to the FCC. But here we have no more than a rulemaking, which as relevant here cannot be retroactive, requested after the time by which the Debtors' liability to Sprint was fixed.

---

[20]    Bankruptcy Code section 502(b).

In addition, as the Creditors' Committee points out, although Sprint was engaged in prepetition litigation in the Eastern District of Virginia, it waited until a very late stage of the Debtors' bankruptcy cases to raise the issue joint and several liability.

This factor likewise does not support primary jurisdiction.

5.  *Balancing Advantages Against Potential Costs of Complications and Delay*

Finally, the unnumbered factor articulated by the Circuit—"balanc[ing] the advantages of applying the doctrine against the potential costs resulting from complications and delay in the administrative proceedings"—compels rejecting assertions of primary jurisdiction here.

Even if the FCC could somehow change the rights and responsibilities of Debtors back on the Filing Date with respect to Sprint's Reimbursement Claim, referring the issue to the FCC for rulemaking would grossly interfere with the bankruptcy process. Rulemaking proceedings in the FCC are a notoriously slow process.  The FCC's own brief describes rulemaking proceedings relevant to these issues that started in 1992 (17 years ago),[21] and I find it surprising, at the least, when the FCC says that concerns in this regard are "speculative."[22]  Given that history, and the nature of the rulemaking process, it is at least foreseeable, if not also certain, that if I were to await the conclusion of rulemaking in the FCC, determination of the issues now before me would take months or years.

I also find it more than a little offensive for the FCC to suggest that the time its rulemaking would take is "irrelevant to the primary jurisdiction question."[23]  As

---

[21]     *See* FCC Br. at 2 nn. 2, 3, 5, 6, 8.

[22]     FCC Br. at 14.

[23]     *Id.*

previously noted, the Second Circuit has at least twice held that "[t]he court must also balance the advantages of applying the [primary jurisdiction] doctrine against the potential costs resulting from complications and delay in the administrative proceedings."[24]  Referring the issue to the FCC for future rulemaking would have a significant adverse impact on the administration of these chapter 11 cases, and have a dramatic adverse impact on the other unsecured creditors in this case.  I find compelling the Committee's argument that a referral to the FCC would upset the reasonable expectations of unsecured creditors as to the receipt of their distributions under the Debtors' plan of reorganization.  Since the amount of the Sprint Claims is so substantial, if the issue of joint and several liability were referred to the FCC, awaiting the conclusion of the FCC's rulemaking would require the creation of distribution reserves so huge as they would effectively preclude any distributions to unsecured creditors.  The Debtors would almost certainly need to wait for a decision on that issue before making any distribution.

        And here there would be little or no harm to any of the parties from this Court deciding the issue.  This Court routinely determines whether debtors are liable to parties-in-interest, and the nature and amount of any such liability.  Assessment of the liability of debtors to their creditors is a traditional function of the Bankruptcy Court, and the facts here don't present the kind of exceptional circumstance in which it might be appropriate to refer a matter of claims allowance to a federal administrative agency.

---

[24]        *See* n.14 *supra*.

## III.

## Joint and Several Liability on the Merits

Upon considering the merits, Sprint's claims against Debtors in this case other

than the licensee, New Satellite Services, must be disallowed.  Under the current FCC

regulations and orders, other "entrants" are potentially liable to Sprint for reimbursement

for the cost of clearing the band.  While "entrants" is not defined in the June 12 Order, its

natural meaning is that it refers to the three licensees who will be given the rights to

operate in the 2 GHz band—Sprint, New Satellite Services and Terrestar—not any of

their corporate affiliates who might be assisting those licensees in conducting their

operations.

Review of the context in which "entrants" was used in the June 12 Order with

respect to the 2 GHz band compels the conclusion that "entrants" was intended to refer to

Sprint (which might well have its own corporate affiliates with whose assistance Sprint

does business) and other *licensees*, like New Satellite Services and Terrestar—without

intending the term "entrants" to refer to company-by-company affiliates of the licensees.

For example, Paragraph 70 of the June 12 Order shows how "entrants" is synonymous

with licensees, as both words were used without distinctions in a single sentence:  "As

with the MSS *entrants*, Sprint Nextel 'is entitled to seek *pro rata* reimbursement of

eligible clearing costs incurred during its 36-month 800 MHz reconfiguration period from

AWS *licensees* that enter the band prior to the end of that period.'"[25]  The two words'

---

[25]     *See* June 12 Order, ¶ 70 (emphasis added).  The inference is compelling that "entrants" was used
in other orders in the same way.  See, for example, the June 12 Order, paragraph 67:
"Responsibility for BAS relocation would be shared between the MSS entrants and the other new
entrants to the band."; paragraph 68:  "[T]he Commission provided that the earlier *entrant* to the
band who relocated BAS, *whether Sprint Nextel or MSS*, could receive reimbursement from a later
*entrant* for the band clearing costs . . . ." (emphasis added); and "We note that when Sprint Nextel
undertook its commitment to relocate the BAS *licensees*, the Commission did not, as discussed

-16-

synonymous nature is apparent once more in Paragraph 82 of the June 12 Order, when it

says that Sprint may obtain cost sharing from "*entrants* when *those licensees* 'enter the

band.'"[26]  And the June 12 Order provides that "an MSS entrant will have entered the

band and incurred a cost sharing obligation when it certifies that *its satellite* is operational

for purposes of meeting its operational milestone."[27]  Drafting this paragraph in this

fashion is inconsistent with the notion that "entrants" was intended to cover separate

corporate affiliates providing services with respect to a single satellite.

Piercing the corporate veil is the exception and not the rule.  As a matter of

common law, unless changed by statute, corporate parents, subsidiaries or sister

corporations are not liable for the other separate entities' liabilities.[28]  When joint and

several liability is imposed—as it is, for example, under ERISA—statutes so provide and

do so unequivocally.  As the Supreme Court noted in *United States v. Bestfoods*, the

failure of the statute to speak to a matter as fundamental as the liability implications of a

corporate ownership demands application of the rule that "to abrogate a common-law

principle, the statute must speak directly to the question addressed by the common

law."[29]  The FCC orders do not "speak directly" to imposing such a fundamental

change—even if, arguendo, they do so at all.  Imposing joint and several liability on

corporate affiliates is such a major change from the normal rule that it cannot lightly be

---

above, remove the obligation of the MSS *entrants* to relocate the licensees . . . ." (emphasis added).

[26]  Emphasis added.

[27]  *Id.* at ¶ 91 (emphasis added).

[28]  *See United States v. Bestfoods*, 524 U.S. 51, 61 (1998) ("It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries.") (internal citations omitted).

[29]  *Id.* at 52.

presumed.  In the absence of language in the FCC's rules and regulations imposing joint

and several liability, there is no reason to impose such liability on the Debtors.

<u>Conclusion</u>

For the foregoing reasons, I rule that primary jurisdiction referral of the issue of

the Debtors' joint and several liability to the FCC is inappropriate, and that no basis

exists under the facts as they have been presented to impose joint and several liability on

the Debtors.  Sprint's claims against any Debtor entities other than New Satellite Services

are disallowed.

SO ORDERED.

Dated: New York, New York          *__s/Robert E. Gerber___*
        September **__30__**, 2009         United States Bankruptcy Judge