James H.M. Sprayregen, P.C.
Christopher J. Marcus
KIRKLAND & ELLIS LLP
Citigroup Center
601 Lexington Avenue
New York, New York  10022-4611
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

- and -

Marc J. Carmel
Lauren M. Hawkins
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

Counsel to the Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DBSD NORTH AMERICA, INC., *et al.*,[1] | ) | Case No. 09-13061 (REG) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**NOTICE OF DEBTORS' MOTION FOR ENTRY OF AN ORDER (A) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING ON A SECOND LIEN, SECURED SUPERPRIORITY BASIS AND (B) GRANTING RELATED RELIEF**

PLEASE TAKE NOTICE that a hearing (the "**Hearing**")[2] on the Debtors' Motion for

Entry of an Order (a) Authorizing the Debtors to Obtain Postpetition Financing on a Second

---

[1]  The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are:  DBSD North America, Inc. (6404); 3421554 Canada Inc. (4288); DBSD Satellite Management, LLC (3242); DBSD Satellite North America Limited (6400); DBSD Satellite Services G.P. (0437); DBSD Satellite Services Limited (8189); DBSD Services Limited (0168); New DBSD Satellite Services G.P. (4044); and SSG UK Limited (6399).  The service address for each of the Debtors is 11700 Plaza America Drive, Suite 1010, Reston, Virginia 20190.

[2]  Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion.

Lien, Secured Superpriority Basis and (b) Granting Related Relief (the "**Motion**"), will be held before the Honorable Robert E. Gerber, United States Bankruptcy Judge, in Courtroom No. 621 of the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004-1408, on **October 27, 2009 at 11:00 a.m. (prevailing Eastern Time)**.

PLEASE TAKE FURTHER NOTICE that any responses or objections to the Motion must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and the Local Rules for the United States Bankruptcy Court for the Southern District of New York (the "**Local Rules**"), and shall be filed with the Bankruptcy Court electronically by registered users of the Bankruptcy Court's case filing system (the User's Manual for the Electronic Case Filing System can be found at www.nysb.uscourts.gov, the official website for the Bankruptcy Court) and, by all other parties in interest, on a 3.5 inch disk, in text-searchable Portable Document Format (PDF), Wordperfect or any other Windows-based word processing format (in either case, with a hard-copy delivered directly to Chambers), and shall be served upon (a) the Debtors and their counsel, (b) the Office of the United States Trustee for the Southern District of New York, (c) counsel to the official committee of unsecured creditors, (d) counsel to DISH Network Corporation, (e) counsel to the ad hoc committee of Senior Noteholders, (f) all known Senior Noteholders, (g) the Internal Revenue Service, (h) the Securities and Exchange Commission, and (i) the parties in interest who have formally requested notice by filing a written request for notice, pursuant to Bankruptcy Rule 2002, so as to be actually received **no later than October 23, 2009 at 4:00 p.m. (prevailing Eastern Time)**. Only those responses that are timely filed, served and received will be considered at the Hearing.

K&E 15736975.3

Failure to file a timely objection may result in entry of a final order granting the Motion as requested by the Debtors.

New York, New York
Dated:  October 12, 2009

/s/ *Marc J. Carmel*

James H.M. Sprayregen, P.C.
Christopher J. Marcus
KIRKLAND & ELLIS LLP
Citigroup Center
601 Lexington Avenue
New York, New York  10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

- and -

Marc J. Carmel
Lauren M. Hawkins
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

Counsel to the Debtors
and Debtors in Possession

James H.M. Sprayregen, P.C.
Christopher J. Marcus
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022-4611
Telephone:   (212) 446-4800
Facsimile:   (212) 446-4900

- and -

Marc J. Carmel
Lauren M. Hawkins
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:   (312) 862-2200

Counsel to the Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | )   Chapter 11 |
| | ) |
| DBSD NORTH AMERICA, INC., *et al.*,[1] | )   Case No. 09-13061 (REG) |
| | ) |
| Debtors. | )   Jointly Administered |
| | ) |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER (A) AUTHORIZING**
**THE DEBTORS TO OBTAIN POSTPETITION FINANCING ON A SECOND LIEN,**
**SECURED SUPERPRIORITY BASIS AND (B) GRANTING RELATED RELIEF**

---

[1]   The Debtors in these chapter 11 cases (the "**Chapter 11 Cases**"), together with the last four digits of each Debtor's federal tax identification number, are: DBSD North America, Inc. (6404); 3421554 Canada Inc. (4288); DBSD Satellite Management, LLC (3242); DBSD Satellite North America Limited (6400); DBSD Satellite Services G.P. (0437); DBSD Satellite Services Limited (8189); DBSD Services Limited (0168); New DBSD Satellite Services G.P. (4044); and SSG UK Limited (6399). The service address for each of the Debtors is 11700 Plaza America Drive, Suite 1010, Reston, Virginia 20190.

# TABLE OF CONTENTS

JURISDICTION ............................................................................................................1

RELIEF REQUESTED....................................................................................................1

COMPLIANCE WITH BANKRUPTCY RULE 4001(C) AND LOCAL RULE 4001-2 .............2

BACKGROUND .........................................................................................................10

    I.       The Prepetition Capital Structure.............................................................. 10

          B.       Senior Notes Due August 2009................................................. 10

          C.       Collateral Trust Agreement....................................................... 11

    II.      The Chapter 11 Cases ............................................................................. 11

          A.       Financing of the Debtors' Chapter 11 Cases to Date................ 12

          B.       The Debtors' Need for Postpetition Financing ......................... 13

    III.     The Debtors' Efforts to Obtain Postpetition Financing. ....................... 14

    IV.    The Postpetition Financing ..................................................................... 15

          A.       The DIP Facility........................................................................ 15

          B.       Use of Cash Collateral .............................................................. 15

          C.       Adequate Protection Obligations .............................................. 15

BASIS FOR RELIEF....................................................................................................16

    I.       The DIP Financing Is Authorized Pursuant to Section 364 of the Bankruptcy Code ....................................................................................................... 17

          A.       Entry into the DIP Facility Is in the Best Interests of the Debtors' Creditors and Estates, Is Necessary to Preserve Estate Assets, and Is an Exercise of the Debtors' Sound and Reasonable Business Judgment. ..... 19

          B.       The DIP Facility Is the Most Favorable Source of Funding Available to the Debtors. ............................................................................. 22

          C.       The Terms of the DIP Facility Are Reasonable Even If It Contains Extraordinary Provisions. ........................................................ 23

    II.      The Interests of the Secured Lenders Are Adequately Protected. ........................ 24

    III.     The DIP Lenders Should Be Accorded the Protections of Section 364(e) of the Bankruptcy Code. ................................................................................. 24

NOTICE.....................................................................................................................25

NO PRIOR REQUEST .................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

In re Ames Dep't Stores, Inc.,
  115 B.R. 34 (Bankr. S.D.N.Y. 1990) ............................................................................. 18, 19

In re Aqua Assocs.,
  123 B.R. 192 (Bankr. E.D. Pa. 1991) ................................................................................... 18

In re Barbara K. Enters., Inc.,
  Case No. 08-11474, 2008 WL 2439649 (Bankr. S.D.N.Y. June 16, 2008) ..................... 18, 19

In re Curlew Valley Assocs.,
  14 B.R. 506 (Bankr. D. Utah 1981) ...................................................................................... 20

In re Exide Techs.,
  340 B.R. 222 (Bankr. D. Del. 2006) ..................................................................................... 20

In re Farmland Indus., Inc.,
  294 B.R. 855 (Bankr. W.D. Mo. 2003) ................................................................................. 18

In re Lyondell Chem. Co.,
  Case No. 09-10023 (REG) (Bankr. S.D.N.Y. March 5, 2009) ........................................ 18, 22

In re Plabell Rubber Prods., Inc.,
  137 B.R. 897 (Bankr. N.D. Ohio 1992) ................................................................................ 22

In re Simasko Prod. Co.,
  47 B.R. 444 (Bankr. D. Colo. 1985) ..................................................................................... 19

In re Sky Valley, Inc.,
  100 B.R. 107 (Bankr. N.D. Ga. 1988), aff'd, 99 B.R. 117 (N.D. Ga. 1989) ........................ 22

In re Snowshoe Co. Inc.,
  789 F.2d 1085 (4th Cir. 1986) .............................................................................................. 22

ION Media Networks, Inc.,
  Case No. 09-13125 (Bankr. S.D.N.Y. July 6, 2009) ............................................................. 20

Pearl Phil GMT (Far East) Ltd. v. Caldor Corp.,
  266 B.R. 575 (S.D.N.Y. 2001) .............................................................................................. 17

Trans World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.),
  163 B.R. 964 (Bankr. D. Del. 1994) ..................................................................................... 19

**Statutes**

11 U.S.C. § 105 ............................................................................................................................. 1

K&E 15414224.20

11 U.S.C. § 361 .................................................................................................................. 1, 6

11 U.S.C. § 362 ...................................................................................................................... 6

11 U.S.C. § 363 ...................................................................................................................... 6

11 U.S.C. § 363(b) ................................................................................................................. 1

11 U.S.C. § 364 ...................................................................................................... 1, 17, 19

11 U.S.C. § 364(a) .............................................................................................................. 22

11 U.S.C. § 364(a)(b) ......................................................................................................... 16

11 U.S.C. § 364(b) .............................................................................................................. 22

11 U.S.C. § 364(c) ............................................................................................................... 17

11 U.S.C. § 364(c)(1) ........................................................................................................... 1

11 U.S.C. § 364(d)(1)(B) ................................................................................................... 24

11 U.S.C. § 364(e) ......................................................................................................... 24, 25

11 U.S.C. § 503(b)(l) .......................................................................................................... 16

28 U.S.C. § 1334 ................................................................................................................... 1

28 U.S.C. § 1408 ................................................................................................................... 1

28 U.S.C. § 1409 ................................................................................................................... 1

28 U.S.C. § 157(b)(2) ........................................................................................................... 1

**Treatises**

Local Bankruptcy Rule 4001-2 ....................................................................................... 1, 2, 3

Local Bankruptcy Rule 4001-2(a)(1) ................................................................................... 6

Local Bankruptcy Rule 4001-2(a)(10) ................................................................................. 3

Local Bankruptcy Rule 4001-2(a)(11) ................................................................................. 9

Local Bankruptcy Rule 4001-2(a)(13) ................................................................................. 9

Local Bankruptcy Rule 4001-2(a)(14) ............................................................................... 10

Local Bankruptcy Rule 4001-2(a)(2) ................................................................................... 6

K&E 15414224.20

Local Bankruptcy Rule 4001-2(a)(3) ..................................................................................... 7

Local Bankruptcy Rule 4001-2(a)(4) ..................................................................................... 5

Local Bankruptcy Rule 4001-2(a)(5) ..................................................................................... 8

Local Bankruptcy Rule 4001-2(a)(8) ..................................................................................... 8

Local Bankruptcy Rule 4001-2(a)(9) ..................................................................................... 9

Local Bankruptcy Rule 4001-2(d) ......................................................................................... 8

Local Bankruptcy Rule 4001-2(h) ......................................................................................... 6

## **Other Authorities**

Bankruptcy Rule 2002 ........................................................................................................ 25

Bankruptcy Rule 4001(b) .................................................................................................... 1

Bankruptcy Rule 4001(c) .................................................................................................. 2, 3

Bankruptcy Rule 4001(c)(1)(A) ........................................................................................... 2

Bankruptcy Rule 4001(c)(1)(B) ......................................................................................... 3, 6

Bankruptcy Rule 4001(c)(1)(B)(i) ....................................................................................... 5

Bankruptcy Rule 4001(c)(1)(B)(ii) ...................................................................................... 6

Bankruptcy Rule 4001(c)(1)(B)(ix) ..................................................................................... 7

Bankruptcy Rule 4001(c)(1)(B)(v) ...................................................................................... 7

Bankruptcy Rule 4001(c)(1)(B)(vi) ..................................................................................... 7

Bankruptcy Rule 9014 ........................................................................................................ 1

K&E 15414224.20

The above-captioned debtors (the "**Debtors**") hereby move the Court, pursuant to this motion (the "**Motion**"), for the entry of a final order: (a) authorizing the Debtors to obtain postpetition financing on a second lien, secured superpriority basis; and (b) granting related relief (the "**DIP Order**").[2]  In support of this Motion, the Debtors respectfully state as follows.

## Jurisdiction

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105, 361, 363(b), and 364 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 4001(b) and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 4001-2 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**").

## Relief Requested

4.      By this Motion, the Debtors respectfully request entry, on a final basis, of the DIP Order:

      a.      authorizing the Debtors to obtain the loans under the DIP Facility (the "**DIP Loans**") in the amount of $25-30 million on a final basis, including:

            (i)      authorizing the Debtors to enter into and comply in all respects with the DIP Facility and all other DIP Loan Documents and approving all of the terms and conditions of such documents;

            (ii)     granting superpriority administrative claim status in favor of the lenders under the DIP Facility (the "**DIP Lenders**") pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all obligations under the DIP Loan Documents;

---

[2]     The Debtors intend to file the form of the proposed DIP Order and DIP Loan Documents (as defined herein) with the Court no later than October 19, 2009.

(iii) granting a fully-perfected lien on all assets of the Debtors (now existing or hereafter acquired and all proceeds thereof) that were not subject to a perfected, non-avoidable lien as of the date of the filing of the Chapter 11 Cases (the "**Petition Date**"), immediately junior only to the adequate protection liens (the "**Senior Adequate Protection Liens**") granted to DISH Network Corporation (the "**Prepetition First Lien Creditors**" or "**DISH**") pursuant to the Final Order (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection to Certain Prepetition Secured Parties, and (C) Granting Related Relief [Docket No. 221] (the "**Final Cash Collateral and Adequate Protection Order**") on such assets, but senior to all other liens, pursuant to section 364(c)(2) of the Bankruptcy Code;

(iv) granting a fully-perfected lien on all assets of the Debtors (now or hereafter acquired and all proceeds thereof) that were, as of the Petition Date, subject to the liens of the Prepetition First Lien Creditors securing the Prepetition First Lien Facility and any other liens agreed to by the DIP Lenders (the "**Permitted Senior Liens**"), immediately junior to such Permitted Senior Liens and Senior Adequate Protection Liens, but senior to all other liens, pursuant to section 364(c)(3) of the Bankruptcy Code; and

(v) granting a fully-perfected senior priming lien on all assets of the Debtors (now or hereafter acquired and all proceeds thereof) that are subject to any liens (other than the Permitted Senior Liens and Senior Adequate Protection Liens, but including, without limitation, all other liens created under the Final Cash Collateral and Adequate Protection Order and the liens (the "**Prepetition Noteholders' Liens**") of the Senior Noteholders securing the Senior Notes (the "**Prepetition Noteholders' Collateral**")) pursuant to section 364(d)(1) of the Bankruptcy Code; and

b. granting related relief.

**Compliance with Bankruptcy Rule 4001(c) and Local Rule 4001-2**

5. In accordance with Bankruptcy Rule 4001(c)(1)(A), a commitment letter (the "**DIP Commitment Letter**") is attached hereto in substantially the form of **Exhibit A** and a summary of the terms and conditions of the proposed debtor in possession credit facility (the "**DIP Term Sheet**") is attached hereto in substantially the form of **Exhibit B**. The debtor in possession credit agreement (the "**DIP Facility**") and the proposed DIP Order will be filed with

a supplemental notice that includes all appropriate disclosures with respect to the proposed DIP Order pursuant to Bankruptcy Rule 4001(c), Local Rule 4001-2, and the Guidelines for Financing Requests—General Order M-274 (the "**Local Guidelines**").

6. Pursuant to Bankruptcy Rules 4001(c)(1)(B) and Local Rule 4001-2, the following chart provides a concise statement and summary of the proposed material terms of the proposed DIP Facility and the DIP Order:[3]

| MATERIAL TERMS | |
|---|---|
| **Interest Rates**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>**DIP Term Sheet p. 4** | **Interest Rate.** All amounts outstanding under the DIP Facility will bear interest at the rate of 20.00% *per annum*. So long as no event of default under the DIP Facility is continuing, interest shall be paid in kind; at any time when an event of default under the DIP Facility is continuing (or otherwise at the Debtors' option), interest shall be paid in cash.<br>**Default Interest Rate.** During the continuance of an Event of Default, the loans and all other outstanding obligations will bear interest at an additional 2.00% *per annum* above the interest rate otherwise applicable. |
| **Maturity**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>**DIP Term Sheet p. 2-3** | The loans under the DIP Facility (the "**DIP Loans**") shall be repaid in full on (each, the "**Final Maturity Date**") the earliest to occur of: (i) the effective date of the Plan (the "**Effective Date**"), (ii) March 31, 2010, (iii) the date any of the Cases is converted to a case under chapter 7 of the Bankruptcy Code and (iv) the acceleration of the DIP Loans, including upon the occurrence of an Event of Default (as defined in the DIP Loan Documents and including, without limitation, the events of default set forth in the term sheet under the section entitled "Events of Default") as provided in the term sheet, in accordance with the terms of the definitive documentation in respect of the DIP Facility and the DIP Collateral (the "**DIP Loan Documents**"). |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Bankruptcy Rule 4001-2(a)(10)<br><br>**DIP Term Sheet p. 8-10** | In addition to other customary events of default (including, without limitation, failure to pay any interest or principal when due, failure to comply with covenants, inaccurate or false representations or warranties, change of control, judgment defaults, ERISA, liens on the DIP Collateral), the DIP Facility shall be subject to the following additional events of default (with thresholds and grace periods to be determined):<br>(a)   any of the Cases shall be dismissed or converted to a Chapter 7 case; any superpriority administrative expense claim or lien shall be granted in any of the Cases without the consent of the Required Lenders, which is *pari passu* with or senior to the Superiority Claims or the DIP Liens, as applicable;<br>(b)   any Loan Party shall file a motion in the Cases without the consent of the Required Lenders to obtain additional financing from a party other than the DIP Lenders; |

---

[3] Capitalized terms used in the following chart but not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Term Sheet, as applicable. This statement is qualified in its entirety by reference to the provisions of the DIP Term Sheet and the DIP Order. To the extent of any inconsistency between this chart and the DIP Term Sheet or the DIP Order, the DIP Term Sheet or the DIP Order, as applicable, shall govern.

3

**(c)** any Loan Party shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any prepetition indebtedness or payables, other than as contemplated under the Final Cash Collateral and Adequate Protection Order or payments agreed to in writing by the Required Lenders and authorized by the Bankruptcy Court;

**(d)** the Bankruptcy Court shall enter an order granting relief from the automatic stay to any creditor or party in interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any Loan Party which have an aggregate value in excess of an amount to be agreed;

**(e)** an order shall be entered reversing, amending, modifying, staying, or vacating the final order confirming the Plan (the "**Confirmation Order**"), the DIP Order, the Final Cash Collateral and Adequate Protection Order, or the Order Authorizing the Debtors to Continue Using Their Existing Cash Management System, Bank Accounts, and Business Forms, (B) Authorizing Continued Intercompany Transactions, and (C) Granting Administrative Priority to Intercompany Claims [Docket No. 109] (collectively, the "**Orders**") or any of the Loan Parties shall apply for authority to do so, without the prior written consent of the Required Lenders or any Order shall otherwise cease to be in full force and effect;

**(f)** any of the Loan Parties shall fail to comply with any Order in any material respect;

**(g)** a chapter 11 trustee, receiver, a responsible officer or an examiner with enlarged powers relating to the operation of the businesses of the Loan Parties shall be appointed in any of the Cases;

**(h)** any Loan Party shall seek to or support any other person's opposition of any motion made in the Bankruptcy Court by the DIP Lenders seeking confirmation of the amounts of the DIP Lenders' claim or the validity or enforceability of the DIP Liens;

**(i)** (i) any Loan Party or any of its affiliates shall seek to, or shall support an other person's motion to, disallow the DIP Lenders' claims or challenge the validity and enforceability of the DIP Liens or contest any material provision of any DIP Loan Document or (ii) the DIP Liens and/or super-priority claims shall otherwise cease to be valid, perfected and enforceable or any material provision of any DIP Loan Document shall cease to be effective;

**(j)** the filing of any pleading or proceeding by any Loan Party or its affiliates (that is not withdrawn, within a time period to be agreed, upon notice to the Loan Parties) which could reasonably be expected to result in a material impairment of the rights or interests of the DIP Lenders or an order of the Bankruptcy Court with respect to any pleading or proceeding brought by another party which results in such a material impairment subject to a cure period to be agreed;

**(k)** entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any Debtor to file a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code, without the prior written consent of the Required Lenders;

**(l)** any person files a chapter 11 plan that contains terms and conditions that are inconsistent in any material respect with the Plan or any exhibit or supplement attached thereto, without the prior written consent of the Required Lenders;

**(m)** any Loan Party shall have filed a motion seeking the entry of, or the Bankruptcy Court shall have entered, an order approving a payment to any person on account of any claim under the Plan (whether in cash or other

4

|  | | |
|---|---|---|
| | | property or whether as adequate protection, settlement of a dispute, or otherwise) that would be materially inconsistent with the treatment of any such person with respect to such claim under the Plan, without the prior written consent of the Required Lenders; |
| | **(n)** | any judgments which are in the aggregate in excess of an amount to be agreed as to any postpetition obligation shall be rendered against any of the Loan Parties and the enforcement thereof shall not be stayed; or there shall be rendered against any of the Loan Parties a non-monetary judgment with respect to a postpetition event which causes or would reasonably be expected to cause a material adverse change or a material adverse effect on the ability of the Loan Parties to perform their obligations under the DIP Loan Documents or the value of the DIP Collateral; |
| | **(o)** | the Plan is amended, supplemented or otherwise modified without the prior consent of the Required Lenders; |
| | **(p)** | the Plan is withdrawn; |
| | **(q)** | the final order confirming the Plan (the "**Confirmation Order**") in form and substance acceptable to the Required Lenders is not entered on or before October 28, 2009; |
| | **(r)** | each of the following is not in form and substance satisfactory to the Required Lenders: (i) the Plan, as confirmed in the Cases and (ii) the Confirmation Order entered by the Bankruptcy Court confirming the Plan; |
| | **(s)** | the Confirmation Order is amended, supplemented, reversed, vacated or otherwise modified without the prior written consent of the Required Lenders; |
| | **(t)** | the FCC denies by final order not subject to appeal, review or reconsideration, application to change the ownership of the Debtors pursuant to the Plan; or the Effective Date of the Plan shall not have occurred on or before March 31, 2010. |
| **Liens and Priorities**<br>Bankruptcy Rule 4001(c)(1)(B)(i)<br>Local Bankruptcy Rule 4001-2(a)(4)<br><br>**DIP Term Sheet p. 1–2** | | All of the Debtors' obligations under the DIP Loan Documents (as defined below) shall, at all times: |
| | **(a)** | pursuant to Bankruptcy Code section 364(c)(1), be entitled to a superpriority administrative expense claim status in the Cases (the "**Superpriority Claim**"); |
| | **(b)** | pursuant to Bankruptcy Code section 364(c)(2), have a fully-perfected lien on all assets of the Loan Parties (now existing or hereafter acquired and all proceeds thereof) that were not subject to a perfected, non-avoidable lien as of the date of the filing of the Cases (the "**Petition Date**"), immediately junior only to the Senior Adequate Protection Liens (as defined below) on such assets, but senior to all other liens; |
| | **(c)** | pursuant to Bankruptcy Code section 364(c)(3), have a fully-perfected lien on all assets of the Loan Parties (now or hereafter acquired and all proceeds thereof) that were, as of the Petition Date, subject to Permitted Senior Liens (as defined below), immediately junior to such Permitted Senior Liens and Senior Adequate Protection Liens, but senior to all other liens; and |
| | **(d)** | pursuant to Bankruptcy Code section 364(d)(1), have a fully-perfected senior priming lien on all assets of the Loan Parties (now or hereafter acquired and all proceeds thereof) that are subject to any liens (other than the Permitted Senior Liens and Senior Adequate Protection Liens, but including, without limitation, all other liens created under the Final Cash Collateral and Adequate Protection Order and the liens (the "**Prepetition Noteholders' Liens**") of the Senior Noteholders securing the Senior Notes (the "**Prepetition Noteholders'** |

5

| MATERIAL TERMS | |
|---|---|
| | Collateral")). |
| | The liens to be granted to the DIP Lenders pursuant to clauses (b) through (d) above shall be referred to, collectively, as the "**DIP Liens**", and the assets of the Loan Parties referred to in clauses (b) through (d) above shall be referred to, collectively, as the "**DIP Collateral**". |
| | As used in the term sheet, "**Permitted Senior Liens**" means (i) the liens of the Prepetition First Lien Creditors securing the Prepetition First Lien Facility and (ii) any other liens agreed to by the DIP Lenders. |
| | As used in the term sheet, "**Senior Adequate Protection Liens**" means the adequate protection liens granted to the Prepetition First Lien Creditors pursuant to the Final Cash Collateral and Adequate Protection Order. |
| | The DIP Order (as each such term is defined below) shall contain provisions prohibiting the Loan Parties from incurring any indebtedness during the pendency of the Cases that ranks *pari passu* with or senior to the Loan Parties' obligations under the DIP Facility (the "**DIP Obligations**"). |
| **Borrowing Limits and DIP Commitment** Bankruptcy Rule 4001(c)(1)(B) Local Bankruptcy Rule 4001-2(a)(1) **DIP Term Sheet p. 1** | **Use of Cash Collateral** Pursuant to the terms and conditions set forth in the Final Cash Collateral and Adequate Protection Order. **DIP Facility**. The DIP Facility shall be comprised of a term loan facility in an aggregate principal amount of $25-30 million (the "**DIP Commitments**"), comprising three drawings thereunder as specified in the DIP Term Sheet. |
| **Conditions** Bankruptcy Rule 4001(c)(1)(B) Local Bankruptcy Rule 4001-2(a)(2), 4001-2(h) **DIP Term Sheet p. 3 and Annex I** | **Budget**. The Loan Parties shall deliver to the DIP Agent a 13-week cash flow budget (commencing on or about the Closing Date) satisfactory in form and substance to the DIP Lenders and showing projected receipts and disbursements for such period, including anticipated uses of the proceeds of borrowings under the DIP Facility (as modified from time to time with the written consent of the Required Lenders, the "**Budget**"). The Debtors have reason to believe that each Budget will be adequate, considering all available assets, to pay all administrative expenses due or accruing during the respective period covered by each Budget. **Borrowings**. Usual and customary for financings of this type, including that the DIP Order shall be in force and effect. **Closing and Initial Availability**. Usual and customary for financings of this type including conditions related to: the Chapter 11 Cases; financial statements, budgets, and reports; performance of obligations; and customary closing documents. Such other conditions as are reasonably requested by the DIP Lenders. **Full Availability**. Usual and customary for financings of this type, including, without limitation, conditions related to the DIP Order and the Budget and variance reports. |
| **Adequate Protection** Bankruptcy Rule 4001(c)(1)(B)(ii) **DIP Term Sheet p. 6** | Pursuant to sections 361 and 363 of the Bankruptcy Code, as consideration for the consent of the holders of the Senior Notes (the "**Senior Noteholders**") to the Debtors' use of their cash collateral, and as adequate protection for, and equal in amount to, the diminution in the value of the Senior Noteholders' interest in the Prepetition Noteholders' Collateral, whether resulting from postpetition sale, lease or use of such collateral, the imposition of the automatic stay under section 362 of the Bankruptcy Code, the priming of the Prepetition Noteholders' Liens, or otherwise, the Senior Noteholders shall receive adequate protection as provided in the Final Cash |

6

| MATERIAL TERMS | |
|---|---|
| | Collateral and Adequate Protection Order. |
| **Waiver or Modifications Related to Plan, Exclusivity, Requesting Use of Cash Collateral or Obtaining Credit** Bankruptcy Rule 4001(c)(1)(B)(v) **DIP Term Sheet p. 10** | The DIP Facility contains a provision stating that it is an event of default if the Plan is amended, supplemented, or otherwise modified without the prior consent of the Required Lenders. |
| **Plan and Confirmation Related Deadlines** Bankruptcy Rule 4001(c)(1)(B)(vi) **DIP Term Sheet p. 10** | It is an event of default if the Confirmation Order is not entered on or before October 28, 2009. |
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix) **DIP Term Sheet p. 11** | The Loan Parties are jointly and severally obligated to indemnify and hold harmless the DIP Agent, each of the DIP Lenders, and each of their respective affiliates, officers, directors, fiduciaries, employees, agents, advisors, attorneys, and representatives from and against all losses, claims, liabilities, damages, and expenses (including, without limitation, out-of-pocket fees and disbursements of counsel) in connection with any investigation, litigation or proceeding, or the preparation of any defense with respect thereto, arising out of or relating to the DIP Facility or the transactions contemplated in the Term Sheet except to the extent resulting from their gross negligence or willful misconduct. |
| **Fees and Expenses** Local Bankruptcy Rule 4001-2(a)(3) **DIP Term Sheet p. 4-5, 11** | **Commitment Amount**. An amount equal to 2% of the DIP Commitments (the "**Commitment Amount**"), payable to each DIP Lender according to its pro rata share of the DIP Commitments on the Closing Date. The Commitment Amount shall be added to the principal of the DIP Loans of each DIP Lender on the Closing Date. **Closing Amount**. An amount equal to 2% of the DIP Commitments (the "**Closing Amount**"), payable to each DIP Lender according to its pro rata share of the DIP Commitments on the Closing Date. The Closing Amount shall be added to the principal of the DIP Loans of each DIP Lender on the Closing Date. **Additional Instruments.** In addition to the above-referenced amounts, on the Closing Date the Debtors shall issue to each DIP Lender additional debt and equity instruments (the "Additional Instruments") which Additional Instruments shall rank *pari passu* with the Senior Notes and the outstanding equity of the Debtors, respectively. The Additional Instruments will be issued in such respective amounts so as to provide that in the event (A) of any sale, transfer or other disposition of all or any substantial part of the assets of the Debtors taken as whole (whether pursuant to Section 363 of the Bankruptcy Code or otherwise) (a "**Disposition**") or (B) any plan of reorganization under the Chapter 11 Cases is confirmed that is not in form and substance approved by the Required Lenders (and, without limiting the foregoing, does not authorize the New Credit Facility and the other matters described in the Commitment Letter dated September 4, 2009 between the Debtors and the Commitment Parties named therein regarding the New Credit Facility) (a "**Non-Conforming Plan**"), the DIP Lenders shall receive a repayment of (or distribution on) such Additional Instruments in an amount equal to 10% of the aggregate amount of Disposition proceeds or other consideration that would otherwise be payable to the Senior Noteholders and to ICO Global Communications (Holdings) Limited ("**ICO Global**") (and any successor in interest |

| MATERIAL TERMS |
| --- |

| | thereto) in connection with such Disposition or under such Non-Conforming Plan. **Agency Fees**. As agreed with the DIP Agent. **Expenses**. A customary reimbursement of costs and expenses of the DIP Agent and the DIP Lenders. |
| --- | --- |
| **Carve-Out**<br>Local Bankruptcy Rule 4001-2(a)(5)<br>Local Bankruptcy Rule 4001-2(d)<br><br>**DIP Term Sheet p. 3** | The Superpriority Claim and the DIP Liens shall be subject to payment of the "Carve-Out" (the "**Carve-Out**") specified in Paragraphs 15 and 16 of the Final Cash Collateral and Adequate Protection Order and for such purposes the term "Event of Default" under the Final Cash Collateral and Adequate Protection Order shall mean an event of default under the DIP Facility. |
| **Limitations in Connection with Operation, Financing, Use, or Sale of Business or Property**<br>Local Bankruptcy Rule 4001-2(a)(8)<br><br>**DIP Term Sheet p. 7-8** | The DIP Loan Documents will contain such financial, affirmative, and negative covenants as are usual and customary for financings of this kind, including, without limitation:<br>(a) compliance with the Budget, including maintaining a positive or no variance or a negative variance of not greater than a percentage to be agreed with respect to comparisons of actual cash receipts and cash operating disbursements to corresponding Budget items (and, without limiting the foregoing, no capital expenditure except as provided in the Budget may be made without the consent of the Required Lenders);<br>(b) Delivery of financial statements, Budget and other reports (including delivery of a reconciliation to actual and a variance analysis as to line items from the Budget and delivery by the fourth Business Day of each week (i) cash balance calculations and (ii) rolling 13-week cash flow projections (together with comparisons of actual payments to Budget items and explanations of any variances of greater than a percentage to be agreed), each in a form and in substance satisfactory to the Required Lenders); notices; maintenance of existence, business and properties; compliance with laws; maintenance of insurance; payment of post-petition taxes and claims; employee benefits; books and records; inspections; environmental matters; additional collateral and guarantors; further assurances; covenants relating to the Cases (which shall include, without limitation, a covenant to diligently pursue the consummation of the Plan as expeditiously as possible in consultation with the DIP Lenders; a covenant to provide and discuss with the DIP Lenders any information and developments in connection with any proposed Disposition or change of control; a covenant that, if requested by the Required Lenders at any time a default is continuing, the Borrower shall retain a chief restructuring officer acceptable to the Required Lenders and a covenant to comply with the Orders (as defined below)). The DIP Loan Documents will contain provisions limiting the rights of DIP Lenders that are competitors of the Borrower to obtain certain information; and (c) limitations with respect to other indebtedness; liens; sales and leasebacks; investments; mergers and consolidations; changes in line of business; asset sales (other than the auction rate securities subject to the Final Order Approving The Sale Of Certain Of The Debtors' Auction Rate Securities For Cash Free And Clear Of Liens, Claims, Interests, And Encumbrances And Granting Related Relief, filed as docket no. 222 in the Cases); acquisitions; dividends; transactions with affiliates; payments of other indebtedness; certain restrictions on subsidiaries; issuance of capital stock; creation of subsidiaries; business; negative pledges; amendments and waivers of organizational documents, junior indebtedness and other material agreements; prohibition on entering into new material agreements or transactions without the consent of the Required Lenders, holding company covenants and covenants relating to the Cases (including, without limitation, no *pari passu* or senior administrative claims or expenses or obligations to make adequate protection payments (other than under the Final Cash Collateral and Adequate Protection Order); a covenant not to amend, supplement or modify the Plan or any of the Confirmation Order (as defined below), the |

8

| MATERIAL TERMS |
|---|

| | |
|---|---|
| | DIP Order, the Final Cash Collateral and Adequate Protection Order or the Cash Management Order (collectively, the "**Orders**") without the Required Lender's prior consent; a covenant not to assume or reject any executory contract or unexpired lease (to the extent that the Schedules to the Plan on file with the Bankruptcy Court as of October 12, 2009 (as docket number 400) provide for the assumption or rejections of any executory contracts and such schedules are modified, amended or otherwise changed, any, such assumption or rejection as a result of such modification, amendment or change is assented to by the DIP Lenders); and a covenant not to consent to termination or reduction of the Exclusivity Period or fail to object to any motion seeking to terminate or reduce the Exclusivity Period). |
| **Limitations on Obligations To Fund Certain Activities** Local Bankruptcy Rule 4001-2(a)(9) **DIP Term Sheet p.3** | The proceeds of the DIP Facility shall be applied to (a) fund certain permitted administrative expenses of the Cases and (b) provide working capital for the Debtors during the pendency of the Cases, in each case subject to compliance with the Budget covenant in the DIP Loan Documents.<br><br>Notwithstanding anything to the contrary in this Term Sheet or any other DIP Loan Documents, no proceeds of the DIP Facility, including no portion of the Carve-Out, may be used (a) for the payment of the fees and/or expenses incurred in (i) challenging, or supporting any challenge of, the DIP Obligations, the DIP Liens or the Superpriority Claim, (ii) initiation or prosecution of any claim or cause of action against the DIP Agent or any DIP Lender, or their respective directors, officers, employees, advisors, agents, successors and assigns, (iii) challenging, or supporting challenge of, the obligations under the Senior Notes, the Prepetition Noteholders' Liens or any Senior Note Claim, (iv) challenging or modifying the exclusive right of any Debtor to file a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code, (v) actively opposing confirmation or consummation of the Plan, (vi) pursuing confirmation or consummation of a Non-Conforming Plan (as defined below), (vii) actions to hinder or delay occurrence of the Effective Date under the Plan or (viii) any other action which with the giving of notice or the passing of time would result in an Event of Default thereunder, (b) for the payment of any prepetition indebtedness (other than pursuant to the Final Cash Collateral and Adequate Protection Order), (c) to make any distribution under a confirmed plan of reorganization in the Cases (other than the Plan), (d) to settle any claim by the allowance of an administrative priority or non dischargeable claim, (e) for the payment or reimbursement of any third party expenses incurred in connection with any Disposition (as defined below) or any proposed Disposition. |
| **Change of Control** Local Bankruptcy Rule 4001-2(a)(11) **DIP Term Sheet p. 8** | A change of control constitutes an event of default. |
| **Repayment** Local Bankruptcy Rule 4001-2(a)(13) **DIP Term Sheet p. 5-6** | **Generally**. All optional and mandatory prepayments shall be applied ratably to the DIP Loans and may not be reborrowed. All mandatory prepayments of the DIP Loans are subject to the prior payment in full of the obligations under the Prepetition Facility.<br>**Voluntary Prepayments**. The DIP Loans may be prepaid in minimum amounts to be agreed upon.<br>**Mandatory Prepayments**. Mandatory prepayment provisions usual and customary for transactions of this type, including 100% of the net proceeds of any sale or other disposition (including as a result of casualty or condemnation) of any asset by the Borrower or any of its subsidiaries, subject to exceptions to be agreed. |

9

| MATERIAL TERMS | |
|---|---|
| **Joint Liability** Local Bankruptcy Rule 4001-2(a)(14) **DIP Term Sheet p. 1** | All DIP Facility Obligations of the Debtors are guaranteed, on a joint and several basis, by the Guarantors. |

## Background

## I. The Prepetition Capital Structure

### A. The Prepetition Facility

7. On March 27, 2008, DBSD North America, Inc. ("**DBSD N.A.**") obtained a $40 million revolving credit facility (the "**Prepetition Facility**") evidenced by that certain Amended and Restated Revolving Credit Agreement, dated as of April 7, 2008, by and among DBSD N.A., as borrower, each of DBSD N.A.'s subsidiaries, as guarantors, Wells Fargo Bank, N.A., as successor administrative agent (the "**Agent**"), the financial institutions and other persons from time to time lenders party thereto (the "**Prepetition Lenders**"), and The Bank of New York Mellon (f/k/a The Bank of New York), as collateral agent. The Debtors' obligations under the Prepetition Facility (the "**Prepetition Facility Obligations**") are secured by a first-priority security interest in substantially all of the Debtors' assets and by a first-priority pledge by ICO Global of the equity of DBSD N.A. (subject to certain exceptions).[4]

### B. Senior Notes Due August 2009

8. In August 2005, DBSD N.A. issued $650 million in aggregate principal amount of 7.5% convertible senior secured notes (the "**Senior Notes**"), due August 15, 2009, pursuant to the Indenture dated as of August 15, 2005, among DBSD N.A., the Debtors as guarantors, and The Bank of New York (n/k/a The Bank of New York Mellon) as trustee (the

---

[4] On July 9, 2009, all of the claims under the Prepetition Facility were assigned to DISH.

"**Indenture Trustee**"), as supplemented by the Supplemental Indenture No. 1 thereto dated as of November 30, 2005, among DBSD N.A., the guarantors party thereto, and the Indenture Trustee and the Supplemental Indenture No. 2 thereto dated as of December 22, 2006, among DBSD N.A., the guarantors party thereto, and the Indenture Trustee (such Indenture, as so supplemented and amended, the "**Indenture**").  The Senior Notes are secured by a second-priority security interest (the "**Senior Noteholders' Liens**") in substantially all of the assets of the Debtors and by a second-priority pledge by ICO Global of the equity of DBSD N.A. (subject to certain exceptions) (the "**Senior Noteholders' Collateral**").

### C.      Collateral Trust Agreement

9.      Pursuant to the Collateral Trust Agreement dated as of August 15, 2005, among ICO Global, the Debtors, and The Bank of New York, as collateral agent and as trustee under the Indenture (as amended, supplemented, or modified from time to time, the "**Collateral Trust Agreement**"), the liens securing the Debtors' obligations under the Indenture are junior in priority to the liens securing the Prepetition Facility Obligations.

## II.      The Chapter 11 Cases

10.      On July 13, 2009, the Debtors filed the Debtors' Second Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code [Docket No. 198] and the First Amended Disclosure Statement for Debtors' First Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code [Docket No. 200] (as amended, the "**Disclosure Statement**").

11.      On July 22, 2009, the Bankruptcy Court entered the Final Cash Collateral and Adequate Protection Order, which authorizes the Debtors to use cash collateral and provides DISH and the Senior Noteholders (collectively, the "**Secured Lenders**") with adequate protection against any diminution in value of their interests.

12.     The proposed terms and conditions of the New Credit Facility—which contemplated providing the Debtors with approximately $53 million in exit financing, a portion of which would be made available prior to the Effective Date—were filed with this Court on July 24, 2009 in the form of a term sheet attached as Exhibit 2 to the solicitation version of the Plan [Docket No. 231].

13.     On September 25, 2009, the Confirmation Hearing on the Plan was completed. As of the date hereof, an order confirming the Debtors' Plan has not yet been entered.

### A.     Financing of the Debtors' Chapter 11 Cases to Date

14.     To date, the Debtors have financed the Chapter 11 Cases by liquidating the majority of their student-loan-backed auction rate securities ("**ARS**") that are not the subject of the settlement with UBS (the "**Non-Eligible ARS**").[5]   The Debtors currently hold only two tranches of Non-Eligible ARS with a total face value of $6.5 million (the "**Remaining Non-Eligible ARS**").   Part of the Remaining Non-Eligible ARS are held in reserve for payment of the Debtors' financial advisors, Jefferies & Company, Inc. ("**Jefferies**"), in accordance with the Order Authorizing the Employment and Retention of Jefferies & Company, Inc. as Investment Banker and Financial Advisor *Nunc Pro Tunc* to the Petition Date [Docket No. 223], which permits the Debtors to pay Jefferies, in whole or in part, by transferring to Jefferies certain of the Non-Eligible ARS.   In any event, the Debtors believe that it would be difficult to find a buyer for

---

[5]     As more fully discussed in the *Debtors' Motion for Entry of an Order Approving the Sale of Certain of the Debtors' Auction Rate Securities for Cash Free and Clear of Liens, Claims, Interests, and Encumbrances and Granting Related Relief* [Docket No. 82] (the "**ARS Sale Motion**"), on November 14, 2008, the Debtors entered into a settlement agreement (the "**UBS Settlement**") with UBS Financial Services, Inc. ("**UBS**"), whereby UBS agreed to repurchase certain "eligible" ARS that UBS sold to the Debtors prior to February 13, 2008 (the "**Eligible UBS ARS**").   Under the terms of the UBS Settlement, at the Debtors' option, the Debtors are able to require UBS to repurchase the Eligible UBS ARS from the Debtors at par value from June 30, 2010 through July 2, 2012.   Conversely, UBS has the right, at its discretion, to purchase the Eligible UBS ARS from the Debtors at any time until July 2, 2012, so long as the Debtors receive payment at par value.   The par value of the Debtors' Eligible UBS ARS is approximately $32.7 million.

these remaining issuances of ARS at the present time and estimate that the Remaining Non-Eligible ARS could be sold, at best, for approximately 45% of their face value, yielding a net realization of only $2.6 million in additional cash for the Debtors' estates.

B.    **The Debtors' Need for Postpetition Financing**

15.    The Debtors originally expected to exit bankruptcy by the end of 2009, but due to unforeseen circumstances, many of which were out of the Debtors' control, they will be unable to do so.  Consequently, while the Debtors initially were hopeful that funds from existing liquidity sources, such as the Non-Eligible ARS, would provide sufficient liquidity throughout the Chapter 11 Cases, the Debtors and their advisors have since determined that additional financing is required.  The Debtors now are hopeful that they will be able to exit bankruptcy in early 2010, and expect that they will require approximately $25-30 million of additional liquidity to consummate the Plan.[6]

16.    The Debtors require the additional financing to, among other things, (a) continue their business, including paying obligations to vendors, suppliers, and employees, (b) fund capital expenditures, (c) pay the costs of administration of their estates, and (d) satisfy other working capital and general corporate purposes.

17.    Even if the Debtors obtained authority to sell the Eligible UBS ARS now at a discount instead of waiting to receive the full face value of such ARS beginning on June 30, 2010, as set forth in the UBS Settlement, the proceeds resulting from such sale of Eligible UBS ARS would still be insufficient to finance the remainder of the Chapter 11 Cases.  At the same

---

[6]    In the event that the Bankruptcy Court confirms the Plan, the resulting transfer of control over the Debtors' FCC licenses as a result of the change of ownership of DBSD N.A. under the Plan requires FCC approval according to the FCC.  The Debtors expect that it will take approximately four to six months to secure regulatory approval for such transfer.  In addition, FCC approval for the transfer of the FCC licenses to Reorganized DBSD Satellite Services is a condition precedent to consummation of the Plan.

K&E 15414224.20

time, pursuing this financing strategy would result in the Debtors foregoing the opportunity to "put" the Eligible UBS ARS to UBS at an expected loss of at least $14.6 million compared with maintaining the Eligible UBS ARS until June 30, 2010.

18.     In fact, the Debtors currently expect to run out of available funds by the end of October 2009.  As such, the Debtors have determined that obtaining the DIP Facility to finance the remainder of the Chapter 11 Cases is in the best interests of their estates, creditors, and all other parties in interest.

## III.     The Debtors' Efforts to Obtain Postpetition Financing.

19.     As described at the Confirmation Hearing, during the Chapter 11 Cases, the Debtors and their advisors have engaged in extensive negotiations with various parties, including the Secured Lenders, in an effort to obtain additional liquidity.  Indeed, Jefferies contacted approximately 40 institutions and traditional DIP lenders to gauge their interest in providing DIP financing.  The Debtors received varying levels of interest and, ultimately, nine parties were willing to execute a confidentiality agreement to receive additional information.  Of those, the Debtors received two alternative DIP financing proposals.  However, neither of these two alternatives offered terms as favorable as those proposed in the DIP Facility and each of those proposals contemplated the creation of non-consensual, priming liens, which would have lead to increased litigation costs and a priming fight with either DISH, the Senior Noteholders, or both.

20.     The Debtors' ability to obtain postpetition financing from alternative parties was complicated by several factors, including the Debtors' substantial amount of prepetition secured debt, the lack of any significant unencumbered assets, and the challenging DIP financing market.  Third-party lenders unanimously indicated that they would require that the liens securing any postpetition financing prime (i.e., be senior in priority to) all existing liens

on the Debtors' assets. The Debtors concluded that it is unlikely, if not impossible, that either DISH or the Senior Noteholders would consent to any proposed third-party DIP financing secured by liens on the Debtors' assets senior to their own. Further, the Debtors and their advisors concluded that the value of the Debtors' encumbered assets relative to the amount of their senior secured debt, and the Debtors' lack of any significant unencumbered assets, made the outcome of any contemplated priming of the Secured Lenders' liens without the consent of the Senior Noteholders highly uncertain.

## IV. The Postpetition Financing

### A. The DIP Facility

21. In accordance with the terms and conditions of the DIP Facility, the DIP Lenders have agreed to extend the DIP Facility in an aggregate amount of $25-30 million, to be made available in three tranches, on the terms summarized above.

22. On or after the date the Bankruptcy Court enters the DIP Order and once the other conditions precedent set forth in the DIP Loan Documents are satisfied or waived, as determined by the DIP Lenders (the "**Closing Date**"), a portion of the DIP Loans shall be available to the Debtors (the "**Initial Availability**"). The remaining undrawn amount of the DIP Commitments shall be available to the Debtors prior to the Effective Date. Additionally, the DIP Facility will be converted into the exit facility contemplated pursuant to the Plan, which should facilitate a smooth transition from chapter 11.

### B. Use of Cash Collateral

23. The Debtors will continue to operate under and use the cash collateral of the Secured Lenders pursuant to the Final Cash Collateral and Adequate Protection Order.

### C. Adequate Protection Obligations

K&E 15414224.20

24.     The Debtors and the Secured Lenders have agreed upon the consideration that will adequately protect the Secured Lenders' interests in the Debtors' property in the Final Cash Collateral and Adequate Protection Order.  The Senior Noteholders have consented to the priming of their current liens, both under the Indenture and those granted under the Final Cash Collateral and Adequate Protection Order, and as such, additional adequate protection is not required.  DISH's liens are not being primed and DISH will continue to retain the adequate protection provided pursuant to the Final Cash Collateral and Adequate Protection Order.

## **Basis for Relief**

25.     The continued viability of the Debtors' business and the continued success of their reorganization efforts are dependent upon obtaining access to postpetition financing, without which the Debtors cannot continue to operate or consummate their restructuring.  As such, the Debtors request authorization to borrow up to $25-30 million under the proposed DIP Facility and to use the DIP Facility proceeds to, among other things, fund their operations and restructuring activities through the Effective Date.

26.     As set forth herein, the DIP Facility is the most favorable financing available to the Debtors at this time.  The Debtors have been unable to procure sufficient financing (a) in the form of unsecured credit allowable under section 503(b)(l) of the Bankruptcy Code or (b) solely as an administrative expense under section 364(a)(b) of the Bankruptcy Code.  Of the two alternative proposals for DIP financing received by the Debtors, (a) the first would have necessitated priming the Senior Noteholders over their objection and (b) the second was only proposed as part of an alternative exit financing scheme and would not have had the consent of either DISH or the Senior Noteholders.  By contrast, the DIP Facility proposed here is provided by and consented to by the Senior Noteholders, the only secured parties whose liens are

being primed. DISH is not being primed by the DIP Facility and retains all of the rights and protections it enjoys under the Final Cash Collateral and Adequate Protection Order. Obtaining the consent of the Senior Noteholders and leaving DISH's liens in tact—and actually *improving* DISH's position due the infusion of an additional $25-30 million in capital into the Debtors' estates—avoids the necessity of a contested priming battle, which the Debtors and their estates simply cannot afford at this time. Thus, based on the foregoing and for the reasons set forth below, the Debtors submit that they have satisfied the requirements to access postpetition financing on a superpriority, secured basis pursuant to section 364 of the Bankruptcy Code.

I.      **The DIP Financing Is Authorized Pursuant to Section 364 of the Bankruptcy Code**

27.     Pursuant to section 364(c) of the Bankruptcy Code, a court may authorize a debtor to incur debt that is (a) entitled to a superpriority administrative expense status, (b) secured by a lien on otherwise unencumbered property, or (c) secured by a junior lien on encumbered property if the debtor cannot obtain postpetition credit on an unsecured basis, on an administrative expense priority, or secured solely by junior liens on the debtor's assets. See 11 U.S.C. § 364(c); Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp., 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense).

28.     Additionally, section 364(d)(1) of the Bankruptcy Code provides that a court may authorize a debtor to incur postpetition debt on a senior or "priming" basis if (a) the debtor is unable to obtain credit otherwise and (b) there is "adequate protection" of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted. See 11 U.S.C. § 364(d)(1). Here, the Senior Noteholders are consenting to the DIP Loans and the liens granted by the DIP Order.

29. Courts in this jurisdiction and others have fashioned guidelines in applying these statutory requirements. Generally, courts advocate using a "holistic approach" to evaluate superpriority postpetition financing agreements, which focuses on the transaction as a whole. As one court has noted:

> Obtaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for use of the funds generated by credit, but also because the credit acquired is of significant benefit to the debtor's estate and . . . the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere.

In re Aqua Assocs., 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991).

30. In evaluating a debtor's proposed postpetition financing, courts consider whether the postpetition financing: (a) is necessary to preserve the assets of the estate and is necessary, essential, and appropriate for continued operation of the Debtors' business; (b) is in the best interests of the Debtors' creditors and estates; (c) is an exercise of a debtor's sound and reasonable business judgment; (d) was negotiated in good faith and at arm's length between the debtor, on the one hand, and the agents and the lenders on the other; and (e) contains terms that are fair, reasonable, and adequate given the circumstances of the debtor and the proposed postpetition lender. In re Farmland Indus., Inc., 294 B.R. 855, 879-80 (Bankr. W.D. Mo. 2003) cited in Transcript of Record at 733:3 7, In re Lyondell Chem. Co., Case No. 09-10023 (REG) (Bankr. S.D.N.Y. March 1, 2009); see also In re Barbara K. Enters., Inc., Case No. 08-11474, 2008 WL 2439649, at *10 (Bankr. S.D.N.Y. June 16, 2008) ("To obtain credit, … a debtor must prove that (1) the debtor cannot obtain credit unencumbered by super-priority status; (2) the credit transaction is necessary to preserve assets of the estate; and (3) the terms of the agreement are fair, reasonable, and adequate.") (citing In re Crouse Group, Inc., 71 B.R. 544, 546 (Bankr. E.D. Pa. 1987)); In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (debtor

in possession financing can only be approved if it is "in the best interest of the estate and within the reasonable judgment of the debtor.").[7]

31.     For the reasons set forth below, the Debtors submit that entry into the DIP Facility satisfies each of these factors.

**A.      Entry into the DIP Facility Is in the Best Interests of the Debtors' Creditors and Estates, Is Necessary to Preserve Estate Assets, and Is an Exercise of the Debtors' Sound and Reasonable Business Judgment.**

32.     A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard. See, e.g., Barbara K. Enters., 2008 WL 2439649, at *14 (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); Trans World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.), 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); Ames Dep't Stores, 115 B.R. at 38 (noting that financing decisions under section 364 of the Bankruptcy Code must reflect a debtor's business judgment).

33.     Generally, the business judgment standard requires that, absent evidence to the contrary, a debtor in possession is afforded discretion to act with regard to business planning activities. See In re Simasko Prod. Co., 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("[D]iscretion to act with regard to business planning activities is at the heart of the debtor's power.") (citations omitted). Moreover, the Court may appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition debtor in possession

---

[7]     Copies of each of the unpublished orders cited in this Motion are attached hereto as **Exhibit C**.

facility. For example, in <u>In re ION Media Networks, Inc.</u>, the Bankruptcy Court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization. This is particularly true in a bankruptcy setting where cooperation and established allegiances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

Case No. 09-13125 (Bankr. S.D.N.Y. July 6, 2009).

34. To determine whether the business judgment standard is met, a court is "required to examine whether a reasonable business person would make a similar decision under similar circumstances." <u>In re Exide Techs.</u>, 340 B.R. 222, 239 (Bankr. D. Del. 2006), aff'd, 2008 WL 522516 (D. Del. 2008); <u>see</u> <u>also</u> <u>In re Curlew Valley Assocs.</u>, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code.") (citation omitted).

35. The Debtors' decision to enter into the proposed DIP Facility is an exercise of their sound business judgment that warrants approval by this Court. Prior to making the determination to choose the current DIP Financing proposal, the Debtors and their advisors undertook a detailed investigation as to the Debtors' projected financing needs for the remainder of the Chapter 11 Cases. The Debtors' decision to enter into the DIP Facility is the culmination

of an intense process targeted at procuring the best available financing under the circumstances to meet these needs.

36.     The Debtors negotiated the DIP Loan Documents in good faith and at arm's length to obtain the required postpetition financing on the most favorable terms currently available to the Debtors.  Based upon the advice of the Debtors' advisors and the Debtors' own analysis, the Debtors have determined in their sound business judgment that the DIP Facility provides financing on more favorable terms than any other reasonably available alternative and avoids a potentially disabling priming battle.

37.     Moreover, as set forth above, the potential need for such additional financing prior to the Effective Date is contemplated by the Plan, which enjoys the support of the Senior Noteholders, the Committee, and ICO Global, and was approved by all classes of claims entitled to vote on the Plan other than those classes containing DISH and Sprint.

38.     The DIP Facility will provide the Debtors with access to the Initial Availability on the Closing Date (and the remaining amounts prior to the Effective Date). Without immediate access to liquidity, the Debtors will run out of cash to the detriment of all parties in interest.  Conversely, the Debtors' access to the DIP Facility will ensure that the going concern value of their assets are preserved, thereby providing a greater recovery to the Debtors' creditors than would be realized if the Debtors were forced to seek alternative financing on less favorable terms, liquidation of the Eligible UBS ARS prior to June 30, 2010, or, worse, if the Debtors were unable to obtain liquidity and forced to engage in a piecemeal liquidation of their assets.  Accordingly, the Debtors submit that entry into the DIP Facility and securing the financing thereunder is absolutely necessary to the preservation of estate assets and is in the best

interest of the Debtors' creditors and all parties in interest; and as such, represents an exercise of the Debtors' sound business judgment.

**B.**     **The DIP Facility Is the Most Favorable Source of Funding Available to the Debtors.**

39.     It is recognized in this jurisdiction and others that the appropriateness of a proposed postpetition financing facility must be considered in light of current market conditions. See, e.g., Transcript of Record at 734-35:24-1, In re Lyondell Chem. Co., Case No. 09-10023 (Bankr. S.D.N.Y. Mar. 5, 2009) (recognizing "the terms that are now available for DIP facilities in the current economic environment aren't as desirable" as they have been in the past); In re Snowshoe Co. Inc., 789 F.2d 1085, 1088 (4th Cir. 1986) (noting that a debtor is not required to seek credit from every possible lender before determining such credit is unavailable). Indeed, courts often recognize that where there are few lenders likely able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [a debtor] to conduct such an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd, 99 B.R. 117 (N.D. Ga. 1989). Rather, a debtor must demonstrate that it made a reasonable effort to seek credit from other sources available under sections 364(a) and (b). See Snowshoe, 789 F.2d at 1088; In re Plabell Rubber Prods., Inc., 137 B.R. 897, 899 900 (Bankr. N.D. Ohio 1992).

40.     The only viable option to provide necessary liquidity to the Debtors and preserve their assets as a going concern is that afforded by the DIP Facility. As discussed above, the Debtors and their advisors have engaged in negotiations with various parties to gauge their interest in providing DIP financing, and seriously considered two alternative proposals to the DIP Facility. Neither alternative offered the Debtors financing on terms as favorable as those proposed under the DIP Facility, or without requiring the priming of one or both of the Secured

Lenders on a non-consensual basis. Accordingly, the Debtors submit that the DIP Facility is the most favorable source of postpetition financing available to the Debtors under the circumstances.

### C. The Terms of the DIP Facility Are Reasonable Even If It Contains Extraordinary Provisions.

41. The Debtors note that the DIP Term Sheet includes the following provisions:

a. **Additional Instruments.** In addition to the Commitment Amount and the Closing Amount, on the Closing Date the Debtors shall issue to each DIP Lender additional debt and equity instruments (the "**Additional Instruments**") which Additional Instruments shall rank *pari passu* with the Senior Notes and the outstanding equity of the Debtors, respectively. The Additional Instruments will be issued in such respective amounts so as to provide that in the event (i) of any sale, transfer or other disposition of all or any substantial part of the assets of the Debtors and its Subsidiaries taken as whole (whether pursuant to section 363 of the Bankruptcy Code or otherwise) (a "**Disposition**") or (ii) any plan of reorganization under the Chapter 11 Cases is confirmed that is not in form and substance approved by the Required Lenders (and, without limiting the foregoing, does not authorize the New Credit Facility and the other matters described in the Commitment Letter dated September 4, 2009 between the Debtors and the Commitment Parties named therein regarding the New Credit Facility) (a "**Non-Conforming Plan**"), the DIP Lenders shall receive a repayment of (or distribution on) such Additional Instruments in an amount equal to 10% of the aggregate amount of Disposition proceeds or other consideration that would otherwise be payable to the Senior Noteholders and to ICO Global in connection with such Disposition or under such Non-Conforming Plan. DIP Term Sheet p. 5.

b. Event of Default. The entry of an order confirming a chapter 11 plan that contains terms and conditions that are inconsistent in any material respect with the Plan or any exhibit or supplement attached thereto, without the prior written consent of the Required Lenders. DIP Term Sheet p. 10; and

c. Event of Default. the Bankruptcy Court shall enter an order granting relief from the automatic stay to any creditor or party in interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any Loan Party which have an aggregate value in excess of an amount to be agreed. DIP Term Sheet p. 9.

42.     The Debtors consented to these terms as part of the complete package of terms under which the Senior Noteholders were willing to offer financing.  The Debtors and their advisors determined in their business judgment that the terms of the DIP Facility, including these terms, were superior to any other set of terms reasonably available to the Debtors.  The benefits provided by the DIP Facility inure to the benefit of the Debtors' estates, creditors, and other parties in interest, and the estates as a whole are best served by the Debtors' entering into the DIP Facility, notwithstanding the inclusion of these provisions.

## II.     The Interests of the Secured Lenders Are Adequately Protected.

43.     A debtor may obtain postpetition credit "secured by a senior or equal lien on property of the estate that is subject to a lien only if" the debtor, among other things, provides "adequate protection" to those parties whose liens are primed.  See 11 U.S.C. § 364(d)(1)(B).

44.     Here, adequate protection has already been provided to the Senior Noteholders pursuant to the Final Cash Collateral and Adequate Protection Order.  Moreover, the Senior Noteholders have consented to the priming of their prepetition liens rendering additional adequate protection unnecessary.  As described above, DISH's liens are not being primed and as such, DISH is not entitled to any additional adequate protection.

## III.    The DIP Lenders Should Be Accorded the Protections of Section 364(e) of the Bankruptcy Code.

45.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Specifically, section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not

affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

46.     The DIP Facility was negotiated in good faith and at arm's length between the Debtors and the DIP Lenders.  The Debtors believe that the terms and conditions of the DIP Facility are fair and reasonable.  Furthermore, no consideration is being provided to any party to, or guarantor of, obligations arising under the DIP Facility, other than as set forth therein.  Finally, amounts under the DIP Facility are being extended in express reliance upon the protections offered by section 364(e), and the DIP Lenders should be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the DIP Order or any provision thereof is vacated, reversed, or modified on appeal, or otherwise.

## Notice

47.     The Debtors have provided notice of this Motion to:  (a) the Office of the United States Trustee for the Southern District of New York; (b) counsel to the Committee; (c) counsel to DISH; (d) counsel to the ad hoc committee of Senior Noteholders; (e) all known Senior Noteholders; (f) the Internal Revenue Service; (g) the Securities and Exchange Commission; and (h) the parties in interest who have formally requested notice by filing a written request for notice, pursuant to Bankruptcy Rule 2002 and the Local Rules.  In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

## No Prior Request

48.     No prior motion for the relief requested herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request entry, on a final basis, of the DIP Order: (a) authorizing the Debtors to obtain postpetition financing on a second lien, secured superpriority basis and (b) granting related relief.

New York, New York
Dated:  October 12, 2009

/s/ *Marc J. Carmel*

James H.M. Sprayregen, P.C.
Christopher J. Marcus
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York  10022-4611
Telephone:      (212) 446-4800
Facsimile:       (212) 446-4900

- and -

Marc J. Carmel
Lauren M. Hawkins
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois  60654
Telephone:      (312) 862-2000
Facsimile:       (312) 862-2200

Counsel to the Debtors
and Debtors in Possession

K&E 15414224.20

# EXHIBIT A

October __, 2009

DBSD North America, Inc.
Plaza America Tower
11700 Plaza America Drive, Suite 1010
Reston, Virginia 20190
Attention:  John Flynn, Executive Vice President

Ladies and Gentlemen:

DBSD North America, Inc., a Delaware corporation (the "***Borrower***") has advised each of the persons signatory hereto as a "DIP Commitment Party" (hereinafter referred to individually as a "***DIP Commitment Party***" and, collectively, the "***DIP Commitment Parties***") that (i) the Borrower and its subsidiaries[1] (collectively, the "***Debtors***") have filed petitions commencing cases (the "***Chapter 11 Cases***") in the United States Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***") under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***"); (ii) on September 4, 2009, the Debtors filed their joint proposed plan of reorganization in the Chapter 11 Cases as docket number 400 (as such joint plan of reorganization has been amended and supplemented through the date hereof, the "***Plan***") and a hearing to consider confirmation of the Plan was held on September 22, 2009, through September 25, 2009 (the "***Confirmation Hearing***") at the conclusion of which the Bankruptcy Court reserved decision; (iii) in connection with the Plan and the Confirmation Hearing, the DIP Commitment Parties entered into that certain Commitment Letter dated September 4, 2009 (the "***Exit Commitment Letter***"), pursuant to which the DIP Commitment Parties in their respective capacities as commitment parties under the Exit Commitment Letter, committed to provide a facility (the "***New Credit Facility***") on the terms and subject to the conditions of the Exit Commitment Letter, to provide funding for the payments to be made upon consummation of the Plan and for working capital thereafter; and (iv) the Debtors wish to obtain a debtor in possession credit facility in an aggregate principal amount of up to $[25,000,000 to 30,000,000] (the "***DIP Facility***") to finance the working capital and certain permitted administrative expenses of the Debtors during the pendency of the Chapter 11 Cases, including for the period between entry of a confirmation order with respect to the Plan, and consummation of the Plan.  In

---

[1]     The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: DBSD North America, Inc. (6404); 3421554 Canada Inc. (4288); DBSD Satellite Management, LLC (3242); DBSD Satellite North America Limited (6400); DBSD Satellite Services G.P. (0437); DBSD Satellite Services Limited (8189); DBSD Services Limited (0168); New DBSD Satellite Services G.P. (4044); and SSG UK Limited (6399).

that connection, you have requested that each DIP Commitment Party commit to provide a portion of the DIP Facility.

Each DIP Commitment Party is pleased to advise you of its commitment to severally provide the portion of the DIP Facility specified opposite the name of such DIP Commitment Party in Exhibit A hereto upon the terms and subject to the conditions set forth or referred to in this commitment letter (the "**DIP Commitment Letter**") and in the Summary of Terms and Conditions attached hereto as Exhibit B (the "**DIP Term Sheet**"). Capitalized terms used and not defined herein have the respective meanings given therein in the DIP Term Sheet. It is understood that amounts repaid or prepaid in respect of DIP Loans may not be reborrowed.

The DIP Commitment Parties reserve the right to syndicate all or any portion of the DIP Facility to one or more other lenders, identified by the DIP Commitment Parties after consultation with you (the "**Proposed Lenders**"), and may commence syndication efforts upon your execution of this DIP Commitment Letter. Without limiting the foregoing, the Proposed Lenders will include all of the Senior Noteholders as of the date of such syndication. The DIP Commitment Parties shall be ratably relieved of their respective obligations to provide their portions of the DIP Facility to the extent that an offer of a Proposed Lender to provide a portion of the DIP Facility is accepted and such Proposed Lender agrees in writing to the terms of this DIP Commitment Letter (such Proposed Lenders whose offers are so accepted, together with the DIP Commitment Parties, the "**DIP Lenders**").

You agree to actively assist each DIP Commitment Party in completing a syndication reasonably satisfactory to it. Such assistance shall include (a) your using commercially reasonable efforts to ensure that the syndication efforts benefit materially from your existing lending and investment banking relationships, (b) direct contact between senior management and advisors of the Borrower, on the one hand, and the proposed DIP Lenders, on the other hand, (c) the hosting, with each DIP Lender, of one or more meetings or conference calls with prospective DIP Lenders on such dates and times as are reasonable to the Borrower and (d) your assistance in the preparation of materials to be used in connection with the syndication of the DIP Facility (collectively with the DIP Term Sheet, the "**Information Materials**"). The DIP Commitment Parties will manage all aspects of any syndication, including decisions as to the selection of institutions and other persons to be approached and when they will be approached, when their commitments will be accepted, which institutions will participate, the allocations of the commitments among the DIP Lenders and the amount and distribution of amounts among the DIP Lenders. To assist the DIP Commitment Parties in any syndication efforts, you agree to promptly prepare and provide to the DIP Commitment Parties all information with respect to the Borrower and its subsidiaries and the transactions contemplated hereby, including all financial information and projections (the "**Projections**"), as we may reasonably request in connection with the structuring, arrangement and syndication of the DIP Facility. You hereby represent and covenant that (a) all information other than the Projections (the "**Information**") taken as a whole that has been or will be made available to any DIP Commitment Party by you or any of your representatives is or will be, as of the time furnished, complete and correct in all material respects and does not or will not, as of the time furnished, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made and (b) the Projections that have been or will be made available to any DIP Commitment Party by you or any of your representatives have been or will be prepared in good faith based upon reasonable assumptions at the time of preparation thereof (it being understood that the Projections are subject to inherent uncertainties and contingencies that may be outside your control and that no assurance can be given that such Projections will be realized). You agree to supplement the Information and Projections from time to time until the Final Maturity Date so that the representations and covenants in the immediately preceding sentence remain correct. You understand that in syndicating

the DIP Facility we may use and rely on the Information and Projections without independent verification thereof.

As consideration for the DIP Commitment Parties' commitments hereunder, you agree to pay the following amounts:

(1) to each DIP Commitment Party, amounts (the "***Commitment Amounts***") equal to 2% of the aggregate amount of the portion of the DIP Facility (whether drawn or undrawn) to be provided by such DIP Commitment Party, such Commitment Amounts to be earned on the date hereof and payable ratably on the earlier of (A) the Closing Date and (B) the Termination Date (as defined below) or any other date on which the commitments of the DIP Commitment Parties hereunder in respect of the DIP Facility expire or otherwise terminate (without the concurrent occurrence of the Closing Date) (such other date, together with the Termination Date, a "***Commitment Amount Payment Date***"), provided that such Commitment Amounts shall not be payable to a DIP Commitment Party on any Commitment Amount Payment Date if such Commitment Amount Payment Date occurs as a direct result of a failure by such DIP Commitment Party to perform its obligations under this DIP Commitment Letter; and

(2) to each DIP Commitment Party, amounts (the "***Closing Amounts***") equal to 2% of the aggregate amount of the portion of the DIP Facility (whether drawn or undrawn) to be provided by such DIP Commitment Party, such Closing Amounts to be earned and payable ratably on the Closing Date;

provided that (x) to the extent the Commitment Amounts or the Closing Amounts are payable on the Closing Date, such amounts shall be added to the principal of the DIP Loan and (y) to the extent the Commitment Amounts are payable on any Commitment Amount Payment Date, such amounts will be payable in cash and in immediately available funds.

In addition to the above-referenced amounts, on the Closing Date the Borrower shall issue to each DIP Lender the "Additional Instruments" referred to in the DIP Term Sheet.

You agree that the Borrower will make all payments under this DIP Commitment Letter free and clear of and without deduction, reduction or withholding for any taxes; provided that if, the Borrower shall be required by applicable law to deduct, reduce or withhold any taxes from any such payments ("***Withholding Tax***"), the sum payable shall be increased as necessary so that after making all required deductions, reductions or withholdings, each DIP Commitment Party receives an amount equal to the sum it would have received had no such deductions, reductions or withholdings been made (the "***Gross up***"). If a DIP Commitment Party determines in its reasonable discretion that it has received a credit or similar benefit for Withholding Taxes paid against its domestic tax due on income for which a Gross-up was provided, it shall pay over such credit or similar benefit to the Borrower (but only to the extent of the additional amounts paid by the Borrower pursuant to this paragraph with respect to the Withholding Tax giving rise to such credit and only to the extent such DIP Commitment Party reasonably determines it would not be worse off than if a Withholding Tax was not payable), net of all out-of-pocket expenses of such DIP Commitment Party and without interest (other than any interest paid by the relevant governmental authority with respect to such credit); provided that if such DIP Commitment Party is required to repay all or a portion of such credit to the relevant governmental authority, the Borrower, upon the request of such DIP Commitment Party, shall repay the amount paid over to the Borrower that is required to be repaid (plus any penalties, interest or other charges imposed by the relevant governmental authority) to such DIP Commitment Party after receipt of written notice that such DIP Commitment Party is required to repay such credit (or a portion thereof) to such governmental authority. In no event shall a DIP Commitment Party be required to share with the Borrower or its advisors any information that the

DIP Commitment Party deems confidential.   In the event that the Borrower fails to make any such required deduction, reduction or withholding, the Borrower shall indemnify each DIP Commitment Party for the amount of any tax and any interest, penalties or additions to tax, and any out-of-pocket expenses that the DIP Commitment Party incurs as a result of such failure.  Each DIP Commitment Party will supply the Borrower with an IRS Form W-8BEN or W-9 as may be applicable.

       You agree that, once paid, the consideration or any part thereof payable under this DIP Commitment Letter shall not be refundable under any circumstances, regardless of whether the transactions or borrowings contemplated hereby are consummated.  All consideration payable hereunder shall be in addition to reimbursement of the DIP Commitment Parties' reasonable out-of-pocket expenses as provided for in this Commitment Letter.  You agree that the DIP Commitment Parties may, in their sole discretion, share all or a portion of any of the amounts payable pursuant hereto with any of the other DIP Lenders.

       Each DIP Commitment Party's commitment hereunder is subject to (a) such DIP Commitment Party not becoming aware after the date hereof of any information or other matter affecting the Borrower and its subsidiaries or the transactions contemplated hereby that, in such DIP Commitment Party's judgment, is inconsistent in a material and adverse manner with any such information or other matter disclosed to such DIP Commitment Party prior to the date hereof, (b) each of the following being in form and substance satisfactory to such DIP Commitment Party: (i) the confirmed Plan, (ii) the final order (the "***Confirmation Order***") entered by the Bankruptcy Court confirming the Plan (which, at all times, shall be in  full force and effect and, as of the Closing Date, shall be a final, non appealable order in full force and effect not subject to a stay) and (iii) the order (the "***DIP Order***") entered by the Bankruptcy Court approving this DIP Commitment Letter and the terms and conditions hereof (which, at all times, shall be in full force and effect and, as of the Closing Date or the Commitment Amount Payment Date, shall be a final, non appealable order in full force and effect not subject to a stay), (c) the negotiation, execution and delivery of definitive documentation for the DIP Facility satisfactory to such DIP Commitment Party, (d) there not occurring or becoming known to such Commitment Party any event, development or circumstance that has had or could reasonably be expected to have a material adverse effect on the business, operations, property, condition (financial or otherwise) or prospects of the Borrower and its subsidiaries taken as a whole, since the date of this DIP Commitment Letter, (e) the Closing Date occurring at or prior to 5:00 p.m. (New York City time) on October 30, 2009, (f) no Commitment Termination Event occurring and (g) the other conditions set forth or referred to in the DIP Term Sheet.  The terms and conditions of each DIP Commitment Party's commitment hereunder and of the DIP Facility are not limited to those set forth herein and in the DIP Term Sheet; <u>provided</u> that those matters not covered by the provisions hereof and of the DIP Term Sheet are subject to the approval and agreement of the DIP Commitment Parties and the Borrower.

       The DIP Commitment Parties may terminate this DIP Commitment Letter and their commitments hereunder, by notice to the Borrower, upon the occurrence of a Commitment Termination Event (the date upon which a Commitment Termination Event occurs, the "***Termination Date***"); <u>provided</u> that, upon the occurrence of a Commitment Termination Event described in clauses (d), (e), (h) or (i) of this paragraph, this DIP Commitment Letter and the commitments of the DIP Commitment Parties hereunder shall automatically terminate, without any notice or cure period.  As used herein, a "***Commitment Termination Event***" shall mean the earliest to occur of: (a) the Borrower shall fail to comply with any provision of this DIP Commitment Letter; (b) the DIP Order in form and substance satisfactory to the DIP Commitment Parties is not entered on or before October 30, 2009; (c) the Confirmation Order in form and substance satisfactory to the DIP Commitment Parties is not entered on or before October 28, 2009; (d) an order is entered by a court of competent jurisdiction reversing, amending, supplementing, vacating or otherwise modifying the DIP Order without the consent of the DIP Commitment Parties; (e) an order is entered by a court of competent jurisdiction reversing, amending,

supplementing, vacating or otherwise modifying the Confirmation Order in any material respect without the consent of the DIP Commitment Parties, it being agreed that an order reversing or vacating the Confirmation Order is material; (f) an order is entered by a court of competent jurisdiction staying the DIP Order and such stay remains in effect for a period in excess of twenty (20) days; (g) an order is entered by a court of competent jurisdiction staying the Confirmation Order and such stay remains in effect for a period in excess of twenty (20) days; (h) any of the Chapter 11 Cases is dismissed or converted to a Chapter 7, or a trustee or examiner with expanded powers is appointed with respect to any of the Debtors; and (i) the Debtors withdraw the Plan, or amend the Plan, in either case without the consent of the DIP Commitment Parties.

The Borrower agrees that it will not, and will not permit any of its subsidiaries to, directly or indirectly seek, solicit, propose, file, support, encourage, or vote for any modification, supplement, or amendment to the Plan or any Non Conforming Plan, unless the Borrower reasonably believes it has a fiduciary obligation to consider or support a Non-Conforming Plan.

The Borrower acknowledges and agrees that the DIP Commitment Parties are not advising the Borrower as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction.  The Borrower shall consult with its own advisors concerning such matters and shall be responsible for making its own independent investigation and appraisal of the transactions contemplated hereby, and the DIP Commitment Parties shall have no responsibility or liability to the Borrower with respect thereto.

You agree (a) to indemnify and hold harmless each DIP Commitment Party and its affiliates and their respective officers, directors, employees, advisors and agents (each, an "***indemnified person***") from and against any and all losses, claims, damages and liabilities to which any such indemnified person may become subject arising out of or in connection with this DIP Commitment Letter, the DIP Facility, the use of the proceeds thereof or any related transaction or any claim, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any indemnified person is a party thereto, and to reimburse each indemnified person promptly upon written demand for any reasonable attorneys' fees of a single legal counsel in each applicable jurisdiction for all indemnified persons (except in cases of conflicts of interest precluding the use of a single legal counsel for all indemnified persons) or other reasonable out-of-pocket expenses incurred in connection with investigating or defending any of the foregoing, provided that the foregoing indemnity will not, as to any indemnified person, apply to losses, claims, damages, liabilities or related expenses to the extent they are found by a final, non-appealable judgment of a court to arise from the willful misconduct or gross negligence of such indemnified person or disputes solely among indemnified persons, and (b) to reimburse each DIP Commitment Party and its affiliates on demand for all reasonable out-of-pocket expenses (including reasonable due diligence expenses, reasonable syndication expenses and reasonable fees, charges and disbursements of attorneys' fees of a single legal counsel in each applicable jurisdiction for all indemnified persons (except in cases of conflicts of interest precluding the use of a single legal counsel for all indemnified persons)) (the "***Expenses***") incurred in connection with the DIP Facility and any related documentation (including this DIP Commitment Letter and the DIP Term Sheet and the definitive financing documentation) or the administration, amendment, modification or waiver thereof, whether or not the financing contemplated hereby is consummated, provided that reimbursement and indemnification obligations relating to administration, amendments, modifications or waivers of definitive financing documentation shall be governed by such definitive financing documentation. No indemnified person shall be liable for any damages arising from the use by others of Information or other materials obtained through electronic, telecommunications or other information transmission systems (except, in any case, to the extent found by a final, non-appealable judgment of a court to arise from the willful misconduct or gross negligence of such indemnified person), or for any special, indirect, consequential or punitive damages in connection with the DIP Facility or its activities relating thereto. To

the extent you determine that to pay any Expenses pursuant to this letter or the DIP Term Sheet the approval of the Bankruptcy Court is required, you agree to file a motion on an expedited basis with the Bankruptcy Court to obtain approval for such payments.

This DIP Commitment Letter shall not be assignable by you without the prior written consent of each DIP Commitment Party (and any purported assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto and the indemnified persons.  This DIP Commitment Letter may not be amended or waived except by an instrument in writing signed by you and each DIP Commitment Party.  This DIP Commitment Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement.  Delivery of an executed signature page of this DIP Commitment Letter by facsimile or e-mail transmission shall be effective as delivery of a manually executed counterpart hereof.  This DIP Commitment Letter is the only agreement that has been entered into among us with respect to the DIP Facility and sets forth the entire understanding of the parties with respect thereto.

This DIP Commitment Letter shall be governed by, and construed in accordance with, the law of the State of New York.  Each party hereto consents to the exclusive jurisdiction of the United States Bankruptcy Court for the Southern District of New York during the time the Chapter 11 Cases are pending, or otherwise to the nonexclusive jurisdiction of any state or federal court located in the City of New York.  Each party hereto irrevocably and unconditionally waives any objection to the laying of venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding has been brought in any such court and any claim that any such suit, action or proceeding has been brought in an inconvenient forum.  EACH PARTY HERETO IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS DIP COMMITMENT LETTER OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).

The DIP Commitment Parties hereby notify the Borrower that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)), it and the other Lenders may be required to obtain, verify and record information that identifies the Borrower, which information includes the Borrower's name and address, and other information that will allow the DIP Commitment Parties and the other Lenders to identify the Borrower in accordance with said Act.  This notice is given in accordance with the requirements of said Act and is effective for each of the DIP Commitment Parties and the other Lenders.

This DIP Commitment Letter is delivered to you on the understanding that neither this DIP Commitment Letter nor the DIP Term Sheet nor any of their terms or substance shall be disclosed, directly or indirectly, to any other person except (a) to your officers, directors, employees, accountants, attorneys, agents and advisors who are directly involved in the consideration of this matter on a confidential and need-to-know basis and for whom you shall be responsible for any breach by any of them of this confidentiality undertaking, (b) to the extent required in motions, in form and substance reasonably satisfactory to the DIP Commitment Parties, to be filed with the Bankruptcy Court or (c) as may be compelled in a judicial or administrative proceeding or as otherwise required by law (in which case you agree to inform us promptly thereof); provided that the DIP Commitment Parties hereby consent to the Borrower's disclosure in the Chapter 11 Cases of the aggregate amount of the commitments under the DIP Facility and the identity of the DIP Commitment Parties.

You acknowledge that each DIP Commitment Party and its affiliates (the term "DIP Commitment Party" as used below in this paragraph being understood to include each DIP Commitment Party's affiliates) may be providing debt financing, equity capital or other services (including financial advisory services) to other companies in respect of which you may have conflicting interests regarding the transactions described hereby or otherwise. None of the DIP Commitment Parties will use confidential information obtained from you by virtue of the transactions contemplated hereby or other relationships with you in connection with the performance by such DIP Commitment Parties of services for other companies, and the DIP Commitment Parties will not furnish any such information to other companies. You also acknowledge that the DIP Commitment Parties have no obligation to use in connection with the transactions contemplated hereby, or to furnish to you, confidential information obtained from other companies.

The compensation, reimbursement, indemnification and confidentiality provisions contained herein shall remain in full force and effect regardless of whether definitive financing documentation shall be executed and delivered and notwithstanding the termination of this DIP Commitment Letter or any DIP Commitment Party's commitment hereunder.

If the foregoing correctly sets forth our agreement, please indicate your acceptance of the terms hereof and of the DIP Term Sheet by returning to us executed counterparts hereof not later than 5:00 p.m. (New York City time), October [_], 2009. The DIP Commitment Parties' commitments herein will automatically expire at such time in the event we have not received such executed counterparts in accordance with the immediately preceding sentence. The DIP Commitment Parties acknowledge that the obligations of the Borrower hereunder are subject to the entry of the DIP Order by the Bankruptcy Court approving this DIP Commitment Letter and the terms and conditions hereof.

We are pleased to have been given the opportunity to assist you in connection with this important financing.

Very truly yours,

[COMPLETE FOR EACH DIP COMMITMENT PARTY]

[_____], as a DIP Commitment Party

By: _____
    Name:
    Title:

Accepted and agreed to
as of the date first
written above by:

DBSD North America, Inc.


By:_____
    Name:
    Title:

DIP Commitment Parties and DIP Commitments

| Name of DIP Commitment Party | DIP Facility Commitment |
|---|---|
| [__] | $[__] |
| | |

Exhibit B

Summary of Terms and Conditions

**EXHIBIT B**

**DBSD NORTH AMERICA, INC.**
**SUMMARY OF TERMS AND CONDITIONS FOR PROPOSED DEBTOR IN POSSESSION**
**CREDIT FACILITY**

This term sheet (the "**Term Sheet**") summarizes certain material terms of a proposed debtor in possession financing (the "**DIP Facility**") among DBSD North America. Inc., a Delaware corporation, and the DIP Lenders (as defined below).

**This Term Sheet is non-binding and does not represent a commitment, unless and until it is attached to (and made a part of) a fully executed and binding commitment letter, in which event it shall be binding on the terms and subject to the conditions set forth therein. This Term Sheet is intended as a summary only and does not reference all of the terms, conditions, representations, warranties, covenants, and other provisions that would be contained in the definitive documentation for the proposed DIP Facility. Capitalized terms used herein and not otherwise defined herein are used herein as defined in the Debtors' Second Amended Joint Plan of Reorganization pursuant to Chapter 11 of the United States Bankruptcy Code (as amended and in effect from time to time, the "Plan") and the Final Cash Collateral and Adequate Protection Order (as defined below).**

| | |
|---|---|
| **Parties:** | DBSD North America, Inc., as debtor and debtor-in-possession (the "**Borrower**") in the voluntary cases (the "**Cases**") that the Borrower and certain of its affiliates, have commenced under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court in the Southern District of New York (the "**Bankruptcy Court**"), each of the Borrower's direct and indirect subsidiaries as guarantors (the "**Subsidiary Guarantors**" and, collectively with the Borrower, the "**Debtors**" or the "**Loan Parties**"), the persons that are lenders under the DIP Facility from time to time (the "**DIP Lenders**"), and [_____], as administrative agent for the DIP Lenders (in such capacity, the "**DIP Agent**"). |
| **Amount:** | The DIP Facility shall be comprised of a term loan facility in an aggregate principal amount of $[25,000,000-30,000,000] (the "**DIP Commitments**"), comprising three drawings thereunder as specified herein under the section entitled "Availability". |
| **Priority/Collateral:** | All of the Debtors' obligations under the DIP Loan Documents (as defined below) shall, at all times: |
| | (i) pursuant to Bankruptcy Code section 364(c)(1), be entitled to a superpriority administrative expense claim status in the Cases (the "**Superpriority Claim**"); |
| | (ii) pursuant to Bankruptcy Code section 364(c)(2), have a fully-perfected lien on all assets of the Loan Parties (now existing or hereafter acquired and all proceeds thereof) that were not subject to a |

perfected, non-avoidable lien as of the date of the filing of the Cases (the "**Petition Date**"), immediately junior only to the Senior Adequate Protection Liens (as defined below) on such assets, but senior to all other liens;

      (iii)    pursuant to Bankruptcy Code section 364(c)(3), have a fully-perfected lien on all assets of the Loan Parties (now or hereafter acquired and all proceeds thereof) that were, as of the Petition Date, subject to Permitted Senior Liens (as defined below), immediately junior to such Permitted Senior Liens and Senior Adequate Protection Liens, but senior to all other liens; and

      (iv)    pursuant to Bankruptcy Code section 364(d)(1), have a fully-perfected senior priming lien on all assets of the Loan Parties (now or hereafter acquired and all proceeds thereof) that are subject to any liens (other than the Permitted Senior Liens and Senior Adequate Protection Liens, but including, without limitation, all other liens created under the Final Cash Collateral and Adequate Protection Order and the liens (the "**Prepetition Noteholders' Liens**") of the Senior Noteholders securing the Senior Notes (the "**Prepetition Noteholders' Collateral**")).

The liens to be granted to the DIP Lenders pursuant to clauses (ii) through (iv) above shall be referred to, collectively, as the "**DIP Liens**", and the assets of the Loan Parties referred to in clauses (ii) through (iv) above shall be referred to, collectively, as the "**DIP Collateral**".

As used herein, "**Permitted Senior Liens**" means (i) the liens of the Prepetition First Lien Creditors securing the Prepetition First Lien Facility and (ii) any other liens agreed to by the DIP Lenders.

As used therein, "**Senior Adequate Protection Liens**" means the adequate protection liens granted to the Prepetition First Lien Creditors pursuant to the Final Cash Collateral and Adequate Protection Order.

The DIP Order (as each such term is defined below) shall contain provisions prohibiting the Loan Parties from incurring any indebtedness during the pendency of the Cases that ranks *pari passu* with or senior to the Loan Parties' obligations under the DIP Facility (the "**DIP Obligations**").

|  |  |
|---|---|
| **Term** | The loans under the DIP Facility (the "**DIP Loans**") shall be repaid in full on (each, the "**Final Maturity Date**") the earliest to occur of: (i) the effective date of the Plan (the "**Effective Date**"), (ii) March 31, 2010, (iii) the date any of the Cases is converted to a case under chapter 7 of the Bankruptcy Code and (iv) the acceleration of the DIP Loans, including upon the occurrence of an Event of Default (as defined in the DIP Loan Documents and including, without limitation, the events of default set forth herein under the section entitled "Events of Default") as provided herein, in accordance with the terms of the definitive documentation in respect of the DIP Facility and the DIP Collateral (the "**DIP Loan** |

**Documents**").

| | |
|---|---|
| **Carve-Out:** | The Superpriority Claim and the DIP Liens shall be subject to payment of the "Carve-Out" (the **Carve-Out**") specified in Paragraphs 15 and 16 of the Final Order (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection to Certain Prepetition Secured Parties, and (C) Granting Related Relief entered by the Bankruptcy Court on July 22, 2009 (the "**Final Cash Collateral and Adequate Protection Order**") and for such purposes the term "Event of Default" under the Final Cash Collateral and Adequate Protection Order shall mean an event of default under the DIP Facility. |
| **Use of Proceeds:** | The proceeds of the DIP Facility shall be applied to (a) fund certain permitted administrative expenses of the Cases and (b) provide working capital for the Debtors during the pendency of the Cases, in each case subject to compliance with the Budget covenant in the DIP Loan Documents. |
| | Notwithstanding anything to the contrary in this Term Sheet or any other DIP Loan Documents, no proceeds of the DIP Facility, including no portion of the Carve-Out, may be used (a) for the payment of the fees and/or expenses incurred in (i) challenging, or supporting any challenge of, the DIP Obligations, the DIP Liens or the Superpriority Claim, (ii) initiation or prosecution of any claim or cause of action against the DIP Agent or any DIP Lender, or their respective directors, officers, employees, advisors, agents, successors and assigns, (iii) challenging, or supporting challenge of, the obligations under the Senior Notes, the Prepetition Noteholders' Liens or any Senior Note Claim, (iv) challenging or modifying the exclusive right of any Debtor to file a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code, (v) actively opposing confirmation or consummation of the Plan, (vi) pursuing confirmation or consummation of a Non-Conforming Plan (as defined below), (vii) actions to hinder or delay occurrence of the Effective Date under the Plan or (viii) any other action which with the giving of notice or the passing of time would result in an Event of Default thereunder, (b) for the payment of any prepetition indebtedness (other than pursuant to the Final Cash Collateral and Adequate Protection Order), (c) to make any distribution under a confirmed plan of reorganization in the Cases (other than the Plan), (d) to settle any claim by the allowance of an administrative priority or non dischargeable claim, (e) for the payment or reimbursement of any third party expenses incurred in connection with any Disposition (as defined below) or any proposed Disposition. |
| **Budget:** | The Loan Parties shall deliver to the DIP Agent a 13-week cash flow budget (commencing on or about the Closing Date) satisfactory in form and substance to the DIP Lenders and showing projected receipts and disbursements for such period, including anticipated uses of the proceeds of borrowings under the DIP Facility (as modified from time to time with the written consent of the Required Lenders, the "**Budget**"). |

| | |
|---|---|
| **Closing Date:** | The date on or after the date (the "**DIP Order Entry Date**") on which the Bankruptcy Court enters the DIP Order (as defined below) approving the DIP Facility and the other conditions precedent set forth in the DIP Loan Documents and summarized in Annex I are satisfied or waived, as determined by the DIP Lenders (the "**Closing Date**"). |
| | For purposes hereof, the term "**DIP Order**" shall mean an order of the Bankruptcy Court on an application or motion by the Borrower that is satisfactory in form and substance to the DIP Lenders, which DIP Order shall approve the DIP Facility and the other transactions contemplated herein (including (1) the grant of superpriority claim status and senior priming and other liens contemplated herein, (2) the authorization of extensions of credit in amounts satisfactory to the DIP Lenders and (3) the approval of the payment by the Borrower of all of the fees, expenses and other amounts provided for herein). |
| **Availability:** | Subject in each case to compliance with the terms, conditions and covenants in the DIP Loan Documents: |
| | (i) On or after the Closing Date, a portion of the DIP Loans, not to exceed $[_____], shall be available to the Borrower (the "**Initial Availability**"); |
| | (ii) On or after a date to be determined in November 2009, a portion of the DIP Loans not to exceed $[____] shall be available to the Borrower; and |
| | (iii) On or after a date to be determined in January 2010, the full remaining undrawn amount of the DIP Commitments shall be available to the Borrower. |
| | Amounts prepaid or repaid in respect of the DIP Loans may not be reborrowed. |
| **Interest Rate:** | All amounts outstanding under the DIP Facility will bear interest at the rate of 20.00% *per annum*. So long as no event of default under the DIP Facility is continuing, interest shall be paid in kind; at any time when an event of default under the DIP Facility is continuing (or otherwise at the Borrower's option), interest shall be paid in cash. |
| **Default Interest**: | During the continuance of an Event of Default, the loans and all other outstanding obligations will bear interest at an additional 2.00% *per annum* above the interest rate otherwise applicable. |
| **Commitment Amount:** | An amount equal to 2% of the DIP Commitments (the "**Commitment Amount**"), payable to each DIP Lender according to its pro rata share of the DIP Commitments on the Closing Date. The Commitment Amount shall be added to the principal of the DIP Loans of each DIP Lender on the Closing Date. |
| **Closing Amount:** | An amount equal to 2% of the DIP Commitments (the "**Closing Amount**"), payable to each DIP Lender according to its pro rata share of |

the DIP Commitments on the Closing Date. The Closing Amount shall be added to the principal of the DIP Loans of each DIP Lender on the Closing Date.

**Additional Instruments:**  In addition to the above-referenced amounts, on the Closing Date the Borrower shall issue to each DIP Lender additional debt and equity instruments (the "**Additional Instruments**") which Additional Instruments shall rank pari passu with the Senior Notes and the outstanding equity of the Borrower, respectively. The Additional Instruments will be issued in such respective amounts so as to provide that in the event (A) of any sale, transfer or other disposition of all or any substantial part of the assets of the Borrower and its Subsidiaries taken as whole (whether pursuant to Section 363 of the Bankruptcy Code or otherwise) (a "**Disposition**") or (B) any plan of reorganization under the Chapter 11 Cases is confirmed that is not in form and substance approved by the Required Lenders (and, without limiting the foregoing, does not authorize the New Credit Facility and the other matters described in the Commitment Letter dated September 4, 2009 between the Borrower and the Commitment Parties named therein regarding the New Credit Facility (the "**Exit Commitment Letter**")) (a "**Non-Conforming Plan**"), the DIP Lenders shall receive a repayment of (or distribution on) such Additional Instruments in an amount equal to 10% of the aggregate amount of Disposition proceeds or other consideration that would otherwise be payable to the Senior Noteholders and to ICO Global Communications (Holdings) Limited (and any successor in interest thereto) in connection with such Disposition or under such Non-Conforming Plan.

**Agency Fees:**  As agreed with the DIP Agent.

**Nature of Fees, Commitment Amount and Closing Amount:**  Non-refundable under all circumstances.

**Currency:**  All borrowings shall be made in U.S. Dollars. All payments under the DIP Facility will be made in immediately available funds, without deduction, setoff or counterclaim.

**Funding Protection:**  Customary for transactions of this type, including breakage costs, gross-up for withholding (without regard to any change in law), compensation for increased costs and compliance with capital adequacy and other regulatory restrictions.

**Voluntary Prepayments:**  The DIP Loans may be prepaid in minimum amounts to be agreed upon.

**Mandatory Prepayments:**  Mandatory prepayment provisions usual and customary for transactions of this type, including 100% of the net proceeds of any sale or other disposition (including as a result of casualty or condemnation) of any asset by the Borrower or any of its subsidiaries, subject to exceptions to be agreed.

**Prepayments Generally**     All optional and mandatory prepayments shall be applied ratably to the DIP Loans and may not be reborrowed.

All mandatory prepayments of the DIP Loans are subject to the prior payment in full of the obligations under the Prepetition Facility.

**Adequate Protection:**     Pursuant to sections 361 and 363 of the Bankruptcy Code, as consideration for the Senior Noteholders' consent to the Debtors' use of their cash collateral, and as adequate protection for, and equal in amount to, the diminution in the value of the Senior Noteholders' interest in the Prepetition Noteholders' Collateral, whether resulting from the postpetition sale, lease or use of such collateral, the imposition of the automatic stay under section 362 of the Bankruptcy Code, the priming of the Prepetition Noteholders' Liens, or otherwise, the Senior Noteholders shall receive adequate protection as provided in the Final Cash Collateral and Adequate Protection Order.

**Conditions to All Borrowings:**     The obligation of the DIP Lenders to make the DIP Loans will be subject to the applicable conditions precedent listed on <u>Annex I</u> attached hereto, and such other conditions as set forth herein.

The conditions to all borrowings will include requirements relating to prior written notice of borrowing, the accuracy in all material respects of representations and warranties (including no material adverse change), the absence of any Default or Event of Default, no legal bar, and will otherwise be customary and appropriate for financings of this type and acceptable to the DIP Lenders.  Such conditions shall include, without limitation, the following:

(a) As a result of such extension of credit, usage of the applicable DIP Commitment shall not exceed (i) the applicable DIP Commitment then in effect and (ii) the amount authorized by the DIP Order, and the Loan Parties shall be in pro forma compliance with the Budget covenant in the DIP Loan Documents;

(b) No appeal of the DIP Order shall have been filed and remain pending;

(c) Each Order (as defined below) shall be in full force and effect, and shall not have been reversed, modified, amended, stayed, vacated or subject to a stay pending appeal;

(d) The Loan Parties shall be in compliance with each Order;

(e) The Loan Parties shall have paid all fees then due and payable as referenced herein;

(f) The DIP Lenders shall have received the required periodic updates pursuant to the Budget and any variance reports, each in form and substance satisfactory to the DIP Lenders; and

(g)  Such other conditions as may be set forth in the DIP Loan Documents.

| | |
|---|---|
| **Representations and Warranties:** | The DIP Loan Documents will contain such customary and appropriate representations and warranties by the Loan Parties as are usual and customary for financings of this kind, including, without limitation: due organization; requisite power and authority; qualifications; due authorization, execution, delivery and enforceability of the DIP Loan Documents; governmental consents; no conflicts; no defaults under material agreements; historical and projected financial condition; no material adverse change since September 4, 2009; title to properties; intellectual property; equity interests and ownership; absence of material unstayed litigation; Investment Company Act and margin stock matters; payment of post-petition taxes; full disclosure; ERISA and other employee matters; environmental matters; creation, perfection and priority of security interests; Patriot Act and other related matters; communications licenses; insurance and the Cases. |
| **Covenants :** | The DIP Loan Documents will contain such financial, affirmative and negative covenants as are usual and customary for financings of this kind, including, without limitation: |
| **- financial covenants :** | Compliance with the Budget, including maintaining a positive or no variance or a negative variance of not greater than a percentage to be agreed with respect to comparisons of actual cash receipts and cash operating disbursements to corresponding Budget items (and, without limiting the foregoing, no capital expenditure except as provided in the Budget may be made without the consent of the Required Lenders). |
| **- affirmative covenants:** | Delivery of financial statements, Budget and other reports (including delivery of a reconciliation to actual and a variance analysis as to line items from the Budget and delivery by the fourth Business Day of each week (i) cash balance calculations and (ii) rolling 13-week cash flow projections (together with comparisons of actual payments to Budget items and explanations of any variances of greater than a percentage to be agreed), each in a form and in substance satisfactory to the Required Lenders); notices; maintenance of existence, business and properties; compliance with laws; maintenance of insurance; payment of post-petition taxes and claims; employee benefits; books and records; inspections; environmental matters; additional collateral and guarantors; further assurances; covenants relating to the Cases (which shall include, without limitation, a covenant to diligently pursue the consummation of the Plan as expeditiously as possible in consultation with the DIP Lenders; a covenant to provide and discuss with the DIP Lenders any information and developments in connection with any proposed Disposition or change of control; a covenant that, if requested by the Required Lenders at any time a default is continuing, the Borrower shall retain a chief restructuring officer acceptable to the Required Lenders and a covenant to comply with the Orders (as defined below)). The DIP Loan Documents will contain provisions limiting the rights of DIP Lenders that are competitors of the |

Borrower to obtain certain information.

**- negative covenants:**    Limitations with respect to other indebtedness; liens; sales and leasebacks; investments; mergers and consolidations; changes in line of business; asset sales (other than the auction rate securities subject to the Final Order Approving The Sale Of Certain Of The Debtors' Auction Rate Securities For Cash Free And Clear Of Liens, Claims, Interests, And Encumbrances And Granting Related Relief, filed as docket no. 222 in the Cases); acquisitions; dividends; transactions with affiliates; payments of other indebtedness; certain restrictions on subsidiaries; issuance of capital stock; creation of subsidiaries; business; negative pledges; amendments and waivers of organizational documents, junior indebtedness and other material agreements; prohibition on entering into new material agreements or transactions without the consent of the Required Lenders, holding company covenants and covenants relating to the Cases (including, without limitation, no *pari passu* or senior administrative claims or expenses or obligations to make adequate protection payments (other than under the Final Cash Collateral and Adequate Protection Order); a covenant not to amend, supplement or modify the Plan or any of the Confirmation Order (as defined below), the DIP Order, the Final Cash Collateral and Adequate Protection Order or the Cash Management Order (collectively, the "**Orders**") without the Required Lender's prior consent; a covenant not to assume or reject any executory contract or unexpired lease, <u>provided</u> that to the extent any executory contract or unexpired lease is listed on the Schedules to the Plan on file with the Bankruptcy Court as of October 12, 2009 (as docket number 400) and such Schedules provide for the assumption or rejection of such executory contract or unexpired lease, the assumption or rejection thereof is permitted under the DIP Loan Documents; and a covenant not to consent to termination or reduction of the Exclusivity Period or fail to object to any motion seeking to terminate or reduce the Exclusivity Period).

**Events of Default:**    In addition to other customary events of default (including, without limitation, failure to pay any interest or principal when due, failure to comply with covenants, inaccurate or false representations or warranties, change of control, judgment defaults, ERISA, liens on the DIP Collateral), the DIP Facility shall be subject to the following additional events of default (with thresholds and grace periods to be determined):

(a)    any of the Cases shall be dismissed or converted to a Chapter 7 case; any superpriority administrative expense claim or lien shall be granted in any of the Cases without the consent of the Required Lenders, which is pari passu with or senior to the Superpriority Claims or the DIP Liens, as applicable;

(b)    any Loan Party shall file a motion in the Cases without the consent of the Required Lenders to obtain additional financing from a party other than the DIP Lenders;

(c)    any Loan Party shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or

otherwise on account of any prepetition indebtedness or payables, other than as contemplated under the Final Cash Collateral and Adequate Protection Order or payments agreed to in writing by the Required Lenders and authorized by the Bankruptcy Court;

(d)    the Bankruptcy Court shall enter an order granting relief from the automatic stay to any creditor or party in interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any Loan Party which have an aggregate value in excess of an amount to be agreed;

(e)    an order shall be entered reversing, amending, modifying, staying, or vacating any Order or any of the Loan Parties shall apply for authority to do so, without the prior written consent of the Required Lenders or any Order shall otherwise cease to be in full force and effect;

(f)    any of the Loan Parties shall fail to comply with any Order in any material respect;

(g)    a chapter 11 trustee, receiver, a responsible officer or an examiner with enlarged powers relating to the operation of the businesses of the Loan Parties shall be appointed in any of the Cases;

(h)    any Loan Party shall seek to or support any other person's opposition of any motion made in the Bankruptcy Court by the DIP Lenders seeking confirmation of the amounts of the DIP Lenders' claim or the validity or enforceability of the DIP Liens;

(i)    (i) any Loan Party or any of its affiliates shall seek to, or shall support an other person's motion to, disallow the DIP Lenders' claims or challenge the validity and enforceability of the DIP Liens or contest any material provision of any DIP Loan Document or (ii) the DIP Liens and/or super-priority claims shall otherwise cease to be valid, perfected and enforceable or any material provision of any DIP Loan Document shall cease to be effective;

(j)    the filing of any pleading or proceeding by any Loan Party or its affiliates (that is not withdrawn, within a time period to be agreed, upon notice to the Loan Parties) which could reasonably be expected to result in a material impairment of the rights or interests of the DIP Lenders or an order of the Bankruptcy Court with respect to any pleading or proceeding brought by another party which results in such a material impairment subject to a cure period to be agreed;

(k)    entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any Debtor to file a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code, without the

prior written consent of the Required Lenders;

(l)     any person files a chapter 11 plan that contains terms and conditions that are inconsistent in any material respect with the Plan or any exhibit or supplement attached thereto, without the prior written consent of the Required Lenders;

(m)     any Loan Party shall have filed a motion seeking the entry of, or the Bankruptcy Court shall have entered, an order approving a payment to any person on account of any claim under the Plan (whether in cash or other property or whether as adequate protection, settlement of a dispute, or otherwise) that would be materially inconsistent with the treatment of any such person with respect to such claim under the Plan, without the prior written consent of the Required Lenders;

(n)     any judgments which are in the aggregate in excess of an amount to be agreed as to any postpetition obligation shall be rendered against any of the Loan Parties and the enforcement thereof shall not be stayed; or there shall be rendered against any of the Loan Parties a non-monetary judgment with respect to a postpetition event which causes or would reasonably be expected to cause a material adverse change or a material adverse effect on the ability of the Loan Parties to perform their obligations under the DIP Loan Documents or the value of the DIP Collateral;

(o)     the Plan is amended, supplemented or otherwise modified without the prior consent of the Required Lenders;

(p)     the Plan is withdrawn;

(q)     the final order confirming the Plan (the "**Confirmation Order**") in form and substance acceptable to the Required Lenders is not entered on or before October 28, 2009;

(r)     each of the following is not in form and substance satisfactory to the Required Lenders: (i) the Plan, as confirmed in the Cases and (ii) the Confirmation Order entered by the Bankruptcy Court confirming the Plan;

(s)     the Confirmation Order is amended, supplemented, reversed, vacated or otherwise modified without the prior written consent of the Required Lenders;

(t)     the FCC denies by final order not subject to appeal, review or reconsideration, application to change the ownership of the Debtors pursuant to the Plan; or

(u)     the Effective Date of the Plan shall not have occurred on or before March 31, 2010.

| | |
|---|---|
| **Voting** | "Required Lenders" shall mean DIP Lenders holding more than 50% of the aggregate amount of the DIP Loans and unused DIP Commitments under the DIP Facility except as to matters requiring unanimity (*e.g.*, the reduction of interest rates, the extension of interest payment dates, the reduction of fees, the extension of the maturity of the Borrower's obligations, the amendment or modification of the super-priority status of the Debtors' obligations and the release of all or substantially all of the Subsidiary Guarantors or all or substantially all of the DIP Collateral). |
| | Any provision of the DIP Loan Documents for which an amendment or waiver requires the consent of 100% of the DIP Lenders may be amended or waived by the Required Lenders and the DIP Agent if at the time the relevant amendment or waiver becomes effective, each DIP Lender not consenting to such amendment or waiver receives payment in full of the principal of, and interest on, its DIP Loans. |
| **Participation in DIP Facility** | The opportunity to participate in the DIP Facility will be offered to all Senior Noteholders on the same terms as the New Credit Facility will be offered to the Senior Noteholders as provided in the Term Sheet annexed to the Exit Commitment Letter as Exhibit B thereto. |
| **Assignments and participations:** | The DIP Loan Documents shall include rights of assignment, subject to the DIP Agent's and the Borrower's consent (each such consent not to be unreasonably withheld or delayed) and participation rights (provided that Borrower's consent will not be required if an Event of Default is continuing or in certain other specified cases, including in connection with the initial syndication of the DIP Facility). |
| **Expenses:** | A customary reimbursement of costs and expenses of the DIP Agent and the DIP Lenders. |
| **Indemnity:** | The Loan Parties shall, jointly and severally, be obligated to indemnify and hold harmless the DIP Agent, each of the DIP Lenders, and each of their respective affiliates, officers, directors, fiduciaries, employees, agents, advisors, attorneys and representatives from and against all losses, claims, liabilities, damages, and expenses (including, without limitation, out-of-pocket fees and disbursements of counsel) in connection with any investigation, litigation or proceeding, or the preparation of any defense with respect thereto, arising out of or relating to the DIP Facility or the transactions contemplated in this Term Sheet except to the extent resulting from their gross negligence or willful misconduct. |
| **Governing Law:** | The DIP Loan Documents will provide that (i) the Loan Parties will submit to the non-exclusive jurisdiction and venue of the Bankruptcy Court, or in the event that the Bankruptcy Court does not have or does not exercise jurisdiction, then in any state or federal court of competent jurisdiction in the State of New York; and shall waive any right to trial by jury. |
| | New York law shall govern the DIP Loan Documents except to the extent |

preempted by federal bankruptcy laws.

## Annex I

### Summary of Conditions Precedent to the Facility

*This Summary of Conditions Precedent outlines certain of the conditions precedent to the funding under the DIP Facility. Certain capitalized terms used herein are defined in the Term Sheet.*

A.     <u>CONDITIONS TO THE CLOSING DATE AND INITIAL AVAILABILITY</u>

1.     <u>Bankruptcy Matters</u>.

      (a)     The Plan shall be in form and substance satisfactory to the DIP Lenders.

      (b)     The Bankruptcy Court shall have entered, upon motion in form and substance satisfactory to the DIP Lenders, the DIP Order, in form and substance satisfactory to the DIP Lenders, containing, among other things, a finding that the DIP Agent and the DIP Lenders are extending credit to the Loan Parties in good faith within the meaning of Section 364(e) of the Bankruptcy Code.

      (c)     No Order shall have been reversed, modified, amended, stayed or vacated, without prior consent of the DIP Lenders.

      (d)     No examiner with increased powers relating to the operation of the businesses of the Loan Parties or trustee shall have been appointed with respect to any of the Loan Parties or their respective properties.

      (e)     The Cash Management Order entered in the Cases as Docket No. 109 shall be in full force and effect.

2.     <u>Financial Statements, Budgets and Reports.</u> The DIP Lenders shall have received the Budget, which Budget shall be in form and substance satisfactory to the DIP Lenders, and such other information (financial or otherwise) as may be requested by them.

3.     <u>Performance of Obligations</u>.

      (a)     All reasonable costs, fees, expenses (including, without limitation, reasonable legal fees) and other compensation contemplated by the DIP Loan Documents to be payable to the DIP Agent or the DIP Lenders shall have been paid to the extent due and the Loan Parties shall have complied in all material respects with all of their other obligations to the DIP Agent and the DIP Lenders.

      (b)     No Default or Event of Default shall exist.

      (c)     Representations and warranties shall be true and correct in all material respects.

      (d)     The DIP Loan Documents shall have been executed and delivered and the DIP Lenders shall have perfection of liens and pledges on the DIP Collateral to their satisfaction.

4.      Customary Closing Documents.  The DIP Lenders shall be satisfied that the Loan Parties have complied with all other customary closing conditions, including, without limitation: (i) the delivery of legal opinions; (ii) evidence of authority; and (iii) obtaining of any third party and governmental consents (including any consents of the U.S. Federal Communications Commission) necessary in connection with the DIP Facility, the financing thereunder and related transactions.

5.      Other Conditions.  Such other conditions as are reasonably requested by the DIP Lenders shall have been satisfied by the Loan Parties.

B.      CONFIRMATIONS BY THE DIP LENDERS

The DIP Lenders will confirm in the DIP Loan Documents that the Plan on file with the Bankruptcy Court as of October 12, 2009 (as docket number 400) and the form of the Confirmation Order proposed by the Debtors on file with the Bankruptcy Court as of October 12, 2009 (as docket number 398) are satisfactory in form and substance.

# EXHIBIT C

**In re ION Media Networks, Inc.,** Case No. 09-13125 (Bankr. S.D.N.Y. July 6, 2009)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ION MEDIA NETWORKS, INC., *et al.*, | ) Case No. 09-13125 (JMP) |
| | ) |
| Debtors. | ) Joint Administration Requested |
| | ) |

**FINAL ORDER (I) AUTHORIZING POSTPETITION SECURED**
**FINANCING PURSUANT TO 11 U.S.C.§§ 105(a),**
**361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e),**
**(II) AUTHORIZING THE DEBTORS' USE OF CASH COLLATERAL**
**PURSUANT TO 11 U.S.C. § 363, AND (III) GRANTING**
**ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. §§ 361, 363 AND 364**

Upon the Motion dated May 19, 2009 (as supplemented on June 25, 2009 [D.E. #100]

and June 30, 2009 [D.E. #118], the "***Motion***") of ION Media Networks, Inc. ("***ION***") and its

affiliated debtors, each as a debtor and debtor in possession (collectively, the "***Debtors***")[1] in the

---

[1]    The Debtors in these chapter 11 cases are:  ION Media Networks, Inc.; America 51, L.P.; ION Media Akron License, Inc.; ION Media Albany License, Inc.; ION Media Atlanta License, Inc.; ION Media Battle Creek License, Inc.; ION Media Boston License, Inc.; ION Media Brunswick License, Inc.; ION Media Buffalo License, Inc.; ION Media Charleston License, Inc.; ION Media Chicago License, Inc.; ION Media Dallas License, Inc.; ION Media Denver License, Inc.; ION Media Des Moines License, Inc.; ION Media Entertainment, Inc.; ION Media Greensboro License, Inc.; ION Media Greenville License, Inc.; ION Media Hartford License, Inc.; ION Media Hawaii License, Inc.; ION Media Hits, Inc.; ION Media Holdings, Inc.; ION Media Houston License, Inc.; ION Media Indianapolis License, Inc.; ION Media Jacksonville License, Inc.; ION Media Kansas City License, Inc.; ION Media Knoxville License, Inc.; ION Media Lexington License, Inc.; ION Media License Company, LLC; ION Media Los Angeles License, Inc.; ION Media LPTV, Inc.; ION Media Management Company.; ION Media Martinsburg License, Inc.; ION Media Memphis License, Inc.; ION Media Milwaukee License, Inc.; ION Media Minneapolis License, Inc.; ION Media New Orleans License, Inc.; ION Media of Akron, Inc.; ION Media of Albany, Inc.; ION Media of Atlanta, Inc.; ION Media of Battle Creek, Inc.; ION Media of Birmingham, Inc.; ION Media of Boston, Inc.; ION Media of Brunswick, Inc.; ION Media of Buffalo, Inc.; ION Media of Cedar Rapids, Inc.; ION Media of Charleston, Inc.; ION Media of Chicago, Inc.; ION Media of Dallas, Inc.; ION Media of Denver, Inc.; ION Media of Des Moines, Inc.; ION Media of Detroit, Inc.; ION Media of Fayetteville, Inc.; ION Media of Greensboro, Inc.; ION Media of Greenville, Inc.; ION Media of Hartford, Inc.; ION Media of Honolulu, Inc.; ION Media of Houston, Inc.; ION Media of Indianapolis, Inc.; ION Media of Jacksonville, Inc.; ION Media of Kansas City, Inc.; ION Media of Knoxville, Inc.; ION Media of Lexington, Inc.; ION Media of Los Angeles, Inc.; ION Media of Louisville, Inc.; ION Media of Martinsburg, Inc.; ION Media of Memphis, Inc.; ION Media of Miami, Inc.; ION Media of Milwaukee, Inc.; ION Media of Minneapolis, Inc.; ION Media of Nashville, Inc.; ION Media of New Orleans, Inc.; ION Media of New York, Inc.; ION Media of Norfolk, Inc.; ION Media of Oklahoma City, Inc.; ION

above-captioned cases (the "***Cases***"), pursuant to sections 105, 361, 362, 363(b), 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) of the Bankruptcy Code, and Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), seeking, among other things:

(a)      authorization for ION, in its capacity as borrower (the "***Borrower***"), to obtain postpetition financing (the "***Financing***") and for each of the other Debtors to guarantee unconditionally (the "***Guarantors***"), on a joint and several basis, the Borrower's obligations in connection with the Financing, consisting of a superpriority priming multiple draw term loan facility in an aggregate principal amount of up to $150,000,000 in respect of new money funding (the "***DIP Loans***");

(b)      authorization for the Debtors to execute and deliver all final documentation consistent with the terms and conditions of the Financing and that certain Debtor In Possession Credit Agreement dated as of [•], 2009, among ION Media Networks, Inc., the subsidiary guarantors, the lenders party thereto (collectively, the "***DIP Lenders***"), and Wilmington Trust

---

Media of Orlando, Inc.; ION Media of Philadelphia, Inc.; ION Media of Phoenix, Inc.; ION Media of Portland, Inc.; ION Media of Providence, Inc.; ION Media of Raleigh, Inc.; ION Media of Roanoke, Inc.; ION Media of Sacramento, Inc.; ION Media of Salt Lake City, Inc.; ION Media of San Antonio, Inc.; ION Media of San Jose, Inc.; ION Media of Scranton, Inc.; ION Media of Seattle, Inc.; ION Media of Spokane, Inc.; ION Media of Syracuse, Inc.; ION Media of Tampa, Inc.; ION Media of Tulsa, Inc.; ION Media of Washington, Inc.; ION Media of Wausau, Inc.; ION Media of West Palm Beach, Inc.; ION Media Oklahoma City License, Inc.; ION Media Orlando License, Inc.; ION Media Philadelphia License, Inc.; ION Media Portland License, Inc.; ION Media Publishing, Inc.; ION Media Raleigh License, Inc.; ION Media Sacramento License, Inc.; ION Media Salt Lake City License, Inc.; ION Media San Antonio License, Inc.; ION Media San Jose License, Inc.; ION Media Scranton License, Inc.; ION Media Songs, Inc.; ION Media Spokane License, Inc.; ION Media Syracuse License, Inc.; ION Media Television, Inc.; ION Media Tulsa License, Inc.; ION Media Washington License, Inc.; ION Media Wausau License, Inc.; ION Media West Palm Beach Holdings, Inc.; ION Media West Palm Beach License, Inc.; ION Television Net, Inc.; Ocean State Television, L.L.C.; Open Mobile Ventures Corporation.  The location of the corporate headquarters for all Debtors except ION Media of New York, Inc. is: 601 Clearwater Park Road, West Palm Beach, Florida  33401-6233.  The location of the corporate headquarters for ION Media of New York, Inc. and the service address for all of the Debtors is:  1330 Avenue of the Americas, New York, New York  10019.  Information regarding the Debtors' business, their pre-arranged restructuring and the background of these chapter 11 cases can be found in the Declaration of R. Brandon Burgess, Chairman, President and Chief Executive Officer of ION Media Networks, Inc., In Support Of First Day Pleadings (the "***First Day Declaration***"), filed on May 19, 2009, the date the Debtors filed their petitions (the "***Petition Date***") under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***").

FSB, as administrative and collateral agent (in such capacity, the "***DIP Agent***") (as amended, restated or otherwise modified from time to time in accordance with the terms thereof, the "***DIP Credit Agreement***"; together with all agreements, documents, and instruments delivered or executed in connection therewith, the "***DIP Documents***"), which DIP Credit Agreement shall be in substantially the same form attached hereto as <u>Exhibit A</u>, and to perform such other and further acts as may be required in connection with the DIP Credit Agreement or other DIP Documents;

(c)     authorization for the Debtors to use proceeds of the Financing and Cash Collateral (as defined below) to provide working capital for, and for other general corporate purposes of, the Debtors, including for payment of any adequate protection obligations as set forth herein;

(d)     the granting of adequate protection to the secured parties whose liens and security interests under the following documents are being primed by the Financing (collectively, the "***Existing Primed Secured Facilities***"):

(i)     the Term Loan Agreement dated as of December 30, 2005 (as amended, restated, supplemented or otherwise modified from time to time, the "***Prepetition Term Credit Facility***"), among ION (formerly known as Paxson Communications Corporation), the subsidiary guarantors party thereto, Wells Fargo Bank, N.A., as successor administrative agent (the "***Prepetition Agent***"), and the lenders party thereto ("***Prepetition Term Lenders***");

(ii)     the indenture dated as of December 30, 2005 (as amended, restated, supplemented or otherwise modified from time to time, the "***First Priority Indenture***") among ION (formerly known as Paxson Communications Corporation), the subsidiary guarantors party thereto, and The Bank of New York Mellon Trust Company, NA

(formerly known as the Bank of New York Trust Company, NA), as trustee (the "***First Priority Notes Trustee***"), governing the Floating Rate First Priority Senior Secured Notes due 2012 (the "***First Priority Notes***" and the holders of the First Priority Notes being the "***First Priority Noteholders***");

(iii)    the indenture dated as of December 30, 2005 (as amended, restated, supplemented or otherwise modified from time to time, the "***Second Priority Indenture***") among ION (formerly known as Paxson Communications Corporation), the subsidiary guarantors party thereto, Manufacturers and Traders Trust Company, as successor trustee to The Bank of New York Mellon Trust Company, NA, as trustee (the "***Second Priority Notes Trustee***" and, together with the First Priority Notes Trustee, the "***Indenture Trustees***"), governing the Floating Rate Second Priority Senior Secured Notes due 2013 (the "***Second Priority Notes***" and the holders of the Second Priority Notes being the "***Second Priority Noteholders***" and, together with the First Priority Noteholders, the "***Noteholders***");

(iv)    (a)    that certain ISDA Master Agreement    (the "***Goldman Master Agreement***"), dated February 22, 2006 among Goldman Sachs Capital Markets, L.P., ION and certain subsidiaries of ION, as amended and supplemented by a Schedule to the Master Agreement, dated February 22, 2006 and two Confirmations, each dated February 22, 2006, in the notional amounts of $326,250,000 and $182,250,000 and (b) that certain ISDA Master Agreement (the "***UBS Master Agreement***" and, together with the Goldman Master Agreement, the "***Master Agreements***"), dated February 22, 2006 among UBS AG, ION and certain subsidiaries of ION, as amended and supplemented by a Schedule to the Master Agreement, dated February 22, 2006 and two Confirmations, each dated February

22, 2006, in the notional amounts of $398,750,000 and $222,750,000 (such amounts owed under the Master Agreements being the "***First Priority Secured Swap Claims***" and the holders of the Prepetition Hedges being the "***Swap Claim Holders***" and, collectively, with the Prepetition Term Lenders and the Noteholders, the "***Prepetition Secured Debt Holders***"); and

(v)     that certain Pledge and Security Agreement dated December 30, 2005 (as the same may have been amended, supplemented, restated or otherwise modified on or prior to the Petition Date, the "***Prepetition Pledge and Security Agreement***") by and between ION (formerly known as Paxson Communications Corporation), each of the other grantors party to the Prepetition Pledge and Security Agreement referred to therein, The Bank of New York Mellon Trust Company, NA, as collateral agent (the "***Collateral Agent***"), the First Priority Notes Trustee, the Second Priority Notes Trustee and the Prepetition Agent.

(e)     authorization for the Debtors to use Cash Collateral in which the Prepetition Secured Debt Holders, the Prepetition Agent, the Indenture Trustees and the Collateral Agent (collectively, the "***Adequate Protection Parties***") may have an interest and the granting of adequate protection to the Adequate Protection Parties with respect to, among other things, such use of their Cash Collateral and use and diminution in the value of the Prepetition Collateral (as defined below);

(f)     the granting of valid, enforceable, non-avoidable and fully perfected first priority priming liens on and senior security interests in all of the property, assets and other interests in property and assets of the Debtors, whether such property is presently owned or after-acquired, and all other "property of the estate" (within the meaning of the Bankruptcy Code) of the

Debtors, of any kind or nature whatsoever, real or personal, tangible, intangible or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the Petition Date, excluding Avoidance Actions (as defined below) and the proceeds thereof, subject only to the Carve-Out (as defined below) on the terms and conditions set forth herein and in the DIP Documents;

(g)     the granting of superpriority administrative expense claims to the DIP Agent and the DIP Lenders pursuant to Bankruptcy Code section 364(c)(1) with respect to the DIP Obligations (as defined below) over any and all administrative expenses of any kind or nature including, without limitation, the kinds specified in or arising or ordered under sections 105(a), 326, 328, 330, 331, 503(b), 506(c), 507, 546(c), 726, 1113 and 1114, subject and subordinate only to the payment of the Carve-Out on the terms and conditions set forth herein and in the DIP Documents; and

(h)     the limitation of the Debtors' and the estates' right to surcharge against the Prepetition Collateral pursuant to Bankruptcy Code section 506(c);

Due and appropriate notice of the Motion, the relief requested therein and the Interim Hearing having been served by the Debtors on, among others, (i) the Office of the United States Trustee for the Southern District of New York (the "*United States Trustee*"), (ii) counsel to the DIP Agent and the DIP Lenders, (iii) counsel to any known secured creditor of record, (iv) the Prepetition Agent, (v) the Collateral Agent, (vi) the Indenture Trustees, (vii) the fifty (50) largest unsecured creditors of the Debtors, (viii) any party asserting liens against any of the Debtors' assets, (ix) the Internal Revenue Service, and (x) the Securities and Exchange Commission in compliance with Bankruptcy Rules 4001(b) and (c) and the Local Rules of the United States Bankruptcy Court for the Southern District of New York (the "*Local Bankruptcy Rules*").

The Interim Hearing having been held by this Court on May 21, 2009, and this Court having entered an interim order dated June 2, 2009 (the "***Interim Order***") that, among other things, (i) authorized (a) the Borrower, on an interim basis, to borrow from the DIP Lenders under the debtor-in-possession credit agreement attached as Exhibit A to the Interim Order up to an aggregate principal amount not to exceed $25 million in DIP Loans and (ii) authorized each Guarantor to guaranty the DIP Obligations (as defined below) of the Borrower; (iii) authorized the Debtors' use of Cash Collateral (as defined below), (iv) granted the adequate protection described in the Interim Order, and (v) scheduled a final hearing (the "***Final Hearing***") to consider entry of a final order (the "***Final Order***") authorizing the balance of the borrowings under the DIP Documents on a final basis, as set forth in the Motion and the DIP Documents, which Interim Order was subsequently extended through and including July 1, 2009, pursuant to the Court's bridge order dated June 23, 2009.

The Supplement to the Motion (the "***Supplement***"), together with the amended and restated DIP Credit Agreement, having been filed with this Court on June 25, 2009.

The Second Supplement to the Motion (the "***Second Supplement***" and together with the Supplement, the "***Supplements***"), together with the further amended and restated DIP Credit Agreement, having been filed with this Court on June 30, 2009.

The Declaration of Steven G. Panagos in Support of Debtors' Motion for Interim and Final Orders (I) Authorizing Postpetition Secured Financing Pursuant to 11 U.S.C. §§ 105(a), 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), (II) Authorizing the Debtors' Use of Cash Collateral Pursuant to 11 U.S.C. § 363, (III) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363 and 364 and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c) having been filed on May 20, 2009 [D.E. # 19].

The Supplemental Declaration of Steven G. Panagos in Support of Debtors' Motion for Interim and Final Orders (I) Authorizing Postpetition Secured Financing Pursuant to 11 U.S.C. §§ 105(a), 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), (II) Authorizing the Debtors' Use of Cash Collateral Pursuant to 11 U.S.C. § 363, (III) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363 and 364 and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c) having been filed on June 30, 2009 [D.E. # 119].

The Declaration of R. Brandon Burgess, Chairman, President and Chief Executive Officer of ION Media Networks, Inc., in Support of Debtors' Motion for Interim and Final Orders (I) Authorizing Postpetition Secured Financing Pursuant to 11 U.S.C. §§ 105(a), 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), (II) Authorizing the Debtors' Use of Cash Collateral Pursuant to 11 U.S.C. § 363, (III) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363 and 364 and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c) having been filed on June 30, 2009 [D.E. # 120].

Due and appropriate notice of the Motion, the Supplements, the final relief requested therein and the Final Hearing, as well as the Interim Order, having been served by the Debtors upon the notice parties in accordance with the terms of the Interim Order (the "***Interim Order Notice Parties***") and, with respect to the Supplements, served on counsel for the statutory committee of unsecured creditors appointed in these chapter 11 cases (the "***Creditors' Committee***") and Cyrus Select Opportunities Master Fund Ltd. ("***Cyrus***," and, together with the Interim Order Notice Parties and the Creditors' Committee, the "***Notice Parties***").

Upon the record made by the Debtors and other parties in interest at the Interim Hearing and at the Final Hearing, and the Court having considered the various objections to the Motion as supplemented by the Supplements, including the Limited Objection of Cyrus Select

Opportunities Master Fund Ltd. [D.E. #71] and the supplement to Cyrus' objection [D.E. #115] (together, the "***Cyrus Objection***") and the objection of the Creditors' Committee [D.E. #114], which objection was resolved on the record at the Final Hearing with such modifications reflected herein; and after due deliberation and consideration and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.      *Disposition*.  The Motion is granted on a final basis in accordance with the terms of this Final Order.  Except as may otherwise be provided herein, [JMP 07/06/09] ~~A~~any objections to the Motion or the Supplements with respect to the entry of this Final Order, including, without limitation, the Cyrus Objection, that have not been withdrawn, waived or settled, and all reservation of rights included therein, are hereby denied and overruled.

2.      *Jurisdiction*.  This Court has core jurisdiction over the Cases commenced on May 19, 2009 (the "***Petition Date***"), the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief granted herein are Bankruptcy Code sections 105, 361, 362, 363 and 364 and Bankruptcy Rules 2002, 4001, 6004 and 9014 and the Local Bankruptcy Rules.

3.      *Notice*.  Under the circumstances, the notice given by the Debtors of the Motion, the relief requested therein, the Interim Hearing, the Interim Order and the Final Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rules 4001(b) and (c) and the Local Bankruptcy Rules, and no further notice of the relief sought at the Final Hearing and the relief granted herein is necessary or required.

4.    *Debtors' Stipulations*.    Subject to the rights of any other party (including the Creditors' Committee) to among other things, challenge the validity, priority, perfection and enforceability of the Existing Primed Secured Facilities (and specifically subject in all respects to paragraph 23 below), the Debtors admit, stipulate, and agree that:

(a)    As of the Petition Date:

(i)    The Debtors were party to or otherwise obligated under the Prepetition Term Credit Facility, without defense, counterclaim or offset of any kind, and were indebted and liable to the Prepetition Term Lenders in the aggregate principal amount of approximately $325 million in respect of loans outstanding thereunder, exclusive of accrued and unpaid interest, premium, if any, and certain fees, costs, expenses, charges and all other obligations incurred in connection therewith as provided by the Prepetition Term Credit Facility (collectively, the "***Term Loan Debt***"), which Term Loan Debt is secured by first priority liens on and security interests in substantially all of the Debtors' assets (the "***Term Loan Collateral***");

(ii)    The Debtors were party to or otherwise obligated under the First Priority Indenture, without defense, counterclaim or offset of any kind, and were jointly and severally indebted and liable to the First Priority Noteholders in the aggregate principal amount of approximately $400 million in respect of the First Priority Notes, exclusive of accrued and unpaid interest, premium, if any, and certain fees, costs, expenses, charges and all other obligations incurred in connection therewith as provided in the First Priority Indenture (the "***First Priority Note Debt***"), which First Priority Note Debt is secured by first priority

liens on and security interests in substantially all of the Debtors' assets (the "***First Priority Note Collateral***");

(iii)    The Debtors were party to or otherwise obligated under the Second Priority Indenture, without defense, counterclaim or offset of any kind, and were jointly and severally indebted and liable to the Second Priority Noteholders in the aggregate principal amount of approximately $448 million in respect of the Second Priority Notes, exclusive of accrued and unpaid interest, premium (if any) and certain fees, costs, expenses, charges and all other obligations incurred in connection therewith as provided in the Second Priority Indenture (the "***Second Priority Note Debt***"), which Second Priority Note Debt is secured by second priority liens on and security interests in substantially all of the Debtors' assets (the "***Second Priority Note Collateral***"); and

(iv)    The Debtors were party to or otherwise obligated under the Master Agreements, without defense, counterclaim or offset of any kind, and were jointly and severally indebted and liable to the Swap Claim Holders in the aggregate principal amount of approximately $121 million in respect of the Prepetition Hedges, exclusive of accrued and unpaid interest and certain fees, costs, expenses, charges and all other obligations incurred in connection therewith as provided in the Master Agreements (the "***Swap Debt***" and, together with the Term Loan Debt and the First Priority Note Debt, the "***First Lien Debt***" and, together with the Second Priority Note Debt, the "***Prepetition Secured Debt***"), which Swap Debt is secured by first priority liens on and security interests in substantially all of the Debtors' assets (the "***Prepetition Hedge Collateral***" and, together with the Term

Loan Collateral, the First Priority Note Collateral and the Second Priority Note Collateral, the "***Prepetition Collateral***").

(b)     The Prepetition Secured Debt constitutes the legal, valid and binding obligations of the Debtors as set forth in the Prepetition Term Credit Facility, the First Priority Indenture, the Second Priority Indenture and the Master Agreements (collectively referred to as the "***Prepetition Loan Documents***"), enforceable in accordance with their terms (other than in respect of the stay enforcement arising from Bankruptcy Code section 362).

(c)     No portion of the Prepetition Secured Debt or any payment made to the Prepetition Agent, the Indenture Trustees, the Collateral Agent or the Prepetition Secured Debt Holders or applied to obligations owing under the Prepetition Loan Documents prior to the Petition Date is subject to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense or "claim" (as such term is defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or other applicable law.

(d)     Each Debtor hereby forever waives and releases any and all "claims" (as such term is defined in the Bankruptcy Code), counterclaims, causes of action, defenses or setoff rights against the Adequate Protection Parties, whether arising at law or in equity, including any recharacterization, subordination, avoidance or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state or federal law.

(e)     The security interests granted to the Collateral Agent on the Prepetition Collateral (collectively, the "***Prepetition Security Interests***") in connection with the

Prepetition Loan Documents and pursuant to the Prepetition Pledge and Security Agreement, including, without limitation, all security agreements, pledge agreements, mortgages, deeds of trust and other security documents executed by any of the Debtors in favor of the Collateral Agent (collectively, the "*Prepetition Collateral Documents*"), for the benefit of the Adequate Protection Parties, are (i) valid, binding, perfected and enforceable liens and security interests in the real and personal property described in the Prepetition Collateral Documents, (ii) not, pursuant to the Bankruptcy Code or other applicable law, subject to avoidance, recharacterization, recovery, subordination, attachment, offset, counterclaim, defense or "claim" (as such term is defined in the Bankruptcy Code) of any kind and (iii) subject and subordinate only to (A) the DIP Liens (as defined below), (B) the Carve-Out and (C) valid, perfected and unavoidable liens and security interests permitted under the applicable Prepetition Loan Documents, but only to the extent that such liens and security interests are permitted by the applicable Prepetition Loan Documents to be senior to or *pari passu* with the applicable Prepetition Security Interests.

(f)     The foregoing admissions, stipulations and agreements are not findings of the Court and are not binding on the Court or on any other party in interest.   [JMP 07/06/09]

5.     *Findings Regarding the Financing*.

(a)     Good cause has been shown for the entry of this Final Order.

(b)     The Debtors have an immediate need to obtain the Financing and to use the Cash Collateral to, among other things, (i) permit the orderly continuation of their businesses; (ii) maintain business relationships with vendors, suppliers, carriers, and

customers of the Debtors; (iii) make payroll; (iv) make capital expenditures; (v) make adequate protection payments and (vi) pay the costs of administration of their estates and satisfy other working capital and general corporate purposes of the Debtors. The ability of the Debtors to obtain sufficient working capital and liquidity through the use of Cash Collateral, incurrence of the new indebtedness for borrowed money and other financial accommodations is vital to the preservation and maintenance of the going concern values of the Debtors and to the Debtors' successful reorganization.

(c)     The Debtors believe the financing proposed to be provided by the DIP Lenders is the most favorable financing available, in accordance with the terms and conditions set forth in the DIP Documents and the Debtors are unable to obtain adequate unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense. The Debtors are also unable to obtain secured credit allowable under Bankruptcy Code sections 364(c)(1), 364(c)(2), and 364(c)(3) for the purposes set forth in the DIP Documents without the Debtors granting to the DIP Agent and the DIP Lenders, subject to the Carve-Out and excluding Avoidance Actions and any proceeds thereof as provided for herein, the DIP Liens and the Superpriority Claims (as defined below) under the terms and conditions set forth in this Final Order and the DIP Documents.

(d)     The terms of the Financing, the DIP Documents and the use of Cash Collateral are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration. [JMP 07/06/09]

(e)     The Financing has been negotiated in good faith and at arm's length among the Debtors, the DIP Agent, and the DIP Lenders, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with the Financing and the DIP Documents and the rights granted in the Interim Order, including without limitation, all loans made to and guarantees issued by the Debtors pursuant to the DIP Documents and all other obligations under the DIP Documents (collectively, the "**_DIP Obligations_**"), shall be deemed to have been extended by the DIP Agent and the DIP Lenders and their affiliates in good faith, as that term is used in Bankruptcy Code section 364(e), and in express reliance upon the protections offered by Bankruptcy Code section 364(e), and the DIP Obligations, the DIP Liens and the Superpriority Claims shall be entitled to the full protection of Bankruptcy Code section 364(e) in the event that this Final Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

(f)     Absent granting the relief sought by this Final Order, the Debtors' estates will be immediately and irreparably harmed.  Consummation of the Financing and authorization of the use of the Prepetition Collateral (including the Cash Collateral) in accordance with this Final Order and the DIP Documents are, therefore, in the best interests of the Debtors' estates and are consistent with the Debtors' fiduciary duties.

6.     _Authorization of the Financing and the DIP Documents._

(a)     The Debtors were by the Interim Order and hereby are expressly authorized and empowered to execute, deliver, and, on such execution and delivery, directed to perform under the DIP Documents, including the DIP Credit Agreement (as modified) and as modified hereunder, and the DIP Documents are hereby approved and

incorporated herein by reference. The DIP Documents and this Final Order shall govern the financial and credit accommodations to be provided to the Debtors by the DIP Lenders; *provided* that in the event of any inconsistency between the DIP Credit Agreement or any other DIP Document and this Final Order, this Final Order shall control.

(b)     The Borrower was by the Interim Order and hereby is authorized to borrow money pursuant to the DIP Documents and the Guarantors are hereby authorized to guaranty such borrowing, in accordance with the terms of this Final Order and the DIP Documents, which shall be used solely for the purposes permitted under the DIP Documents, this Final Order and in accordance with the Operating Forecast and the 13-Week Projections (each, as defined in the DIP Credit Agreement), plus permitted variances as set forth in the DIP Documents, as well as to make the payment of Professional Fees (as defined below) incurred by the Debtors and the Creditors' Committee cases.

(c)     In furtherance of the foregoing and without further approval of this Court, each Debtor was by the Interim Order and hereby is authorized and directed, and the automatic stay imposed by Bankruptcy Code section 362 is hereby lifted to the extent necessary, to perform all acts and to make, execute and deliver all instruments and documents (including, without limitation, the DIP Credit Agreement, the execution or recordation of any security and pledge agreements, financing statements, and any mortgages contemplated thereby), and to pay all fees, that may be reasonably required or necessary for the Debtors' performance of their obligations under the Financing including, without limitation:

(i)     the execution, delivery and performance of the DIP Documents, including, without limitation, the DIP Credit Agreement in substantially the same form filed with the Court on or about June 30, 2009, any security and pledge agreement, and any mortgage contemplated thereby;

(ii)    the execution, delivery and performance of one or more amendments, waivers, consents or other modifications to and under the DIP Documents for, among other things, the purpose of adding additional entities as DIP Lenders and reallocating the commitments for the Financing among the DIP Lenders, in each case in such form as the Debtors, the DIP Agent and the DIP Lenders (to the extent required under the DIP Credit Agreement) may reasonably agree, it being understood that no further approval of the Court shall be required for amendments, waivers, consents or other modifications to and under the DIP Documents or the DIP Obligations that do not (A) shorten the maturity of the extensions of credit thereunder, (B) increase the commitments or the rate of interest or fees payable thereunder or (C) materially adversely affect the rights of the Adequate Protection Parties (and, in any case, a copy of each such amendment, waiver, consent or other modification referenced in this subsection (C) shall be immediately provided to the Adequate Protection Parties including, but not limited to, the Prepetition Agent, the First Priority Notes Trustee, and the Collateral Agent);

(iii)   the non-refundable payment to each of the Initial Lenders (as defined in the DIP Credit Agreement), the DIP Agent, or the DIP Lenders, as the case may be, of the fees referred to in the DIP Credit Agreement and reasonable

17

costs and expenses as may be due from time to time, including, without limitation, fees and expenses of counsel, information agents and other professionals retained by the DIP Agent and the DIP Lenders as provided for in the DIP Documents, which such fees and expenses shall not be subject to the approval of the Court, nor shall any recipient of any such payment be required to file with respect thereto any interim or final fee application with the Court;

(iv) make the adequate protection payments provided for in this Final Order; and

(v) the performance of all other acts required under or in connection with the DIP Documents.

(d) The procedures for making allocations of the DIP Loans (the "*Procedures*"), as described in Schedule 2.01 of the DIP Credit Agreement, are hereby approved. Allocations of the DIP Loans made by the DIP Agent in accordance with the Procedures will be final and binding. The DIP Agent may, in connection with such allocations, conclusively rely on, and shall have no liability whatsoever in respect of, record date ownership information provided to it. The DIP Agent and the Prepetition Agent, the Indenture Trustees or the Collateral Agent, as applicable, shall have no liability whatsoever in respect of the Procedures, including, without limitation, in respect of the representations and warranties made by, and the other information provided by, subscribers pursuant to the Procedures. In furtherance of the foregoing and in connection with the consummation of the Financing and the related DIP Documents, the performance of such acts as set forth in the Procedures and related documentation is hereby authorized and approved.

(e)     Upon execution and delivery of the DIP Credit Agreement and the other DIP Documents, such DIP Documents shall constitute valid, binding and non-avoidable obligations of the Debtors enforceable against each Debtor party thereto in accordance with their respective terms and the terms of this Final Order for all purposes during the Cases, any subsequently converted Case of any Debtor under chapter 7 of the Bankruptcy Code or after the dismissal of any Case.  No obligation, payment or repayment thereof, or recovery on or in respect thereof, transfer or grant of security under the DIP Credit Agreement, the other DIP Documents or this Final Order shall be stayed, restrained, revocable, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable law (including without limitation, under Bankruptcy Code sections 502(d), 548 or 549 or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment or counterclaim.

(f)     The Guarantors hereby are authorized and directed to jointly, severally and unconditionally guarantee in full all of the DIP Obligations of the Borrower.

7.     *Unconditional Guarantee of Subsequently Arranged or Organized Subsidiaries.* Except as otherwise agreed by the DIP Agent, the obligations of the Borrower shall further be unconditionally guaranteed by each and every subsequently acquired or organized direct or indirect subsidiary of any of the Debtors, which shall be made a Debtor and a Guarantor, and shall be deemed a Guarantor immediately upon its acquisition and/or organization.

8.     *Superpriority Claims.*  Pursuant to Bankruptcy Code section 364(c)(1), all of the DIP Obligations shall constitute allowed senior administrative expense claims against each of the Debtors (the "***Superpriority Claims***") with priority over any and all administrative expenses,

adequate protection claims, diminution claims (including all Adequate Protection Obligations (as defined below)) and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in Bankruptcy Code sections 503(b) and 507(b), and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, or 1114 or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for the purposes of Bankruptcy Code section 1129(a)(9)(A) be considered administrative expenses allowed under Bankruptcy Code section 503(b) and which shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, subject only to the payment of the Carve-Out to the extent specifically provided for herein; provided, however, that the Superpriority Claims shall not include, and thus shall expressly exclude, causes of action and any proceeds or property recovered in connection with the pursuit of claims or causes of action arising under chapter 5 of the Bankruptcy Code, if any (the "*Avoidance Actions*"), which Avoidance Actions shall be preserved and addressed in connection with a chapter 11 plan and at no time prior thereto. Except as set forth in this Final Order, no other superpriority claims shall be granted or allowed in these Cases.

9. *Carve-Out.* "*Carve-Out*" means (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest pursuant to 31 U.S.C. § 3717 (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $100,000 incurred by a trustee under Bankruptcy Code section 726(b) (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order or otherwise, all

unpaid fees, disbursements, costs and expenses (collectively, the "***Professional Fees***") incurred by professionals or professional firms retained by (x) the Debtors pursuant to Bankruptcy Code section 327 and (y) the Creditors' Committee (collectively, the "***Professional Persons***") at any time before or on the first business day following delivery by the DIP Agent of a Carve-Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice; and (iv) after the first business day following delivery by the DIP Agent of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order or otherwise, the payment of Professional Fees of Professional Persons in an aggregate amount not to exceed $4,000,000 (the "***Post Carve-Out Trigger Notice Cap***") (plus the amounts specified in items (i) through (iv) hereof). "***Carve-Out Trigger Notice***" means written notice delivered by the DIP Agent to the Debtors and their lead counsel, the United States Trustee, and lead counsel to the Creditors' Committee (with the Debtors to promptly provide copies to the Prepetition Agent, the Indenture Trustees, the Collateral Agent and their counsel), which notice may be delivered following the occurrence of an Event of Default as defined in the DIP Credit Agreement) under the DIP Documents, stating that the Post Carve-Out Trigger Notice Cap has been invoked.

10.     As security for the DIP Obligations, effective and perfected upon the date of the Interim Order and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the DIP Agent or any DIP Lender of, or over, any DIP Collateral (as defined below), the following security interests and liens were by the Interim Order and hereby  are granted by the Debtors to the DIP Agent, for the benefit of the DIP Agent and the DIP Lenders (all property identified in clauses (a), (b) and (c) below being

collectively referred to as the "***DIP Collateral***"[2]), subject, only in the event of the occurrence and during the continuance of an Event of Default, to the payment of the Carve-Out (all such liens and security interests granted to the DIP Agent, for the benefit of the DIP Lenders, pursuant to the Interim Order, this Final Order and the DIP Documents, the "***DIP Liens***"):

(a)     <u>First Lien on Cash Balances and Unencumbered Property.</u>  Pursuant to Bankruptcy Code 364(c)(2), a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all prepetition and postpetition property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to valid, perfected and non-avoidable liens (collectively, "***Unencumbered Property***"), including without limitation, any such unencumbered cash of the Debtors (whether maintained with the DIP Agent or otherwise) and any investment of such cash, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, equipment, general intangibles, documents, instruments, interests in leaseholds, real properties, patents, copyrights, trademarks, trade names, other intellectual property, equity interests, and the proceeds of all the foregoing.  For purposes of clarity, Unencumbered Property shall not include any proceeds or property recovered in connection with the pursuit of the Avoidance Actions.

(b)     <u>Liens Priming Prepetition Secured Parties' Liens.</u>  Pursuant to Bankruptcy Code section 364(d)(1), a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all prepetition and postpetition property of the Debtors (including, without limitation, Cash Collateral, inventory,

_____

[2] Notwithstanding anything to the contrary in this Final Order or the DIP Documents, DIP Collateral and the DIP Liens shall not include, and thus shall expressly exclude, the Avoidance Actions.

accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, equipment, general intangibles, documents, instruments, interests in leaseholds, real properties, patents, copyrights, trademarks, trade names, other intellectual property, equity interests, and the proceeds of all the foregoing), whether now existing or hereafter acquired, that is subject to any existing lien presently securing the Prepetition Secured Debt. Such security interests and liens shall be senior in all respects to the interests in such property of the Adequate Protection Parties arising from current and future liens of the Adequate Protection Parties (including, without limitation, adequate protection liens granted hereunder), but shall be junior to any (i) valid, perfected, enforceable and unavoidable security interests and liens of other parties, if any, on such property existing immediately prior to the Petition Date, or (ii) valid, perfected and unavoidable interests in such property arising out of statutory liens existing immediately prior to the Petition Date that become perfected subsequent to the Petition Date as permitted by Bankruptcy Code section 546(b).

(c)     Liens Junior to Certain Other Liens. Pursuant to Bankruptcy Code section 364(c)(3), a valid, binding, continuing, enforceable, fully-perfected security interest in and lien upon all prepetition and postpetition property of the Debtors (other than the property described in clauses (a) or (b) of this paragraph 10, as to which the liens and security interests in favor of the DIP Agent will be as described in such clauses), whether now existing or hereafter acquired, that is subject to (i) valid, perfected, enforceable and unavoidable liens in existence immediately prior to the Petition Date or (ii) valid, perfected and unavoidable interests in such property arising out of statutory liens existing immediately prior to the Petition Date that become perfected subsequent to the Petition

Date as permitted by Bankruptcy Code section 546(b), which security interests and liens in favor of the DIP Agent are junior to such valid, perfected and unavoidable liens.

(d)     Liens Senior to Certain Other Liens.  The DIP Liens and the Adequate Protection Liens (as defined below) shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under Bankruptcy Code section 551; (ii) any liens arising after the Petition Date (other than as set forth in paragraph 10(c) above) including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtors; or (iii) any intercompany or affiliate liens of the Debtors.

11.     *Protection of DIP Lenders' Rights.*

(a)     All DIP Collateral shall be free and clear of all liens, claims and encumbrances, except for those liens, claims and encumbrances expressly permitted under the DIP Documents or this Final Order.

(b)     Until all DIP Obligations (including any non-contingent claim for indemnification by the DIP Agent or the DIP Lenders) shall have been indefeasibly paid in full in cash or otherwise satisfied in full as set forth in paragraph 25 (other than contingent indemnity obligations as to which no claim has been asserted when all other amounts have been paid) and the commitments under the DIP Documents have terminated, the Adequate Protection Parties shall (i) take no action to foreclose upon or recover in connection with the liens granted thereto pursuant to the Prepetition Loan Documents, the Interim Order or this Final Order, or otherwise exercise remedies against any DIP Collateral, except to the extent authorized by an order of this Court, (ii) be

deemed to have consented to any release of DIP Collateral authorized under the DIP Documents and (iii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the DIP Collateral unless, solely as to this clause (iii), the DIP Lenders file financing statements or other documents to perfect the liens granted pursuant to the Interim Order or this Final Order, or as may be required by applicable state law to continue the perfection of valid and unavoidable liens or security interests in effect as of the Petition Date.

(c)     The automatic stay provisions of Bankruptcy Code section 362 are vacated and modified to the extent necessary to permit the DIP Agent and the DIP Lenders to exercise (i) immediately upon the occurrence of an Event of Default (subject to applicable grace periods) or the Maturity Date (as defined in the DIP Credit Agreement), all rights and remedies under the DIP Documents other than those rights and remedies against the DIP Collateral as provided in clause (ii) below and (ii) upon the occurrence and during the continuance of an Event of Default (subject to any applicable grace periods) and the giving of five (5) business days' prior written notice to the Debtors (with the Debtors to promptly provide a copy to counsel to any Committee, the United States Trustee, First Priority Notes Trustee, the Prepetition Agent and the Collateral Agent and each of their counsel) to the extent provided for in any DIP Document, all rights and remedies against the DIP Collateral provided for in any DIP Document (including without limitation, to the extent applicable, the right to set off against any accounts maintained by the Debtors with the DIP Agent or any DIP Lender or any affiliate thereof) and provided that, upon the receipt of any such notice, the Borrower may only make

disbursements in the ordinary course of business and with respect to the Carve-Out, but may not disburse any other amounts.  In any hearing regarding any exercise of rights or remedies, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing, and the Debtors and the Adequate Protection Parties hereby each waive their right to seek relief, including, without limitation, under Bankruptcy Code section 105, to the extent such relief would in any way impair or restrict the rights and remedies of the DIP Agent or the DIP Lenders set forth in this Final Order or the DIP Documents.  In no event shall the DIP Agent, the DIP Lenders, or the Adequate Protection Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral.  The delay or failure to exercise rights and remedies under the DIP Documents or this Final Order by the DIP Agent or any DIP Lenders shall not constitute a waiver of the DIP Agent's or such DIP Lender's rights hereunder, thereunder or otherwise, unless any such waiver is pursuant to a written instrument executed in accordance with the terms of the applicable DIP Documents.

12.      *Limitation on Charging Expenses Against Collateral*.  Except to the extent of the Carve-Out, no costs or expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral, the Prepetition Collateral or the Cash Collateral pursuant to Bankruptcy Code section 506(c) or any similar principle of law without the prior written consent of the DIP Agent, the Prepetition Agent, the Indenture Trustees, or the Collateral Agent, as the case may be, and no such consent shall be implied from any other

action, inaction, or acquiescence by the DIP Agent, the DIP Lenders, the Prepetition Agent, the Indenture Trustees or the Prepetition Secured Debt Holders.

13.     In light of their agreement to subordinate their liens and superpriority claims to the Carve-Out, the DIP Lenders and the Adequate Protection Parties shall be entitled to all benefits of Bankruptcy Code section 552(b) and the "equities of the case" exception under Bankruptcy Code section 552(b) shall not apply to such parties with respect to the proceeds, products, offspring, or profits of any of their collateral; provided, however, that nothing in this paragraph 13 shall prejudice the right of any party in interest to challenge the right of the DIP Lenders to assert a claim under the authority of Bankruptcy Code section 552(b) in any proceeds of any FCC license owned by any affiliate of the Debtors.  [JMP 07/06/09]

14.     *Cash Collateral.*  Pursuant to Bankruptcy Code section 552, any proceeds of the Prepetition Collateral are cash collateral of the applicable Adequate Protection Parties within the meaning of Bankruptcy Code section 363(a).  All cash proceeds of the Prepetition Collateral and all other cash collateral (as defined in the Bankruptcy Code) of the Adequate Protection Parties is referred to herein as "***Cash Collateral***."[3]

15.     *Use of Cash Collateral.*  The Debtors are hereby authorized to use all Cash Collateral of the Adequate Protection Parties but solely in accordance with the Operating Forecast and the 13-Week Projections (plus permitted variances as set forth in the DIP Documents), including, but not limited to, payment of Professional Fees and to make adequate protection payments to the Adequate Protection Parties, and the Adequate Protection Parties are directed promptly to turn over to the Debtors all Cash Collateral received or held by them; provided that the Adequate Protection Parties are granted adequate protection as hereinafter set

---

[3] For purposes of clarity, Cash Collateral shall not include, and thus shall expressly exclude, the Avoidance Actions and any proceeds thereof.

forth and, except on the terms and conditions of this Final Order, the Debtors shall be enjoined and prohibited from at any time using the Cash Collateral. The Debtors' right to use Cash Collateral, and the Adequate Protection Parties' consent to the use of Cash Collateral, shall terminate automatically on the Maturity Date, <u>provided</u> that the Debtors shall continue to have the right to use Cash Collateral (and the Adequate Protection Parties' consent to such continued use of Cash Collateral), and the Debtors are hereby directed to use Cash Collateral, to pay and satisfy the payments contemplated by the Carve-Out until repayment of the DIP Obligations, with any such payment to be subject to such further and other orders of the Court regarding the compensation of professionals.

16. *Adequate Protection.* The Adequate Protection Parties are entitled, pursuant to Bankruptcy Code sections 361, 363(e) and 364(d)(1), to adequate protection of their interests in their respective Prepetition Collateral, including the Cash Collateral, subject to any rights of the Creditors' Committee or any other party in interest to assert a Lender Claim pursuant to paragraph 23 hereof, for and equal in amount to the aggregate diminution in the value (each such diminution, a "***Diminution in Value***") of the Adequate Protection Parties' security interests in the Prepetition Collateral during the Cases (which Diminution in Value shall be calculated in accordance with Bankruptcy Code section 506(a)) as a result of, among other things, the Debtors' sale, lease or use of Cash Collateral and any other of the Prepetition Collateral, the priming of the Adequate Protection Parties' security interests and liens in the Prepetition Collateral by the DIP Agent and the DIP Lenders pursuant to the DIP Documents and this Final Order, and the imposition of the automatic stay pursuant to Bankruptcy Code section 362 or otherwise; <u>provided</u>, <u>however</u>, that no Adequate Protection Party shall be entitled to adequate protection with respect to any Diminution in Value of such Adequate Protection Party's interest in the Prepetition Collateral resulting from

any successful Avoidance Action or other Lender Claim against, or Avoidance Action proceeds recovered from, such Adequate Protection Party.  As adequate protection, the Adequate Protection Parties are hereby granted the following (collectively, the "***Adequate Protection Obligations***")[4]:

      (a)    <u>Adequate Protection Liens.</u>  As security for and solely to the extent of any Diminution in Value of the Prepetition Security Interests, the Collateral Agent (for itself and for the respective benefit of the applicable Adequate Protection Parties) are by the Interim Order and hereby is granted, effective and perfected upon the date of the Interim Order and without the necessity of the execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements or other agreements, a replacement security interest in and lien upon all the DIP Collateral (together, the "***Adequate Protection Liens***"), subject and subordinate only to (i) the Carve-Out and (ii) the DIP Liens and any liens on the DIP Collateral that are senior to, or *pari passu* with, the DIP Liens, which Adequate Protection Liens shall rank in the same relative priority and right as do the respective security interests and liens of the respective Existing Primed Secured Facilities as of the Petition Date.  Notwithstanding the foregoing, the Adequate Protection Liens granted in respect of the Second Priority Note Debt shall at all times be junior to the Prepetition Liens in respect of the First Lien Debt.

      (b)    <u>Section 507(b) Claims.</u>  To the extent of any Diminution in Value of the Prepetition Security Interests, the Adequate Protection Parties were by the Interim Order and hereby are granted, subject to the payment of the Carve-Out, allowed superpriority administrative expense claims (the "***Adequate Protection Parties' Superpriority***

---

[4] For avoidance of doubt, and notwithstanding anything to the contrary in this Final Order or the DIP Documents, Adequate Protection Obligations (including Adequate Protection Liens, Adequate Protection Parties' Superpriority Claims) shall not include, and thus shall expressly exclude, the Avoidance Actions and the proceeds thereof.

*Claims*") as provided for in Bankruptcy Code section 507(b), immediately junior to the claims under Bankruptcy Code section 364(c)(1) held by the DIP Agent and the DIP Lenders, which Adequate Protection Parties' Superpriority Claims shall rank in the same relative priority and right as do the respective claims of the Prepetition Secured Parties as of the Petition Date, <u>provided</u> that the Adequate Protection Parties shall not receive or retain any payments, property or other amounts in respect of the Adequate Protection Parties' Superpriority Claims under Bankruptcy Code section 507(b) granted hereunder or under the Existing Primed Secured Facilities unless and until the obligations under the DIP Obligations have indefeasibly been paid in cash in full or as otherwise agreed by the DIP Lenders as provided for in the DIP Documents; and, _provided_, _further_, that the Second Priority Noteholders shall not be entitled to receive any amounts in respect of the foregoing until the claims of the holders of First Lien Debt have been indefeasibly paid in full in cash.

(c)     <u>Fees and Expenses</u>.   The Prepetition Agent, the First Priority Notes Trustee, and the Collateral Agent shall receive (for the benefit of the Prepetition Term Lenders and the First Priority Noteholders) from the Debtors current cash payments of all reasonable and documented fees and expenses payable to the Prepetition Agent, the First Priority Notes Trustee and the Collateral Agent under the Prepetition Term Credit Facility, First Priority Notes Indenture and the Pledge and Security Agreement, respectively, including reasonable and documented professional fees and expenses incurred for the benefit of the Prepetition Term Lenders during the Prepetition Agent transition period, promptly upon delivery of invoices    herefore (subject in all respects to applicable privilege or work product doctrines) to the Debtors, the DIP Agent and the

Creditors' Committee and without the necessity of filing motions or fee applications, including such amounts arising before and after the Petition Date; provided that, with respect to fees and expenses of professionals retained by the Prepetition Agent, the First Priority Notes Trustee and the Collateral Agent, such reimbursement shall be limited to (i) Troutman Sanders LLP, as counsel for the First Priority Trustee and the Collateral Agent and (ii) Loeb & Loeb, LLP and Schulte Roth & Zabel LLP, as counsel for the Prepetition Agent, and shall not include the fees and expenses of any financial or other consultants or advisors. All amounts paid as Adequate Protection are deemed permitted uses and expenditures for purposes of the Financing and are permitted uses of Cash Collateral.

(d)     Financial Reporting. The Debtors shall provide the Prepetition Agent, the Indenture Trustees and the Creditors' Committee with financial and other reporting substantially in compliance with, and substantially upon the time frames set forth in, the Existing Primed Secured Facilities and any reporting described herein and in the DIP Documents.

(e)     Additional Guarantors. To the extent any entity becomes a guarantor of the DIP Obligations, and each and every subsequently acquired or organized direct or indirect subsidiary of any of the Debtors, which shall be made a Debtor and a Guarantor, shall be deemed a guarantor under the Existing Primed Secured Facilities immediately upon becoming a Guarantor of the DIP Obligations.

17.     *Additional Liens*. All intercompany/affiliate liens of the Debtors, if any (other than any liens securing the DIP Obligations), will be contractually subordinated to the DIP Obligations and to the Adequate Protection Obligations on terms satisfactory to the DIP Agent,

the Required Lenders, the Prepetition Agent, the First Priority Notes Trustee and the Collateral Agent..

18.     *Finding of Adequate Protection.*     Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Adequate Protection Parties.

19.     *Reservation of Rights of Adequate Protection Parties.*     Upon a material change in circumstances, any Adequate Protection Party may request further or different adequate protection, and the Debtors or any other party may contest any such request; <u>provided</u> that any such further or different adequate protection shall at all times be subordinate and junior to the claims and liens of the DIP Agent and the DIP Lenders granted under the Interim Order, this Final Order or the DIP Documents.  Except as expressly provided herein, nothing contained in this Final Order (including, without limitation, the authorization of the use of any Cash Collateral) shall impair or modify any rights, claims or defenses available in law or equity to any Adequate Protection Party, the DIP Agent or any DIP Lender.

20.     *Perfection of the DIP Liens and Adequate Protection Liens.*

(a)     Subject to the provisions of paragraph 11(b) above, the Debtors, the DIP Agent, the DIP Lenders and the Adequate Protection Parties are hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of or control over, or take any other action in order to validate and perfect the liens and security interests granted to them hereunder.  Whether or not the DIP Agent and/or the Collateral Agent shall, in their sole discretion, choose to file such financing statements,

trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or take possession of or control over, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge or dispute or subordination, at the time and on the date of entry of the Interim Order. Upon the request of the DIP Agent and/or the Collateral Agent, without any further consent of any party, each Debtor is authorized to take, execute, deliver and file such instruments (in each case without representation or warranty of any kind) to enable the DIP Agent and/or the Collateral Agent to further validate, perfect, preserve and enforce the DIP Liens and the Adequate Protection Liens. Except where expressly agreed in writing to the contrary between the Debtors and the applicable parties, the Debtors shall execute and deliver to the DIP Agent, the Prepetition Agent, the Indenture Trustees and the Collateral Agent all such agreements, financing statements, instruments and other documents as the DIP Agent, the Prepetition Agent, the Indenture Trustees and/or the Collateral Agent may reasonably request to more fully evidence, confirm, validate, perfect, preserve and enforce the DIP Liens and the Adequate Protection Liens. All such documents will be deemed to have been recorded and filed as of the Petition Date.

(b)      A certified copy of this Final Order may, in the discretion of the DIP Agent or the Collateral Agent, as the case may be, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Final Order for filing and recording.

(c)     ~~Any provision of any lease or other license, contract or other agreement~~ ~~that requires (i) the consent or approval of one or more landlords or other parties or (ii)~~ ~~the payment of any fees or obligations to any governmental entity, in order for any~~ ~~Debtor to pledge, grant, sell, assign or otherwise transfer any such leasehold interests, or~~ ~~the proceeds thereof, or other postpetition collateral related thereto, is hereby deemed to~~ ~~be inconsistent with the applicable provisions of the Bankruptcy Code. Any such~~ ~~provision shall have no force and effect with respect to the transactions granting~~ ~~postpetition liens, in any leasehold interest or the proceeds of any assignment and/or sale~~ ~~thereof by any Debtor, in favor of the DIP Lenders in accordance with the terms of the~~ ~~DIP Documents or this Final Order or in favor of the Adequate Protection Parties in~~ ~~accordance with the terms of the Prepetition Loan Documents, the Prepetition Collateral~~ ~~Documents or this Final Order.~~ [JMP 07/06/09]

21.      *Preservation of Rights Granted Under the Order.*

(a)      Other than the Carve-Out, no claim or lien having a priority superior to or *pari passu* with those granted by the Interim Order or this Final Order to the DIP Agent, the DIP Lenders or the Adequate Protection Parties shall be granted or allowed while any portion of the Financing (or any refinancing thereof) or the commitments thereunder or the DIP Obligations or the Adequate Protection Obligations remain outstanding, and the DIP Liens and the Adequate Protection Liens shall not be (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under Bankruptcy Code section 551 or (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under Bankruptcy Code section 364(d) or otherwise.

(b)      Subject to paragraph 23 with respect to the Prepetition Secured Debt and the Prepetition Security Interests (but in no event with respect to the DIP Obligations), except as set forth in the DIP Credit Agreement and as more fully described in paragraph 25 below, unless all DIP Obligations shall have indefeasibly been paid in cash in full or satisfied in a manner otherwise agreed to by the Required Lenders (as defined in the DIP Credit Agreement) and the Adequate Protection Obligations shall have been indefeasibly paid in cash in full, the Debtors shall not seek, and it shall constitute an Event of Default and terminate the right of the Debtors to use Cash Collateral if any of the Debtors seek, or if there is entered, (i) any modification or extension of this Final Order without the prior written consent of the DIP Agent and the Required Lenders (or, to the extent the DIP Obligations shall have been indefeasibly paid in cash in full or satisfied in a manner otherwise agreed to by the Required Lenders, the Prepetition Agent, the Indenture

Trustees and the Collateral Agent, as applicable), and no such consent shall be implied by any other action, inaction or acquiescence, (ii) to the extent the modification or extension materially adversely affects the rights of the Adequate Protection Parties, any modification or extension without the prior consent of the Prepetition Agent, the First Priority Notes Trustee and the Collateral Agent, as applicable, and no such consent shall be implied by any other action, inaction or acquiescence or (iii) an order converting or dismissing any of the Cases.

(c)     If an order dismissing any of the Cases under Bankruptcy Code section 1112 or otherwise is at any time entered, such order shall provide (in accordance with Bankruptcy Code sections 105 and 349) that (i) the superpriority claims, priming liens, security interests, Adequate Protection Liens and replacement security interests granted to the DIP Agent and the DIP Lenders and, as applicable, the Adequate Protection Parties pursuant to the Interim Order or this Final Order shall continue in full force and effect and shall maintain their priorities as provided in this Final Order until all DIP Obligations and Adequate Protection Obligations shall have been indefeasibly paid in cash in full (or, with respect to the DIP Obligations, otherwise satisfied in a manner agreed to by the Required Lenders) and that such superpriority claims, priming liens, Adequate Protection Liens and replacement security interests, shall, notwithstanding such dismissal, remain binding on all parties in interest and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in (i) above.

(d)     If any or all of the provisions of this Final Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect

(i) the validity, priority or enforceability of any DIP Obligations or Adequate Protection Obligations incurred prior to the actual receipt of written notice by the DIP Agent, the Prepetition Agent, the Indenture Trustees or the Collateral Agent, as applicable, on the effective date of such reversal, stay, modification or vacation or (ii) the validity or enforceability of any lien or priority authorized or created hereby or pursuant to the DIP Credit Agreement with respect to any DIP Obligations or Adequate Protection Obligations. Notwithstanding any such reversal, stay, modification or vacation, any use of Cash Collateral, or DIP Obligations or Adequate Protection Obligations incurred by the Debtors to the DIP Agent, the DIP Lenders or the Adequate Protection Parties prior to the actual receipt of written notice by the DIP Agent, the Prepetition Agent, the Indenture Trustees or the Collateral Agent, as applicable, of the effective date of such reversal, stay, modification or vacation shall be governed in all respects by the original provisions of this Final Order, and the DIP Agent, the DIP Lenders and the Adequate Protection Parties shall be entitled to all the rights, remedies, privileges and benefits granted in Bankruptcy Code section 364(e), this Final Order and pursuant to the DIP Documents, with respect to all uses of Cash Collateral, DIP Obligations and Adequate Protection Obligations.

(e)     Except as expressly provided in this Final Order or in the DIP Documents, the DIP Liens, the Superpriority Claims, the Adequate Protection Obligations, all other rights and remedies of the DIP Agent, the DIP Lenders and the Adequate Protection Parties granted by the provisions of this Final Order and the DIP Documents shall survive, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Cases to a case under chapter 7, dismissing any of the Cases, terminating the joint administration of these Cases or by any other act or omission or (ii)

the entry of an order confirming a plan of reorganization in any of the Cases and, pursuant to Bankruptcy Code section 1141(d)(4), the Debtors have waived any discharge as to any remaining DIP Obligations. The terms and provisions of this Final Order and the DIP Documents shall continue in these Cases, in any successor cases if these Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code, the DIP Obligations, the DIP Liens, the Superpriority Claims and the Adequate Protection Obligations and all other rights and remedies of the DIP Agent, the DIP Lenders, or the Adequate Protection Parties granted by the provisions of this Final Order and the DIP Documents shall continue in full force and effect until the DIP Obligations and the Adequate Protection Obligations are indefeasibly paid in cash in full (or, with respect to the DIP Obligations, otherwise satisfied as described more fully in paragraph 25 below).

22. *Limitation on Use of Financing Proceeds and Collateral.* Notwithstanding anything herein or in any other order by this Court to the contrary, no borrowings, Cash Collateral, Prepetition Collateral, DIP Collateral, Adequate Protection Liens, portion of the proceeds of the Financing or part of the Carve-Out may be used for any of the following (each, a "***Lender Claim***") without the prior written consent of each affected party: (a) to object, contest or raise any defense to the validity, perfection, priority, extent or enforceability of any amount due under any DIP Document, Prepetition Loan Document or Prepetition Collateral Document, or the liens or claims granted under the Interim Order or this Final Order, any DIP Document, any Prepetition Loan Document or Prepetition Collateral Document, (b) to assert any claim or cause of action against the DIP Agent, any DIP Lender, the Prepetition Agent, the Indenture Trustees, the Collateral Agent or any Prepetition Secured Lender or their respective agents, affiliates,

representatives, attorneys or advisors, (c) except to contest the occurrence or continuation of an Event of Default as set forth in paragraph 11(c)(ii), to prevent, hinder or otherwise delay the DIP Agent's, the Prepetition Agent's, an Indenture Trustee's or Collateral Agent's assertions, enforcement or realization on the Cash Collateral or the DIP Collateral in accordance with the DIP Documents, the Prepetition Loan Documents, the Prepetition Collateral Documents, the Interim Order or this Final Order, (d) to assert or prosecute any action for preferences, fraudulent conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests or defenses against the Prepetition Agent, the Indenture Trustees, the Collateral Agent or any Prepetition Secured Lender or their respective affiliates, representatives, attorneys or advisors in connection with matters related to the Prepetition Loan Documents, the Prepetition Collateral Documents, the Prepetition Secured Debt, the Prepetition Security Interests, or the Prepetition Collateral or (e) to seek to modify any of the rights granted to the DIP Agent, the DIP Lenders, or the Adequate Protection Parties hereunder or under the DIP Documents, the Prepetition Loan Documents or the Prepetition Collateral Documents, provided that advisors to the Creditors' Committee may investigate the Prepetition Security Interests and, subject to any applicable law with respect to standing, commence any related proceedings as a representative of the Debtors' estates at an expense not to exceed $150,000.

23.    *Effect of Stipulations on Third Parties.*

(a)    Each stipulation, admission and agreement contained in this Final Order, including, without limitation, in paragraph 4 of this Final Order, shall be binding upon the Debtors and any successor thereto (including without limitation any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors) in all circumstances and for all purposes, and the Debtors are deemed to have irrevocably waived and relinquished all

Lender Claims as of the date of the entry of the Interim Order. Each stipulation and admission contained in this Final Order, including without limitation, in paragraph 4 of this Final Order, shall be binding upon all other parties in interest, including, without limitation, the Creditors' Committee, under all circumstances and for all purposes, except that with respect to the stipulations, admissions and agreements with respect to the Prepetition Loan Documents, the Prepetition Secured Debt and the Prepetition Security Interests in this Final Order, including, without limitation, in paragraph 4 to the extent that (i) the Creditors' Committee or another party in interest has, subject to the limitations contained herein, including, among other things, in paragraph 22, timely and properly filed an adversary proceeding or contested matter asserting a Lender Claim with respect to any of the stipulations or admissions set forth in paragraph 4 by no later than September 21, 2009 (the "***Challenge Period***"); provided, however, that the Challenge Period may be extended (a) as has been agreed to, in writing, by the Prepetition Agent, applicable Indenture Trustee or the Collateral Agent in their sole discretion or (b) by an order of the Court, for cause shown, after notice and a hearing and (ii) there is a final order in favor of the plaintiff sustaining such Lender Claim.

(b)    The success of any particular Lender Claim shall not alter the binding effect on each party in interest of any stipulation or admission not subject to such Lender Claim. Except to the extent (but only to the extent) a timely and properly filed adversary proceeding or contested matter asserting a Lender Claim, as provided in clause (a) above, is successful, (i) the Prepetition Secured Debt shall constitute allowed claims, not subject to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaims, defenses or "claims" (as such term is defined in the Bankruptcy Code) of any kind

pursuant to the Bankruptcy Code or other applicable law, for all purposes in the Cases and any subsequent chapter 7 cases, (ii) the Prepetition Security Interests shall be deemed to have been, as of the Petition Date, legal, valid, binding perfected and enforceable liens and security interests not subject to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaims, defenses or "claims" (as such term is defined in the Bankruptcy Code) of any kind, and (iii) the Prepetition Secured Debt and the Prepetition Security Interests shall not be subject to any other or further challenge by any party in interest seeking to exercise the rights of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors).

(c)     Nothing in this Final Order vests or confers on any person (as defined in the Bankruptcy Code), including the Creditors' Committee and any other Committee, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, Lender Claims with respect to the Prepetition Loan Documents or the Prepetition Secured Debt.

24.     *Priorities Among Adequate Protection Parties.*  Notwithstanding anything to the contrary herein or in any other order of this Court, in determining the relative priorities and rights of the Adequate Protection Parties (including, without limitation, the relative priorities and rights of the Adequate Protection Parties with respect to the adequate protection granted hereunder), such relative priorities and rights shall continue to be governed by the Prepetition Loan Documents and the Prepetition Collateral Documents, and the adequate protection rights granted hereunder to each Adequate Protection Party shall have the same relative seniority and priority vis-à-vis the adequate protection rights granted to each other Adequate Protection Party as the

prepetition claims of such Adequate Protection Party have relative to the prepetition claims of such other Adequate Protection Party (taking into consideration whether such claims are secured and the entity against which such claims are held or not held); provided, however, that the Second Priority Noteholders shall not be entitled to receive any amounts in respect of the foregoing until the claims of the holders of First Lien Debt and the Adequate Protection Obligations have been indefeasibly paid in full in cash.

25.      *Treatment of DIP Claims.*[5] Except as otherwise set forth herein and as more fully set forth in Schedule 2.05 to the DIP Credit Agreement, unless, at the Borrower's option, the Borrower repays in cash on the Approved Plan Consummation Date the outstanding principal amount of all (but not less than all) New Money Loans, on such Approved Plan Consummation Date, the sum of (i) the outstanding principal amount of all (but not less than all) New Money Loans and (ii) the aggregate unused amount of the New Money Commitments, in each case as of the Approved Plan Consummation Date, will be converted to 62.50% (or such lesser proportional percentage to reflect any prepayment of the New Money Loans pursuant to Sections 2.04(a) or (b) of the DIP Credit Agreement) (the "***Conversion Equity***") of the new common stock of the reorganized Borrower (the "***New Common Stock***")[6] issued under the Approved Plan on a fully diluted basis after giving effect to all New Common Stock issued on the Approved Plan Consummation Date (such conversion, the "***Conversion***"); *provided, however,* that if the final $50 million of unused New Money Commitments is not funded or contributed within one (1) year after the consummation of a plan of reorganization, then the Conversion Equity issued shall be

---

[5]   All terms used but not otherwise defined in this paragraph 25 shall have the meanings set forth in the DIP Credit Agreement.

   [6]   To the extent that any Lender cannot certify that its direct and indirect ownership of the New Common Stock will be less than 25% foreign owned for FCC purposes, such Lender shall receive nominally priced warrants to purchase New Common Stock in lieu of New Common Stock.

reduced, *pro rata,* such that the Conversion Equity shall equal 62.5% of the New Common Stock on a fully diluted basis as set forth above, multiplied by a fraction, the numerator of which is the sum of the principal amount of New Money Loans advanced plus equity contributions actually made as of such date, and the denominator of which is $150,000,000, which shall be effected pursuant to documentation reasonably acceptable to the Required Initial Lenders; *provided, further,* that upon such conversion, customary minority shareholder rights and registration rights shall be provided for, which shall, in each case, be reasonably acceptable to the Required Initial Lenders; *provided, further,* that (A) prior to such conversion, with respect to any New Money Loans, each Lender shall, at its option, either (i) sell such New Money Loan to a Lender, or (ii) agree to effectuate the conversion of such New Money Loan into equity, (B) prior to such conversion, with respect to any unused New Money Commitments that are to be converted, on or after the Transfer of Control (as defined below), if the Board of Directors of the reorganized Borrower should determine in its reasonable discretion that such contribution is necessary, each Lender shall, at its option, either (i) fund its ratable portion of such unused New Money Commitments, (ii) execute a commitment to provide an equity contribution equal to its ratable portion of such unused New Money Commitment, which will be required to be funded by the Lenders on the earlier of (x) the date the Board of Directors of the reorganized Borrower determines in its reasonable discretion that such funding is necessary and (y) 1 year after the Transfer of Control, or (iii) sell any such unused New Money Commitments to a Lender that will effectuate either (i) or (ii) above, and (C) in connection with such conversion, at the option of the Initial Lenders, the Initial Lenders shall provide to the Borrower an exit credit facility in an aggregate principal amount of $10.0 million, which credit facility shall have the following terms: (x) interest rate and other economic terms shall be the same as in the Facility, provided that the

Borrower shall not be required to pay an origination, commitment, extension, exit or other comparable or substitute fee, or any prepayment premium, penalty or fee and (y) non-economic terms shall be substantially similar to the terms of the Facility, provided that the bankruptcy concepts shall be generally removed. For purposes hereof, "*Transfer of Control*" means the FCC approval of transfer of control to the holders of New Common Stock. For the avoidance of doubt, none of the Agents shall be responsible for making any of the calculations set forth above or for the consummation of the Conversion. In the event that a chapter 11 plan is proposed in the Cases that provides for the DIP Lenders to receive treatment other than payment in full in cash on account of the DIP Obligations, the DIP Lenders will be impaired and entitled to vote to accept or reject such plan.

26. *Order Governs.* In the event of any inconsistency between the provisions of this Final Order and the DIP Documents, the provisions of this Final Order shall govern.

27. *Binding Effect; Successors and Assigns.* The DIP Documents and the provisions of this Final Order, including all findings herein, shall be binding upon all parties in interest in these Cases, including without limitation, the DIP Agent, the DIP Lenders, the Adequate Protection Parties, any Committee appointed in these Cases, and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to Bankruptcy Code section 1104, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Agent, the DIP Lenders, and the Adequate Protection Parties, provided, however, that except to the extent expressly set forth in this Final Order, the Adequate Protection Parties shall have no obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 trustee

or similar responsible person appointed for the estates of the Debtors. In determining to make the DIP Loans (whether under the DIP Credit Agreement, a promissory note or otherwise), to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Final Order or the DIP Documents, the DIP Agent, the DIP Lenders and the Adequate Protection Parties shall not (i) be deemed to be in control of the operations of the Debtors or (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates.

28.     *No Impact on Certain Contracts or Transactions.*   No rights of any entity in connection with a contract or transaction of the kind listed in Bankruptcy Code sections 555, 556, 559, 560 or 561, whatever they might or might not be, are affected by the provisions of this Final Order.

29.     *Effectiveness.*   This Final Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Final Order.

30.     *Reimbursement of Fees and Expenses of the Minority First Lien Holder Group.* Notwithstanding anything herein, the ad hoc group of holders of First Lien Debt (the "***Minority First Lien Holder Group***"), who, as of July 1, 2009, holds approximately $114 million, or approximately 13.4%, of First Lien Debt,[7] shall be paid in full for all reasonable and documented out-of-pocket fees and expenses (including, without limitation, fees and expenses incurred in connection with objecting to the proposed postpetition debtor-in-possession financing, preparing

---

[7]     On July 1, 2009, the Minority First Lien Holder Group filed an amended 2019 Statement with the Court, verifying that this group holds approximately $114 million, or 13.4%, of the First Lien Debt.

and negotiating commitment letters and the proposed backstop letter), including the fees and expenses of Ropes & Gray LLP, as well as $250,000 in fees to Chilmark Partners and $60,000 in fees to Media Services Group, and their respective out-of-pocket expenses, incurred up to and including the date of entry of this Final Order, promptly upon delivery of invoices therefor (subject in all respects to applicable privilege or work product doctrines) to the Debtors, the DIP Agent, the Creditors' Committee and attorneys for the Ad Hoc First Lien Lender Group[8] without the necessity of filing motions or fee applications, with such fees and expenses being an administrative expense claim under Bankruptcy Code section 503; provided, however, that the Minority First Lien Holder Group shall also be paid in full for those reasonable fees and expenses incurred by Ropes & Gray LLP after entry of this Final Order in connection with, and limited to, developing the subscription procedures for the Financing, up to $10,000 in the aggregate for such out-of-pocket fees and expenses incurred after entry of this Final Order, without the necessity of filing motions or fee applications, with such fees and expenses being an administrative expense claim under Bankruptcy Code section 503.

31.     *Disclosure Date*.   The "***Disclosure Date***" under the respective confidentiality agreements signed by the members of the Minority First Lien Holder Group will be accelerated to a date that is as soon as practicable, but in any event not less than fifteen (15) days prior to any subscription deadline or record date under the DIP Credit Agreement.

---

[8]     The Ad Hoc First Lien Lender Group filed a 2019 Statement on May 21, 2009, verifying that this group holds over $437 million, or over 60%, of First Lien Debt.

32.    *Headings*.  Section headings used herein are for convenience only and are not to affect the construction or to be taken into consideration in interpreting this Final Order.

Dated:  July 6, 2009
           New York, New York

_____*s/ James M. Peck*_____
UNITED STATES BANKRUPTCY JUDGE

**In re Lyondell Chem. Co.**, Case No. 09-10023 (Bankr. S.D.N.Y. Mar. 1, 2009)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                    :
In re:                                              :
                                                    :       Chapter 11 Case No.
                                                    :
LYONDELL CHEMICAL COMPANY, *et al.*,                :       09-10023 (REG)
                                                    :
                                                    :       (Jointly Administered)
           Debtors.                                 :
                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**FINAL ORDER (I) AUTHORIZING DEBTORS (A) TO OBTAIN POST-
PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c)(1),
364(c)(2), 364(c)(3), 364(d)(1) AND 364(e), (B) TO UTILIZE CASH COLLATERAL
PURSUANT TO 11 U.S.C. § 363 AND (C) TO PURCHASE CERTAIN ASSETS
PURSUANT TO 11 U.S.C. § 363 AND (II) GRANTING ADEQUATE
PROTECTION TO PRE-PETITION SECURED PARTIES
PURSUANT TO 11 U.S.C. §§ 361, 362, 363 AND 364**

Upon the motion (the "**Motion**"), dated January 6, 2009, of Lyondell Chemical

Company ("**Lyondell**") and certain of its affiliates (collectively, the "**Borrowers**") and

each of their affiliated debtors, each as debtor and debtor-in-possession (collectively, the

"**Debtors**"), in the above-captioned cases (the "**Cases**") pursuant to sections 105, 361,

362, 363(b), 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of title 11 of

the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), Rules 2002,

4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy

Rules**") and the Local Bankruptcy Rules, seeking, among other things:

(a)       authorization for each Borrower to obtain post-petition financing

(the "**Financing**") and to guaranty the obligations of each other Borrower in

connection with the Financing, and for each of the other Debtors (the

"**Guarantors**") to guaranty the Borrowers' obligations in connection with the Financing, consisting of:

      (i)     a super priority non-amortizing revolving credit facility made available to the Borrowers in an aggregate principal amount of up to $1,540,000,000 (the "**ABL DIP Facility**") that may, at the option of the Borrowers, and with no obligation or commitment on the part of the then existing ABL DIP Lenders (as defined below) be increased (through the addition of new lenders acceptable to the Arrangers (as defined below)) to up to $2,000,000,000 in aggregate principal amount, subject to the terms and conditions of the Debtor-In-Possession Credit Agreement to be dated on or about March 2, 2009 (the "**ABL DIP Credit Agreement**"), with Citibank, N.A., or an affiliate acting as Administrative Agent (in such capacity, the "**ABL DIP Agent**") for itself and a syndicate of financial institutions (together with Citibank, N.A., and including the fronting and issuing banks for the letters of credit thereunder, the "**ABL DIP Lenders**") to be arranged by Citigroup Global Markets Inc., Goldman Sachs Lending Partners LLC, Merrill Lynch Capital Corporation, ABN AMRO Bank N.V. and UBS Securities LLC (collectively, the "**Arrangers**"), substantially in the form filed with the Court on February 23, 2009; and

      (ii)     a super priority multiple draw term loan facility made available to the Borrowers in an aggregate principal amount of up to $6,500,000,000 (the "**Term DIP Facility**") consisting of $3,250,000,000

in respect of new money funding (the "**New Money DIP Loans**") and a dollar-for-dollar roll up of $3,250,000,000 in respect of Senior Facility Pre-Petition Debt (as defined below) beneficially owned (as contemplated in the DIP Term Sheet (as defined below), "**Beneficially Owned**") by the applicable Term DIP Lenders (as defined below) at 11:59 p.m. (prevailing Eastern time) on January 7, 2009 (the "**Roll Up DIP Loans**"), on a dollar of New Money DIP Loans for a dollar of Roll Up DIP Loans basis, subject to the terms and conditions of the Debtor-In-Possession Credit Agreement to be dated on or about March 2, 2009 (the "**Term DIP Credit Agreement**" and together with the ABL DIP Credit Agreement, the "**DIP Credit Agreements**"), with UBS AG, Stamford Branch, as Administrative Agent (in such capacity, the "**Term DIP Agent**" and, together with the ABL DIP Agent, the "**DIP Agents**"), for itself and a syndicate of financial institutions (together with the Term DIP Agent, the "**Term DIP Lenders**" and, together with the ABL DIP Lenders, the "**DIP Lenders**"), substantially in the form filed with the Court on February 23, 2009;

(b) authorization for the Debtors to execute and deliver all final documentation consistent with the terms and conditions of the Financing and the DIP Credit Agreements (all such final documentation, collectively with the DIP Credit Agreements, the "**DIP Documents**"), which final documents shall be in form and substance acceptable to the Instructing Group (as defined in the DIP Term Sheet (as defined below)) and to perform such other and further acts as may

be required in connection with the DIP Credit Agreements or the other DIP Documents;

(c)     authorization for the Debtors to use proceeds of the Financing and Cash Collateral (as defined below) to discharge irrevocably, at the closing and initial funding of the Financing, any amounts outstanding under the Emergency DIP Financing approved by this Court on January 7, 2009 (the "**Emergency DIP Financing**") and all ABL Pre-Petition Lender Debt (as defined below) arising under or in connection with the Credit Agreement dated as of December 20, 2007 (as amended, supplemented or otherwise modified from time to time, the "**ABL Pre-Petition Credit Agreement**") among Lyondell, Equistar Chemicals, LP, Houston Refining LP, Basell USA Inc. and the subsidiaries of LyondellBasell Industries AF S.C.A. ("**Lyondell AF**") from time to time party thereto, each lender party thereto (collectively, the "**ABL Pre-Petition Secured Lenders**") and Citibank, N.A., as administrative agent and collateral agent (in such capacities, the "**ABL Pre-Petition Agent**"), and each loan document executed in connection with the ABL Pre-Petition Credit Agreement (collectively with the ABL Pre-Petition Credit Agreement, the "**ABL Pre-Petition Loan Documents**");

(d)     authorization for the Debtors to use proceeds of the Financing and Cash Collateral (as defined below) to repurchase:

(i)     from LyondellBasell Receivables I, LLC (the "**RP SPV**"), a non-debtor affiliate of the Debtors, the "**Seller Receivables**" (as defined in the RP Receivables Purchase Agreement) previously sold or contributed to the RP SPV pursuant to the Receivables Sale Agreement dated as of

December 20, 2007 among Lyondell and the other Sellers party thereto, as sellers, RPA Seller as buyer, and Lyondell, as buyer's servicer (the "**Receivables Sale Agreement**"), for the purchase price of approximately $500 million, contemporaneously with the RP SPV repurchasing from Citibank, N.A., in its capacity as Administrative Agent and Asset Agent (the "**RPA Agent**") for the purchasers (the "**RPA Purchasers**") under that certain pre-petition $1,150,000,000 Receivables Purchase Agreement dated as of December 20, 2007 (as amended, supplemented or otherwise modified from time to time, the "**RP Receivables Purchase Agreement**"), the Receivable Interests (as defined in the RP Receivables Purchase Agreement) previously sold to the RPA Agent for the benefit of the RPA Purchasers pursuant to the RP Receivables Purchase Agreement; and

(ii)    from Basell Capital Corporation (the "**Basell SPV**", and together with the RP SPV, the "**Receivables SPVs**"), a non-debtor affiliate of the Debtors, the "**Receivables**" (as defined in the Receivables Purchase Agreement and, together with the Seller Receivables, the "**Receivables Assets**") previously sold to the Basell SPV pursuant to the Purchase and Contribution Agreement dated as of July 29, 2005 among the Debtor Basell USA Inc. ("**Basell USA**") and Basell Canada Inc., as sellers, and Basell Capital Corporation, as purchaser (the "**Purchase and Contribution Agreement**") for the purchase price of approximately $114,650,299.20 (plus per diem interest of $15,732.59 to the extent

payment is made after January 6, 2009), contemporaneously with the Basell SPV repurchasing from Citicorp North America, Inc. (the "**Basell Agent**", and together with the RPA Agent, the "**Receivables Agents**"), in its capacity as Program Agent and the sole Investor Agent for the investors (the "**Basell Purchasers**," and together with the RPA Purchasers, the "**Receivables Purchasers**") under that certain pre-petition Receivables Purchase Agreement dated as of July 29, 2005 among the Basell SPV, CAFCO, LLC, Citibank, N.A., Citicorp North America, Inc. ("**CNAI**"), as Program Agent and Investor Agent, Basell Canada Inc. and Basell USA (as heretofore amended, the "**Basell Receivables Purchase Agreement**", and together with the RP Receivables Purchase Agreement, the "**Receivables Facilities**") the Receivable Interests (as defined in the Basell Receivables Purchase Agreement) previously sold to CNAI for the benefit of the Basell Purchasers pursuant to the Basell Receivables Purchase Agreement;

(e)     the granting of adequate protection to the secured parties whose liens and security interests under the following documents are being primed by the Financing:

(i)     the Senior Credit Agreement dated as of December 20, 2007 (as amended, restated, supplemented or otherwise modified from time to time, the "**Senior Facility Pre-Petition Credit Agreement**") among the Debtors and their affiliates party thereto, the lenders party thereto (collectively, the "**Senior Facility Pre-Petition Secured**

6

**Lenders**"), Citibank, N.A. or its successor, as primary administrative agent and collateral agent and Citibank International plc or its successor, as European administrative agent (collectively, in such capacities, the "**Senior Facility Pre-Petition Agent**"), and each arranger and bookrunner party thereto, and each Loan Document (as defined in the Senior Facility Pre-Petition Credit Agreement) and each other document executed in connection with the Senior Facility Pre-Petition Credit Agreement, including, for the avoidance of doubt, any Secured Hedge Agreements, Treasury Services Agreements and Letters of Credit and Existing Letters of Credit (as defined in the Senior Pre-Petition Facility Credit Agreement) (collectively with the Senior Facility Pre-Petition Credit Agreement, the "**Senior Facility Pre-Petition Loan Documents**");

    (ii)  the Bridge Loan Agreement dated as of December 20, 2007 (as amended, restated, supplemented or otherwise modified from time to time, the "**Bridge Pre-Petition Loan Agreement**") among LyondellBasell Finance Company, as borrower, the subsidiaries and affiliates of Lyondell party thereto, the lenders party thereto (collectively, the "**Bridge Pre-Petition Secured Lenders**" and, together with the ABL Pre-Petition Secured Lenders and the Senior Facility Pre-Petition Secured Lenders, the "**Pre-Petition Secured Lenders**"), Merrill Lynch Capital Corporation, as administrative agent (in such capacity, the "**Bridge Pre-Petition Agent**" and, together with the ABL Pre-Petition Agent and the Senior Facility Pre-Petition Agent, the "**Pre-Petition Agents**"), Citibank,

7

N.A., as collateral agent, and each arranger and bookrunner party thereto, and each document executed in connection with the Bridge Pre-Petition Loan Agreement, including, for the avoidance of doubt, any Hedge Agreements as defined in the Bridge Pre-Petition Loan Agreement (collectively with the Bridge Pre-Petition Loan Agreement, the "**Bridge Pre-Petition Loan Documents**" and, together with the ABL Pre-Petition Loan Documents and the Senior Facility Pre-Petition Loan Documents, the "**Pre-Petition Loan Documents**");

(iii)  the Indenture (the "**Arco Indenture**") dated as of June 15, 1988, as supplemented by a Supplemental Indenture dated January 5, 2000 with The Bank of New York as Indenture Trustee (in such capacity, the "**Arco Trustee**"), governing the 10 1/4% Debentures due 2010 and the 9.8% Debentures due 2020 issued by the Arco Chemical Company (as predecessor to Lyondell) (the "**Arco Notes**" and the holders of the Arco Notes, the "**Arco Noteholders**") and each document executed in connection with the Arco Indenture (collectively with the Arco Indenture, the "**Arco Note Documents**"); and

(iv)  the Indenture (the "**Equistar Indenture**") dated as of January 29, 1996, as supplemented by Supplemental Indentures dated February 15, 1996, December 1, 1997, November 3, 2000 and November 17, 2000, with Texas Commerce Bank National Association as Indenture Trustee (in such capacity, including its successors and assigns, the "**Equistar Trustee**" and, together with the Arco Trustee, the "**Indenture**

**Trustees**") governing the 7.55% Senior Notes due 2026 issued by the Lyondell Petrochemical Company (the "**Equistar Notes**" and the holders of the Equistar Notes, the "**Equistar Noteholders**" and, together with the Arco Noteholders, the "**Noteholders**") and each document executed in connection with the Equistar Indenture (collectively with the Equistar Indenture, the "**Equistar Note Documents**" and, together with the Arco Note Documents, the "**Pre-Petition Note Documents**"); and

(f)     authorization for the Debtors to use any Cash Collateral (as defined below) in which the Senior Facility Pre-Petition Agent, any Senior Facility Pre-Petition Secured Lender, the Bridge Pre-Petition Agent, any Bridge Pre-Petition Secured Lender, any Indenture Trustee or any Noteholder (together, the "**Adequate Protection Parties**") may have an interest and the granting of adequate protection to the Adequate Protection Parties with respect to, *inter alia*, such use of their Cash Collateral (as defined below) and all use and diminution in the value of their collateral.

Due and appropriate notice of the Motion, the relief requested therein and the interim hearing (the "**Interim Hearing**") having been served by the Debtors on the fifty largest unsecured creditors of the Debtors, on the DIP Agents, the DIP Lenders, the Emergency DIP Lender (as defined below), the Pre-Petition Agents, the Receivables Agents, the Indenture Trustees, the other administrative agents or indenture trustees for each of the Debtors' funded debt facilities or their counsel, if known, the Pre-Petition Secured Lenders, the Office of the United States Trustee for the Southern District of New York, the Internal Revenue Service and the Securities and Exchange Commission

(collectively, the "**Notice Parties**") in compliance with Bankruptcy Rule 4001(b) and (c) and the Local Bankruptcy Rules.

The Interim Hearing having been held by this Court on January 7 and 8, 2009, and this Court having entered an interim order (the "**Interim Order**") dated January 8, 2009 that, among other things, (i) authorized (a) each Borrower, on an interim basis, to forthwith borrow or obtain letters of credit from the DIP Lenders under the term sheet attached as Exhibit A to the Interim Order (the "**DIP Term Sheet**") up to an aggregate principal or face amount not to exceed $1,515,000,000 pursuant to the ABL DIP Facility and $2,167,000,000 in New Money DIP Loans (subject to any limitations of borrowings under the DIP Documents) and (b) the roll up of $2,167,000,000 in Senior Facility Pre-Petition Debt to be administered under the Term DIP Credit Agreement, (ii) authorized each Borrower to guaranty the DIP Obligations (as defined below) of each other Borrower and the Guarantors to guaranty the DIP Obligations of each Borrower, (iii) authorized the Debtors' use of Cash Collateral (as defined below), (iv) granted the adequate protection described in the Interim Order, and (v) scheduled a final hearing (the "**Final Hearing**") to consider entry of a final order (the "**Final Order**") authorizing the balance of the borrowings and letter of credit issuances under the DIP Documents on a final basis, as set forth in the Motion and the DIP Documents.

Due and appropriate notice of the Motion, the final relief requested therein and the Final Hearing, as well as the Interim Order, having been served by the Debtors upon the Notice Parties, including, but not limited to, the Senior Facility Pre-Petition Secured Lenders that are not also Term DIP Lenders, the Environmental Protection Agency and

following its formation, the Statutory Committee of Unsecured Creditors (the "**Creditors' Committee**"), in accordance with the terms of the Interim Order.

The Debtors having filed a notice of filing of the proposed Final Order (the "**Supplemental Notice**"), dated February 20, 2009, together with proposed drafts of the DIP Credit Agreements. Due and appropriate notice of the Supplemental Notice and the relief requested therein having been served by the Debtors on the Notice Parties, including, but not limited to, the Senior Facility Pre-Petition Secured Lenders that are not also Term DIP Lenders, the Creditors' Committee and the Environmental Protection Agency.

Upon the record made by the Debtors and other parties in interest at the Interim Hearing and at the Final Hearing and after due deliberation and consideration and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.      *Disposition.* The Motion is granted in accordance with the terms of this Final Order. Any objections to the Motion or the Supplemental Notice with respect to the entry of this Final Order that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled.

2.      *Jurisdiction.* This Court has core jurisdiction over the Cases, the Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought herein are sections 105, 361, 362, 363 and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004 and 9014 and the Local Bankruptcy Rules.

3. *Notice*. Under the circumstances, the notice given by the Debtors of the Motion, the relief requested therein, the Interim Hearing, the Interim Order and the Final Hearing constitutes appropriate, due and sufficient notice thereof and complies with Bankruptcy Rule 4001(b) and (c) and the Local Bankruptcy Rules, and no further notice of the relief sought at the Final Hearing and the relief granted herein is necessary or required.

4. *Debtors' Stipulations*. Without prejudice to the rights of the Creditors' Committee or any other party (but which rights are subject to the limitations thereon contained in paragraph 24 hereof), the Debtors admit, stipulate and agree that:

(a)     As of the date of the commencement of the Cases (the "**Petition Date**"):

(i)     the Debtors party to or otherwise obligated under the ABL Pre-Petition Loan Documents, without defense, counterclaim or offset of any kind, were jointly and severally indebted and liable to the ABL Pre-Petition Secured Lenders in the aggregate principal amount of approximately $765,945,222.00 in respect of loans made and in the aggregate face amount of $262,283,245.65 in respect of letters of credit issued by the ABL Pre-Petition Secured Lenders, *plus* interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees that are chargeable or reimbursable under the ABL Pre-Petition Loan Documents), charges and all other obligations incurred in connection therewith as provided in the ABL Pre-Petition Loan Documents (collectively, the "**ABL Pre-Petition Debt**"), secured by liens

on and security interests in (the "**ABL Pre-Petition Security Interests**") certain personal property of the Debtors and their affiliates (the "**ABL Pre-Petition Collateral**");

(ii)     the Debtors party to or otherwise obligated under the Senior Facility Pre-Petition Loan Documents, without defense, counterclaim or offset of any kind, were jointly and severally indebted and liable to the Senior Facility Pre-Petition Secured Lenders in the aggregate principal amount of approximately $10,330,016,583.61 and €1,287,016,252.02 in respect of loans made and in the aggregate face amount of $38,467,380.14 in respect of letters of credit issued by the Senior Facility Pre-Petition Secured Lenders, *plus* interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees that are chargeable or reimbursable under the Senior Facility Pre-Petition Loan Documents), charges, Obligations (as defined in the Senior Pre-Petition Credit Agreement) and all other obligations incurred in connection therewith as provided in the Senior Facility Pre-Petition Loan Documents (collectively, the "**Senior Facility Pre-Petition Debt**"), which Senior Facility Pre-Petition Debt is secured by liens on and security interests in (the "**Senior Facility Pre-Petition Security Interests**") certain real and personal property of the Debtors and their affiliates (the "**Senior Facility Pre-Petition Collateral**");

(iii)     the Debtors party to or otherwise obligated under the Bridge Pre-Petition Loan Documents, without defense, counterclaim or

offset of any kind, were jointly and severally indebted and liable to the Bridge Pre-Petition Secured Lenders in the aggregate principal amount of approximately $8,000,000,000 in respect of loans made by the Bridge Pre-Petition Secured Lenders, *plus* interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees that are chargeable or reimbursable under the Bridge Pre-Petition Loan Documents), charges and all other obligations incurred in connection therewith as provided in the Bridge Pre-Petition Loan Documents (collectively, the "**Bridge Pre-Petition Debt**" and, together with the ABL Pre-Petition Debt and the Senior Facility Pre-Petition Debt, the "**Pre-Petition Lender Debt**"), secured by liens on and security interests in (the "**Bridge Pre-Petition Security Interests**" and, together with the ABL Pre-Petition Security Interests and the Senior Facility Pre-Petition Security Interests, the "**Pre-Petition Lender Security Interests**") certain real and personal property of the Debtors and their affiliates (the "**Bridge Pre-Petition Collateral**" and, together with the ABL Pre-Petition Collateral and the Senior Facility Pre-Petition Collateral, the "**Pre-Petition Lender Collateral**");

(iv)     the Debtors party to or otherwise obligated under the Arco Note Documents, without defense, counterclaim or offset of any kind, were jointly and severally indebted and liable to the Arco Noteholders in the aggregate principal amount of $325,000,000 in respect of the Arco Notes, *plus* interest thereon and fees, expenses (including any attorneys',

accountants', appraisers' and financial advisors' fees that are chargeable or reimbursable under the Arco Note Documents), charges and all other obligations incurred in connection therewith as provided in the Arco Note Documents (collectively, the "**Arco Pre-Petition Debt**") secured by liens on and security interests in certain real and personal property of certain of the Debtors (the "**Arco Pre-Petition Collateral**"); and

(v)     the Debtors party to or otherwise obligated under the Equistar Note Documents, without defense, counterclaim or offset of any kind, were jointly and severally indebted and liable to the Equistar Noteholders in the aggregate principal amount of $150,000,000 in respect of the Equistar Notes, *plus* interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees that are chargeable or reimbursable under the Equistar Note Documents), charges and all other obligations incurred in connection therewith as provided in the Equistar Note Documents (collectively, the "**Equistar Pre-Petition Debt**") secured by liens on and security interests in certain real and personal property of certain of the Debtors (the "**Equistar Pre-Petition Collateral**").

(b)     The Pre-Petition Lender Debt constitutes the legal, valid and binding obligation of the respective Debtors named in the Pre-Petition Loan Documents, enforceable in accordance with its terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code).

(c)     No portion of the Pre-Petition Lender Debt or any payments made to the Pre-Petition Agents or the Pre-Petition Secured Lenders or applied to the obligations owing under the Pre-Petition Loan Documents prior to the Petition Date is subject to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense or "claim" (as such term is defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or other applicable law.

(d)     Each Debtor hereby forever waives and releases any and all "claims" (as such term is defined in the Bankruptcy Code), counterclaims, causes of action, defenses or setoff rights against each of the Pre-Petition Agents and each of the Pre-Petition Secured Lenders, solely in its capacity as a Pre-Petition Agent or a Pre-Petition Secured Lender and not in any other capacity or in respect to any other relationship it may have, or have had, with or in respect to the Debtors, whether arising at law or in equity, including, without limitation, any recharacterization, subordination, avoidance or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state or federal law; *provided*, *however*, that nothing herein or in any of the DIP Documents shall operate as a release or waiver of any claims or causes of action held by any party (including, without limitation, any of the Debtors) against any Debtor, any "affiliate" of any Debtor (as such term is defined in the Bankruptcy Code) or any officer, director or direct or indirect shareholder (or affiliate thereof) of any Debtor.

(e)　　The Pre-Petition Lender Security Interests granted to the Pre-Petition Agents on the Pre-Petition Lender Collateral pursuant to and in connection with the Pre-Petition Loan Documents, including, without limitation, all security agreements, pledge agreements, mortgages, deeds of trust and other security documents executed by any of the Debtors in favor of any Pre-Petition Agent, for its benefit and for the benefit of the applicable Pre-Petition Secured Lenders, are (i) valid, binding, perfected and enforceable liens and security interests in the real and personal property described in the Pre-Petition Loan Documents, (ii) not, pursuant to the Bankruptcy Code or other applicable law, subject to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense or "claim" (as such term is defined in the Bankruptcy Code) of any kind and (iii) subject and subordinate only to (A) the DIP Liens (as defined below) and any liens on the DIP Collateral (as defined below) that are senior to, or *pari passu* with, the DIP Liens, (B) the Carve-Out (as defined below) to which the DIP Liens are subject, (C) liens granted in respect to the Debtor Reimbursement Claims and the Debtor Contribution Claims as such terms are defined in and made pursuant to the Final Order Authorizing Debtors to (I) Maintain and Use Existing Bank Accounts, Books, Records and Business Forms; (II) Maintain and Use Existing Cash Management System, As Modified; and (III) Provide Superpriority Status For Intercompany Receivables ("**Final Cash Management Order**"), (D) the Adequate Protection Liens (as defined below) and (E) valid, perfected and unavoidable liens and security interests permitted under the applicable Pre-Petition Loan Documents, but only to the extent that

17

such liens and security interests are permitted by the applicable Pre-Petition Loan Documents to be senior to or *pari passu* with the applicable Pre-Petition Lender Security Interests.

(f)     The aggregate value of the ABL Pre-Petition Collateral exceeds the aggregate amount of the ABL Pre-Petition Debt.

(g)     The aggregate value of the Senior Facility Pre-Petition Collateral exceeds the aggregate amount of pre-petition debt secured by such collateral, including the Senior Facility Pre-Petition Debt, the Arco Pre-Petition Debt and the Equistar Pre-Petition Debt.

(h)     The aggregate value of the Seller Receivables exceeds the aggregate amount payable by the RP SPV to the RPA Agent pursuant to the RP Receivables Purchase Agreement, and the aggregate value of the Receivables exceeds the aggregate amount payable by the Basell SPV to the Basell Agent pursuant to the Basell Receivables Purchase Agreement.

(i)     Each sale of any Receivables Asset to any Receivables SPV was a "true sale" and was for fair consideration and is not otherwise voidable or avoidable. The RP SPV is the valid, legal and beneficial owner of the Seller Receivables and the Basell SPV is the valid, legal and beneficial owner of the Receivables. The Debtors have no knowledge of any basis on which the assets and liabilities of either of the Receivables SPVs could be substantively consolidated with any of the Debtors or with each other. As of the Petition Date, each of the Receivables SPVs was validly obligated to the Receivables Purchasers for their respective obligations under the Receivables Facilities, and neither

Receivables SPV has any counterclaim, setoff, defense or objection against or relating to such obligations.

(j)     The RPA Purchasers have a first claim to collections on the Seller Receivables and the Basell Purchasers have a first claim to collections on the Receivables, each by virtue of their valid, perfected, first priority security interest thereon.  No action has been taken by either of the Receivables SPVs which would result in the avoidance, recharacterization, postponement or subordination of the Receivables SPVs' respective obligations under the Receivables Facilities.

5.     *Findings Regarding the Financing.*

(a)     Good cause has been shown for the entry of this Final Order.

(b)     The Debtors need to obtain the full amount of the Financing (including, but not limited to, the New Money DIP Loans) and use Cash Collateral (as defined below) to permit, among other things, the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers and customers, to make payroll, to make capital expenditures, to pay the ABL Pre-Petition Debt and the Emergency DIP Financing, to repurchase the Receivables Assets and to satisfy other working capital and operational needs.  The access of the Debtors to sufficient working capital and liquidity through the use of Cash Collateral, incurrence of new indebtedness for borrowed money and other financial accommodations is vital to the preservation and maintenance of the going concern values of the Debtors and to a successful reorganization of the Debtors.

(c)     The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code for the purposes set forth in the DIP Credit Agreements without the Debtors (i) granting to the DIP Agents and the DIP Lenders, subject to the Carve-Out as provided for herein, the DIP Liens and the Superpriority Claims (in each case, as defined below) under the terms and conditions set forth in this Final Order and in the DIP Documents and (ii) allowing any Term DIP Lender to designate loans outstanding under the Senior Facility Pre-Petition Credit Agreement as Roll Up DIP Loans pursuant to the terms hereof on a dollar-for-dollar basis with the aggregate amount of such Term DIP Lender's then outstanding New Money DIP Loans and NM Commitment (as defined in the Term DIP Credit Agreement) to provide New Money DIP Loans, in each case, as of the date hereof, such designated Roll Up DIP Loans being a necessary inducement to, and a portion of the compensation for, such Term DIP Lender providing such New Money DIP Loans.

(d)     The terms of the Financing, including the Roll Up DIP Loans, and the use of Cash Collateral (as defined below) are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(e)     The Financing has been negotiated in good faith and at arm's length among the Debtors, the DIP Agents and the DIP Lenders, and all of the Debtors' obligations and indebtedness arising under, in respect of or in connection with the Financing and the DIP Documents and the rights granted in the Interim Order, including without limitation, all loans, including the Roll Up DIP Loans, made to, guarantees issued by, and all letters of credit issued for the account of, the Debtors pursuant to the DIP Documents, and any other obligations under the DIP Documents, including credit extended in respect of overdrafts and related liabilities and other depository, treasury, and cash management services and other clearing services provided by any Agent or its affiliates (all of the foregoing collectively, the "**DIP Obligations**"), shall be deemed to have been extended or received, as appropriate, by the DIP Agents and the DIP Lenders and their affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Obligations, the DIP Liens (as defined below) and the Superpriority Claims (as defined below) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Final Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(f)     As of the Petition Date, the Receivables Purchasers had a first claim to post-petition collections on the Receivables Assets by virtue of their valid, perfected, first priority security interest thereon. The repurchase of the Receivable Assets by the Debtors from the respective Receivables SPVs will

afford the Debtors enhanced liquidity in the near term as pre-petition Receivables Assets are collected.

(g)     Payment of the ABL Pre-Petition Debt and the Emergency DIP Financing and the repurchase of the Receivables Assets reflects the Debtors' exercise of prudent business judgment consistent with their fiduciary duties.

(h)     Subject to the proviso in the last sentence of paragraph 6(f), the right of the DIP Lenders to designate Roll Up DIP Loans and any compensation or payment that may be received by such DIP Lenders incremental to what would have been received had such Roll Up DIP Loans continued to be administered under the Senior Facility Pre-Petition Credit Agreement are hereby authorized as compensation for, in consideration for, and solely on account of, the agreement of such DIP Lenders to make the New Money DIP Loans and not as payments under, adequate protection for, or otherwise on account of, the Senior Facility Pre-Petition Debt; *provided* that any reduction in the principal amount of the Roll Up DIP Loans made pursuant to any payment under the Term DIP Credit Agreement shall constitute a dollar-for-dollar repayment of the Roll Up DIP Loans under the Senior Facility Pre-Petition Credit Agreement.

(i)     Absent granting the relief sought by this Final Order, the Debtors' estates will be immediately and irreparably harmed.  Consummation of the Financing and authorization of the use of Cash Collateral in accordance with this Final Order and the DIP Documents is therefore in the best interests of the Debtors' estates consistent with their fiduciary duties.

6. *Authorization of the Financing and the DIP Credit Agreements.*

(a)     The Debtors were by the Interim Order and hereby are authorized to execute and enter into the DIP Documents, including the DIP Credit Agreements, and the DIP Documents are hereby approved.  The DIP Documents and this Final Order shall govern the financial and credit accommodations to be provided to the Debtors by the DIP Lenders; *provided* that in the event of a conflict between the DIP Documents and this Final Order, this Final Order shall control.

(b)     The Borrowers were by the Interim Order and hereby are authorized to borrow money and obtain letters of credit pursuant to the DIP Documents and any related promissory notes, and the Borrowers and the Guarantors are hereby authorized to guaranty such borrowings and the Borrowers' obligations with respect to such letters of credit, in accordance with the terms of this Final Order and the DIP Documents, which shall be used solely for the purposes permitted under the DIP Documents and in accordance with the Operating Forecast (as defined in the DIP Documents), including, without limitation, (i) to provide working capital for the Borrowers and the Guarantors (including, without limitation, foreign affiliates guaranteeing the DIP Obligations), (ii) to, at the closing of the Financing and initial funding, discharge in full and irrevocably the ABL Pre-Petition Debt and the Emergency DIP Financing, and to repurchase the Receivables Assets, (iii) to enter into any and all other and further agreements and arrangements in connection therewith and (iv) to pay interest, fees and expenses in accordance with this Final Order and the DIP

Documents. In addition to such loans and obligations, the Debtors are authorized to incur overdrafts and related liabilities arising from treasury, depository and cash management services including any automated clearing house fund transfers provided to or for the benefit of the Debtors by the DIP Agents or any of their affiliates, *provided, however*, that nothing herein shall require any DIP Agent or any other party to incur overdrafts or to provide any such services or functions to the Debtors.

(c)     In furtherance of the foregoing and without further approval of this Court, each Debtor was by the Interim Order and hereby is authorized and directed to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), and to pay all fees, that may be reasonably required or necessary for the Debtors' performance of their obligations under the Financing, including, without limitation:

(i)     the execution, delivery and performance of the DIP Documents, including, without limitation, the DIP Credit Agreements, any security and pledge agreements, any mortgages contemplated thereby and the letter agreements referred to in clause (iii) below, and, as to the DIP Credit Agreements, in substantially the same form as filed with the Court on or about February 20, 2009, with only such changes as may be agreed to by the Debtors, the DIP Agents and the Instructing Group,

(ii)     the execution, delivery and performance of one or more amendments, waivers, consents or other modifications (any modifications

to the form of DIP Credit Agreements attached hereto being subject to this paragraph 6(c)(ii)) to and under the DIP Documents for, among other things, the purpose of adding additional financial institutions as DIP Lenders and reallocating the commitments for the Financing among the DIP Lenders, in each case upon the terms and conditions set forth in the applicable DIP Credit Agreement (it being understood that no further approval of the Court shall be required for amendments, waivers, consents or other modifications to and under the DIP Documents (or any material fees paid in connection therewith) (x) to increase the aggregate commitments under the ABL DIP Facility to up to $2,000,000,000 in connection with the incurrence by the Borrowers of the ABL Accordion (as defined in the ABL DIP Credit Agreement), (y) to make any non-material modifications or (z) to make any "material" modification or amendment to any of the DIP Documents; *provided*, *however*, that notice of any material modification or material amendment to any of the DIP Documents shall be filed with the Bankruptcy Court, and the Creditors' Committee, the U.S. Trustee and any other party in interest shall have 5 business days from the date of such filing within which to object in writing to such proposed modification or amendment; *provided further* that if the Creditors' Committee, the U.S. Trustee or any other party in interest, timely objects to any material modification or amendment to the DIP documents, then such modification or amendment shall only be permitted pursuant to an order of this Court after notice and a hearing. For

purposes hereof, a "material" modification shall mean any modification that operates to (1) shorten the maturity of the extensions of credit under the DIP Documents or otherwise require more rapid principal amortization than is currently required under the DIP Credit Agreements, (2) increase, except pursuant to the ABL Accordion, the aggregate amount of any of the commitments thereunder, (3) increase the rate of interest or any other fees or charges payable thereunder (other than to the extent contemplated in the DIP Documents as in effect on the date hereof, including, without limitation, Section 2.05 of the Term DIP Credit Agreement), (4) add specific new Events of Default (as defined in the applicable DIP Credit Agreement) or shorten the notice or grace period in respect to any Default (as defined in the applicable DIP Credit Agreement) or Event of Default currently in the DIP Documents, (5) enlarge the nature and extent of default remedies available to the DIP Agents or DIP Lenders following the occurrence and during the continuance of an Event of Default, (6) add additional financial covenants or make any financial covenant or other negative or affirmative covenant or representation and warranty more restrictive on the Debtors or (7) otherwise modify the DIP Documents in a manner materially less favorable to the Debtors and their estates),

(iii)     the non-refundable payment to each member of the Instructing Group (as defined in the DIP Term Sheet), the DIP Agents or the DIP Lenders, as the case may be, of (a) the fees referred to in the DIP Documents (and in the separate letter agreements between them in

connection with the Financing) and (b) the reasonable costs and expenses as may be due from time to time, including, without limitation, fees and expenses of the professionals retained as provided for in the DIP Documents without the necessity of filing retention motions or fee applications,

(iv)    the execution and delivery of such documents and the taking of all acts as shall be necessary or desirable in order to effect the roll up of a portion of the Senior Facility Pre-Petition Debt Beneficially Owned by the applicable DIP Lenders at 11:59 p.m. (prevailing Eastern time) on January 7, 2009 in consideration and on account of the agreement of the applicable DIP Lenders to make the New Money DIP Loans (and not on account of any pre-petition debt of such DIP Lenders) in accordance with the DIP Term Sheet and the DIP Documents, and

(v)    the performance of all other acts required under or in connection with the DIP Documents.

(d)    The procedures for making allocations of the New Money DIP Loans set forth in the New Money Loan Commitment Procedures Memorandum and the New Money Loan Commitment Standard Terms, substantially in the form filed with the Court on February 23, 2009 (collectively, the "**Procedures**"), are hereby approved. Allocations of the New Money DIP Loans made by the Term DIP Agent in accordance with the Procedures will be final and binding. The Term Agent may, in connection with such allocations, conclusively rely on, and shall have no liability whatsoever in respect of, record date ownership information

provided to it. The Term DIP Agent and the Senior Facility Pre-Petition Agent may conclusively rely on, and shall have no liability whatsoever in respect of, the representations and warranties made by, and the other information provided by, subscribers pursuant to the Procedures. In furtherance of the foregoing and in connection with the consummation of the Financing and the related DIP Documents, the performance of such acts as set forth in the Procedures and related documentation is hereby authorized and approved. Citibank, N.A. and its affiliates, in connection with the Senior Facility Pre-Petition Loan Documents, shall have no liability whatsoever solely in their respective capacities as primary Administrative Agent, European Administrative Agent, Collateral Agent (as such terms are defined in the Senior Facility Pre-Petition Loan Documents) or otherwise under the Senior Facility Pre-Petition Loan Documents, or to any successor to any such capacity under the Senior Facility Pre-Petition Loan Documents, solely with respect to any alleged claim, disgorgement, counterclaim, recoupment, offset, or other cause of action under any theory at law or in equity arising under or in any way related to actions they undertake to effectuate, or to their administration of, the Roll Up DIP Loans; *provided*, *however*, that the foregoing is subject to the proviso in the last sentence of paragraph 6(f) hereof and to paragraph 24 hereof with respect to any rights of the Creditors' Committee or other parties in interest to bring a challenge on behalf of the Debtors' estates.

(e)     The amendment to Annex V of the DIP Term Sheet, which sets forth the method of allocation for the New Money DIP Loans, substantially in the form filed with the Court on February 23, 2009, is hereby approved.

(f)     Upon execution and delivery of the DIP Credit Agreements and the other DIP Documents, such DIP Documents shall constitute valid, binding and non-avoidable obligations of the Debtors enforceable against each Debtor party thereto in accordance with their respective terms and the terms of this Final Order for all purposes during the Cases, any subsequently converted case of any Debtor under chapter 7 of the Bankruptcy Code or after the dismissal of any Case. Except as provided in the proviso appearing at the end of this paragraph 6(f), no obligation, payment, roll up or repayment thereof or recovery on or in respect thereof, transfer or grant of security under the DIP Credit Agreements, the other DIP Documents or this Final Order shall be stayed, restrained, revocable, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable law (including without limitation, under sections 502(d), 548 or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment or counterclaim; *provided, however*, that the Court reserves the right to unwind, after notice and hearing, the Roll Up DIP Loans, or a portion thereof (which might include the disgorgement or re-allocation of interest, fees, principal or other incremental consideration paid in respect thereto and not paid on account of the Senior Facility Pre-Petition Debt or the avoidance of liens and/or guarantees with respect to one or more of the Debtors), solely in the event that there is a timely successful challenge, pursuant and subject to the limitations contained in paragraph 24, to the validity, enforceability, extent, perfection or priority of the Senior Facility Pre-Petition

Debt or the Senior Facility Pre-Petition Security Interests, and only to the extent that, the Court finds that, in light of such timely successful challenge, the Roll Up DIP Loans unduly advantaged the Roll Up DIP Lenders (as defined below).

7. *Payment of the ABL Pre-Petition Debt, the Emergency DIP Financing and Repurchase of the Receivables Assets.* The Debtors were by the Interim Order and hereby are authorized and directed to use proceeds of the Financing and Cash Collateral to, at the closing of the Financing, discharge the ABL Pre-Petition Debt and the Emergency DIP Financing, and repurchase the Receivables Assets and to enter into, and perform under, any and all other and further agreements and arrangements in connection therewith. Any such discharge or repurchase shall be irrevocable and shall not be subject to challenge, rescission, disgorgement or any other challenge under any circumstances, including, without limitation, pursuant to any Lender Claim (as defined below).

8. *Superpriority Claims.* Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed senior administrative expense claims against each of the Debtors (the "**Superpriority Claims**") with priority over any and all administrative expenses, adequate protection claims, diminution claims (including all Adequate Protection Obligations (as defined below)) and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment,

30

which allowed claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which shall be payable from and have recourse to all pre- and post-petition property of the Debtors and all proceeds thereof, including, without limitation all Avoidance Actions (as defined below), subject only to (i) the proviso in the last sentence of paragraph 6(f) and (ii) the payment of the Carve-Out to the extent specifically provided for herein. The Superpriority Claims granted hereunder to the ABL DIP Lenders shall be *pari passu* with the Superpriority Claims granted hereunder to the holders of the New Money DIP Loans (the "**New Money DIP Lenders**"). The Superpriority Claims granted hereunder to the holders of the Roll Up DIP Loans (the "**Roll Up DIP Lenders**") shall be immediately junior in priority and subject to the Superpriority Claims of the New Money DIP Lenders and ABL DIP Lenders.

9. *Carve-Out*. The "**Carve-Out**" means (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a), (ii) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an amount not exceeding $10,000,000, and (iii) after the occurrence and during the continuance of an Event of Default (as defined in the applicable DIP Credit Agreement), an amount not exceeding $25,000,000 in the aggregate, which amount may be used subject to the terms of this Final Order, to pay any fees or expenses incurred by the Debtors and any professionals of any statutory committees appointed in the Cases (each, a "**Committee**") that remain unpaid subsequent to the payment of such fees and expenses from available funds remaining in the Debtors' estates for such creditors, in respect of (A) allowances of compensation for services

rendered or reimbursement of expenses awarded by the Bankruptcy Court to the Debtors'
or any professionals of any Committee and (B) the reimbursement of expenses allowed
by the Bankruptcy Court incurred by the Committee members in the performance of their
duties (but excluding fees and expenses of third party professionals employed by such
members), *provided* that (x) the dollar limitation in this clause (iii) on fees and expenses
shall neither be reduced nor increased by the amount of any compensation or
reimbursement of expenses incurred, awarded or paid prior to the occurrence of an Event
of Default in respect of which the Carve-Out is invoked or by any fees, expenses,
indemnities or other amounts paid to any Pre-Petition Agent or Pre-Petition Secured
Lender and (y) nothing herein shall be construed to impair the ability of any party to
object to the fees, expenses, reimbursement or compensation described in clauses (A) and
(B) above.  As among the DIP Collateral (as defined below), the Carve-Out, if and to the
extent invoked pursuant to this Final Order, shall be allocated one-third against the ABL
DIP Collateral (as defined below) and two-thirds against the Term DIP Collateral (as
defined below).  Prior to the occurrence of an Event of Default (as defined in either of the
DIP Credit Agreements), the Debtors shall be permitted to pay fees to Court-approved
professionals employed by the Debtors or any Committee in accordance with the interim
compensation procedures established by the Court and applicable law.

   10. *DIP Liens.*  As security for the DIP Obligations, effective and perfected
upon the date of the Interim Order and without the necessity of the execution, recordation
of filings by the Debtors of mortgages, security agreements, control agreements, pledge
agreements, financing statements or other similar documents, or the possession or control
by any DIP Agent or DIP Lender of, or over, any DIP Collateral (as defined below), the

following security interests and liens were by the Interim Order and hereby are granted

by the Debtors to the DIP Agents for their own benefit and the respective benefit of the

applicable DIP Lenders (all property identified in clauses (a), (b) and (c) below being

collectively referred to as the "**DIP Collateral**"), subject, only in the event of the

occurrence and during the continuance of an Event of Default (as defined in the

applicable DIP Credit Agreement), to the payment of the Carve-Out (all such liens and

security interests granted to the DIP Agents, for their own benefit and the respective

benefit of the applicable DIP Lenders, pursuant to this Final Order and the DIP

Documents, the "**DIP Liens**"):

      (a)      <u>First Lien on Cash Balances and Unencumbered Property</u>.

Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding,

continuing, enforceable, fully-perfected first priority senior security interest in

and lien upon all pre- and post-petition property of the Debtors (limited, in the

case of Basell Germany Holdings GmbH ("**Basell GmbH**") to the equity interests

of its direct subsidiaries to the extent required in the DIP Documents), whether

existing on the Petition Date or thereafter acquired, that, on or as of the Petition

Date is not subject to valid, perfected and non-avoidable liens (collectively,

"**Unencumbered Property**"), including without limitation, any such

unencumbered cash of the Debtors (whether maintained with a DIP Agent or

otherwise) and any investment of such cash, inventory, accounts receivable, other

rights to payment whether arising before or after the Petition Date, contracts,

properties, plants, equipment, general intangibles, documents, instruments,

interests in leaseholds, real properties, patents, copyrights, trademarks, trade

names, other intellectual property, equity interests, and the proceeds of all the foregoing. Unencumbered Property shall also include the proceeds of, and property received on account of, (whether by judgment, settlement or otherwise) the Debtors' claims and causes of action (collectively, the "**Avoidance Actions**") under sections 502(d), 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code and any other avoidance actions under the Bankruptcy Code (such proceeds and property, collectively, the "**Avoidance Proceeds**").

(b)     <u>Liens Priming Pre-Petition Secured Parties' Liens</u>.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all pre- and post-petition property of the Debtors (including, without limitation, Cash Collateral (as defined below), inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, equipment, general intangibles, documents, instruments, interests in leaseholds, real properties, patents, copyrights, trademarks, trade names, other intellectual property, equity interests, and the proceeds of all the foregoing (but limited, in the case of Basell GmbH, as described in paragraph 10(a) above)), whether now existing or hereafter acquired, that is subject to any existing lien presently securing the Arco Notes, the Equistar Notes or the Pre-Petition Lender Debt (including in respect of issued but undrawn letters of credit).  Such security interests and liens shall be senior in all respects to the interests in such property of the Adequate Protection Parties arising from current and future liens of the Adequate Protection Parties (including, without

limitation, adequate protection liens granted hereunder), but shall be junior to any (i) valid, perfected, enforceable and unavoidable security interests and liens of other parties, if any, on such property existing immediately prior to the Petition Date or (ii) valid, enforceable and unavoidable interests in such property arising out of statutory liens existing immediately prior to the Petition Date that become perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code.

(c) <u>Liens Junior to Certain Other Liens</u>. Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected security interest in and lien upon all pre- and post-petition property of the Debtors (other than the property described in clauses (a) or (b) of this paragraph 10, as to which the liens and security interests in favor of the DIP Agents will be as described in such clauses (and other than the equity interests of the direct subsidiaries of Basell GmbH excluded from such clauses)), whether now existing or hereafter acquired, that is subject (i) to valid, perfected, enforceable and unavoidable liens in existence immediately prior to the Petition Date or (ii) to valid, enforceable and unavoidable interests in such property arising out of statutory liens existing immediately prior to the Petition Date that become perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, which security interests and liens in favor of the DIP Agents are junior to such valid, perfected and unavoidable liens.

(d) <u>Liens Senior to Certain Other Liens</u>. Except as provided in the proviso in the last sentence of paragraph 6(f), the DIP Liens shall not be subject or

subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code, (ii) any liens arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtors or (iii) any intercompany or affiliate liens of the Debtors, other than any valid, perfected, enforceable and unavoidable post-petition liens that may have arisen or arise in favor of Elgin Joliet and Eastern Railway Company (now known as Gary Railway) or its designees pursuant to the applicable agreements or tariffs in connection with its transportation and storage work for the Debtors in an amount not to exceed $2,800,000.

(e)     Non-Debtor Affiliates.  Nothing contained herein shall affect the continuing existence of the Senior Facility Pre-Petition Debt to be designated and administered as Roll Up DIP Loans under the Term DIP Credit Agreement or the obligations of non-debtor affiliates of the Debtors with respect to any guarantees provided by such non-debtor affiliates under the Senior Facility Pre-Petition Loan Documents or with respect to the Senior Facility Pre-Petition Security Interests granted by such non-debtor affiliates.

11.     *Protection of Term DIP Lenders' Rights*.  Any compensation, payments or recoveries received by the DIP Lenders on account or in respect of the Roll Up DIP Loans incremental to what would have been received had such Roll Up DIP Loans continued to be administered under the Senior Facility Pre-Petition Credit Agreement shall be compensation for, in consideration for, and solely on account of, the agreement

of such DIP Lenders to make the New Money DIP Loans and not as payments under, adequate protection for, or otherwise on account of, the Senior Facility Pre-Petition Debt; *provided*, *however*, that the foregoing shall not preclude or in any way abrogate the rights of any party as provided for in paragraphs 6(f) and 24 hereof.

12.     *Priority of DIP Liens.*  Notwithstanding anything to the contrary herein, the DIP Liens granted hereunder to the New Money DIP Lenders (the "**New Money DIP Liens**") shall be immediately junior in priority and subject to the DIP Liens granted to the ABL DIP Lenders (the "**ABL DIP Liens**" and together with the New Money DIP Liens, the "**Senior DIP Liens**") in respect of the ABL DIP Collateral (as defined below) and the ABL DIP Liens shall be immediately junior in priority and subject to the New Money DIP Liens in respect of the Term DIP Collateral (as defined below) (it being understood that the Senior DIP Liens granted hereunder in respect of the Avoidance Proceeds shall be *pari passu*).  The DIP Liens granted hereunder to the Roll Up DIP Lenders (the "**Roll Up DIP Liens**") shall be immediately junior in priority and subject to the Senior DIP Liens in respect of the DIP Collateral.  The "**ABL DIP Collateral**" shall consist of all DIP Collateral consisting of pre- and post-petition cash and Cash Collateral (other than cash proceeds of property that was Term DIP Collateral when such proceeds arose), and any investment of such cash and Cash Collateral, inventory, accounts receivable, and other related rights to payment, contracts and assets of the Debtors, whether existing on the Petition Date or acquired thereafter, and the proceeds of all of the foregoing.  The "**Term DIP Collateral**" shall consist of all DIP Collateral except for the ABL DIP Collateral (it being understood that the ABL DIP Collateral and the Term DIP Collateral shall include the Avoidance Proceeds on an equal and ratable basis).

13.     *Protection of DIP Lenders' Rights.*

(a)     All DIP Collateral shall be free and clear of all liens, claims and encumbrances, except for those liens, claims and encumbrances expressly permitted under the DIP Documents or this Final Order.

(b)     So long as there are any borrowings or letters of credit or other amounts or DIP Obligations (other than contingent indemnity obligations as to which no claim has been asserted when all other amounts have been paid and no letters of credit are outstanding) outstanding under the DIP Credit Agreements or the DIP Lenders have any Commitment (as defined in the applicable DIP Credit Agreement), the Pre-Petition Agents, the Indenture Trustees and the Adequate Protection Parties shall (i) take no action to foreclose upon or recover in connection with the liens granted thereto pursuant to the Pre-Petition Loan Documents, the Pre-Petition Note Documents, the Interim Order or this Final Order, or otherwise exercise remedies against any DIP Collateral, except to the extent authorized by an order of this Court, (ii) be deemed to have consented to any release of DIP Collateral authorized under the DIP Documents and (iii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the DIP Collateral unless, solely as to this clause (iii), the DIP Lenders file financing statements or other documents to perfect the liens granted pursuant to the Interim Order or this Final Order, or as may be required by applicable state law to continue the perfection of valid and unavoidable liens or security interests as of the Petition Date.

(c)     The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Agents and the DIP Lenders to exercise (i) immediately upon the occurrence of an Event of Default (as defined in the applicable DIP Credit Agreement), all rights and remedies under the DIP Documents other than those rights and remedies against the DIP Collateral as provided in clause (ii) below and (ii) upon the occurrence and during the continuance of an Event of Default and the giving of five business days' prior written notice to the Debtors (with a copy to counsel to any Committee and to the United States Trustee) to the extent provided for in any DIP Document, all rights and remedies against the DIP Collateral provided for in any DIP Document (including, without limitation, the right to set off against accounts maintained by the Debtors with any DIP Agent or DIP Lender or any affiliate thereof).  In any hearing regarding any exercise of rights or remedies, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing, and the Debtors and the Pre-Petition Agents, the Indenture Trustees and the Adequate Protection Parties hereby each waive their right to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of either DIP Agent or the DIP Lenders set forth in this Final Order or the DIP Documents.  In no event shall the DIP Agents, the DIP Lenders, the Pre-Petition Agents or the Pre-Petition Secured Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral.  The delay or failure to exercise rights

and remedies under the DIP Documents or this Final Order by any of the DIP Agents or DIP Lenders shall not constitute a waiver of such DIP Agent's or such DIP Lender's rights hereunder, thereunder or otherwise, unless any such waiver is pursuant to a written instrument executed in accordance with the terms of the applicable DIP Documents.

14.     *Limitation on Charging Expenses Against Collateral*.  Except to the extent of the Carve-Out, no costs or expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral, the Pre-Petition Lender Collateral or the Cash Collateral (as defined below) pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law without the prior written consent of the DIP Agents or the Pre-Petition Agents, as the case may be, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agents, the DIP Lenders, the Pre-Petition Agents or the Pre-Petition Secured Lenders.

15.     *Cash Collateral*.  With the exception of any funds in a blocked account pursuant to the ABL Loan Documents, to the extent any funds of the Debtors were on deposit with any Adequate Protection Party as of the Petition Date, including, without limitation, all funds deposited in, or credited to, an account of any Debtor with any Adequate Protection Party immediately prior to the filing of the Debtors' chapter 11 petitions (regardless of whether, as of the time of filing, such funds had been collected or made available for withdrawal by any such Debtor), such funds (the "**Deposited Funds**") are subject to rights of setoff.  By virtue of such setoff rights, the Deposited Funds are

subject to a lien in favor of such Adequate Protection Party, giving rise to a secured claim pursuant to sections 506(a) and 553 of the Bankruptcy Code. The Adequate Protection Parties are obligated, to the extent provided in the Pre-Petition Loan Documents or the Pre-Petition Note Documents (together, the "**Existing Documents**"), as the case may be, to share the benefit of such liens and setoff rights with the other Adequate Protection Parties that are party to or are otherwise beneficiaries of such documents, subject to paragraph 24 hereof. Pursuant to section 552 of the Bankruptcy Code, any proceeds of the Pre-Petition Collateral (as defined below) of the Adequate Protection Parties (including, without limitation, the Deposited Funds or any other funds on deposit at the Adequate Protection Parties or at any other institution as of the Petition Date) are cash collateral of the applicable Adequate Protection Parties within the meaning of section 363(a) of the Bankruptcy Code. The Deposited Funds, all cash proceeds of the Pre-Petition Collateral of the Adequate Protection Parties and all other cash collateral (as defined in the Bankruptcy Code) of the Adequate Protection Parties is referred to herein as "**Cash Collateral**."

16. *Use of Cash Collateral*. The Debtors are hereby authorized to use all Cash Collateral of the Adequate Protection Parties, and the Adequate Protection Parties are directed promptly to turn over to the Debtors all Cash Collateral received or held by them, *provided* that the Adequate Protection Parties are granted adequate protection as hereinafter set forth and, except on the terms and conditions of this Final Order, the Debtors shall be enjoined and prohibited from at any time using the Cash Collateral. The Debtors' right to use Cash Collateral, and the Adequate Protection Parties' consent to use of Cash Collateral, shall terminate automatically (i) on the Termination Date (as defined

in the ABL DIP Credit Agreement) with respect to the Cash Collateral that is ABL DIP

Collateral and (ii) on the Maturity Date (as defined in the Term DIP Credit Agreement)

with respect to Cash Collateral that is Term DIP Collateral.

17.     *Adequate Protection*.  The Adequate Protection Parties are entitled,

pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, to adequate

protection of their interest in their respective pre-petition collateral (collectively, the

"**Pre-Petition Collateral**"), including the Cash Collateral, subject to any rights of the

Creditors' Committee or other party in interest to assert a Lender Claim pursuant to

paragraph 24 hereof, for and equal in amount to the aggregate diminution in the value of

the Adequate Protection Parties' interest in the Pre-Petition Collateral during the Cases,

including, without limitation, any such diminution during the Cases resulting from the

sale, lease or use by the Debtors (or other decline in value) of Cash Collateral and any

other Pre-Petition Collateral, the priming of the Adequate Protection Parties' security

interests and liens in the Pre-Petition Collateral by the DIP Agents and the DIP Lenders

pursuant to the DIP Documents and this Final Order, and the imposition of the automatic

stay pursuant to section 362 of the Bankruptcy Code; *provided*, *however* that no

Adequate Protection Party shall be entitled to adequate protection with respect to any

diminution in the value of such Adequate Protection Party's interest in its Pre-Petition

Collateral resulting from any successful Avoidance Action or other Lender Claim against,

or Avoidance Proceeds recovered from, such Adequate Protection Party.  As adequate

protection, the applicable Pre-Petition Agents, the Indenture Trustees and the Adequate

Protection Parties are hereby granted the following (collectively, the "**Adequate**

**Protection Obligations**"):

(a)  Adequate Protection Liens.  The Pre-Petition Agents and Indenture Trustees (for themselves and for the respective benefit of the applicable Adequate Protection Parties) were by the Interim Order and hereby are granted (effective and perfected upon the date of the Interim Order and without the necessity of the execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements or other agreements) a replacement security interest in and lien (the "**Adequate Protection Liens**") upon all the DIP Collateral, subject and subordinate only to (i) the DIP Liens and any liens on the DIP Collateral that are senior to, or *pari passu* with, the DIP Liens, (ii) the liens securing Debtor Intercompany Transfers and Non-Debtor Intercompany Transfers as such terms are defined in and granted pursuant to the Final Cash Management Order and (iii) the Carve-Out.  The Adequate Protection Liens granted hereunder to the Bridge Pre-Petition Secured Lenders shall be immediately junior in priority and subject to the Adequate Protection Liens granted to the Senior Facility Pre-Petition Secured Lenders, the Arco Noteholders and the Equitstar Noteholders (collectively, the "**Senior Adequate Protection Parties**"), and the Adequate Protection Liens granted hereunder to the Adequate Protection Parties shall otherwise rank in the same relative priority and right both as among the Senior Adequate Protection Parties and vis-à-vis the Bridge Pre-Petition Secured Lenders as such parties' respective pre-petition liens and security interests do with respect to the Pre-Petition Collateral as of the Petition Date under the Existing Documents.  For the avoidance of doubt, the Adequate Protection Liens granted to the Indenture Trustees shall be senior in priority to those of the Bridge Pre-

Petition Secured Lenders in all DIP Collateral irrespective of such parties' pre-petition security interests and relative priorities.

(b)     Section 507(b) Claims.  The Pre-Petition Agents and Indenture Trustees (for themselves and for the respective benefit of the applicable Adequate Protection Parties) were by the Interim Order and hereby are granted, allowed superpriority claims (the "**Adequate Protection Claims**") as provided for in section 507(b) of the Bankruptcy Code, subject to the payment of the Carve-Out and immediately junior to (i) the claims under section 364(c)(1) of the Bankruptcy Code held by the DIP Agents and the DIP Lenders and (ii) the superpriority claims granted in respect to Debtor Reimbursement Claims and the Debtor Contribution Claims as such terms are defined in, and made pursuant to, the Final Cash Management Order; *provided, however*, that the Adequate Protection Claims granted (x) to the Bridge Pre-Petition Secured Lenders shall be immediately junior in priority and subject to the Adequate Protection Claims granted to the Senior Adequate Protection Parties and (y) to the Adequate Protection Parties shall, among both the Senior Adequate Protection Parties and with respect to the Bridge Pre-Petition Secured Lenders, rank in the same right and priority as do the respective claims of such parties as of the Petition Date under the Existing Documents (for the avoidance of doubt, the superpriority claims granted to the Indenture Trustees shall be senior in priority to those of the Bridge Pre-Petition Secured Lenders irrespective of such parties' pre-petition security interests and relative priorities); and *provided further* that no Pre-Petition Agent, Indenture Trustee or Adequate Protection Party shall receive or retain any

payments, property or other amounts in respect of the Adequate Protection Claims or any claims granted under the Existing Documents unless and until the DIP Obligations have indefeasibly been paid in cash in full or as otherwise agreed by the DIP Lenders or approved in the DIP Documents. For the avoidance of doubt, nothing contained in this Final Order, including, without limitation, paragraph 26 hereof, or any of the DIP Documents, including, without limitation, Section 2.12 of the Term DIP Credit Agreement, shall constitute any such agreement or approval by the DIP Lenders.

(c)     Fees and Expenses. The Pre-Petition Agents and the Indenture Trustees (in both cases, both present and former) shall receive from the Debtors current cash payments of all fees and expenses payable to them under the Existing Documents, including, but not limited to, the reasonable fees and disbursements of counsel, financial and other consultants, promptly upon receipt of invoices therefor (subject in all respects to applicable privilege or work product doctrines) and without the necessity of filing motions or fee applications, including such amounts arising before and after the Petition Date. A single law firm and a single financial advisor (which at the present time are Milbank, Tweed Hadley & McCloy LLP and Moelis & Company LLC) to the Ad Hoc Group of Senior Secured Lenders shall receive from the Debtors current cash payments of all fees and expenses, including, but not limited to, the reasonable fees and disbursements of counsel, financial and other consultants and advisors (which the Debtors understand may include, to the extent necessary, an industry expert), promptly upon receipt of invoices therefore (subject in all respects to applicable privilege or

work product doctrines) and without the necessity of filing motions or fee applications. The Debtors shall pay the reasonable and documented fees in accordance with this paragraph 17(c), only after each such professional has provided copies of its fee and expense statements to the U.S. Trustee and counsel to the Creditors' Committee contemporaneously with the delivery of such fee and expense statements to the Debtors, provided, however, that the Debtors shall be permitted to pay any transaction fee, success fee or bonus to a financial advisor or investment banker to the Pre-Petition Agents, the Ad Hoc Group of Senior Secured Lenders and Indenture Trustees only following the entry of an order of this Court approving the reasonableness of such fee after notice to the Creditors' Committee and other parties in interest and a hearing, subject in all cases to the right of any Senior Facility Pre-Petition Secured Lenders to assert claims for any other amounts provided for in the Senior Facility Pre-Petition Loan Documents (but not for current payment of such other amounts), and without prejudice to the right of any other party, including the Debtors and the Creditors' Committee to object to such assertion. Such statements shall contain reasonable detail as to the number of hours worked and applicable hourly rates, but may be redacted to the extent necessary to delete any information subject to attorney-client privilege, any information constituting attorney work product or any other confidential information and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or any benefits of the attorney work product doctrine, provided that any financial advisor to the Ad Hoc Group of Senior Secured Lenders shall not be required to keep detailed time records. None of the fees,

costs and expenses payable pursuant to this paragraph 17(c) shall be subject to separate approval by this Court (but this Court shall resolve any disputes as to the reasonableness of any such fees, costs and expenses) and the United States Trustee, the Creditors' Committee or any other party in interest may object to the reasonableness of the fees, costs and expenses included in any professional fee invoice submitted hereunder, provided that, any such objection shall be forever waived and barred unless (i) it is filed with this Court and served on counsel to the parties seeking payment no later than 15 days after the objecting parties receiving such applicable professional fee invoice and (ii) it describes with particularity the items and categories of fees, costs and expenses that are subject to the objection and it provides for a specific basis for the objection to each such item of category of fees, costs and expenses; provided further, however, that the Debtors shall promptly pay all amounts that are not subject of any objection. Any hearing on an objection to any payment of any fees, costs and expenses of such professionals shall be limited to the reasonableness of the particular items or categories of fees, costs, and expenses which are the subject to such objection. Except as provided in this paragraph 17(c), the Debtors shall not make any payment in respect to attorneys' or other professional fees incurred by any Pre-Petition Secured Lenders, any Noteholder or any other Adequate Protection Party.

(d)      <u>Monitoring of Collateral</u>.  The Pre-Petition Agents shall be permitted to retain expert consultants and financial advisors at the expense of the Debtors, which consultants and advisors shall be given reasonable access for

purposes of monitoring the business of the Debtors and the value of the DIP Collateral.

(e) <u>Financial Reporting</u>. The Debtors shall provide the Pre-Petition Agents, the Ad Hoc Group of Senior Secured Lenders and the Indenture Trustees with financial and other reporting as described in the DIP Documents. Copies of all reports provided to the Pre-Petition Agents, and the Ad Hoc Group of Senior Secured Lenders and the Indenture Trustees shall simultaneously be provided to the financial advisors to the Creditors' Committee.

18. *Post-Petition Interest to Senior Facility Pre-Petition Secured Lenders*. In connection with the applicable Existing Documents, (i) the Senior Facility Pre-Petition Agent shall receive from the Debtors immediate cash payment of all accrued and unpaid interest and letter of credit fees at the non-default rates provided for in the Senior Facility Pre-Petition Loan Documents and all other accrued and unpaid fees and disbursements owing to the Senior Facility Pre-Petition Secured Lenders under the Senior Facility Pre-Petition Loan Documents and incurred prior to the Petition Date and (ii) on the first business day of each month beginning on March 2, 2009, Lyondell and Basell GmbH shall pay, to the extent attributable to Lyondell or Basell GmbH, respectively, all accrued but unpaid interest and letter of credit and other fees under the Senior Facility Pre-Petition Credit Agreement for the applicable EC Test Period (as defined below) with respect to the Senior Facility Pre-Petition Debt that has not been designated as Roll Up DIP Loans at the non-default contract rate applicable on the Petition Date (including LIBOR pricing options available in accordance with the Senior Facility Pre-Petition Credit Agreement) under the Senior Facility Pre-Petition Loan Documents only if

Liquidity (as defined below) determined as of such date <u>minus</u> the aggregate amount of such accrued but unpaid interest and letter of credit and other fees with respect to such EC Test Period is greater than $1,015,000,000 (and, for the avoidance of doubt, if Liquidity is less than such amount, no such interest or letter of credit or other fees shall be paid); *provided* that the Senior Facility Pre-Petition Agent and each Senior Facility Pre-Petition Secured Lender reserves the right to assert claims for the payment of additional interest calculated at any other applicable rate of interest (including, without limitation, default rates), or on any other basis, provided for in the Senior Facility Pre-Petition Loan Documents, and for the payment of any other amounts provided for in the Senior Facility Pre-Petition Loan Documents; and *provided further* that if, (x) interest is not paid currently in accordance with clause (ii) of this paragraph or (y) in accordance with applicable law, the Court allows any claim by the Senior Credit Facility Pre-Petition Agent for the payment of additional interest calculated at any other applicable rate of interest (including, without limitation, default rates), or on any other basis, provided for in the Senior Facility Pre-Petition Loan Documents, or for the payment of any other amounts provided for in the Senior Facility Pre-Petition Loan Documents, then each such claim arising under clause (x) or (y) of this paragraph shall constitute a priority administrative expense pursuant to section 507(b) of the Bankruptcy Code and shall be paid in full in cash upon the effective date of any confirmed chapter 11 plan with respect to any Debtor.  "**Liquidity**" means, on any date of determination, the sum of (i) (A) the consolidated amount of Unrestricted Cash (as defined in the Term DIP Credit Agreement) of Lyondell AF and its subsidiaries on such date, (B) the Available ABL Commitment (as defined in the Term DIP Credit Agreement) in effect on such date and

(C) the Available NM Commitment (as defined below) in effect on such date to the extent capable of being drawn on such date, less (ii) any Additional Restricted Cash (as defined in the Term DIP Credit Agreement). "**Available NM Commitment**" means, as of any date of determination, an amount equal to the unused amount of the NM Commitments (as defined in the Term DIP Credit Agreement) in effect on such date. "**EC Test Period**" means, with respect to any payment date, the preceding calendar month.

19. *Finding of Adequate Protection.* Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Adequate Protection Parties. Without limiting the generality of the foregoing, under the circumstances and given that the above-described adequate protection afforded the Adequate Protection Parties and their rights under the Existing Documents by (i) the equity cushion in the Adequate Protection Parties' collateral, which is both preserved and enhanced by the entry into the Financing, (ii) the Adequate Protection Liens, (iii) the Adequate Protection Claims, (iv) the current cash payments of all fees and expenses payable to the Pre-Petition Agents and the Indenture Trustees (in both cases, both present and former) under the Existing Documents and to the Ad Hoc Group of Senior Secured Lenders, (v) the reasonable access given to the Pre-Petition Agents' expert consultants and financial advisors (retained at the expense of the Debtors) for purposes of monitoring the business of the Debtors and the value of the DIP Collateral, (vi) the provision of financial and other reporting to the Pre-Petition Agents, the Ad Hoc Group of Senior Secured Lenders

and the Indenture Trustees as described in the DIP Credit Agreements and DIP Documents and (vii) the payment to the Senior Facility Pre-Petition Lenders, subject to the provisions of paragraph 18(ii) hereof, of all accrued but unpaid interest and letter of credit and other fees at the non-default contract rate applicable on the Petition Date (including LIBOR pricing options available in accordance with the Senior Facility Pre-Petition Credit Agreement) under the Senior Facility Pre-Petition Loan Documents is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Adequate Protection Parties.

20.     *Reservation of Rights of Adequate Protection Parties.*  Upon a material change in circumstances, any Adequate Protection Party may request further or different adequate protection, and the Debtors or any other party may contest any such request; *provided* that any such further or different adequate protection shall at all times be subordinate and junior to the claims and liens of the DIP Agents and the DIP Lenders granted under the Interim Order, this Final Order or the DIP Documents.  Except as expressly provided herein, nothing contained in this Final Order (including, without limitation, the authorization of the use of any Cash Collateral) shall impair or modify any rights, claims or defenses available in law or equity to any Pre-Petition Agent, Pre-Petition Secured Lender, Adequate Protection Party, DIP Agent or DIP Lender including, without limitation, rights of a party to a swap agreement, securities contract, commodity contract, forward contract or repurchase agreement with a Debtor to assert rights of setoff or other rights with respect thereto as permitted by law (or the right of a Debtor to contest such assertion).

21. *Perfection of DIP Liens and Adequate Protection Liens.*

(a)     Subject to the provisions of paragraph 13(b) above, the Debtors, the DIP Agents, the Pre-Petition Agents, the Indenture Trustees, the DIP Lenders and the Adequate Protection Parties are hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of or control over, or take any other action in order to validate and perfect the liens and security interests granted to them hereunder.  Whether or not the DIP Agents on behalf of the DIP Lenders or the Pre-Petition Agents and/or the Indenture Trustees on behalf of the Adequate Protection Parties shall, in their sole discretion, choose to file such financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or take possession of or control over, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge dispute or subordination, at the time and on the date of entry of the Interim Order. Upon the request of a DIP Agent, each of the Pre-Petition Agents, the Indenture Trustees and the Adequate Protection Parties, without any further consent of any party, is authorized to take, execute, deliver and file such instruments (in each case without representation or warranty of any kind) to enable the DIP Agents to further validate, perfect, preserve and enforce DIP Liens.  Except where expressly agreed in writing to the contrary between the Debtors and the applicable counterparties, the Debtors shall execute and deliver to the DIP Agents, the Pre-

Petition Agents and the Indenture Trustees all such agreements, financing statements, instruments and other documents as the DIP Agents, the Pre-Petition Agents and the Indenture Trustees may reasonably request to more fully evidence, confirm, validate, perfect, preserve and enforce the DIP Liens and the Adequate Protection Liens.  All such documents will be deemed to have been recorded and filed as of the Petition Date.

(b)     A certified copy of this Final Order may, in the discretion of the DIP Agents, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Final Order for filing and recording.

(c)     Any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign or otherwise transfer any such leasehold interest, or the proceeds thereof, or other post-petition collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code.  Any such provision shall have no force and effect with respect to the transactions granting post-petition liens, in such leasehold interest or the proceeds of any assignment and/or sale thereof by any Debtor, in favor of the DIP Lenders in accordance with the terms of the DIP Documents or this Final Order.

22.    *Preservation of Rights Granted Under the Order.*

(a)    No claim or lien having a priority superior to or *pari passu* with those granted by the Interim Order or this Final Order to the DIP Agents, the DIP Lenders or the Adequate Protection Parties shall be granted or allowed while any portion of the Financing (or any refinancing thereof) or the Commitment (as defined in the ABL DIP Credit Agreement) or the NM Commitment (as defined in the Term DIP Credit Agreement) or the DIP Obligations or the Adequate Protection Obligations remain outstanding, and the DIP Liens and the Adequate Protection Liens shall not be (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise.

(b)    Subject to the proviso in the last sentence of paragraph 6(f) with respect to the Roll Up DIP Loans and to paragraph 24 with respect to the Pre-Petition Lender Debt and the Pre-Petition Lender Security Interests (but in no event with respect to any DIP Obligations other than the Roll Up DIP Loans), unless all DIP Obligations shall have indefeasibly been paid in cash in full (and, with respect to outstanding letters of credit issued pursuant to the DIP Credit Agreements, cash collateralized in accordance with the provisions of the DIP Credit Agreements) and the Adequate Protection Obligations shall have been indefeasibly paid in cash in full, the Debtors shall not seek, and it shall constitute an Event of Default (as defined in the applicable DIP Credit Agreement) and

terminate the right of the Debtors to use Cash Collateral if any of the Debtors seeks, or if there is entered, (i) any modification or extension of this Final Order without the prior written consent of the Required Lenders (as defined in the ABL DIP Credit Agreement), in the case of the ABL DIP Facility, and the Required Lenders (as defined in the Term DIP Credit Agreement), in the case of the Term DIP Facility (or, to the extent the DIP Obligations shall have been indefeasibly paid in cash in full, the Pre-Petition Agents and Indenture Trustees), and no such consent shall be implied by any other action, inaction or acquiescence, or (ii) an order converting or dismissing any of the Cases.

(c)     If an order dismissing any of the Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (i) the Superpriority Claims, priming liens, security interests and replacement security interests granted to the DIP Agents, the DIP Lenders and, as applicable, the Adequate Protection Parties pursuant to the Interim Order or this Final Order shall continue in full force and effect and shall maintain their priorities as provided in this Final Order until all DIP Obligations and Adequate Protection Obligations shall have been indefeasibly paid in cash in full (and that such Superpriority Claims, priming liens and replacement security interests, shall, notwithstanding such dismissal, remain binding on all parties in interest) and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in (i) above.

(d)      If any or all of the provisions of this Final Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect (i) the validity, priority or enforceability of any DIP Obligations or Adequate Protection Obligations incurred prior to the actual receipt of written notice by the DIP Agents, the Pre-Petition Agents or the Indenture Trustees, as applicable, of the effective date of such reversal, stay, modification or vacation or (ii) the validity or enforceability of any lien or priority authorized or created hereby or pursuant to the DIP Credit Agreements with respect to any DIP Obligations or Adequate Protection Obligations.  Notwithstanding any such reversal, stay, modification or vacation, any use of Cash Collateral, or DIP Obligations or Adequate Protection Obligations incurred by the Debtors to the DIP Agents, the DIP Lenders, the Pre-Petition Agents, the Indenture Trustees or the Adequate Protection Parties prior to the actual receipt of written notice by the DIP Agents, the Pre-Petition Agents or the Indenture Trustees, as applicable, of the effective date of such reversal, stay, modification or vacation shall be governed in all respects by the original provisions of this Final Order, and the DIP Agents, the DIP Lenders, the Pre-Petition Agents, the Indenture Trustees and the Adequate Protection Parties shall be entitled to all the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, this Final Order and pursuant to the DIP Documents with respect to all uses of Cash Collateral, DIP Obligations and Adequate Protection Obligations.

(e)      Except as expressly provided in this Final Order or in the DIP Documents, the DIP Liens, the Superpriority Claims, the Adequate Protection

Obligations, the Adequate Protection Liens and all other rights and remedies of the DIP Agents, the Pre-Petition Agents, the Indenture Trustees, the DIP Lenders, the Pre-Petition Secured Lenders and the Adequate Protection Parties granted by the provisions of this Final Order and the DIP Documents shall survive, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Cases to a case under chapter 7, dismissing any of the Cases, terminating the joint administration of these Cases or by any other act or omission or (ii) the entry of an order confirming a plan of reorganization in any of the Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations; *provided*, *however*, that the Roll Up DIP Loans shall be discharged so long as the Roll Up DIP Loans are treated in accordance with paragraph 26 hereof.  The terms and provisions of this Final Order and the DIP Documents shall continue in these Cases, in any successor cases if these Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, the Superpriority Claims and the Adequate Protection Obligations and all other rights and remedies of the DIP Agents, the Pre-Petition Agents, the Indenture Trustees, the DIP Lenders, the Pre-Petition Secured Lenders and the Adequate Protection Parties granted by the provisions of this Final Order and the DIP Documents shall continue in full force and effect until the DIP Obligations and the Adequate Protection Obligations are indefeasibly paid in cash in full.

23.    *Limitation on Use of Financing Proceeds and Collateral*.

Notwithstanding anything herein or in any other order by this Court to the contrary, no

borrowings, proceeds of letters of credit, Cash Collateral, Pre-Petition Lender Collateral,

DIP Collateral, portion of the proceeds of the Financing or part of the Carve-Out may be

used for any of the following (each, a "**Lender Claim**") without the prior written consent

of each affected party: (a) to object, contest or raise any defense to the validity,

perfection, priority, extent or enforceability of (i) any amount due under any DIP

Document or Pre-Petition Loan Document, or the liens or claims granted under the

Interim Order or this Final Order, any DIP Document or any Pre-Petition Loan Document

or (ii) the "true sale" nature of the sale of the Receivables Assets by the Debtors to the

Receivables SPVs, any amounts due under the Receivables Facilities or the liens and

security interests of the Receivables Purchasers against the Receivables Assets, (b) to

assert any claim or cause of action against any DIP Agent, DIP Lender, Pre-Petition

Agent, Receivables Agent, Pre-Petition Secured Lender or Receivables Purchaser or their

respective agents, affiliates, representatives, attorneys or advisors, (c) except to contest

the occurrence or continuation of an Event of Default as forth in paragraph 13(c)(ii), to

prevent, hinder or otherwise delay the DIP Agents' or the Pre-Petition Agents' assertion,

enforcement or realization on the Cash Collateral or the DIP Collateral in accordance

with the DIP Documents, the Pre-Petition Loan Documents, the Interim Order or this

Final Order, (d) to assert or prosecute any action for preferences, fraudulent conveyances,

other avoidance power claims or any other claims, counterclaims or causes of action,

objections, contests or defenses against any Pre-Petition Agent, Receivables Agent, Pre-

Petition Secured Lender or Receivables Purchaser or their respective affiliates,

representatives, attorneys or advisors in connection with matters related to the Pre-

Petition Loan Documents, the Pre-Petition Lender Debt, the Pre-Petition Lender Security

Interests, the Pre-Petition Collateral, the Receivables Assets or the Receivables Facilities (including the obligations thereunder), (e) to assert or prosecute any claim that the assets and liabilities of either of the Receivables SPVs should be substantively consolidated with any of the Debtors or with each other or (f) to seek to modify any of the rights granted to the DIP Agents, the DIP Lenders, the Pre-Petition Agents or the Pre-Petition Secured Lenders hereunder or under the DIP Documents or the Pre-Petition Loan Documents, *provided* that advisors to the Creditors' Committee may investigate the Pre-Petition Lender Security Interests and, subject to any applicable law with respect to standing, commence and prosecute any related proceedings as a representative of the Debtors' estates at an aggregate expense for such investigation and prosecution not to exceed $250,000.

24.    *Effect of Stipulations on Third Parties.*

(a)    Each stipulation, admission and agreement contained in this Final Order, including, without limitation, in paragraph 4 of this Final Order, shall be binding upon the Debtors and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors) under all circumstances and for all purposes, and the Debtors are deemed to have irrevocably waived and relinquished all Lender Claims as of the date of entry of the Interim Order. Each stipulation, admission and agreement contained in this Final Order, including, without limitation, in paragraph 4 of this Final Order, shall also be binding upon all other parties in interest, including, without limitation, each Committee, under all circumstances and for all purposes, except that with respect to the stipulations, admissions and agreements with respect to the Pre-

Petition Loan Documents, the Pre-Petition Lender Debt and the Pre-Petition

Lender Security Interests in this Final Order, including, without limitation, in

paragraph 4 (collectively, the "**Debtors' Stipulations**") to the extent that (i) a

party in interest has, subject to the limitations contained herein, including, *inter*

*alia*, in paragraph 23, timely and properly filed an adversary proceeding or

contested matter asserting a Lender Claim (it being understood that a timely and

properly filed motion seeking standing to prosecute such Lender Claim with a

copy of the proposed complaint attached shall satisfy this requirement) with

respect to any of the Debtors' Stipulations by no later than June 1, 2009 (or such

later date as has been (x) agreed to, in writing, by the applicable Pre-Petition

Agent or Indenture Trustee in its sole discretion or (y) ordered by the Court for

cause upon a showing that the Debtors have not reasonably cooperated in

providing reasonably and timely requested information), and (ii) there is a final

order in favor of the plaintiff sustaining such Lender Claim.

(b)     The success of any particular Lender Claim shall not alter the

binding effect on each party in interest of any stipulation or admission not subject

to such Lender Claim.  Except to the extent (but only to the extent) a timely and

properly filed adversary proceeding or contested matter asserting a Lender Claim

as provided in clause (a) above is successful, (i) the Pre-Petition Lender Debt

shall constitute allowed claims, not subject to avoidance, recharacterization,

recovery, subordination, attack, offset, counterclaims, defense or "claim" (as such

term is defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy

Code or other applicable law, for all purposes in the Cases and any subsequent

chapter 7 cases, (ii) the Pre-Petition Lender Security Interests shall be deemed to have been, as of the Petition Date, legal, valid, binding perfected and enforceable liens and security interests not subject to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaims, defense or "claim" (as such term is defined in the Bankruptcy Code) of any kind, (iii) the Pre-Petition Lender Debt and the Pre-Petition Lender Security Interests shall not be subject to any other or further challenge by any party in interest seeking to exercise the rights of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors), (iv) the obligations under the Receivables Facilities shall not be subject to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaims, defense or "claim" (as such term is defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or other applicable law, for all purposes in the Cases and any subsequent chapter 7 cases and (v) the obligations under the Receivables Facilities and the "true sale" nature of the sale of the Receivables Assets to the Receivables SPVs shall not be subject to any other or further challenge by any party in interest seeking to exercise the rights of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors).

(c)     Nothing in this Final Order vests or confers on any person (as defined in the Bankruptcy Code), including the Creditors' Committee, standing or authority to pursue any cause of action belonging to the Debtors or their estates,

including, without limitation, Lender Claims with respect to the Pre-Petition Loan Documents or the Pre-Petition Lender Debt. Subject to the provisions of this paragraph 24, nothing contained herein shall constitute an admission by the Creditors' Committee or any party in interest other than the Debtors as to the value of the ABL Pre-Petition Collateral, the Senior Facility Pre-Petition Collateral or any other assets of the Debtors or their estates.

25. *Priorities Among Adequate Protection Parties.* Notwithstanding anything to the contrary herein or in any other order of this Court, in determining the relative priorities and rights of the Adequate Protection Parties (including, without limitation, the relative priorities and rights of the Adequate Protection Parties with respect to the adequate protection granted hereunder), such relative priorities and rights shall continue to be governed by the Existing Documents, and the adequate protection rights granted hereunder to each Adequate Protection Party shall have the same relative seniority and priority vis-à-vis the adequate protection rights granted to each other Adequate Protection Party as the pre-petition claims of such Adequate Protection Party have relative to the pre-petition claims of such other Adequate Protection Party (taking into consideration whether such claims are secured and the entity against which such claims are held or not held). For the avoidance of doubt, the Adequate Protection Liens and superpriority claims granted to the Indenture Trustees shall be senior in priority to those granted to the Bridge Pre-Petition Secured Lenders irrespective of such parties' pre-petition security interests and relative priorities.

26. *Limitations in Respect of the Roll Up DIP Loans.* The Roll Up DIP Loans will not be required to be repaid in cash on the Consummation Date (as defined in the

Term DIP Credit Agreement) of a Reorganization Plan (as defined in the Term DIP Credit Agreement) that provides for the treatment of the Roll Up DIP Loans as described below, *provided* that the Debtors shall use reasonable endeavours to repay such loans in full in cash upon the occurrence of the Consummation Date.  Upon the vote of the Roll Up DIP Loan class to accept a Reorganization Plan in accordance with section 1126 of the Bankruptcy Code or, failing to obtain same, pursuant to section 1129(b) of the Bankruptcy Code, the Reorganization Plan may require that Roll Up DIP Loans be refinanced or otherwise replaced with other debt securities or financial indebtedness instruments (any such debt security or financial indebtedness instrument, a "**Roll Up Replacement Security**") (A) with a present value equal to the accrued principal and interest due in respect of the Roll Up DIP Loans as of the effective date of such Reorganization Plan, (B) with a maturity not exceeding the earlier of (i) the date that is five years therefrom (subject to reduction pursuant to Section 2.05 of the Term DIP Credit Agreement) and (ii) the earliest maturity or redemption date applicable to any of the Senior Facility Pre-Petition Debt or Bridge Pre-Petition Debt (in each case, as may be extended pursuant to the Reorganization Plan) or any securities or financial instruments that replace such Senior Facility Pre-Petition Debt and (C) subject to affirmative and negative covenants, events of default and other terms for such applicable Roll Up Replacement Security as shall be agreed upon or as proposed in a Reorganization Plan which shall be confirmed by the Bankruptcy Court; *provided* that pursuant to such Reorganization Plan the relative lien position of the Roll Up DIP Lenders in respect of all of the DIP Collateral and the Senior Facility Pre-Petition Collateral not constituting DIP Collateral as described in this Final Order is maintained as it existed prior thereto and any

Roll Up Replacement Security shall be guaranteed to the same extent and with the same priority by the Guaranty made in connection with the Term DIP Credit Agreement and any and all guarantees made in connection with the Senior First Lien Credit Agreement; *provided further* that pursuant to such Reorganization Plan (i) the principal amount of indebtedness of Lyondell AF and its subsidiaries secured by liens with higher priority than the liens securing the Roll Up DIP Loans shall not exceed the sum of (x) $4,790,000,000 plus (y) the amount (up to a maximum of $460,000,000) by which the ABL DIP Facility is increased after the date hereof in accordance with its terms, less (z) the aggregate amount of repayments of New Money DIP Loans and repayments of loans (and cash collateralizations of letters of credit) under the ABL DIP Credit Agreement coupled with permanent reductions of commitments under the ABL DIP Credit Agreement, (ii) none of the Senior Facility Pre-Petition Debt or Bridge Pre-Petition Debt may be paid (in whole or in part) in cash unless the Roll Up DIP Loans are paid in full in cash and (iii) the aggregate amount of the Roll Up DIP Loans, together with other indebtedness of Lyondell AF and its subsidiaries secured by liens that are *pari passu* with the liens securing the Roll Up DIP Loans, shall not exceed the sum of (x) $3,250,000,000 minus (y) the principal amount of Roll Up DIP Loans repaid or consensually converted into equity or other securities of Lyondell AF or its subsidiaries or any of their successors as any of the foregoing may be reorganized under chapter 11 of the Bankruptcy Code or otherwise. The provisions of this paragraph 26 shall be subject to the proviso in the last sentence of paragraph 6(f) hereof.

27.     *Collateral Agent*. To the extent that any Pre-Petition Agent or Receivables Agent is the secured party under any account control agreements, listed as

loss payee under the Debtors' insurance policies or is the secured party under any Pre-Petition Loan Document or Receivables Facility, the DIP Agents are also deemed to be the secured party under such account control agreements, loss payee under the Debtors' insurance policies and the secured party under each such Pre-Petition Loan Document and Receivables Facility, shall have all rights and powers attendant to that position (including, without limitation, rights of enforcement) and shall act in that capacity and distribute any proceeds recovered or received *first*, for the benefit of the DIP Lenders in accordance with the DIP Credit Agreements and *second*, subsequent to indefeasible payment in full of all DIP Obligations, for the benefit of the Adequate Protection Parties. Each Pre-Petition Agent and Receivables Agent shall serve as agent for the DIP Agents for purposes of perfecting their respective security interests and liens on all DIP Collateral that is of a type such that perfection of a security interest therein may be accomplished only by possession or control by a secured party.

28.    *Order Governs.*  In the event of any inconsistency between the provisions of this Final Order and the DIP Documents, the provisions of this Final Order shall govern.

29.    *Binding Effect; Successors and Assigns.*  The DIP Documents and the provisions of this Final Order, including all findings herein, shall be binding upon all parties in interest in these Cases, including, without limitation, the DIP Agents, the DIP Lenders, the Pre-Petition Agents, the Indenture Trustees, the Pre-Petition Secured Lenders, the Adequate Protection Parties, any Committee appointed in these Cases, and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an

examiner appointed pursuant to section 1104 of the Bankruptcy Code or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Agents, the DIP Lenders, the Pre-Petition Agents, the Indenture Trustees, the Pre-Petition Secured Lenders, the Adequate Protection Parties, the Receivables SPVs, the Receivables Agents, the Receivables Purchasers and the Debtors and their respective successors and assigns, *provided*, *however*, that the DIP Agents, the DIP Lenders, the Pre-Petition Agents and the Pre-Petition Secured Lenders shall have no obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.  In determining to make any loan (whether under the DIP Credit Agreements, a promissory notes or otherwise), to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to the Interim Order, this Final Order or the DIP Documents, the DIP Agent, the DIP Lenders, the Pre-Petition Agents, the Indenture Trustees, the Pre-Petition Secured Lenders and the Adequate Protection Parties shall not (i) be deemed to be in control of the operations of the Debtors, (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates or (iii) be deemed to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601, *et seq.*, as amended, or any similar federal or state statute).

30.     *No Impact on Certain Contracts or Transactions.*  No rights of any entity in connection with a contract or transaction of the kind listed in sections 555, 556, 559,

560 or 561 of the Bankruptcy Code, whatever they might or might not be, are affected by the provisions of this Final Order.

31. *Exclusions.* For the avoidance of doubt, nothing herein or in any of the DIP Documents shall operate as a release or waiver of, or a limit on expenditures in pursuit of, any claims or causes of action held or assertable by any party (including, without limitation, any of the Debtors or any other party in interest) against any Debtor, any "affiliate" of any Debtor (as such term is defined in the Bankruptcy Code) or any officer, director or direct or indirect shareholder (or affiliate thereof) of any Debtor.

32. *GIM Cogeneration LLC.*

(a) Notwithstanding anything to the contrary in this Order, the DIP Agents, for their own benefit and the respective benefit of the applicable DIP Lenders, are granted a lien in the Cogen Site (as defined in that certain Second Amended and Restated Site Lease Agreement dated December 15, 1999 between Equistar Chemicals, LP and GIM Channelview Cogeneration, LLC (as assignee of Reliant Energy Services Channelview LLC) (the "**Lease Agreement**"), and easements appurtenant thereto, junior and subordinate to any of GIM Channelview Cogeneration, LLC's ("**GIM**") rights and estates in the Cogen Site and easements appurtenant thereto, including, without limitation, any of its rights and estates under the Lease Agreement and the agreements creating such appurtenant easements, including GIM's possessory interests in the Cogen Site, any easements appurtenant to the Cogen Site, and any other rights, estates and/or interests related thereto; provided, however, that nothing contained herein shall affect or modify the rights and obligations of the Debtors with respect to the

Lease Agreement, including, without limitation, their rights and obligations under the Bankruptcy Code.

(b)     GIM is hereby authorized to file and/or record (and take all steps necessary related thereto) that certain Subordination and Attornment Agreement dated on or prior to the closing of the Term DIP Credit Agreement and the ABL DIP Credit Agreement, by and among GIM, Citibank, N.A., as ABL Facility Agent and Lender, and UBS AG, Stamford Branch, as Term Facility Agent and Lender.

(c)     Notwithstanding anything to the contrary in this Order, the DIP Agents, for their own benefit and the respective benefit of the applicable DIP Lenders, are granted a lien in any proceeds that may be generated from the assumption and assignment or other disposition, if any, of the rights of Equistar Chemicals, LP, as landlord, under the Lease Agreement, and, notwithstanding anything to the contrary in this Order and for the avoidance of doubt, the DIP Lenders are not granted a lien in GIM's rights and estates under the Lease Agreement or any easements appurtenant to the Cogen Site (as defined in the Lease Agreement).

(d)     Notwithstanding anything to the contrary in this Order, the DIP Agents, for their own benefit and the respective benefit of the applicable DIP Lenders, agree that nothing in this Order shall impact, affect, or attempt to modify any of GIM's rights under that certain Second Amended and Restated Energy Supply Agreement dated December 15, 1999 between Equistar Chemicals, LP and GIM Channelview Cogeneration, LLC (as assignee of Reliant Energy

68

Services Channelview LLC) (the "**Energy Supply Agreement**") or that certain

Second Amended and Restated Steam Supply Agreement dated December 15,

1999 between Equistar Chemicals, LP and GIM Channelview Cogeneration, LLC

(as assignee of Reliant Energy Services Channelview LLC) (the "**Steam Supply**

**Agreement**," together with the Energy Supply Agreement, the "**Supply**

**Agreements**") including, without limitation, the terms of payment under the

Energy Supply Agreement or the Steam Supply Agreement, including, any rights

of setoff or recoupment; provided, however, that nothing contained herein shall

affect or modify the rights of the Debtors with respect to the Supply Agreements,

including, without limitation, their rights under the Bankruptcy Code.

        (e)      Notwithstanding anything to the contrary in this Order and for the

avoidance of doubt, the DIP Lenders are granted a lien in the Supply Agreements,

including any payments that may be due, now or in the future, from GIM to

Debtors under the Supply Agreements, subject to all of the terms and conditions

of such Supply Agreements including, without limitation, any of GIM's rights of

netting, setoff and/or recoupment.

33.    *2015 Notes.*  Notwithstanding anything to the contrary stated herein,

nothing contained in the DIP Documents or this Order shall or be deemed to: (a)

constitute an amendment, modification or supplement to the Indenture for the

$615,000,000 $8^{3/8}$ % Senior Notes Due 2015 and €500,000,000 $8^{3/8}$ % Senior Notes Due

2015, dated as of August 10, 2005, as amended from time to time (the "**2015**

**Indenture**"), or the documents executed and delivered in connection with the 2015

Indenture (with the 2015 Indenture, the "**2015 Documents**"); (b) constitute a finding or

determination that the DIP Documents or this Order would or would not constitute a violation of, or a default under, the 2015 Documents or the 2015 Notes; or (c) constitute an admission by the 2015 Trustee or the holders of the 2015 Notes.

34.     *Senior First Lien Credit Agreement Amendment.*  The Debtors are hereby authorized to execute and deliver the Senior First Lien Credit Agreement Amendment (as defined in the Term DIP Credit Agreement); *provided, however* that the Senior First Lien Credit Agreement Amendment is not a DIP Document; and *provided further* that nothing in this Final Order, the DIP Documents or the Senior First Lien Credit Agreement Amendment shall constitute a finding of fact or legal conclusion by this Court as to the effectiveness or the effect of the Senior First Lien Credit Agreement Amendment on the rights of the Senior Facility Pre-Petition Secured Lenders under the Senior Facility Pre-Petition Loan Documents.

35.     *Effectiveness.*  This Final Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Final Order.

36.    *Headings.*  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Final Order.

Dated:    ***March 1, 2009***
          New York, New York

                                          ***s/Robert E. Gerber***
                                          _____
                                          HON. ROBERT E. GERBER
                                          UNITED STATES BANKRUPTCY JUDGE

1          UNITED STATES BANKRUPTCY COURT
           SOUTHERN DISTRICT OF NEW YORK
2
                              .  Chapter 11
3                             .
   IN RE:                     .  Case No. 09-10023 (REG)
4                             .
   LYONDELL CHEMICAL COMPANY, .  New York, New York
5                             .  Friday, February 27, 2009
                   Debtors.   .  8:35 a.m.
6    . . . . . . . . . . . . . .  Volume 3.  Pages 561-762

7          TRANSCRIPT OF FINAL HEARING ON MOTION
              FOR POST-PETITION FINANCING
8          BEFORE THE HONORABLE ROBERT E. GERBER
           CHIEF UNITED STATES BANKRUPTCY JUDGE
9
   APPEARANCES:  (On the record)
10
   For the Debtors:         George A. Davis,, Esq.
11                          Andrew Troop, Esq.
                            CADWALADER, WICKERSHAM & TAFT, LLP
12                          One World Financial Center
                            New York, New York  10281
13
                            Mark C. Ellenberg, Esq.
14                          Peter Friedman, Esq.
                            CADWALADER, WICKERSHAM & TAFT, LLP
15                          1201 F Street N.W.
                            Washington, DC  20004
16

17
   (Appearances Continued)
18

19

20 Audio Operator:          Electronically Recorded
                            by Karen and Brent, ECROs
21
   Transcription Company:   Rand Reporting & Transcription, LLC
22                          80 Broad Street, Fifth Floor
                            New York, New York 10004
23                          (212) 504-2919
                            www.randreporting.com
24

25 Proceedings recorded by electronic sound recording,
   transcript produced by transcription service.

1  about half an hour for me to dictate, of the bases for this

2  ruling:

3         The standards for approval of a facility of this

4  character were set forth by Judge Jerry Venters in his very

5  frequently cited decision in Farmland Industries, 294 BR 855,

6  Bankruptcy Western District of Missouri, 2003.  As Judge

7  Venters set forth the standards, they are:

8         One, that the proposed financing is an exercise of

9  sound and reasonable business judgment;

10         Two, that the financing is in the best interests of

11  the estate and its creditors;

12         Three, that the credit transaction is necessary to

13  preserve the assets of the estate and is necessary, essential

14  and appropriate for the continued operation of the debtors'

15  businesses;

16         Four, that the terms of the transaction are fair,

17  reasonable and adequate, given the circumstances of the

18  debtor/borrower and the proposed lender;

19         And, five, that the financing was negotiated in good

20  faith and at arm's length between the debtors, on the one hand,

21  and the agents and the lenders on the other hand.

22         Rearranging, and for purposes of discussion, in order

23  of increasing difficulty, I'm going to address them in turn.

24         The first that I should address, which is Number 3 in

25  Judge Venter's decision, is whether the financing is necessary;

1  that is, whether the credit transaction is necessary to

2  preserve the assets of the estate and is necessary, essential

3  and appropriate for the continued operation of the debtors'

4  business.  In that regard, there can be no doubt.  It's not

5  disputed by anyone.  The debtors absolutely need the requested

6  funding, and without it, they would quickly liquidate.  This

7  isn't a matter of judgment or opinion; it's a matter of reality

8  and is wholly undisputed.  This financing is of the highest

9  importance that one could possibly imagine with respect to this

10  estate.

11         The second requirement is that the financing is in the

12  best interests of the estate and its creditors.  And, certainly

13  from an overall perspective, that, once more, cannot be

14  doubted.

15         The third factor, as I'm ordering them now, which was

16  the first that those -- of those that Judge Venters

17  articulated, was that the proposed financing is an exercise of

18  sound and reasonable business judgment.  I've considered the

19  testimony with respect to the efforts by the debtors and their

20  professionals to get this deal put together and to negotiate

21  the best terms they could.  And I'm satisfied that this

22  requirement has likewise been satisfied.

23         I noted before at the DIP preliminary hearing, and my

24  view hasn't changed, that the terms that are now available for

25  DIP financings in the current economic environment aren't as

1   desirable as they were when I ruled on similar motions earlier

2   in my tenure on the bench.  But I can't find any fault with

3   respect to the efforts in trying to -- the efforts by the

4   estate in trying to do and get the best deal it could, and I

5   can't ignore the facts as to the present state of the financial

6   markets which, understandably, were a major element of the

7   evidence and argument in the hearing that took place before me

8   over the last three days.  See, for example, Jaffe declaration,

9   Paragraph 9, and the designated deposition testimony that was

10  quoted at that point in the declaration.

11          I found Mr. Dugan to be a very credible witness, even

12  after cross-examination, and though I didn't see Mr. Jaffe live

13  and had to rely on his testimony that I read, I see no basis

14  for not accepting his testimony as well.  They described the

15  state of the credit markets and the challenges the debtors

16  faced in trying to get the financing they did.

17          Talking about some relatively minor inconsistencies in

18  testimony as to who asked for what and when; what do we know

19  from that?  Among other things, different lender

20  representatives, businesspeople and counsel, dealt with

21  different borrower representatives, businesspeople and counsel.

22  I think it's true that there are some seeming inconsistences

23  between the recollections of the lender witnesses, Jaffe and

24  Dugan, and of Mr. Bigman as set forth to me in this hearing.

25  But I think that any inconsistencies in that regard are not

763

CERTIFICATION

We certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

Transcriptionists:  Cathryn Lynch, NJ Cert. No. 565, Sherri Lynn Breach, AAERT Cert. No. 397, Coleen Rand, AAERT Cert. No. 341



_____  March 5, 2009
Coleen Rand, AAERT Cert. No. 341
Certified Court Transcriptionist/Agency Director
For Rand Reporting & Transcription, LLC