UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

_____

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| DBSD NORTH AMERICA, INC., *et al.*, | ) | |
| | ) | Case No. 09-13061 (REG) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

_____

BENCH DECISION[1] ON CONFIRMATION

APPEARANCES:

KIRKLAND & ELLIS LLP
*Attorneys for the Debtors and Debtors in Possession*
601 Lexington Avenue
New York, New York  10022-4611
By:    James H.M. Sprayregen, P.C., Esq.
       Christopher J. Marcus, Esq.
       Yosef J. Riemer, Esq. (argued)
       Lee Ann Stevenson, Esq. (argued)
       Matthew F. Dexter, Esq. (argued)
       Christopher V. Coulston, Esq. (argued)

-and-

300 North LaSalle
Chicago, Illinois  60654
By:    Marc J. Carmel, Esq. (argued)
       Sienna R. Singer, Esq.
       Lauren M. Hawkins, Esq.

---

[1]    I use bench decisions to lay out in writing decisions that are too long, or too important, to dictate in open court, but where the circumstances do not permit more leisurely drafting or more extensive or polished discussion.  Because they often start as scripts for decisions to be dictated in open court, they typically have less in the way of citations and footnotes, and have a more conversational tone.

CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
*Attorneys for Official Committee of Unsecured Creditors*
101 Park Avenue
New York, New York  10178
By:    Steven J. Reisman, Esq.
       Maryann Gallagher, Esq. (argued)
       Timothy A. Barnes, Esq.

MILBANK, TWEED, HADLEY & McCLOY LLP
*Attorneys for Ad Hoc Committee of Senior Noteholders*
1 Chase Manhattan Plaza
New York, New York 10005
By:    Dennis F. Dunne, Esq.
       Risa M. Rosenberg, Esq.
       Michael E. Comerford, Esq.
       Jeremy S. Sussman, Esq.

-and-

1850 K Street, N.W., Suite 1100
Washington, D.C. 20006
By:    Andrew M. Leblanc, Esq. (argued)

LINKLATERS LLP
*Attorneys for DISH Network Corporation*
1345 Avenue of the Americas
New York, New York  10105
By:    Martin N. Flics, Esq. (argued)
       Paul S. Hessler, Esq. (argued)

K&L GATES LLP
*Attorneys for  Sprint Nextel Corporation*
Hearst Tower, 47th Floor
214 North Tryon Street
Charlotte, North Carolina  28202
By:    John H. Culver III, Esq. (argued)
       Felton E. Parrish, Esq.

Bench Decision on Confirmation.................................................................................................... 1
Facts ............................................................................................................................................... 2
  1. Background .............................................................................................................................. 2
  2. The Debtors' Debt Structure ................................................................................................... 4
  3. The Bankruptcy Cases ............................................................................................................ 6
  4. The Debtors' Plan of Reorganization ..................................................................................... 7
  5. Treatment of First Lien Debt under Plan ............................................................................... 9
  6. Interest Rate under the Amended Facility ............................................................................ 10
  7. Feasibility............................................................................................................................. 12
     A.    Startup Nature of Business.............................................................................................. 12
     B.    Proposals for Additional Financing ................................................................................ 14
     C.    Proposals by Strategic Investors .................................................................................... 16
     D.    Indicia of Feasibility ...................................................................................................... 17
     E.    Conclusions re Feasibility............................................................................................... 20
  8. Valuation of the Reorganized Debtors.................................................................................. 22
     A.    Enterprise Value of the Debtors: The Experts' Methodologies...................................... 22
     B.    Trading Comparables Analysis ....................................................................................... 26
     C.    Spectrum Transactions Analysis .................................................................................... 27
     D.    DCF Analysis .................................................................................................................. 28
     E.    Appropriate Valuation without DCF Analysis Value ..................................................... 29
     F.    Conclusions re Valuation ................................................................................................ 29
  9. Liquidation Value ................................................................................................................. 31
Discussion .................................................................................................................................... 32
  1. Feasibility............................................................................................................................. 33
  2. Cramdown............................................................................................................................. 37
     A.    Cramdown Vis-à-vis DISH.............................................................................................. 38
     B.    Cramdown Vis-à-vis Sprint ............................................................................................. 47
  3. Best Interests of Creditors Test ............................................................................................ 56
  4. Good Faith ............................................................................................................................ 58
  5. Releases................................................................................................................................. 59
     A.    Releases By the Debtors, of Claims Owned by the Debtors............................................ 59
     B.    The Exculpation Provisions ............................................................................................ 60
  6. Substantive Consolidation .................................................................................................... 63
  7. Retention of Jurisdiction ...................................................................................................... 64
Conclusion ................................................................................................................................... 67

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE

In this contested matter in the jointly administered cases of DBSD North America

(**"DBSD N.A."**) and its subsidiaries (the **"Debtors"**)—who have launched a satellite, and

are in the developmental stages of creating a satellite system with components in space

and on earth—the Debtors seek confirmation of their chapter 11 plan (the **"Plan"**).

Confirmation is supported by the bulk of the holders of the Debtors' second lien secured

debt (the **"Second Lien Debt"**),[2] including an ad hoc committee of those holders (the

**"Ad Hoc Committee"**), and the Official Committee of Unsecured Creditors (the

**"Creditors' Committee"**).

But confirmation is opposed by first lien creditor DISH Network (**"DISH"**),

which bought up all of the first lien secured debt (the **"First Lien Debt"**) in July (two

weeks after the Plan was announced), at par, and for strategic reasons unrelated to a

creditor's normal desire for the maximization of its recovery on its claims.[3]  The Plan

also is opposed by unsecured creditor Sprint-Nextel Corporation (**"Sprint"**), which has

pending claims (subject to asserted defenses) against Debtor New DBSD Satellite

Services G.P. (**"New Satellite Services"**), one of the Debtors.[4]

---

[2]     The Second Lien Debt has also been referred to by its more official name, the Senior Secured
Notes (the **"Senior Notes"**), which are 7.5% convertible senior secured notes due 2009.  Its
holders are often referred to as the **"Senior Noteholders."**

[3]     Through an affiliate, DISH also purchased a substantial amount of Second Lien Debt, which was
voted against the Plan but which was insufficient to prevent approval of the Plan by the Second
Lien Debt class.  *See* Jane Sullivan Certification at Exhibit A.  Approximately 85% in number, and
78% in amount, of Second Lien Debt claims voted to accept the Plan.  Presumably, the DISH
affiliate was among the approximately 15% in number, and 22% in amount, of Second Lien Debt
claims that voted to reject the Plan.

[4]     Sprint had originally filed those claims against each of the various Debtors, but by decision dated
September 30, 2009, I disallowed the claims that Sprint had filed against each of the Debtors other
than New Satellite Services.

1

The Plan will be confirmed.  The following are my Findings of Fact and Conclusions of Law in connection with this determination.

<u>Facts</u>

Except by way of background, this decision doesn't spend time discussing undisputed issues.  As requested, I will issue full Findings of Fact and Conclusions of Law, to the extent not inconsistent with those in this decision, which will include discussion of undisputed matters.

*1. Background*

DBSD N.A.—a Debtor, and the parent company of the other Debtor entities—is an approximately 99.8% owned subsidiary of non-Debtor ICO Global Communications (Holdings) Limited (**"ICO Global,"** referred to in Plan documents and the parties' briefs as the **"Existing Shareholder"**), a publicly traded satellite communications company based in Reston, Virginia.  ICO Global and its predecessor entities have been in the satellite communications industry for over 14 years.  ICO Global acquired substantially all of the assets, and assumed certain liabilities, of ICO Global Communication (Holdings) Limited (**"Old ICO"**) pursuant to a reorganization plan in the prior chapter 11 case of Old ICO.

Following the reorganization and acquisition of Old ICO, ICO Global focused on developing a U.S. mobile satellite service (often called **"MSS"**) business.  ICO Global's challenges included the problem of signal blockages resulting from buildings and other terrain, and capacity limitations plaguing the satellite communications industry.  To help meet these, ICO Global successfully lobbied the Federal Communications Commission (**"FCC"**) to promulgate new rules to permit the integration of *terrestrial* components—*i.e.*, related facilities on earth—into U.S. mobile satellite service networks.  Following the

2

FCC's promulgation of new rules that created a less-restrictive regulatory climate, in December 2004, ICO Global formed DBSD N.A. to develop an integrated mobile satellite and terrestrial services network (the **"Satellite System"**).  DBSD N.A. and its direct and indirect subsidiaries—the Debtors in the chapter 11 cases—conduct all of ICO Global's North American operations, as well as certain international operations.  The Existing Shareholder ICO Global is not a debtor in these chapter 11 cases.  It is out of the money, but under the Plan, by reason of a gift from the Second Lien Debt to unsecured creditors and equity, the Existing Shareholder will get a distribution.

The Debtors are a next generation mobile satellite service operator authorized to offer satellite terrestrial services throughout the U.S. using a satellite.  The Debtors conduct the majority of their operations in North America.  Their principal offices are located in Reston, Virginia, and they employ approximately 40 employees.  The Satellite System has been in development since 2004.  The Debtors designed the Satellite System to permit its use with a wide-range of technology partners, and in January 2009, the Debtors received FCC authority for a ground support system for the Satellite System (called an ancillary terrestrial component (**"ATC"**) and, together with MSS, **"MSS/ATC"**) services), subject to certain ATC "gating criteria"—FCC requirements with which any mobile satellite service operator seeking to modify its existing license to incorporate an ancillary terrestrial component into its systems must comply.

The Debtors intend to capitalize on the growth of the wireless sector in the U.S. by using their Satellite System to offer satellite and terrestrial wireless service throughout the U.S.  The commencement of a full-scale hybrid system utilizing both a satellite and land-based components (the **"MSS/ATC Hybrid Network"**) will require a great deal of

3

additional capital.  Thus, the Debtors have been exploring opportunities to offer their

services to strategic service providers who have the capacity to integrate the Debtors'

satellite and terrestrial services with services already offered to their existing customers.

*2.  The Debtors' Debt Structure*

As described more fully below, the Debtors have:

(a) First lien secured debt (the First Lien Debt), entirely held by

DISH, in the present principal amount of approximately $51 million,[5]

guarantied by all Debtors, which thus is an obligation of each of them;

(b) Second lien secured debt (the Second Lien Debt), held

principally by the Ad Hoc Committee and DISH, in the present principal

amount of approximately $752 million, guarantied by all Debtors, which

thus is an obligation of each of them;

(c) Unsecured debt (the **"Unsecured Debt"**), owed by various of

the Debtors, including, most significantly unsecured debt in the claimed

amount of approximately $211 million, owing to Sprint by Debtor New

Satellite Services.  The Debtors additionally owe substantial sums to

unsecured creditors Space Systems/Loral (**"Loral"**) and Hughes Network

Systems (**"Hughes"**), but the Debtors entered into settlements with Loral

and Hughes under which the Debtors would assume, as modified, their

executory contracts with those parties, with the effect that the unsecured

obligations to Loral and Hughes, as modified, will be paid in full.

---

[5]    *See* 9/23/09 Hrg. Tr. (Henkin Cross) 8 (stating that the First Lien Debt will be approximately
$50.8 million as of the effective date); Nabholz Decl. ¶ 31 ("assuming a December 31, 2009, Plan
consummation (the same date as in the Disclosure Statement), the First Lien Lenders' claim will
total approximately $50 million").  I will use the larger figure and round it to $51 million.

Under all valuations of the Debtors' enterprise offered by the various parties, and the valuation I have found (described below), the First Lien Debt is fully secured; the Second Lien Debt is undersecured; and all Unsecured Debt (except with respect to assumed contracts) is out of the money.

More specifically, prior to the Petition Date, the Debtors were party to two principal financing facilities: a $40 million first-lien working capital facility, initially at a 12.5% annual interest rate (the **"Prepetition Facility"**), secured by substantially all of the Debtors' assets and property (the **"Collateral"**),[6] and a second lien facility (the **"Second Lien Facility"**) of Senior Notes, giving rise to the Second Lien Debt. Pursuant to a Collateral Trust Agreement dated August 15, 2005 (the **"Collateral Trust Agreement"**), the liens securing the Prepetition Facility, not surprisingly, are senior to the liens securing the Second Lien Facility, and, like most intercreditor agreements, there are various constraints on Second Lien Facility remedies.

The Prepetition Facility was a revolving working capital facility with a maturity date at issuance of 13 months (several months before the maturity date of the Second Lien Facility), with cash interest due and payable at maturity. In addition to the first lien security interest over the Collateral, the Prepetition Facility required that the Existing Shareholder pledge its equity interest in the Debtors in favor of the First Lien Lender. As an additional protection to the First Lien Lender, any proceeds received from the sale or disposition of the Debtors' Auction Rate Securities, or any other net cash proceeds received from the sale of assets or from the issuance of debt or equity, were required to be used first to repay the Debtors' obligations under the Prepetition Facility. However,

---

[6]     The Collateral included "auction rate securities," (the **"Auction Rate Securities"**) which had been purchased as a species of cash equivalent to increase yields on cash, but which turned out not to be as marketable as anticipated, and which could not be sold quickly except at a loss.

5

the Collateral Trust Agreement did not require that the insolvency distributions to the

Second Lien Debt be remitted to the First Lien Debt; it simply required that lien priority

be preserved.[7]  As of the Petition Date, the principal amount of the Prepetition Facility

was approximately $46 million, and it was accruing interest at a rate of 16.0% per

annum.[8]  It thus is expected to be approximately $51 million as of the effective date of

the Plan if the Plan is confirmed.

3.  *The Bankruptcy Cases*

On May 15, 2009 (the **"Petition Date"**), the Debtors filed voluntary petitions for

relief under the Bankruptcy Code.  Prior to the filing of these cases, the Debtors and their

Existing Shareholder entered into a support agreement (the **"Support Agreement"**) with

certain holders of the Second Lien Debt pursuant to which, among other things, the

Debtors agreed to (a) proceed with a plan of reorganization that would exchange the

Debtors' Senior Notes into approximately 95% of the new common stock of the

reorganized Debtors (the **"New Common Stock"**), with 5% of the New Common Stock

going to the Existing Shareholder and (b) comply with a strict timeline for the occurrence

of events in these chapter 11 cases.  On July 24, 2009, the Debtors filed the Plan and an

amended disclosure statement (the **"Disclosure Statement"**).

As of March 31, 2009, the Debtors' assets appeared on their books at a book (not

market or enterprise) value of approximately $630 million.  As of the Petition Date, the

Debtors had total outstanding liabilities in the aggregate principal amount of $810

million, consisting primarily of approximately $51 million in secured First Lien Debt and

---

[7]        *See* Collateral Trust Agreement § 2.7(d).

[8]        *See* 8/28/09 Nabholz Decl. ¶ 31.  The interest rate had been increased to 16% under forbearance
agreements entered into between the Debtors and the predecessor creditors from whom DISH
bought the First Lien Debt.

approximately $752 million of Second Lien Debt, in each case including accrued but unpaid interest.

*4. The Debtors' Plan of Reorganization*

The Plan seeks, principally through substantial deleveraging and realignment of operations, to focus on the Debtors' core operations, to capitalize on opportunities in the future. The Debtors will reduce their funded debt and other financial obligations by converting all of their Second Lien Debt and general unsecured claims into equity of the reorganized Debtors.

The Plan provides for the Debtors to continue to operate as a pre-revenue enterprise, implementing cost-saving initiatives until the Debtors obtain strategic partnerships with entities that are able to complement the Debtors' satellite offerings or obtain additional capital to continue funding the enterprise.

There is, however, no current funding for expanding operations, and there are no present alternatives in place for deriving revenue.[9] Any means of generating substantial revenue, other than the leasing of spectrum, has significant associated costs.

On the Effective Date, the Reorganized Debtors plan to enter into a $57.25 million exit financing facility (the **"New Credit Facility"**), the proceeds of which will be used to pay cash amounts required under the Plan, and to fund the reorganized Debtors' expected cash burn. Certain of the Senior Noteholders have agreed to backstop the exit financing facility in the form of the New Credit Facility, participation in which will be offered to all Senior Noteholders. The New Credit Facility will be at an interest rate of 20%, with a 2% commitment fee, a 2% closing fee, with warrants to acquire up to 20% of

---

[9]    *See* 9/22/09 Hrg. Tr. (Corkery Cross) 99.

the New Common Stock and a lien on all assets that are subject to the First Lien Lender's liens, junior to those liens. On September 18, 2009, the Debtors filed a commitment letter for the New Credit Facility.

Under the Plan, the First Lien Debt will be satisfied with debt issued under an amended credit facility (the **"Amended Facility"**), the terms of which are discussed in more detail below. The Second Lien Debt will be satisfied with the issuance of approximately 95% of New Common Stock not issued to general unsecured creditors or distributed as the New Credit Facility shares,[10] for an estimated recovery of 51%-73%.[11] The general unsecured claims will receive their pro rata share of the total number of shares of New Common Stock, minus the New Credit Facility shares to be issued on the effective date, and further multiplied by, at most, 1.5% (as set forth in section I.A.72 of the Plan),[12] for an estimated recovery of 4%-46%.[13] A convenience class of unsecured creditors will be created, consisting of claims of $50,000 or less (or consensually reduced to that amount), which will receive in cash 40% of the value of those claims. The Existing Stockholder will receive 5% of the New Common Stock not issued to recipients of the general unsecured creditors' shares and the New Credit Facility shares, as well as certain warrants.

---

[10]     New Credit Facility Shares are 5%-10% of the New Common Stock issued on the Effective Date or reserved for issuance to the lenders under the New Credit Facility, and 5%-7% of the New Common Stock to be issued upon a subsequent event, as more specifically set forth in section I.A.92 of the Plan.

[11]     *See* Disclosure Statement § I.C.

[12]     *See* Plan § I.A.72.

[13]     *See* Disclosure Statement § I.C.

8

*5.  Treatment of First Lien Debt under Plan*

Based upon a postpetition interest accrual rate of 16.0%, and assuming a

December 31, 2009, Plan consummation (the same assumed date as in the Disclosure

Statement), the First Lien Lenders' claim will total approximately $51 million.[14]

The Plan proposes that to satisfy the claims of the First Lien Lender under the

Prepetition Facility, the Debtors will replace the First Lien Debt with new obligations

under the Amended Facility, which will have a first lien on all of the Debtors' assets

other than the Auction Rate Securities.  The Auction Rate Securities will be

unencumbered and available for working capital purposes.  The Amended Facility will

have a principal equal to the allowed claim on account of the Prepetition Facility, a four

year maturity date, PIK interest at a rate of 12.5% per annum, and, as a result, no cash

payments of principal or interest until maturity.[15]

In addition, the Plan strips the First Lien Lender of the Existing Shareholder's

pledge of 100% of the equity interests in the Debtors—though this is hardly meaningful,

as the lien on that equity interest is structurally subordinated to the various Debtors'

substantial existing debt, and out of the money.  The Amended Facility also contains a

standstill provision—negotiated by the Senior Noteholders that were members of the Ad

Hoc Committee—that restricts the First Lien Lender from enforcing its rights against the

Collateral.[16]  The terms of the Amended Facility also eliminated or loosened certain

---

[14]        *See* n. 5 above.

[15]        *See* Nabholz Decl. ¶ 32.

[16]        *See* 9/22/09 Hrg. Tr. (Henkin Cross) 247-248.

9

affirmative and negative covenants that are in the Prepetition Facility documentation.[17]
The cross-default provisions in the Amended Facility are also less restrictive.[18]

*6.  Interest Rate under the Amended Facility*

The proposed interest rate under the Amended Facility is at the original 12.5% rate of the Prepetition Facility, an amount less than the 14.5% default rate under the Prepetition Facility, and the 16.0% rate effective since May 2009, under forbearance agreements executed between the Debtors and the First Lien Debt holders from whom DISH bought its position.  The Prepetition Facility effectively paid cash interest after 13 months, whereas the Amended Facility will pay cash interest upon maturity in 48 months.

Under the Plan, the Debtors intend to use the 4 years before the Amended Facility becomes due to get the strategic investor or additional financing source they need. However, before their assets could generate significant revenue, the Debtors would need to obtain a substantial infusion of capital.[19]  They now have committed financing for the first two of the next four years, but will need either a strategic investor or additional financing for the two after that, at which time the Amended Facility will become due.[20]

Although the developmental nature of the Debtors' business and absence of present revenue would at first blush suggest uncertainty as to repayment under the Amended Facility, I find that the risk is not new, or increased, to warrant awarding DISH an interest rate higher than the one proposed under the Amended Facility.  Rather, the

---

[17]    *See* 9/22/09 Hrg. Tr. (Henkin Cross) 250.

[18]    *See* 9/22/09 Hrg. Tr. (Henkin Cross) 251.

[19]    *See* 9/22/09 Hrg. Tr. (Corkery Cross) 97, 99-100 (testifying about the various business plans).

[20]    *See* 9/22/09 Hrg. Tr. (Corkery Cross) 96.

risks associated with the Debtors' business existed (to a substantially similar degree) at the time the original holders of the First Lien Debt entered into the Prepetition Facility—and certainly in July 2009, when DISH purchased the First Lien Debt at par.

Most significantly, upon Plan confirmation, the Debtors will have deleveraged by over $600 million. The Plan currently contemplates that the Debtors will have $81 million in total debt at the Effective Date, and the total indebtedness can be projected to be in the range of $260 million by 2013.[21] This major change in the Debtors' debt load resulting from the Debtors' reorganization considerably reduces the risk on First Lien Debt.

I find persuasive Mr. Henkin's testimony as to the interest rates of first lien revolvers listed in the Markit database, of which none had an initial rate at issuance over LIBOR + 100 basis points (approximately 10.75%).[22] Other transactions cited by Mr. Henkin support the sufficiency of the Amended Facility interest rate. In August 2009, Sirius XM Radio raised $257 million of 9.75% Senior Secured Notes due 2015. Mr. Henkin's adjustment to that rate to account for the PIK interest in the Amended Facility would be 12.375%. In addition, in February 2008, the Debtors' competitor TerreStar raised a $100 million credit facility due 2013 with a 14% interest rate, at a time when it did not yet have a satellite in space.

---

[21]    *See* 9/22/09 Hrg. Tr. (Corkery Cross) 94-95 (testifying that the $260 million total debt at the end of the Debtors' four-year Plan period will be the result of the Amended Facility (including interest under the Amended Facility), the New Credit Facility, and any additional financing to be received).

[22]    *See* Henkin Reply Aff. ¶ 58.

The interest rate on the New Credit Facility is not an appropriate comparable, as that facility is structured in a manner akin to a rights offering, has equity attached to encourage participation, and, of course, is junior to the Amended Facility.[23]

Despite the extension of the term of the loan, I find that risk of nonpayment of the Amended Facility has not increased so as to make a 12.5% interest rate—even as a PIK interest rate—insufficient to give DISH the present value of its allowed secured claim on account of the Prepetition Facility.

## 7. Feasibility

Because the Debtors are still in the developmental stage and do not yet have cash revenues, but also because the Debtors' FCC rights and already launched satellite are very valuable, the parties sharply dispute feasibility. The underlying facts are these.

### A.    Startup Nature of Business

Without a doubt, the Debtors are still in a developmental stage. Their satellite has been launched, and is operational—getting the Debtors past a very major hurdle.[24] But the Debtors have no current source of revenue and "in the context of revenues, [the Debtors] don't have a significant operating profile at this time."[25] Although the Debtors have proposed certain alternative means of deriving revenue, "none of those alternatives are [currently] in place."[26]

---

[23]    *See* 9/22/09 Hrg. Tr. (Henkin Cross) 233.

[24]    One can obtain insurance for the risks of a failed satellite launch, but the insurance only partly compensates for the delays and losses that would be occasioned if a launch effort were unsuccessful.

[25]    *See* 9/22/09 Hrg. Tr. (Corkery Cross) 91-93.

[26]    *See* 9/22/09 Hrg. Tr. (Corkery Cross) 102.

12

A leasing of the Debtors' spectrum to third parties could generate revenue without a material expenditure of capital, but the Debtors currently do not have a signed spectrum lease deal. All or nearly all of the other proposed revenue generating plans require additional investment on the part of the Debtors,[27] in substantial amounts, estimated to range from $300 million to $1.5 billion. Expenditures of this character are presently not contemplated in the current Plan.[28] Until revenues come in, the Debtors will burn cash, and any material improvements in their system will require capital expenditures for which they do not yet have financing.

The Debtors presently estimate that over the next four years, they will lose $25 million per year in startup costs.[29] The Plan's financial projections include those costs, along with those needed to cure defaults under executory contracts and to make payment on administrative expenses.

The Debtors have a funding commitment from an initial 5 financial institutions[30] (most or all of whom are members of the Ad Hoc Committee) for up to $52.75 million— a commitment that will provide the necessary funding for approximately 2 years. But the Debtors will have a balloon obligation on the Amended Facility at the end of 4 years (in the amount of approximately $82.6 million,[31] and will have to repay junior debt incurred under the New Credit Facility. The Debtors do not yet have a commitment to pay those sums, and do not project available cash at the end of the 4-year period to pay off the debt

---

[27]    *See* 9/22/09 Hrg. Tr. (Corkery Cross) 104.

[28]    *See* 9/22/09 Hrg. Tr. (Corkery Cross) 99.

[29]    *See* 9/22/09 Hrg. Tr. (Corkery Cross) 93.

[30]    The ability to participate in the New Credit Facility will be offered to all of the Second Lien Debt holders as part of a process to take place after the confirmation hearing. *See* 9/22/09 Hrg. Tr. (Henkin Cross) 212. Presumably DISH, which also bought up Second Lien Debt, would have the ability, if it wished, to participate in the New Credit Facility as well.

[31]    *See* 9/23/09 Hrg. Tr. (Henkin Re-Direct) 79-80.

on those two facilities[32]—an amount estimated to be approximately $260 million.[33]  Thus

the Plan contemplates additional financing beyond the commitments that have currently

been delivered.[34]

Without the present ability to build out a terrestrial supplement to their network or

to implement any other revenue generating mechanism, the Debtors must either obtain

further financing[35] or a strategic partner.

B.    *Proposals for Additional Financing*

The Debtors have gone out to get additional financing; have received financing

proposals by strangers to the case; and have also received proposals from strategic

investors.  These have included proposals by DISH, which, as I've previously noted, here

and elsewhere, bought the First Lien Debt at par, and came into this case as a strategic

investor.

The Debtors asked their retained financial advisor Jeffries & Company, Inc.

("**Jeffries**") to market the New Credit Facility to potential lenders; to secure and evaluate

other proposals for financing; and to secure and evaluate strategic proposals.  As Michael

Henkin, a Managing Director of Jeffries testified, approximately 50 parties were

contacted by his firm with respect to the New Credit Facility, of which between 30 and

---

[32]    *See* 9/22/09 Hrg. Tr. (Corkery Cross) 96.

[33]    *See* 9/22/09 Hrg. Tr. (Corkery Cross) 94.

[34]    *See* 9/22/09 Hrg. Tr. (Corkery Cross) 110.

[35]    Kurt S. Plumer a partner of Highland Capital Management ("**Highland**"), which is a member of
the Ad Hoc Committee, testified that Highland has considered whether it would provide funding
to the Debtors when the New Credit Facility is exhausted.  Mr. Plumer stated "it's hard to make a
commitment … two years in advance, but yes … we would certainly look at providing the
financing."[35]  Obviously, this falls short of being a commitment.  I regard it as neither supporting
nor undercutting the Debtors' belief that additional financing or a strategic transaction can
reasonably be expected.

40 were not Second Lien Debt holders.[36]  Between 8 and 10 of those expressed interest in getting more information, signing a confidentiality agreement, and financing the Debtors.[37]

Two proposals by parties other than DISH were made with respect to financing for the Debtors.  One proposal was made by a single party (called, for purposes of this discussion, "**Party X**"), and another was made jointly by Party X and another party (called, for purposes of this discussion, "**Party Y**").

The Party X proposal, which has since expired, proposed funding of $75 million, coming in the form of a DIP financing that would convert into a larger exit financing.  A portion of the DIP financing could be used to repay the First Lien Debt.  There was also a proposal to leave the First Lien financing in place and to simply provide incremental DIP financing and not immediately repay the Amended Facility.  The proposal had multiple components.  It would provide a $75 million DIP, a $100 million exit facility, a $50 million supplemental exit facility, and an equity rights offering of $50 million—all adding up to $275 million.  However, the $75 million DIP facility would then roll into, potentially, the $100 million exit facility, so in aggregate that proposed financing would be for $200 million of aggregate financing.[38]  This financing would be secured, and while the testimony was inconclusive as to whether the Auction Rate Securities would be part of the collateral package, "[t]hey very well may have been."[39]

---

[36]    *See* 9/22/09 Hrg. Tr. (Henkin Cross) 214.

[37]    *See* 9/22/09 Hrg. Tr. (Henkin Cross) 214.

[38]    The proposed interest rate was 12% if cash-pay, or 15% with a PIK feature.  Maturity was sometime in 2010.

[39]    *See* 9/22/09 Hrg. Tr. (Henkin Cross) 218-220.

Another financing proposal was made jointly by Party X and Party Y. It offered $140 million, which would be used to repay the existing First Lien Debt and make additional funds available to the Debtors. It had a 5-year maturity; an interest rate of LIBOR plus a margin to be negotiated (with a 3% LIBOR floor). Verbal indications were that the rate would be either 9% if cash-pay and 12% if PIK, or 10% if cash-pay and 13% if PIK. This too would be a secured facility, secured by all of the assets of the Debtors, including the Debtors' Auction Rate Securities.[40]

In addition, DISH, which had made its strategic investment in the Debtors' First Lien Debt and Second Lien Debt, also made at least one proposal to the Debtors with respect to financing. However, the specifics of that proposal were not put in the public record, and while a copy of a DISH proposal was provided to me *in camera*, I believe that it's unnecessary and inappropriate for me to discuss its specifics.

C.    *Proposals by Strategic Investors*

Apart from its efforts to secure additional financing, Jeffries separately engaged in a process to secure proposals from strategic partners—a process that included about 35 parties. They were approached with a different perspective—not simply to provide financing, but rather to either acquire the company, make an investment in it, or to establish a business partnership with the company. [41]

No agreement has been reached with a strategic investor, but there have been 3 proposals for strategic transactions. Party X and Party Y made one such proposal.[42] A

---

[40]    *See* 9/22/09 Hrg. Tr (Henkin Cross) 219-221.

[41]    *See* 9/22/09 Hrg. Tr. (Henkin Cross) 294.

[42]    *See* 9/22/09 Hrg. Tr. (Henkin Cross) 268.

16

new party (**"Party Z"**) also made a proposal with respect to a strategic arrangement.[43]

And DISH itself made a proposal for a strategic transaction.

The public record of the confirmation hearing (intentionally) does not reveal the specifics of the various strategic transaction proposals, as it is inconsistent with the maximization of the Debtors' value for any of the competing bidders to know what the others have offered.  And while I've been provided with copies of the proposals on an *in camera* basis (for the limited purpose of satisfying myself that the testimony in court that the proposals existed was truthful and not exaggerated), I will not discuss their specifics either, for the same reason.  But I can and do find that there have, in fact, been actual proposals for strategic transactions with the Debtors—3 of them, in fact—and that the Debtors' premise that there will be proposals made to them for one or more strategic transactions is well-founded and entirely reasonable—especially since one of the strategic transaction proposals came from objector DISH itself.

       D.      *Indicia of Feasibility*

As further support for their contention that their expectation that additional financing and/or a strategic transaction is reasonable, the Debtors submitted evidence of the success of other companies in the mobile satellite industry competitors in entering into transactions of that nature.

The Debtors' ability to raise capital was assessed primarily by looking to the success of the Debtors' two main competitors, SkyTerra Communications, Inc. (**"SkyTerra"**) and TerreStar Corporation (**"TerreStar"**).  Despite the events in 2008 that

---

[43]        *See* 9/22/09 Hrg. Tr. (Henkin Cross) 268.

17

resulted in the credit crisis,[44] both SkyTerra and TerreStar raised substantial funds.
SkyTerra and TerreStar faced greater risk factors at the time they raised funds in 2008
than the Debtors would upon emergence from chapter 11.[45]

Prior to securing funding in 2008, TerreStar had a pre-existing debt of
$568 million, and SkyTerra had debt of $762 million.  Neither company had launched its
next generation satellite or received FCC authorization for the ATC.[46]  Each secured
financing for a five year period.

While TerreStar ultimately launched a satellite in July 2009, SkyTerra has yet to
launch a satellite.  Nevertheless, in or around February 2008 (a year and a half before the
TerreStar satellite was launched), Echostar Corporation and Harbinger Capital Partners
provided TerreStar with $300 million in financing.[47]

SkyTerra (though it has yet to launch a satellite) was able to raise $500 million in
July 2008.  And in the midst of the confirmation hearing, the common stock of SkyTerra
was acquired by its largest shareholder, Harbinger Capital Partners, in a deal that will
take the company private.[48]

The Debtors are further along in operational matters than either SkyTerra or
TerreStar were when the competitors raised their additional capital.  Unlike either of their
competitors at the relevant times, the Debtors have already launched their satellite, and
received FCC authorization for both MSS and ATC.

---

[44]    *See* 9/24/09 Hrg. Tr. (Brodsky Re-Direct) 96.

[45]    *See* 9/23/09 Hrg. Tr. (Henkin Re-Cross) 104.

[46]    SkyTerra did not have ATC authorization from the FCC, either.  But it did have an existing MSS
       license. *See* 9/23/09 Hrg. Tr. (Henkin Re-Cross) 103.

[47]    The TerreStar financing was in the form in the form of $150 million in 6% convertible debt,
       $100 million in vendor construction, and $50 million in 15% senior secured PIK notes due 2014.
       *See* Corrected Decl. of Yuri Brodsky (**"Brodsky Decl."**) ¶ 20.

[48]    *See* 9/24/09 Hrg. Tr. (Brodsky Re-Direct) 107-08.

The Debtors were able to select their spectrum location on the S-band before TerreStar because of their earlier satellite launch, and as a result their spectrum block is not adjacent to band reserved for governmental use.[49]    Consequently, the Debtors' spectrum, unlike spectrum held by TerreStar, is substantially free from interference from adjacent operators.[50]    The Debtors have an advantage over SkyTerra in that the Debtors have a contiguous spectrum block, while SkyTerra's band is broken up into multiple smaller blocks.[51]

Additionally, upon exit from chapter 11 the Debtors will have much less debt than either of the two competitors when they secured their additional financing.[52]    And comparing the Debtors to their competitors now, the Reorganized Debtors will have less than $100 million in debt, as contrasted to SkyTerra's and TerreStar's debt balances of approximately $1.233 billion and $900 million, respectively.[53]

I found credible Mr. Brodsky's testimony that if a company has sufficient asset value, it may be able to raise capital even if it has no revenue.[54]    And while I found DISH's expert Mr. Farrar truthful, and knowledgeable in many respects, I did not find his predictions of Debtor failure to be credible; too many of his earlier predictions did not pan out, and after cross-examination I did not develop confidence in his judgment or his ability to make predictions.

---

[49]    *See* Corkery Reply Aff. ¶10 (stating that the Debtors should be able to commercially use a greater segment of their spectrum because it is not adjacent to band reserved for the government).

[50]    *See* Corkery Reply Aff. ¶ 5.

[51]    *See* Corkery Reply Aff. ¶ 11.

[52]    *See* 9/24/09 Hrg. Tr. (Brodsky Re-Direct) 156 (testifying that a "upon emergence [the Debtors are] going to have much less debt than the other two companies").

[53]    *See* Brodsky Reply Decl. ¶ 4.

[54]    *See* Brodsky Reply Decl. ¶ 4.

19

Other indicia likewise suggest that the Debtors will emerge from chapter 11 with a good chance to succeed.  Although the Debtors now lack the funding to build out the proposed MSS/ATC Hybrid Network, or to make other major capital expenditures without either additional funding or a strategic partner, they have attributes that would be of value to many, if not most, potential strategic partners, including their FCC ATC authorization.[55]  Without dispute, the Debtors' spectrum—of which the Debtors have 20 MHz, all of which is usable—is very valuable.  There is only a finite amount of spectrum available, and the demand for spectrum has increased with the introduction of new devices that require greater bandwidth.  There are currently no scheduled FCC auctions of additional spectrum.  This will make existing wireless service providers more inclined to satisfy their spectrum needs by partnering with or acquiring companies like the Debtors.[56]

E.    *Conclusions re Feasibility*

There can be no assurance that the reorganized Debtors will succeed.  But I find that the evidence suggests that they will.  Certainly, their belief that they will succeed is much more than reasonable, and I have not been persuaded that it is likely that they will fail.  Their FCC rights—with respect to bandwidth and ATC authority—are very valuable, making them a very attractive candidate for a strategic acquirer or partner.  DISH's actions in this case—making its purchase of First Lien Debt, at par—provide further—and quite dramatic—evidence of the Debtors' value as a strategic investment.  DISH's acquisition proposal does so even more strongly.  The proposals by the other

---

[55]    *See* 9/24/09 Hrg. Tr. (Brodsky Cross) 98.

[56]    *See* Corkery Decl. ¶ 19; Henkin Decl. ¶ 18.

20

potential strategic acquirers further bolster the conclusion that the Debtors, especially after being de-leveraged, will be an attractive acquisition or partnership candidate.

Likewise, I find that the likelihood that the Debtors will be able to secure necessary financing two years from now is very high. The Debtors' competitors were able to secure substantial amounts of additional capital while in much weaker positions than the Debtors will be upon emergence. The financing proposals that recently have come in from disinterested third parties give further credence to the Debtors' position that there is a likelihood that adequate financing will be secured. Mr. Brodsky, from UBS Securities, testified persuasively that "because of the presence of capital to fund the company today, there is likely to be presence of capital to fund the company in the future. The fact that there is interest from a strategic investor and a couple of financial investors is a positive sign."[57] The actions of DISH and other third party acquirers, partners, and/or lenders serve as further validation of potential investor demand and interest in the Debtors.

I see no persuasive basis to conclude that the reorganized Debtors, once de-leveraged and in a position to consider the pending (or other) strategic transaction and financing proposals, will default on their obligations on the Amended Facility, or on the New Credit Facility. I see even less likelihood of a future liquidation or need for further reorganization. I can and do make a finding that confirmation of the plan is not likely to be followed by the Debtors' liquidation, or the need for further reorganization.

I find that the Debtors' Plan is feasible.

---

[57]     *See* 9/24/09 Hrg. Tr. (Brodsky Re-Direct) 111.

8.  *Valuation of the Reorganized Debtors*

   A.    *Enterprise Value of the Debtors: The Experts' Methodologies*

DISH's and the Debtors' experts (Mr. Nabholz and Mr. Henkin, respectively)

used the same three valuation methodologies—"Trading Comparables Analysis,"

"Spectrum Transactions Analysis," and "Discounted Cash Flows (**"DCF"**) Analysis" —

to determine the Debtors' enterprise value.  But the experts applied them with significant

differences.  Each expert also weighted the values produced by the three methodologies

differently.  Mr. Henkin effectively weighted the Trading Comparables Analysis at 90%,

and the other two methodologies at 5% each.[58]  By contrast, Mr. Nabholz weighted the

Trading Comparables Analysis at 20%, and the other two methodologies at 40% each.[59]

   1.    *Trading Comparables Analysis Generally*

For the Trading Comparables Analysis, both experts used SkyTerra and TerreStar

as comparable public MSS/ATC companies, and calculated their total enterprise value

(**"TEV"**) per megahertz-population (**"MHz POP"**).  In determining the value range

based on the trading comparables, Mr. Henkin weighted both the book and market value-

based valuations of the two comparable companies.[60]  Using this method, Mr. Henkin

calculated the range of the Debtors' value as approximately $380 million to $650 million.

Mr. Nabholz reviewed the two companies' valuations using both book and market

values of their debt, but he only applied the market value approach, finding it to be more

---

[58]    *See* 9/22/09 Hrg. Tr. (Henkin Cross) 302 (stating that use of "our midpoint" effectively weights
the trading comparables analysis at 90%).

[59]    *See* 9/24/09 Hrg. Tr. (Nabholz Cross) 173, 193.

[60]    *See* August 18, 2009 Expert Report of Michael Henkin (**"Henkin Report"**) at 16.

relevant.[61]  Using this method, Mr. Nabholz calculated the range of the Debtors' value as approximately $530 million to $590 million.[62]

>    2.    *Spectrum Transactions Analysis Generally*

For the Spectrum Transactions Analysis, Mr. Henkin selected comparable transactions based on spectrum *auctions* and *transactions,* and evaluated the mean and median transaction price paid per MHz POP.[63]  Mr. Henkin initially analyzed all spectrum transactions and auctions since 2001, and compared these spectrum transaction types to the Debtors' spectrum.  Mr. Henkin determined that the AWS Auction (Auction 66) in September 2006, the Clearwire/AT&T transaction in February 2007, and the Clearwire/Sprint transaction in May 2008 were the most comparable.  Since in order for the Debtors to fully utilize their MSS/ATC spectrum capability, they would have to produce a second satellite, Mr. Henkin made a deduction to the Debtors' implied value to account for the additional cost of constructing a second satellite, as the cost would have to be incurred before the Debtors could fully utilize their ATC spectrum compatibility.[64]  Using this method, Mr. Henkin reached a valuation range for the Debtors of $850 million to $3.1 billion.[65]

Mr. Nabholz' Spectrum Transactions Analysis was based solely on the FCC's AWS-1 Auction (Auction 66), for which Mr. Nabholz calculated the price per MHz POP.[66]  To account for changes in valuation that Mr. Nabholz believes have occurred

---

[61]    *See* August 18, 2009 Expert Report of Robert Nabholz (**"Nabholz Report"**) at 4.

[62]    *See* Nabholz Report at 4.

[63]    *See* Henkin Report at 12.

[64]    *See* Henkin Report at 18.

[65]    *See* Henkin Report at 18.

[66]    *See* Nabholz Report at 5.

since the auction closed in September 2006, Mr. Nabholz adjusted the price per MHz

POP by the average percentage change in SkyTerra and TerreStar's stock prices since the

time of the conclusion of the AWS-1 Auction, which was an average drop of

approximately 85%.[67] Mr. Nabholz also deducted the cost of building a spare satellite

and the uncommitted additional funding requirements to finance the Debtors on a pre-

revenue basis through 2013.[68] Using this method, Mr. Nabholz concluded that the

valuation range for the Debtors is $140 million to $215 million.[69]

> ### 3.    DCF Analysis Generally

The DCF Analysis calculates the present value of the projected after-tax free cash

flows over a forecasted period, and the present value of the "terminal" or "exit" value of

the Debtors' business at the end of the forecasted period.[70] Mr. Henkin used the cash

flows from the Mobile Interactive Media (**"MIM"**) business plan—which would require

a significant capital investment of approximately $1.5 billion.[71] (The MIM plan also

assumes that the Debtors continue to pursue a business plan of acquiring a second

satellite, establishing a ground network for its MSS/ATC Hybrid Network, and that the

Debtors will successfully secure the financing needed to fund the business in the near-

term.)[72] The terminal value was calculated using an EBITDA multiple between 6.0x and

6.5x, which was derived by using the midpoint between the median 2009 and 2010

---

[67]    See Nabholz Report at 6, Exhibit E.

[68]    See Nabholz Report at 6.

[69]    See Nabholz Report at 6.

[70]    See Nabholz Report at 3.

[71]    See Henkin Aff. ¶ 10.

[72]    See Henkin Report at 20.

TEV/EBITDA of wireless, satellite, and competitive local exchange industries.[73]

Discount rates of 22% and 24% were applied.[74]  Using this method, Mr. Henkin

calculated the Debtors' value from $570 million to $900 million.[75]

Mr. Nabholz used the Debtors' financial projections from 2010 through 2013 as

presented in the Debtors' Disclosure Statement—negative cash flows—for the interim

free cash flows, and the average TEV/MHz POP derived in the trading comparables and

precedent spectrums transactions analyses for the terminal value.[76]  Because the negative

cash flows in the Debtors' Disclosure Statement are not subject to the uncertainty

associated with revenues or assumed exit sale transactions, Mr. Nabholz used a risk-free

rate to discount those interim cash flows in one scenario, and a higher adjusted rate of

25% in a second scenario.[77]  A 25% discount rate was applied to the terminal value in

both scenarios.[78]  Using this method, Mr. Nabholz concluded that the range of value of

the Debtors' is $70 million to $100 million.[79]

I had serious problems with the use of DCF Analysis by each expert.  Mr. Henkin

used DCF Analysis even though the Debtors could not expect to achieve the projected

cash flows without major capital expenditures—possibly as much as $1.5 billion—which

they cannot now make.  The premise upon which he forecast his cash flows was, at least

under presently known facts, unrealistic.  By the same token, I had similar problems with

the use of DCF Analysis by Mr. Nabholz, when he based it on a stream of consistently

---

[73]     *See* Henkin Report at 23.

[74]     *See* Henkin Report at 23.

[75]     *See* Henkin Report at 13.

[76]     *See* Nabholz Report at 3.

[77]     *See* Nabholz Report at 3.

[78]     See Nabholz Report at Exhibit C.

[79]     *See* Nabholz Report at 3.

negative cash flows.  While I can see how one might examine a stream of cash flows with some yearly cash flows that were negative, I have difficulty seeing how a stream of *totally negative* cash flows could provide a basis for valuation.  It seems extraordinarily unlikely to me, if not remote, that anyone would pay to secure a stream of uniformly negative cash flows, and thus that a valuation could appropriately be based on such a stream.  Anyone buying an enterprise with such negative cash flows would have to be doing it for some reason *other than* the projected loss stream coming in—asset value, perhaps—but would not be buying it for the privilege of taking an unrelenting stream of losses.

B.    *Trading Comparables Analysis*

I find that the Trading Comparables Analysis resulted in the most reliable valuation of the Debtors' business.  Mr. Henkin and Mr. Nabholz each used SkyTerra and TerreStar—companies with directly comparable assets operating in the same segment of the MSS industry[80]—as comparables.  SkyTerra and TerreStar share the Debtors' developmental status, are subject to the same or similar specialized regulatory parameters and on-going funding requirements, and their businesses involve the development and utilization of next-generation wireless communication technology.[81]

Mr. Henkin's Trading Comparables Analysis calculation resulted in an enterprise value of $380 million to $650 million,[82] and Mr. Nabholz' Trading Comparables Analysis calculation resulted in a valuation of $530 million to $590 million.  It is significant that the Trading Comparables Analysis evaluation method yielded the smallest

---

[80]    *See* Henkin Aff. ¶ 8.

[81]    *See* Henkin Aff. ¶ 8.

[82]    *See* Henkin Aff. ¶ 8; Nabholz Decl. ¶ 9.

26

valuation differences between the two experts, with differences of a relatively small $150 million and $60 million between the two minimum values and the two maximum values, respectively,[83] and of only $45 million in each valuation's mean.

Mr. Henkin evaluated the mean and median TEV per MHz POP on both a book and a market basis.[84] Mr. Nabholz, on the other hand, evaluated the companies on a market basis only.[85] I find Mr. Henkin's method to be more persuasive; I agree with Mr. Henkin that because the stock of the comparable companies was trading at a significant discount at the time of the valuation, and because of the uncertainty in the markets, it was prudent to weight the book and market value equally.[86] I find that Mr. Nabholz' sole reliance of the market value of the comparable companies made his valuation unduly subject to trading discount at the time of valuation.

C.    *Spectrum Transactions Analysis*

I find the Spectrum Transactions Analysis less reliable than the Trading Comparables Analysis. However, for the extent to which it is considered, I find Mr. Henkin's Spectrum Transactions Analysis the more persuasive of the two experts' valuations, because the relatively large range of values reached by Mr. Henkin was tempered by his low weighting of this method, which takes into account "historical

---

[83]    By contrast, the discrepancies between the minimum values and maximum values calculated in the spectrum transactions analysis by the two experts, on the other hand, are $710 million and $2.885 billion, respectively.  *See* Henkin Aff. ¶ 9 (spectrum transactions analysis yielding a value range of $850 million to $3.1 billion); Nabholz Decl. ¶ 14 (precedent spectrum transactions methodology yielding a value range of $140 million to $215 million).

[84]    *See* Henkin Report at 17; 9/22/09 Hrg. Tr. (Henkin Cross) 306 (explaining that the debt securities were valued both on a book and a market basis, and the equity securities were valued only on a market basis).

[85]    *See* Nabholz Decl. ¶ 10.

[86]    *See* 9/22/09 Hrg. Tr. (Henkin Cross) 307.

supply and demand considerations that have since changed."[87]  The relatively low

number of transactions and the large range of values make such a low weighting

appropriate.

On the other hand, Mr. Nabholz' use of only a single transaction—though that

transaction was the only one he found to be comparable—necessitates placing less than a

40% weighting on that figure.

     *D.    DCF Analysis*

As noted above, I had serious problems with the use by each expert of DCF

Analysis, as Mr. Henkin's analysis assumed positive future cash flows from a business

plan (the MIM business plan) that would require capital investment of approximately

$1.5 billion to achieve it,[88] while Mr. Nabholz' valuation used negative values for the

projected cash flows for years 2010 through 2013.[89]

Then, Mr. Nabholz' heavy weighting of the DCF Analysis (at 40%)[90] skewed Mr.

Nabholz's overall valuation to the low extreme.  Similarly, Mr. Henkin's reliance on cash

flows that would require an influx of $1.5 billion of capital to achieve unjustifiably

skewed his valuation toward the high extreme.  The discrepancies in the value ranges

derived by the two experts from the DCF Analysis further evidenced a lack of reliability,

with $500 million and $800 million discrepancies between the two minimum amounts

---

[87]    Henkin Aff. ¶ 9.

[88]    *See* 8/20/09 Henkin Deposition Tr. 60 (testifying that the MIM business plan cannot be implemented without $1.5 billion of capital); Henkin Aff. ¶ 10.  Mr. Henkin assumed that the Debtors would be implementing the MIM business plan, as opposed to the actual forecasted financial projections in the Disclosure Statement.  *Id.*

[89]    *See* Nabholz Decl. ¶ 6 ("I used the Debtors' Financial Projections from 2010 through 2013 as presented in their Disclosure Statement.").

[90]    *See* Nabholz Decl. ¶ 18.

and the two maximum amounts, respectively, [91] and with a very large difference of $650 million in the mean.

Accordingly, I directed the parties to submit supplemental declarations that would assist me in making valuation findings with DCF Analysis omitted.

E.    *Appropriate Valuation without DCF Analysis Value*

Taking DCF entirely out of the valuation of the Debtors' business, I find the remainder of Mr. Henkin's valuation to be reliable. I agree with both experts, as they set forth in their respective supplemental declarations, that the most appropriate way to allocate the weighting previously afforded to the DCF analysis is to do so between the other two methodologies on a pro rata basis.[92] Such treatment maintains what the experts consider to be the relative reliability of the two methodologies. Mr. Henkin's updated valuation of the Debtors' business (with the Trading Comparables Analysis weighted at 94.7%, and the Spectrum Transactions Analysis weighted at 5.3%) resulted in a valuation range of $492 million to $692 million.[93] Mr. Nabholz' updated valuation of the Debtors' business (with the Trading Comparables Analysis weighted at 33.3%, and the precedent Spectrum Transactions Analysis weighted at 66.7%) resulted in a valuation range of $270 million to $340 million.[94]

F.    *Conclusions re Valuation*

As noted above, the experts' Trading Comparables Analyses resulted in similar valuation ranges, which suggests that this methodology is the most reliable. In part for

---

[91]    *See* Henkin Aff. ¶10 (calculating a value range of $570 million to $900 million under the discounted cash flow analysis); Nabholz Decl. ¶ 5 (estimating a value range of $70 million to $100 million under the discounted cash flow analysis).

[92]    *See* Supplemental Henkin Decl. ¶ 6; Supplemental Nabholz Decl. ¶ 3.

[93]    *See* Supplemental Henkin Decl. ¶ 6.

[94]    *See* Supplemental Nabholz Decl. at Exhibit A.

that reason, I find Mr. Henkin's overall weighting to be more reliable, as the greatest

weight was allocated to the most reliable methodology.  As used by each expert, the

Spectrum Transactions Analysis methodology has indicia of unreliability, making that

method less relevant in determining an appropriate value range for the Debtors, and

therefore, less deserving of substantial weighting.  Mr. Henkin's use of several spectrum

transactions as comparables resulted in an extremely broad value range for the Debtors,

making it less useful in determining the Debtors' actual value.  Mr. Nabholz' use of a

single transaction, on the other hand, and the substantial adjustments to the value range

(to reflect the stock prices of SkyTerra and TerreStar), also suggests that the resulting

value range is less reliable.

I find that the very low weighting Mr. Henkin allocated to the Spectrum

Transactions Analysis valuation more appropriately addresses the difficulty of comparing

spectrum transactions, and takes into account the relative unreliability of a range of

values that is so broad.  Although I do not find Mr. Nabholz' adjustments (based on

SkyTerra and TerreStar's stock prices) to be improper, I am hesitant to give such heavy

weighting (as did Mr. Nabholz) to a methodology that the expert believed needed such

substantial adjustments.  Therefore, I find Mr. Henkin's weighting with respect to the

Spectrum Transactions Analysis, and therefore his overall weighting, more appropriate.

I find that Mr. Henkin's overall valuation method, as modified in the

Supplemental Henkin Declaration, is the best assessment of the Debtors' value.  I note

that Mr. Henkin's Trading Comparables Analysis produced a valuation range lower than

that of Mr. Nabholz, and therefore, if I were to use Mr. Nabholz' values for the Trading

Comparables Analysis (while applying Mr. Henkin's weighting), the overall valuation range would be even higher.

Based on Mr. Henkin's overall valuation of the Reorganized Debtors, as modified by the elimination of the DCF Analysis in Mr. Henkin's supplemental declaration, I find that the value of the reorganized Debtors' business is in the range of $492 million to $692 million. That valuation provides the First Lien Lender with liens on assets that (on an enterprise valuation basis) are worth more than approximately 6 to 8.44 times the amount (approximately $82 million) that the First Lien Lender will be owed under the Amended Facility at maturity, based on the Debtors' lowest and highest estimated enterprise values, respectively.

That leads me to find, and I do find, that the First Lien Lender's principal and interest will be safe over the next four years, and that the proposed interest rate for the Amended Facility is satisfactory.

*9. Liquidation Value*

Mr. Henkin, the Debtors' expert, was the only expert who provided a liquidation valuation for the Debtors. His liquidation analysis used a comparable set of prior mobile satellite system sales in bankruptcies[95] to calculate a recovery rate expressed as "fixed assets as a percentage of transaction value,"[96] the median of which was 16.3%. This percentage was then used to assess the potential sale value of the Debtors' satellite systems assets[97] by a Chapter 7 trustee.[98]

---

[95]    *See* Henkin Decl. ¶ 13. The comparable sales referenced were ICO Global North America (2000), Globalstar L.P. (2003), Iridium (1999), and Orbcomm (2000). *Id.*

[96]    *See* Henkin Decl. ¶ 13.

[97]    Most of the Debtors' liquidation value comes from the Auction Rate Securities and its satellite and spectrum assets. *See* Henkin Decl. ¶ 13.

I saw no basis for concluding that Mr. Henkin's methodology or reasoning was anything other than correct, and, as I noted, no other evidence with respect to liquidation value was offered. Mr. Henkin's net estimated liquidation value for the Debtors was $113 million to $153 million,[99] and I find accordingly.

The consequences of that valuation are very different for each of the two objectors to confirmation. At any valuation within the range Mr. Henkin (and now I) found, DISH would be paid in full. By contrast, at any valuation within that range, Sprint would get nothing in a liquidation. The First Lien Debt (of approximately $51 million) and the Second Lien Debt (of approximately $752 million)—each of which would have a senior claim to all of the Debtors' assets, including those of Debtor New Satellite Services, which guarantied the debt of each—would leave nothing for junior unsecured claims.

<u>Discussion</u>

DISH contends that the Plan fails to comply with the "feasibility" requirements of section 1129(a)(11) of the Bankruptcy Code; with the "Cramdown" requirements imposed by sections 12129(a)(8), 1129(b)(1), and 1129(b)(2); with the "good faith" requirement of section 1129(a)(3); and the "best interests of creditors" requirement of section 1129(a)(7). DISH further contends that non-consensual exculpations in favor of Plan participants, and releases by the Debtors to the Existing Shareholder are overly broad and illegal.

Sprint likewise raises a best interests of creditors objection, and contends that discharge provisions in the Plan are overly broad, that the Plan improperly consolidates

---

[98]      *See* Henkin Decl. ¶ 13.

[99]      *See* Henkin Aff. ¶ 12.

32

the Debtors' estates for distribution purposes, and that the Plan's retention of jurisdiction

provisions are overly broad.  Most importantly, however, Sprint contends that the Plan

violates the Absolute Priority Rule.

        With the objections overlapping in material respects, I consider the objections

together, by concept, in turn.

*1. Feasibility*

        Section 1129(a)(11) of the Bankruptcy Code requires that the Court determine

that:

> Confirmation of the plan is not likely to be followed
> by the liquidation, or the need for further financial
> reorganization, of the debtor or any successor to the
> debtor under the plan, unless such liquidation or
> reorganization is proposed in the plan.

        This requirement is typically referred to in the bankruptcy community as the

"feasibility" requirement, and those contending that it hasn't been satisfied, as DISH

contends here, typically say, by shorthand, that the plan isn't "feasible."  But as the

quoted language makes clear, "feasibility" is an inexact shorthand for the statutory

requirement, which is better described by reference to the actual text of the Bankruptcy

Code, and the caselaw construing it.

        To demonstrate that a plan is feasible, it isn't necessary that success be

guaranteed.[100]  "In making determinations as to feasibility, . . . a bankruptcy court does

not need to know to a certainty or even a substantial probability, that the plan will

succeed.  All it needs to know is that the plan has a reasonable likelihood of success."[101]

---

[100]    *See In re Johns-Manville*, 843 F.2d 636, 649 (2d Cir. 1988) ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success.  Success need not be guaranteed.").

[101]    *In re Adelphia Bus. Solutions, Inc.*, 341 B.R. 415, 421-22 (S.D.N.Y. 2003) (*citing In re Johns-Manville Corp.*, 843 F.2d at 650); *In re Johns-Manville Corp.*, 68 B.R. 618, 635 (Bankr. S.D.N.Y.

"[T]he feasibility inquiry is peculiarly fact intensive and requires a case by case analysis, using as a backdrop the relatively low parameters articulated in the statute…."[102] "[T]here is a relatively low threshold of proof necessary to satisfy the feasibility requirement."[103]

In assessing feasibility, courts consider a number of probative factors, including the soundness and adequacy of the capital structure and working capital for the business in which the debtor will engage post-confirmation; the prospective availability of credit; whether the reorganized debtor will have the ability to meet its requirements for capital expenditures; and economic and market conditions.[104] Considering these factors, I find the plan to be feasible.

Turning first to the soundness and adequacy of the Debtors' capital structure upon emergence, I note again, as noted in my Findings of Fact, that if the Debtors emerge from chapter 11 in accordance with their proposed Plan, they'll be dramatically deleveraged.

---

1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'g order*, 843 F.2d 636 (2d Cir. 1988); *In re Texaco Inc.*, 84 B.R. 893, 910 (Bankr. S.D.N.Y. 1988) (A plan is feasible if there is a "reasonable assurance of commercial viability."); *In re Prudential Energy Co.*, 58 B.R. 857, 862 (Bankr. S.D.N.Y. 1986) ("Guaranteed success in the stiff winds of commerce without the protection of the Code is not the standard under § 1129(a)(11)."); *see also In re Briscoe Enters., Ltd. II*, 994 F.2d 1160, 1166 (5th Cir. 1993) ("Only a reasonable assurance of commercial viability is required."); *In re Eddington Thread Mfg. Co.*, 181 B.R. 826, 832-33 (Bankr. E.D. Pa. 1995), *appeal dismissed as moot*, 189 B.R. 898 (E.D. Pa. 1995) (finding that a plan is feasible "so long as there is a reasonable prospect for success and a reasonable assurance that the proponents can comply with the terms of the plan"); *Mut. Life Ins. Co. of N.Y. v. Patrician St. Joseph Partners Ltd. P'ship (In re Patrician St. Joseph Partners Ltd. P'ship)*, 169 B.R. 669, 674 (D. Ariz. 1994) ("A plan meets this feasibility standard if the plan offers a reasonable prospect of success and is workable").

[102]   *In re Eddington Thread Mfg. Co.*, 181 B.R. 826, 833 (Bankr. E.D. Pa. 1995) (Raslavich, C.J.).

[103]   *Id.  See also In re Brotby*, 303 B.R. 177, 191 (9th Cir. B.A.P. 2003) ("a relatively low threshold of proof will satisfy § 1129(a)(11), … so long as adequate evidence supports a finding of feasibility"); *Mercury Capital Corp. v. Milford Conn. Assocs., L.P.*, 354 B.R. 1, 9 (D. Conn. 2006) ("[A] 'relatively low threshold of proof' will satisfy the feasibility requirement.").

[104]   *See, e.g., In re Worldcom, Inc.*, 2003 WL 23861928, at *58; *In re Leslie Fay Cos.*, 207 B.R. 764, 789 (Bankr. S.D.N.Y. 1997); *In re Texaco Inc.*, 84 B.R at 910; *In re Prudential Energy*, 58 B.R. at 862-63; *see also Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co. (In re U.S. Truck Co.)*, 800 F.2d 581, 589 (6th Cir. 1986); *In re Repurchase Corp.*, 332 B.R. 336, 342 (Bankr. N.D. Ill. 2005), *aff'd*, 2008 WL 4379035 (N.D. Ill, Mar. 24, 2008).

Upon emergence, the Debtors will evolve from their present situation, with approximately $810 million in funded debt, down to a much lower approximately $51 million.[105]  Use of the exit financing working capital that they'll have available, discussed above and below, will add an estimated $173.4 million in new second lien debt junior to DISH's projected $82.6 million in First Lien Debt at the 4-year mark, but the overall indebtedness will still be quite modest relative to the Debtors' enterprise value.  I think there can be no serious doubt that the Debtors will be much healthier financially than they are now.

Turning next to liquidity and availability of working capital, it's undisputed that the Debtors have commitments for working capital financing for the next two years.  And while at that point they'll need to have secured a financing commitment, or a strategic investor or partner, I think their view that they'll be able to secure one or the other, if not both, is very reasonable.  We had testimony establishing offers of that character that already have been made.  I was provided with written copies of those offers, *in camera*, and was able to provide myself with comfort that the testimony was truthful.[106]  Further, I found credible the testimony of Yuri Brodsky, of UBS, when he testified as to his belief that reorganized DBSD would be able to successfully access the debt and/or equity capital markets when required, including in 2011.  And we saw how Terrestar and

---

[105]    The funded debt will then increase by reason of the PIK feature on the first lien Amended Facility and by second lien indebtedness incurred under the New Credit Facility.

[106]    As noted on the record in the course of the confirmation hearing, DISH sought copies of the financing and acquisition proposals, for the stated reason of testing whether witnesses Corkery and Henkin were truthful and not exaggerating when they testified that the Debtors had received such proposals.  I ruled that it was understandable that DISH would want to test their credibility, but that it would be inappropriate to give a bidder like DISH copies of the competing proposals.  I said that I'd receive the proposals in camera, and after having reviewed them, I was satisfied that the testimony of each was truthful, although Mr. Henkin's recollection of the specifics of the proposals was more accurate than Mr. Corkery's.

SkyTerra could access the capital markets in a condition no stronger (and in most respects quite weaker) than the Debtors will be upon emergence here.

I also see no material risk that the Debtors will default on their obligations to DISH under the restructured first lien note, or that, if they do, DISH won't be repaid in full or will force a liquidation. The PIK arrangements proposed for DISH are understandable. They provide satisfactory comfort to DISH that it will be repaid and provide DISH with the return to which DISH is entitled, while avoiding the drain on liquidity that would result from current payment of interest. Based on my valuation of the Debtors' enterprise, DISH will have collateral to debt coverage of approximately 6 to 8.44 times. As I found the Brodsky testimony credible, I see no material risk of a default to DISH in the first place. But if there were one, I likewise see no material risk that DISH wouldn't be repaid in full, and that there then might be a liquidation.

Finally, while I cannot of course speculate as to future market conditions, I heard credible testimony that the credit markets have loosened up since the time that the Debtors filed their chapter 11 cases, and the offers of financing that the Debtors received bear this out. It's sufficient for the purposes of consideration of this factor that there was no evidence that market conditions will now get worse, and that I shouldn't believe what I heard from Messrs. Henkin, Corkery and Brodsky with respect to the Debtors' ability to refinance their debt, or secure a strategic investor.

Thus as a conclusion of law, or mixed question of fact and law, I determine that the plan is feasible as that expression is used in connection with section 1129(a)(11) determinations, and that the requirements of section 1129(a)(11) have been satisfied.

*2. Cramdown*

Two classes of creditors voted to reject the Plan—DISH, in Class 1 (First Lien Debt Claims), and Sprint, in Class 5H (General Unsecured Claims against New Satellite Services). They raise different issues, as DISH's claim is secured, and its vote was designated; Sprint's Class 5H claim is unsecured, and while it was objected to, it was temporarily allowed for voting purposes under Fed.R.Bankr.P. 3018(a) in the amount of $2 million—an amount sufficient to result in rejection by its class.

In DISH's case, I determine that the Debtors do not have to satisfy the section 1129(b) requirements for cramdown, but that, in any event, they did so. In Sprint's case, I find that the Debtors *do* have to satisfy section 1129(b), but likewise have done so.

As general matters, applicable to both creditors, I start with fundamental principles. Section 1129(b)(1) of the Bankruptcy Code provides that if all applicable requirements of section 1129(a) are met other than section 1129(a)(8) (which requires that *every* impaired class vote in favor of the Plan), a plan may be confirmed so long as the requirements set forth in section 1129(b) are satisfied. To confirm a plan that hasn't been accepted by all impaired classes (thereby failing to satisfy section 1129(a)(8)), the plan proponent must show that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes. Here, Class 1 (First Lien Debt) and Class 5H (General Unsecured Claims against New Satellite Services) were the only impaired classes that voted to reject the Plan.

I don't think there could be any serious doubt that the Plan doesn't "discriminate unfairly." Until DISH bought up all of the claims in Class 1, all holders of First Lien Debt were treated the same way. Although the Plan doesn't discriminate unfairly in other

37

respects either, it's particularly obvious that by classifying secured claims based on the collateral held (the customary way of treating secured claims under a plan), the Plan doesn't discriminate unfairly in any way affecting Class 1, and I don't understand DISH to be arguing to the contrary.

Similarly, except for the Unsecured Claims convenience class,[107] all unsecured claims will receive their pro rata share of the stock and warrants that the reorganized Debtors will issue.  As relevant here, all unsecured claims in amounts greater than $50,000 against New Satellite Services are included in Class 5H, and every holder of an allowed claim within Class 5H will receive the same treatment under the Plan as every other such holder.

The second requirement is the requirement that the plan be "fair and equitable," which raises different issues as between DISH and Sprint, which I consider in turn.

A.    *Cramdown Vis-à-vis DISH*

After buying up all of the claims in the First Lien Debt class (Class 1), DISH voted against acceptance of the Plan.  But DISH's vote was designated—disqualified— for reasons I set forth in my separate ruling on the Debtors' designation motion.  When I so ruled, I observed that determining the *consequences* of the designation presented a separate issue, and that this issue was sufficiently debatable to require supplemental

---

[107]    The Code expressly allows a plan to provide for the creation of one or more separate classes of unsecured claims less than a specific amount for administrative convenience. *See* § 1122(b) ("A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience."); *see also* 7 *Collier* ¶ 1122.03[5].  It is also permissible for a plan to impair a convenience class (as was done here, where convenience class members will get 40¢ on the dollar in cash), so long as the legislative purpose behind section 1122(b), the reduction of administrative costs for the estate, is accomplished. *Id.* Here, where, *inter alia*, the Plan provides for the delivery of common stock and warrants to the holders of larger claims, and doing so for unsecured creditors with the much smaller claims that would put them in the convenience class would result in the issuance of fractional shares and warrants, the classification is easy for me to understand and approve, and I can and do grant the "reasonable and necessary" finding.

38

briefing, which has now come in.  I now have to determine whether, under these facts, the cramdown requirements of section 1129(b) of the Bankruptcy Code must be satisfied if the Plan is to be confirmed, and, if so, whether they have been.

For the reasons set forth below, I determine that the requirements of section 1129(b) don't need to be satisfied here.  But in any event, they have been.

*(i)  Consequences of Designation of DISH Votes*

Because DISH bought up *all* of the claims in Class 1 before voting against the Plan, my earlier ruling designating its vote gives rise to an uncommon follow-up issue. How should a bankruptcy court treat a situation where a creditor buys up all of the votes in a class after a plan has been proposed, with the desire to defeat the plan then under consideration—with the effect that, even if its vote is designated, there is nobody else in that class to assent to the plan?  Does the creditor whose vote has just been disqualified get the very same benefits it would receive if its rejection had been counted and considered valid—the right to insist on satisfaction of the requirements for cramdown— with the court's designation order effectively having become meaningless?

Though the issue is one of first impression, I conclude that this can't possibly be the law.  Rather, I rule that at least where an entity's vote has been disqualified under circumstances where it bought up all of the claims in a class after a plan was announced, making assent by that class impossible, it cannot secure the benefits of a dissenting class by indirection.  That class cannot be counted for purposes of consideration of section 1129(a)(8).  The good faith requirement of section 1129(a)(3) provides sufficient safeguards to ensure that plan proponents don't abuse the benefits of a court's designation ruling.

As usual, I start with textual analysis. DISH's vote was designated under section 1126(e) of the Bankruptcy Code.[108] Then, section 1126(c) of the Bankruptcy Code, which generally addresses when a class of claims has accepted a plan, also speaks to the effects of voting within the class of a designation order. That latter section provides:

> A class of claims has accepted a plan if such plan has been accepted by creditors, *other than any entity designated under subsection (e) of this section*, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, *other than any entity designated under subsection (e) of this section,* that have accepted or rejected such plan.[109]

But here there *are no* creditors other than the designated entity, because that entity bought up all of their claims. There is nobody else left in the class. Section 1126(c) says explicitly that an entity that's been designated isn't to be counted for the purposes of plan acceptance or rejection, and the sentence structure of that subparagraph tells me that when the designated entity has bought up all of the claims in its class and can't be counted, and there *aren't any* "creditors, other than any entity designed under subsection (e)," the class should be regarded as vacant.

How do we deal with a class with no members who may vote? Several of the contentions put forward by the constituencies supporting the Plan have merit in this regard, and as they do, I don't need to address some of their other contentions, which may be more debatable.

---

[108]    That section provides:

> On request of a party in interest, and after notice and a hearing, the court may designate any entity whose acceptance or rejection of such plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions of this title.

[109]    Emphasis added.

Turning to the first of the meritorious contentions, I agree with the Plan
supporters that Class 1 must now be disregarded for analysis of section 1129(a)(8).  As
we've noted, DISH bought up all of the claims in the class, and left the class with no
other class members.  To hold, even though the sole class occupant DISH was
disqualified from rejecting, that Class 1 *effectively rejected anyway*, because there was
nobody left to accept, would make my designation ruling meaningless.  DISH's conduct
made acceptance by Class 1 impossible, and when any DISH ballots were disqualified,
Class 1 was effectively empty.  The most appropriate way to deal with that is by
disregarding Class 1 for purposes of section 1129(a)(8).[110]

I also agree with the Plan supporters' second point—that if Class 1 must be
considered at all, it should now be regarded as an accepting class.  I've previously ruled
that the Tenth Circuit's decision in *Ruti-Sweetwater*[111] was correct and should be
followed,[112] and I held in accordance with *Ruti-Sweetwater* in my *Adelphia* decision.
I've also stated, repeatedly, that I believe in *stare decisis*, and that I follow the precedents
of the bankruptcy judges in this district in the absence of manifest error.[113]  I respect and

---

[110]    That is consistent with Article III(D)(4) of the Plan.  It provides:

> Any class of Claims that is not occupied as of the
> commencement of the Confirmation Hearing by the Holder of
> an Allowed Claim or a Claim temporarily allowed under
> Bankruptcy Rule 3018 (*i.e.*, no Ballots are cast in a Class
> entitled to vote on the Plan) shall be deemed eliminated from
> the Plan for purposes of voting to accept or reject the Plan and
> for purposes of determining acceptances or rejection of the
> Plan by such Class pursuant to section 1129(a)(8) of the
> Bankruptcy Code.

[111]    *Heins v. Ruti-Sweetwater, Inc. (In re Ruti-Sweetwater, Inc.)*, 836 F.2d 1263 (10th Cir. 1988).

[112]    *See In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 260-263 (Bankr. S.D.N.Y. 2007).

[113]    *See, e.g., In re Adelphia Commc'ns Corp.*, 359 B.R. 65, 72 n. 13 (Bankr. S.D.N.Y. 2007) ("This Court has been on record for many years as having held that the interests of predictability in this District are of great importance, and that where there is no controlling Second Circuit authority, it follows the decisions of other bankruptcy judges in this district in the absence of clear error."); *In re General Motors Corp.*, 407 B.R. 463, 486-87 & n.19, 504 (Bankr. S.D.N.Y. 2009) (same,

41

follow my own decisions to no lesser extent than I respect and follow the decisions of my colleagues, and on this issue I believe that my decision in *Adelphia* was hardly "manifest error," and in fact was right.  For the reasons I articulated at greater length in *Adelphia*— including, most significantly, that the Bankruptcy Code focuses on those who vote, and not the total membership of classes, and because the former Act made confirmation depend on votes, and not failures to vote—where the plan proponents have otherwise secured the assent of at least one impaired class, and there are no votes whatever in a particular class, the absence of votes in a class doesn't result in failure to satisfy section 1129(a)(8).

*Ruti-Sweetwater* continues to be the only case at the Circuit level addressing this issue, but more importantly, I continue to believe, as I did in *Adelphia*,[114] that *Ruti-Sweetwater* was correctly decided.  And it would be incongruous to accept a different view when the failure to secure *any* votes in the class arises not from creditor apathy, but from the affirmative acts of an entity whose vote deservedly was disqualified.  To the extent that the Class 1 vote isn't disregarded, Class 1 should be deemed to be an accepting class.

### (ii)  Treatment of DISH Claim

I recognize, however, that the issue I just addressed is one of first impression. And while I consider the Tenth Circuit's decision in *Ruti-Sweetwater* to represent the better view, it is not the only view.  As against the possibility that a higher court in this Circuit might adopt the contrary view, I think I should address whether the Plan

---

adhering to *Chrysler* decision as issued at Bankruptcy Court level, before Second Circuit's full opinion affirming the Bankruptcy Court's decision came down).

[114]    *See Adelphia*, 368 B.R. at 261.

42

supporters have made the necessary cramdown showing under section 1129(b)—as against the possibility that DISH might still secure the benefits of that section if it could secure a reversal of my designation determination, or achieve the same result by reason of the fact that because it bought up all of the Class 1 votes, assenting votes in that class could not be had.  On the merits of the 1129(b) issue, I conclude that assuming, *arguendo*, that DISH could secure the benefits of a member of a non-accepting class, the Plan satisfies the requirements for cramdown of a dissenting secured creditor class, by providing DISH with the "indubitable equivalent" of its claims.

As noted above, here there are no issues with respect to unfair discrimination, and the sole issue that would exist as to cramdown of DISH (assuming that it could secure rights based on non-assent to the Plan) would be with respect to the "fair and equitable" requirement.  Section 1129(b)(2)(A) provides three alternative bases upon which a plan can be "fair and equitable" with respect to a class of impaired secured claims, such as Class 1 here.  One of these is to provide the "indubitable equivalent" of the secured claims held by members of the class.[115]  Although "indubitable equivalent" isn't defined under the Bankruptcy Code, courts generally will find the requirement satisfied where a plan both protects the creditor's principal and provides for the present value of the creditor's claim.[116]  In doing so, courts focus on the value of the collateral relative to the secured claim, and the proposed interest rate of the facility providing the indubitable equivalent.

---

[115]     Bankruptcy Code § 1129(b)(2)(A)(iii).

[116]     *See, e.g., In re Sparks,* 171 B.R. 860, 866 (Bankr. N.D. Ill. 1994 (a plan provides the indubitable equivalent of a claim to the creditor where it "(1) provides the creditor with the present value of its claim, and (2) insures the safety of its principle [sic].") (citations omitted).

43

Under the Plan, DISH will receive the obligations and collateral under the Amended Facility.  The Amended Facility, which will mature four years after the Effective Date, will be secured by a first lien on substantially all assets of the reorganized Debtors other than the Auction Rate Securities.  The Debtors' TEV is $492 million to $692 million, and since Debtor assets include their valuable spectrum rights, the Debtors' value is likely to increase (and at the least is unlikely to depreciate) as the demand for spectrum increases, which I believe that it will.[117]  The Amended Facility will accrue interest, which may be paid in kind at the option of the reorganized Debtors—what we call a "**PIK**" feature—at 12.5% per annum.[118]  That 12.5% per annum compares to market rates as of August 28, 2009 of 3.25% for the prime rate; 1.75% for the 3-year Treasury Note; and 2.375% for the 5-year Treasury note.[119]

To determine whether the Debtors have provided DISH with the indubitable equivalent of its claim, I first have to be satisfied that DISH's principal is protected to the same extent that it is now.  Courts find that a creditor's principal is protected where its claim is sufficiently oversecured by the collateral.[120]  Here, the First Lien Debt will

---

[117]    *See* Henkin Aff. ¶¶ 20–23; Henkin Reply Aff. ¶ 30; Corkery Aff. ¶ 15.

[118]    *See* Notice of Amendment to Plan Supplement Exhibit to the Debtors' Second Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code [Docket No. 291].

[119]    *See* Bloomberg.com, Market Data - Rates & Bonds - Government Bonds; Bloomberg.com, Market Data - Rates & Bonds - Key Rates, as provided by the Debtors without contradiction.

[120]    *See Travelers Ins. Co. v. Pikes Peak Water Co. (In re Pikes Peak Water Co.),* 779 F.2d 1456, 1461 (10th Cir. 1985) (affirming confirmation of a chapter 11 plan on grounds that the secured creditor would receive the indubitable equivalent of its claim where the value of the collateral was 34% greater than the $2.9 million claim); *In re James Wilson Assocs.,* 965 F.2d 160, 172–73 (7th Cir. 1992) (affirming confirmation of a chapter 11 plan that provided a creditor with a 7-year note bearing interest at a rate of the 7-year Treasury note rate plus 2.5% where the $3.2 million note was secured by collateral with a market value of approximately $6 million); *Woods v. Pine Mountain, Ltd. (In re Pine Mountain, Ltd.),* 80 B.R. 171, 174–75 (B.A.P. 9th Cir. 1987) (affirming the trial court's determination that the creditor would receive the indubitable equivalent of its claim where (a) the chapter 11 plan provided a first lien creditor with a second priority note bearing interest at the higher of 12% or the prime rate plus 1.5% and (b) the collateral was worth

increase to approximately $82.6 million at maturity, if (as it is reasonable to assume) the

PIK feature is fully utilized and all interest is paid in kind.  The Amended Facility, which

will be used to satisfy the First Lien Debt, will be secured by assets with an enterprise

value that I've found to be from $492 million to $692 million—at least 9.6 times the

approximately $51 million in Prepetition Facility Claims, and at least 6 times the

approximately $80 million that will be due under the Amended Facility at maturity.[121]

DISH will still be dramatically oversecured.  And I've found as a fact that by reason of

the interest of strategic purchasers and those who can be expected to provide financing,

there is little risk of default on the Amended Facility, or, even more clearly, any material

risk that DISH will not ultimately receive payment in full.  Accordingly, I'm comfortable,

and find, as a mixed question of fact and law, that DISH will receive the indubitable

equivalent of its claims insofar as we must consider the protection of its principal and

previously accrued interest.

I also determine that the proposed interest rate is sufficient to provide DISH with

the indubitable equivalent of its claim.  Published case law with respect to determination

of the appropriate interest rate in a cramdown situation under section 1129(b)(2)(A) in

the Second Circuit and in other jurisdictions generally pertains not to cramdown under

section 1129(b)(2)(A)(iii), but rather to cramdown under section 1129(b)(2)(A)(i), where

the secured creditor keeps *all* of its prepetition collateral.  In determining the

---

at least twice the value of the claim and the new first lien debt together and was likely to
appreciate); *In re Mulberry Phosphates, Inc.,* 149 B.R. 702, 711–12 (Bankr. M.D. Fla. 1993)
(holding that the creditor received the indubitable equivalent of its $14 million claim where the
plan provided it with a 6-year replacement note secured by collateral valued at $23.2 million and
bearing interest at the prime rate plus 1.5%).  *Compare Metro. Life Ins. Co. v. Murel Holding
Corp. (In re Murel Holding Corp.),* 75 F.2d 941, 943 (2nd Cir. 1935) (reversing denial of motion
to vacate automatic stay where the a negative amortizing plan bearing interest at an annual rate of
5.25% was "secured by a margin of only ten per cent").

[121]    *See* Henkin Aff. ¶ 21; n. 5 above.

appropriateness of a proposed cramdown interest rate, courts in this district have looked

to the market interest rate for loans with similar terms.[122]  Still other courts have

considered the prepetition contract rate in determining whether the cramdown interest

rate is sufficient.[123]  There is other arguably relevant law, under chapter 13 of the

Bankruptcy Code,[124] but I consider reliance on these two bases to be preferable.

Here, the Plan contemplates the payment of interest at the same rate as the

contract rate under the Prepetition Facility—12.5%.  I agree with the Plan supporters'

contention that this rate is appropriate if compared to the Prepetition Facility interest rate,

especially since the Prepetition Facility rate was set at a time when the Debtors were very

significantly more leveraged, and the Amended Facility interest rate includes a larger

margin above the national prime rate than the Prepetition Facility interest rate did.[125]

The Amended Facility will be oversecured several times over, and will accrue

interest at the contract rate though in a lower interest rate environment.  The contract rate

that has been proposed includes a larger margin of interest above the prime rate than

---

[122]  *See, e.g., In re One Time Square Assocs. Ltd. P'ship,* 159 B.R. 695, 706 (Bankr. S.D.N.Y. 1993),
*aff'g order,* 165 B.R. 773 (S.D.N.Y. 1994), aff'd, 41 F.3d 1502 (2d Cir. 1994), *cert. denied*, 513
U.S. 1153 (1995) (holding that the proper interest rate in a section 1129(b)(2)(A)(i) scenario was
the market rate for loans "similar in term, quality of security, and risk of repayment or financial
condition of the borrower") (citation omitted); *In re Cellular Info. Sys., Inc.,* 171 B.R. 926, 944
(Bankr. S.D.N.Y. 1994) (determining the appropriate interest rate in a section 1129(b)(2)(A)(i)
cramdown scenario by adding 3.82% to the 3-month LIBOR rate and reducing the rate to account
for lender's profits and the costs of servicing the loan).

[123]  *See In re Cellular Info. Sys., Inc.,* 171 B.R. at 938 ("The interest rate under an original loan
agreement is informative as to a proposed cramdown interest rate's merits to the extent that the
original rate was set near in time to a debtor's chapter 11 proceeding and in a period in which
market conditions were substantially similar to present conditions.").

[124]  *See, e.g., Till v. SCS Credit Corp.,* 541 U.S. 465, 466 (2004) (plurality) (examining several
methods of determining cramdown interest rates in chapter 13 cases and ruling that an increment
over the prime rate was the most appropriate).

[125]  For example, on April 7, 2008, when the original Prepetition Facility Lenders entered into the
Prepetition Facility with the Debtors, the prime rate of interest was 5.25%.  It was 3.25% on
August 28, 2009.  Now the Amended Facility will provide the holders of the First Lien Debt with
a larger margin above the prime rate than the Prepetition Facility did.

provided under the Prepetition Facility.  Accordingly, the Plan both protects the principal

of Class 1, and provides DISH with the lost present value of its claims.  I determine that

the Plan satisfies the cramdown requirements of section 1129(b)(2)(A)(iii), and is "fair

and equitable" with respect to Class 1.

> **B.    *Cramdown Vis-à-vis Sprint***

Here too, with respect to the class of unsecured claims (against Debtor New

Satellite Services) where Sprint has its claim, the only issue is the extent to which the

Plan complies with the Absolute Priority Rule.  It's not wholly clear that, as the Debtors

contend,[126] the Absolute Priority Rule needn't be considered vis-à-vis Sprint (whose

claim is only against Debtor New Satellite Services), because the existing corporate

structure will be maintained only for "administrative convenience," and value will go to

more junior equity only with respect to a different debtor (DBSD North America).  But I

don't need to decide that, because I agree with the Plan supporters that the "Gifting"

Doctrine—under which senior secured creditors voluntarily offer a portion of their

recovered property to junior stakeholders (as the Senior Noteholders did here)—defeats

Sprint's Absolute Priority Rule objection here.  In fact, but for that gift, Sprint itself

would receive nothing.

The Gifting Doctrine permits creditors, if they wish, to "gift" part of the

distributions to which they'd otherwise be entitled to junior classes or interests, even if

that gift results in unequal distributions to classes that would otherwise be *pari passu*, or

if the gift makes distributions to a class when a more senior class has not been paid in

---

[126]        *See* Debtors' Omnibus Response to Plan Objections at 39-40.

full.[127]  Its rationale was explained in *SPM*, the case from which the doctrine first

evolved.  As the First Circuit there explained, provisions of the Bankruptcy Code

governing priority of creditors "apply only to distributions of property of the estate."  It

continued:

> The Code does not govern the rights of creditors to
> transfer or receive nonestate property.  While the
> debtor and the trustee are not allowed to pay
> nonpriority creditors ahead of priority creditors, ...
> creditors are generally free to do whatever they

---

[127]    *See Official Unsecured Creditors Comm. v. Stern (In re SPM Mfg. Corp.),* 984 F.2d 1305, 1313–
14 (1st Cir. 1993) ("***SPM***") (authorizing payment from secured creditor to general unsecured
creditors while priority tax creditors received nothing); *In re MCorp Fin., Inc.,* 160 B.R. 941, 960
(S.D. Tex. 1993) (Hughes, D.J.) ("***MCorp***") (senior creditors may share their proceeds with FDIC,
even if the FDIC was junior to an impaired objecting class); *In re Genesis Health Ventures, Inc.,*
266 B.R. 591, 598, 617-18 (Bankr. D. Del. 2001) (Wizmur, J.) ("***Genesis Health Ventures***")
(allocation of equity and warrants to management who were former equity holders did not violate
Absolute Priority Rule when the allocation was a voluntary transfer of value from senior lenders,
who were secured by liens on substantially all of the Genesis debtors' assets); *In re Union Fin.
Servs. Group,* 303 B.R. 390, 423 (Bankr. E. D. Mo. 2003) (Schermer, J.) ("***Union Financial
Services***") (payment to unsecured creditors by senior secured creditors did not constitute unfair
discrimination); *In re WorldCom Inc.,* 2003 WL 23861928, *60–61 (Bankr. S.D.N.Y. 2003)
(Gonzalez, J.) ("***WorldCom***") ("The absolute priority rule is inapplicable to contributions of Plan
recoveries made by certain creditors to other creditors," following *SPM*, *Genesis Health Ventures*,
and *MCorp*); *In re World Health Alternatives, Inc.,* 344 B.R. 291, 298–99 (Bankr. D. Del. 2006)
(Walsh, J.) ("***World Health Alternatives***") (carve out agreements in which a secured creditor gives
up a portion of its lien for the benefit of unsecured junior creditors do not offend the Absolute
Priority Rule); *In re Journal Register Co.,* 407 B.R. 520, 533 (Bankr. S.D.N.Y. 2009) (Gropper,
J.) ("***Journal Register***") (authorizing gift from secured lenders to unsecured trade creditors).  *See
also In re RCN Corp*., No. 04-13638 (RDD) (Drain, J.) ("***RCN***"), (Bankr. S.D.N.Y. Dec. 8, 2004),
Findings of Fact and Conclusions of Law re Confirmation at 17-18 (approving, under section
1129(b), plan that gave distributions to junior equity interests pursuant to gift from unsecured
creditor class, even though subordinated claims would receive nothing under the plan, and
preferred stock interests were paid less than in full).

Other cases have disapproved its use.  *See In re Armstrong World Industries, Inc*., 432 F.3d 507,
514 (3d Cir. 2005) (finding Absolute Priority Rule applied and was violated where an unsecured
creditor class would receive and automatically transfer warrants to the holder of equity interests in
the event that its co-equal class rejected the plan); *In re Sentry Operating Co. of Texas Inc.,* 264
B.R. 850 (Bankr. S.D. Tex. 2001); *In re Snyders Drug Stores Inc*., 307 B.R. 889 (Bankr. N.D.
Ohio 2004).

*See generally* Harvey R. Miller and Ronit J. Berkovich, *The Implications of the Third Circuit's
Armstrong Decision on Creative Corporate Restructuring,* 55 Am. U. L. Rev. 1345, 1421–22
(2006) ("***Miller & Berkovich***"); Damian Schaible and Eli Vonnegut, "*SPM Manufacturing* to
*Journal Register:*  Indicators of a Successful "Gift Plan," 28 ABI Journal No. 8, at 14 (Oct. 2009)
("***Schaible & Vonnegut***").

> wish with the bankruptcy dividends they receive,
> including to share them with other creditors.[128]

In *SPM*, the First Circuit considered a case that had been converted from chapter 7 to chapter 11, in which an undersecured creditor had agreed, while the case was back in chapter 11, to share proceeds of its collateral with general unsecured creditors—skipping over priority claimants who would have had priority over the general unsecured creditors if property of the estate had been distributed under normal statutory priorities. Rejecting a challenge to that distribution plan, the First Circuit noted that the proceeds of the collateral were the property of the secured creditor, and that there was nothing in the Bankruptcy Code forbidding a secured creditor to have voluntarily paid part of the funds it would receive "to some or all of the general, unsecured creditors after the bankruptcy proceedings finished."[129] It then ruled that there was no basis for distinguishing a situation where the secured creditor might "enter into a contract *during* bankruptcy in which it promises to do the same thing."[130]

Thus, underlying the Gifting Doctrine, as it has evolved, is the concept that if the creditor class is entitled to property from the estate—as particularly is the case when a class of secured creditors holds a perfected security interest in the property—it may generally do whatever it wishes with such property, including transferring it to other holders of claims or interests[131]—at least so long as the property clearly belongs to the

---

[128]    *SPM*, 984 F.2d at 1313.

[129]    *SPM*, 984 F.2d at 1313.

[130]    *SPM*, 984 F.2d at 1313.

[131]    *See SPM,* 984 F.2d at 1313.

senior creditor gift-giving class and, in the views of some, there are good business reasons for the gift.[132]

While analytically, in a number of respects, the Gifting Doctrine can apply to gifts from both secured and unsecured creditors, its use is more controversial when the gift comes from unsecured creditors.  Conversely, when the gift comes from a class with one or more duly perfected secured creditors, the rationale for the doctrine is particularly strong, as the secured creditor class has a property interest in the property it has elected to gift, and if it were to enforce its security interest, the property would never become part of the estate to be subject to distribution to unsecured creditors under a plan.  And if the secured creditor class is undersecured, that will mean, at least in most cases (as it does here), that any complaining creditor would get nothing anyway, whether or not the gift had been made—making it difficult, if not impossible, to see how the complaining creditor can be legitimately aggrieved by the gift.

The Gifting Doctrine has been applied in two distinct, but related, contexts in cramdown usage.  It has been applied to provide a gloss on the requirements under section 1129(b)(1) of the Bankruptcy Code that a plan not "discriminate unfairly,"[133] and also that it be "fair and equitable."[134]  In both contexts, the Gifting Doctrine cases share the attribute of a consensual give-up of entitlements by the more senior class.  While the Gifting Doctrine has not been uniformly followed on a nationwide basis—though the most prominently cited case rejecting the Gifting Doctrine (and the only case at the Circuit level) involved gifts from *unsecured* creditors, and distinguished *SPM*, rather than

---

[132]    *See Schaible & Vonnegut* at 14.

[133]    *See, e.g., Union Financial Services*, 303 B.R. at 421; *Journal Register*, 407 B.R. at 531-32.

[134]    *See, e.g., MCorp*, 160 B.R. at 959-60; *Genesis Health Ventures*, 266 B.R. at 616; *WorldCom*, 2003 WL 23861928, at *61-62.

rejecting it[135]—the Gifting Doctrine is accepted and applied in this District.[136]  Consistent

with the decisions of the other Bankruptcy Judges in this District,[137] the majority of the

cases,[138] and what I believe to be the better view, I conclude that I too should follow the

Gifting Doctrine—at least where, as here, the gift comes from secured creditors,[139] there

is no doubt as to their secured creditor status, where there are understandable reasons for

the gift,[140] where there are no "ulterior, improper ends" (such as the avoidance of

taxes),[141] and where the complaining creditor would get no more if the gift had not been

made.

Sprint makes a number of arguments to the end that I should not follow *SPM*, and,

impliedly, all of the other cases applying the Gifting Doctrine, even in chapter 11, which

Sprint does not address.  Sprint first argues that *SPM* is distinguishable, because "this is

---

[135]    *See Armstrong World Industries*, 432 F.3d at 514.  The *Armstrong* court distinguished *SPM*, but did not say that *SPM* was wrongly decided.

[136]    *See WorldCom,* 2003 WL 23861928, at *61 ("The absolute priority rule is inapplicable to contributions of Plan recoveries made by certain creditors to other creditors."); *Journal Register*, 407 B.R. at 533 ("It is concluded that under the facts of these cases the existence of plan provisions that facilitate the Trade Account Distribution do not result in a classification issue or provide any other reason to deny confirmation of this Plan."); *RCN*, Findings of Fact and Conclusions of Law at 18 (holders of preferred stock and equity interests would receive distributions under the plan, even though subordinated claims would receive no distribution and preferred stock would receive payment less than in full, where distributions to holders of preferred stock and equity were "based on the agreement of holders of RCN General Unsecured Claims to voluntarily allocate a portion of the value that they would otherwise receive" to those other holders).

[137]    *See* n.113 *supra*.

[138]    *See* n.127 *supra*.

[139]    I don't need to decide, and do not decide, whether the members of an *unsecured* class of creditors can "gift" their distributions to a more junior class of creditors or to equity while skipping over other unsecured creditors in the process.

[140]    Sprint does not seem to dispute that there were good business reasons for the Second Lien Debt's gifts to unsecured creditors and the Existing Shareholder.  I find as a fact that there were, as the donees' continued cooperation and assistance would be valuable to the reorganized Debtors.  Assuming, without deciding, that gifting by a secured creditor class must have a good business purpose to be respected, I find that requirement satisfied here.

[141]    *Journal Register*, 407 B.R. at 531, citing *In re Scott Cable Commc'ns, Inc*., 227 B.R. 596-603-04 (Bankr. D. Conn. 1998) (denying confirmation where principal purpose of plan was the avoidance of taxes, contrary to section 1129(d)).

not a chapter 7 liquidation, and [citing *Armstrong*] that the *SPM* outcome has been

expressly rejected in the context of a plan of reorganization."[142]  But that is an overly

simplistic argument, ignoring the real basis upon which *SPM* was decided—that property

to which an undersecured secured creditor was entitled would not be available for

distribution by the estate.  That principle is equally applicable in chapters 7 and 11.  And

Sprint fails to address the fact that the *Armstrong* court distinguished *SPM* because in

*SPM*, but not *Armstrong*, the gift in *SPM* came from *secured creditors*—exactly what we

have here.

Judge Walsh made this point when rejecting *Armstrong* arguments in *World

Health Alternatives*.[143]  Approving the gifting in *World Health Alternatives*, and finding

*Armstrong* distinguishable, he observed:

> *SPM* involved a *secured creditor's* perfected
> security interest.  The Third Circuit [in *Armstrong*]
> recognized that this meant "that the property was
> not subject to distribution under the Bankruptcy
> Code's priority scheme."  … This is the case here as
> well.[144]

And the District Court in *Armstrong*, whose reasoning the Third Circuit endorsed,[145]

expressly distinguished the situation where the donor of the gift would be a secured

creditor.  It stated:

> [R]ather than viewing a distribution of the debtor's
> property in contravention to the Bankruptcy Code's
> distribution scheme, the sharing agreement in *SPM*
> may be more properly construed as an ordinary
> "carve out," i.e., "an agreement by a party secured
> by all or some of the assets of the estate to allow

---

[142]    Sprint Br. at 5.

[143]    *See* 344 B.R. at 298-99.

[144]    *Id.* at 298 (emphasis added; citation to *Armstrong* omitted).

[145]    *See Armstrong*, 432 F.3d at 514.

> some portion of its lien proceeds to be paid to others
> [to secure their cooperation or to compensate
> priorities as part of cash collateral agreements]."…
> Unlike the Debtor in the instant case, the secured
> lender in *SPM* had a substantive right to dispose of
> its property, including the right to share the
> proceeds subject to its lien with other classes.[146]

Likewise, neither *Armstrong* court criticized *Genesis Health Ventures*, and each

seemingly endorsed it, simply distinguishing *Genesis Health Ventures* on the ground that

it "involved property subject to the senior creditors' liens that was 'carved out' for the

junior claimants."[147]

Sprint also suggests that the Second Circuit rejected gifting in its decision in

*Iridium*,[148] which had disapproved a settlement (under which a seemingly secured

creditor had gifted value in a manner that potentially could result in distributions to

unsecured creditors while leaving administrative expense claims unpaid) on the ground

that the settlement approval hadn't given sufficient attention to the Absolute Priority

Rule.  But the problem in *Iridium* wasn't the gifting itself; it was that the gifting

creditors' secured status was *in dispute*, and it wasn't clear that the donors really were

secured, with the ability to make the gift.  As the Second Circuit observed:

> Here, the Settlement perfected and validated the
> Lenders' liens only upon the entry of an order
> approving the Settlement and only to the extent
> authorized by the Settlement.  Until the Settlement
> was approved, then, the Lenders' liens were
> contested and the money held by the Lenders was
> an asset of the Estate.  This case is quite different
> from *SPM,* where the creditor had an uncontested,

---

[146]    *In re Armstrong World Industries, Inc.*, 320 B.R. 523, 538-39 (D. Del. 2005 ), *aff'd* 432 F.3d 507
(3d Cir. 2005) (internal citations omitted; bracketed material in original).

[147]    432 F.3d at 514, quoting the District Court decision, 320 B.R. at 539.

[148]    *In re Iridium Operating LLC*, 478 F.3d 452 (2d Cir. 2007).

> "perfected, first security interest in all of SPM's
> assets except certain real estate."[149]

Significantly, the *Iridium* court went on to say:

> Thus, we need not decide if *SPM* could ever apply
> to Chapter 11 settlements, because it is clear that the
> Lenders did not actually have a perfected interest in
> the cash on hand.[150]

It also is the case that the gifting here does not injure any junior creditor. In fact, the only class that receives less than its entitlement is the one agreeing to provide the gift. More junior creditors do better, not worse, by reason of the gift.

I agree with Sprint that the gifts to unsecured creditors and the Existing Shareholder were not for wholly eleemosynary purposes, and it may be that the term "gift" is in some respects a misnomer. I have little doubt that the Second Lien Debt decided to make the gifts because the Second Lien Debt regarded it as in its interest to do so—most obviously, to build consensus and win support. But donors always make gifts because they perceive there to be a reason to make them, and even if it could be argued that the unsecured creditors and Existing Shareholder provided some type of "consideration" to the Second Lien Debt, I could not find—and do not find—that any consideration that Second Lien Debt holders provided was of such a value as to make the distributions to those parties anything other than a gift that Second Lien Debt holders had the right to make.

Judge Gropper's decision in *Journal Register*, while principally an unfair discrimination decision, is also instructive. After explaining the Gifting Doctrine,[151] he

---

[149]    478 F.3d at 461 (footnotes and citations omitted).

[150]    *Id.*

[151]    *See Journal Register*, 407 B.R. at 529-531.

observed that there was no principle that would preclude the secured lenders in his case from making the "gift" totally outside the Plan and the chapter 11 process. He then declined the suggestion that he should look to the mechanics by which the gift would be made to "cause the Court to invalidate it."[152] Significantly, he observed that there (as here), "if the Court excised the gift provision from the Plan, the recoveries of the 'disfavored' … creditors would not be increased. This would only put the 'gift' at risk by providing the Secured Lenders with an opportunity to withdraw their offer."[153] "This would not benefit any party."[154]

While stated in the context of unfair discrimination objections to the Gifting Doctrine, Judge Gropper's observations in rejecting those objections are no less applicable here as well. He observed:

> A more negative result would take place if the Court were to deny confirmation of the Plan altogether on grounds that it provides unequal treatment to unsecured creditors. At least two possibilities would arise under this scenario: (i) the Debtors and the Secured Lenders could propose another Plan that provides no recovery for the general unsecured class as a whole, and the Secured Lenders could then pay the trade creditors after confirmation of that Plan if they chose to do so; or (ii) the Secured Lenders could decide not to pay any other party and perhaps attempt to foreclose outside chapter 11 altogether. *This would jeopardize the recoveries of all general unsecured creditors who overwhelmingly voted to accept the proposed Plan and create the possibility of a result that would contravene the overriding purpose behind chapter 11 of maximizing the going concern value of a*

---

[152]    *Journal Register*, 407 B.R. at 533.

[153]    *Journal Register*, 407 B.R. at 529.

[154]    *Journal Register*, 407 B.R. at 529.

> *debtor's business for the benefit of its*
> *stakeholders.*[155]

Sprint's objections to the use of the Gifting Doctrine, and its related Absolute

Priority Rule objection, are overruled.

### 3. Best Interests of Creditors Test

Section 1129(a)(7) of the Bankruptcy Code—the "Best Interests of Creditors" test

—applies only to holders of non-accepting impaired claims or interests.[156]  Here, the Plan

satisfies the Best Interests of Creditors Test, as demonstrated by looking at distributions

under the Plan and contrasting the distributions that could be made in light of the

Liquidation Analysis.  Here, the net proceeds available for distribution to stakeholders in

a hypothetical chapter 7 liquidation would be significantly less than the value of

distributions under the Plan, because, among other reasons, the Debtors' assets would not

be sold as a going concern[157] and, thus, would lose all going concern value of the

business, such as intangible assets and goodwill.  Similarly, proceeds received in a

chapter 7 liquidation would likely be significantly discounted due to the distressed nature

of the sales of the Debtors' assets.[158]

As noted above,[159] I've found that the liquidation value of the Debtors' assets

would be only $113 million to $153 million.  Each of the individual Debtors guarantied

---

[155]    *Journal Register*, 407 B.R. at 533-34.

[156]    *See Bank of America Nat. Trust and Sav. Ass'n v. 203 N. LaSalle St. P'ship,* 526 U.S. 434, 441
         n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even
         if the class as a whole votes to accept the plan."); *In re Source Enters., Inc.,* 2007 WL 2903954, at
         *7 (Bankr. S.D.N.Y. 2007); *Adelphia.,* 368 B.R. at 251 (stating that section 1129(a)(7) is satisfied
         when an impaired holder of a claim would receive "no less than such holder would receive in a
         hypothetical chapter 7 liquidation").

[157]    *See* Henkin Reply Aff. ¶ 50 (discussing a number of reasons that liquidation value is generally
         lower than enterprise value).

[158]    *See* Henkin Reply Aff. ¶ 50.

[159]    *See* page 32.

all of the secured debt.  Thus, every Debtor would be on the hook for all of the secured

debt until all of the First Lien Debt and Second Lien Debt—totaling approximately

$810 million—was paid in full.  With so little in the way of liquidation value, *nothing*

would be left for any unsecured creditors, dissenting or otherwise.

It appears that Sprint is the only unsecured creditor that has rejected the Plan and

objected to confirmation based on the Best Interests of Creditors Test.  But Sprint will get

a recovery under the Plan (based, ironically, on the gifting to which it objects), while in a

liquidation, it would get nothing.

Likewise, assuming, without deciding, that DISH is entitled to the benefits of the

Best Interests of Creditors Test with respect to the Second Lien Debt claims it bought

up,[160] I find that the Best Interests of Creditors Test has been satisfied with respect to

DISH's Second Lien Debt as well.  On the liquidation value I've found ($113 million to

$153 million), after payment of First Lien Debt there will only be $62 million to

$102 million to satisfy $752 million in Second Lien Debt claims—yielding a recovery of

from 13.8% to 14% on Second Lien Debt.[161]  While the math to precisely compute the

Second Lien recoveries, based on the TEV that I've found ($492 million to $692 million),

is more difficult, it appears that Second Lien Debt holders, even with their gifts to other

classes, will get many times those recoveries in a liquidation.[162]

The Best Interests of Creditors Test has been satisfied here.

---

[160]   I also assume, without deciding, that Sprint could invoke the Best Interests of Creditors Test with
respect to its First Lien Debt even with its vote having been designated, but I've found that here
the First Lien Debt will be paid in full—no less than it would get in a liquidation—making this
matter academic.

[161]   Debtors' Memorandum in Support of Plan at 31.  I compare the Debtors' recovery percentages for
the Second Lien Debt in a liquidation even though I compute even lower recovery percentages for
the Second Lien Debt; however, use of the Debtors' higher numbers is more conservative.

[162]   The deficiency claims of Second Lien Debt holders—including, of course, DISH—would, like
other unsecured claims, receive nothing in the event of a liquidation.

*4.  Good Faith*

Section 1129(a)(3) provides that a reorganization plan must be "proposed in good faith and not by any means forbidden by law."  Good faith is "generally interpreted to mean that there exists a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code."[163]  A plan is proposed in good faith only if it has "a legitimate and honest purpose to reorganize the debtor."[164]

Whether a reorganization plan has been proposed in good faith must be viewed in the totality of the circumstances.[165]  "The bankruptcy judge is in the best position to assess the good faith of the parties' proposals."[166]

Here I have no doubt whatever that the Plan was proposed in good faith.  The Debtors had the need to deleverage their business, and did exactly that, doing so on a largely consensual basis by converting debt to equity.  Their dealings with the Second Lien Debt (and also the Creditors' Committee, which ultimately came on board) were aboveboard and the kinds of dealings that are typical in chapter 11 cases of this type.  The willingness of most of the Second Lien Debt holders other than the DISH affiliate to share their distributions with unsecured creditors and with the Existing Stockholder likewise was neither unusual nor any evidence of Debtor bad faith.  The arrangements to formulate a largely consensual plan were simply an embodiment of that which is normal and to be expected in any chapter 11 case.

---

[163]    *Matter of Madison Hotel Associates,* 749 F.2d 410, 425 (7th Cir. 1984) (internal quotations omitted); *Mercury Capital Corp. v. Milford Conn. Assocs., L.P.* 354 B.R. 1, 9 (D Conn. 2006).

[164]    *Mercury Capital*, 354 B.R. at 7 (quoting *In re Elsinore Shore Assoc.,* 91 B.R. 238, 260 (Bankr. D.N.J. 1988)).

[165]    *See In re Jasik,* 727 F.2d 1379, 1383 (5th Cir. 1984).

[166]    *Jasik,* 727 F.2d at 1383.

58

Faced with the appearance of DISH—a newcomer to the case with obvious strategic objectives—the Debtors played by the rules, even increasing the interest rate to be offered in connection with DISH's First Lien Debt, and improving upon some of the debt covenants.

The Debtors' conduct was fully consistent with the required "legitimate and honest purpose to reorganize the debtor."

*5.  Releases*

DISH challenges releases under the Plan of claims Debtors might have against others (*e.g.*, the Existing Shareholder) under the Plan, and "exculpation" provisions— releases by third parties of other third parties. Though for different reasons, I find these objections unfounded.

A.    *Releases By the Debtors, of Claims Owned by the Debtors*

Turning first to releases by the Debtors of claims that undoubtedly belong to the estate, I cannot find anything wrong with these.  The releases and discharges of claims and causes of action by the Debtors, pursuant to section 1123(b)(3)(A) of the Bankruptcy Code,[167] represent a valid exercise of the Debtors' business judgment, and are fair, reasonable and in the best interests of the estate.

I can't agree with DISH's suggestion that the Debtors released claims of which they were aware.  Mr. Corkery testified credibly that he was unaware of any significant

---

[167]      That section provides, that subject to provisions not applicable here:

> **(b)** … a plan may—
>
> …
>
>> **(3)** provide for—
>>
>>> **(A)** the settlement or adjustment of any claim or interest belonging to the debtor or to the estate…

potential claims against any released parties, including the Existing Shareholder.  And these are not, of course, claims that DISH owns.  Instead, to the extent any claims exist, they are claims that the *Debtors* own; DISH could not assert them except on behalf of the estate, and then only after getting an *STN* order upon a showing that prosecution of them was in the best interests of the estate.

Section 1123(b)(3) permits a debtor to include a settlement of any claims it might own as a discretionary provision in its plan, and I find the Debtors' releases to be both appropriate and reasonable.

B.    *The Exculpation Provisions*

The exculpation provisions, by contrast, involve claims owned by third parties (*e.g.*, stakeholders in the case, including DISH), against other third parties (*e.g.*, other stakeholders), against whom the former may have grievances.  Exculpation provisions are frequently included in chapter 11 plans, because stakeholders all too often blame others for failures to get the recoveries they desire; seek vengeance against other parties; or simply wish to second guess the decisionmakers in the chapter 11 case.

Though exculpation provisions have a salutary purpose, that salutary purpose is insufficient by itself to make them proper as a general rule.  As the Second Circuit's decision in *Metromedia*,[168] and my earlier decision in *Adelphia*[169] provide, exculpation provisions (and their first cousins, so-called "third party releases") are permissible under some circumstances, but not as a routine matter.[170]  They may be used in *some* cases, including those where the provisions are important to a debtor's plan; the claims are

---

[168]    *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.),* 416 F.3d 136 (2d Cir. 2005).

[169]    *Adelphia*, 368 B.R. at 266.

[170]    *Adelphia*, 368 B.R. at 267.

"channeled" to a settlement fund rather than extinguished; the enjoined claims would

indirectly impact the debtor's reorganization by way of indemnity or contribution; the

released party provides substantial consideration; and where the plan otherwise provides

for the full payment of the enjoined claims.[171]

Importantly, they may also be used if the affected creditors consent.[172]  And that

is what we have here.

Though the matter needed supplemental clarification, and the Debtors' reply brief

went off on wholly different (and largely untenable) bases for justifying the exculpation

provisions,[173] it now appears that entities, like DISH and Sprint, who voted against the

Plan are not bound by the releases in the exculpation provisions except with respect to

those relatively few entities that will provide material consideration to the estate in the

form of new money.[174]  Rather, the only parties who will be bound by the exculpation

provisions will be those who assented to them, or who may be deemed to have done so.

That includes those who voted in favor of the Plan, and those who abstained with respect

to it and who failed to opt out from the exculpation provisions.

Like the Seventh Circuit in *Specialty Equipment*, the Second Circuit has held that

nondebtor releases are permissible if the affected creditors consent.[175]  And in *Calpine*,[176]

the Debtors' reorganization plan included a similar third party release provision that also

---

[171]      *Adelphia*, 368 B.R. at 267.

[172]      *Id.  See also In re Specialty Equipment Companies, Inc.*, 3 F.3d 1043,1047 (7th Cir. 1993), the
leading case in this area.

[173]      *See* Debtors Reply Br. at 6-7.

[174]      In light of that, it is difficult for me to see how they have standing to complain of a provision that
will not affect them in any event.  In an excess of caution, I discuss the matter anyway.

[175]      *See Metromedia*, 416 F.3d at 142.

[176]      *In re Calpine Corp.*, 2007 WL 4565223 (December 17, 2007).

bound creditors who abstained and did not opt out of the release.  In that case, the ballots explicitly stated that a vote to accept the Plan or abstention from voting without opting out of the releases each constituted an assent to the releases set forth in the Plan.  Judge Lifland found that the holders of claims and interests who voted to accept the plan, or abstained and did not opt, out were given adequate notice that they would be granting the release by acting in such a manner.[177]

Similarly, adequate notice is provided in this case, as both the Plan and Disclosure Statement have the third party release provision set off in bold font, and the ballots set forth in both capitalized and bold text the effect of consenting to the Plan or abstaining without opting out of the release.[178]  Except for those who voted against the Plan, or who abstained and then opted out, I find the Third Party Release provision consensual and within the scope of releases permitted in the Second Circuit.

No release is provided for gross negligence, willful misconduct, fraud, or criminal conduct, and the release covers only conduct in connection with the chapter 11 cases. The language of the exculpation clause substantially conforms to the language that has become standard in this Circuit.[179]

Except for those particular entities that are providing new funding to the Debtors as part of the New Financing Facility, I'm not in a position to approve the exculpation provisions except on the basis of consent.  But while the exculpation provisions will not bind those, like DISH, who rejected the Plan, or who abstained and then opted out, they

---

[177]    *Calpine*, 2007 WL 4565223 at *10 ¶31; *see also In re Conseco*, 301 B.R. 525, 528 (Bankr. N.D. Ill. 2003) (holding that a release provision that bound those who agreed to be bound, either by voting or abstaining and not opting out of the release was consensual).

[178]    *See* Notice of Supplement to the Debtors' Motion for Entry of an Order, Exhibit B [Docket No. 148].

[179]    *See e.g.*, *In re Drexel Burnham,* 960 F.2d 285, 293 (2d Cir. 1992).

will bind those who voted to accept the Plan.  They are permissible, under applicable law,

on the basis of consent.

### 6. *Substantive Consolidation*

      In its objection to the Plan, Sprint argues that although the Plan does not expressly

provide for substantive consolidation of the Debtors' estates, "the distribution formula

contemplated by the Plan constitutes an implicit substantive consolidation of the Debtors'

bankruptcy estates for purposes of distribution."[180]  Sprint properly observes that

"unsecured claims will be aggregated for the purposes of distribution and will share in a

pro rata distribution regardless of which Debtor is responsible for the claim."[181]

However, it is also the case that the *only* distribution available to any unsecured creditor,

regardless of which Debtor is responsible for the claim, is a gift from Class 2.  Since

every distribution available to unsecured creditors is a gift, the distribution formula does

not decrease the distribution to which Sprint, or any other unsecured creditor, is entitled

on account of its unsecured claim.

      Of course, as the Second Circuit noted in *In re Augie/Restivo Baking Co*,

substantive consolidation is "'a measure vitally affecting substantive rights,'"[182] and

"[t]he sole purpose of substantive consolidation is to ensure the equitable treatment of all

creditors."[183]  But that truism is inapplicable here.  There here is no intermingling of

property that is otherwise property of individual Debtor estates, nor is there any adverse

substantive effect as a result of the pro rata distribution of the gift.  I determine that there

---

[180]     Sprint Objection at 11.

[181]     Sprint Objection at 16.

[182]     *In re Augie/Restivo Baking Co.*, 860 F.2d 515, 518 (2d Cir. 1988) (quoting *Flora Mir Candy Corp. v. R.S. Dickson & Co.*, 432 F.2d 1060, 1062 (2d Cir. 1970)).

[183]     *Augie/Restivo*, 860 F.2d at 518.

was not a substantive consolidation here, and that the substantive rights of all unsecured

creditors, including Sprint, as holders of out of the money unsecured claims and

recipients of a gift, have not been affected by the Plan's distribution formula.

*7.  Retention of Jurisdiction*

In its objection, Sprint also argues that Plan provisions providing for retention of

jurisdiction (the "**Retention Provisions**") over all matters arising out of or related to the

Debtors' bankruptcy cases are overly broad.  Additionally, Sprint argues that the

Retention Provisions "must be amended to clarify that they are not intended to divest the

FCC of matters within its primary jurisdiction."[184]  Sprint's arguments are unpersuasive

and contrary to authority in this district.[185]

Implicit in Sprint's argument that the Retention Provisions are overly broad is an

argument that confirmation of a plan under chapter 11 of the Bankruptcy Code somehow

reduces the grant of bankruptcy jurisdiction provided in § 1334(b).  Neither § 1334(b),

any other statutory provision, nor any controlling case law supports such an argument.

Article XII of the Plan, entitled Retention of Jurisdiction, provides, in part:

> Notwithstanding the entry of the Confirmation
> Order and the occurrence of the Effective Date, on
> and after the Effective Date, *the Bankruptcy Court*
> *shall retain jurisdiction over all matters arising out*
> *of, or related to, the Chapter 11 Cases* and the Plan
> pursuant to sections 105(a) and 1142 of the
> Bankruptcy Code …[186]

---

[184]    Sprint Objection at 15.

[185]    *See, e.g., In re Global Crossing Ltd. Securities Litigation*, 2003 WL 22705127 (S.D.N.Y. 2003); *Back v. AM Gen. Corp. (In re Chateaugay Corp.)*, 213 B.R. 633 (S.D.N.Y. 1997); *In re Lombard-Wall, Inc.*, 44 B.R. 928 (Bankr. S.D.N.Y. 1984).

[186]    Plan § XII (italics added).

In essence, this provision attempts to retain post-confirmation jurisdiction to the same

extent that the Court had jurisdiction pre-confirmation pursuant to 28 U.S.C. § 1334(b).

That provision provides, in part:

> [N]otwithstanding any Act of Congress that confers
> exclusive jurisdiction on a court or courts other than
> the district courts, the district courts *shall have*
> *original but not exclusive jurisdiction of all civil*
> *proceedings arising under title 11, or arising in or*
> *related to cases under title 11.*

In deciding the limits on bankruptcy jurisdiction, the Supreme Court has made

clear that, "[t]he jurisdiction of the bankruptcy courts, like that of other federal courts, is

grounded in, and limited by, statute."[187]  Therefore, any analysis of the jurisdiction of a

bankruptcy court, whether pre-confirmation or post-confirmation, begins with an

examination of the statutory provision that grants or limits jurisdiction, in this case 28

U.S.C. § 1334.[188]  That provision of the Judicial Code—not the Bankruptcy Code—

provides the statutory basis for a bankruptcy court's broad jurisdiction to hear all

proceedings arising under title 11, in cases under title 11, or related to cases under title

11.  And importantly, neither § 1334 nor any other statutory provision explicitly limits

bankruptcy jurisdiction to pre-confirmation matters.  Thus, as Judge Lynch observed in

*Global Crossing*, "bankruptcy jurisdiction is not cut off the moment a plan of

---

[187]    *Celotex Corp. v. Edwards*, 514 U.S. 300, 307 (1995).

[188]    Another provision, 28 U.S.C. § 157, which sometimes is said to address jurisdiction, more
properly should be thought of as addressing the power of a bankruptcy judge, an Article I judge, to
decide certain matters, and not to subject matter jurisdiction itself.  When a district judge sits as a
bankruptcy judge, which occasionally happens, the distinction is more apparent.  The district
court's jurisdiction arises from the applicable subject matter jurisdiction statute, 28 U.S.C. § 1334,
and not from 28 U.S.C. § 157.

reorganization is confirmed, nor is the analysis under § 1334 of whether a case is 'related to' the bankruptcy proceedings otherwise modified."[189]

Of course, the Second Circuit has held, in *In re Johns-Manville Corp.*, that, "[a] bankruptcy court retains post-confirmation jurisdiction in a chapter 11 proceeding only to the extent provided in the plan of reorganization.  The bankruptcy court's post-confirmation jurisdiction therefore is defined by reference to the Plan."[190]  However, that observation doesn't affect post-confirmation jurisdiction when the plan provides for retention of jurisdiction to the fullest extent possible pursuant to statute, nor does it limit a bankruptcy court's ability to confirm a plan containing such retention of jurisdiction provisions.  Thus I find no reason why the Retention Provisions prevent confirmation of the Plan on the basis that they are overly broad.

Sprint's second argument against the Retention Provision—that it must be amended to assure the FCC retains primary jurisdiction—essentially asks me to issue an advisory ruling on whether I would have post-confirmation jurisdiction to hear a specific matter.  Since no party has yet asked me to invoke my jurisdiction post-confirmation to hear that matter, that matter isn't properly before me now.  Further weakening Sprint's argument, Sprint and the FCC have previously made similar arguments in this case in the context of the Debtors' objection to Sprint's claims,[191] and I found the doctrine of

---

[189]    *Global Crossing*, 2003 WL 22705127 (citing *In re U.S. Brass Corp.*, 301 F.3d 296, 304 (5th Cir. 2002) ("Section 1334 does not expressly limit bankruptcy jurisdiction upon plan confirmation."); 8 Collier on Bankruptcy ¶ 1142.04[1] ("Bankruptcy jurisdiction is governed by 28 U.S.C. § 1334; this is so whether the matter at issue arises before or after confirmation of a plan.").

[190]    *In re Johns-Manville Corp.*, 7 F.3d 32, 34 (2d Cir. 1993) (internal citations omitted).

[191]    *See* Sprint Primary Jurisdiction Brief; FCC Primary Jurisdiction Brief.

primary jurisdiction to be inapplicable when it was raised then.  For that reason too,[192] there is no basis for changing the decision that I then issued now.

<u>Conclusion</u>

For the foregoing reasons, the Plan will be confirmed.  The Debtors are to settle an order and any further Findings of Fact and Conclusions of Law that they desire[193] in accordance with the foregoing.

Dated: New York, New York                    ___*s/Robert E. Gerber*___
       ***October 26, 2009***                    United States Bankruptcy Judge

---

[192]    *See* Bench Decision on Debtors' Objection to Proofs of Claims Filed By Sprint Nextel Corporation.

[193]    Any such Findings of Fact and Conclusions of Law may and should cross-reference this decision to avoid repetition.