# Exhibit A

**Investment Agreement Amendment**

**FIRST AMENDMENT TO AMENDED AND RESTATED INVESTMENT AGREEMENT**

FIRST AMENDMENT TO AMENDED AND RESTATED INVESTMENT AGREEMENT, dated as of March 15, 2011 (this "<u>Amendment</u>"), between DBSD NORTH AMERICA, INC., a Delaware corporation (the "<u>Company</u>") and DISH NETWORK CORPORATION, a Nevada corporation ("<u>Investor</u>").

**RECITALS**

WHEREAS the Investor and Company are parties to that certain Amended and Restated Investment Agreement, dated as of February 24, 2011 (the "<u>Agreement</u>");

WHEREAS, the Investor and ICO Global Communications (Holdings) Limited have entered into that certain Restructuring Support Agreement, dated as of March 15, 2011 (as amended, supplemented or otherwise modified from time to time, the "<u>Support Agreement</u>"), and that certain Implementation Agreement dated as of March 15, 2011 (as amended, supplemented or otherwise modified from time to time, the "<u>Implementation Agreement</u>"); and

WHEREAS the Investor and Company desire to amend the Agreement and certain of its exhibits pursuant to Section 6.03 of the Agreement as set forth in this Amendment.

NOW, THEREFORE, in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Investor and Company hereby mutually agree as follows:

1. Capitalized terms used herein but not otherwise defined shall have the meanings ascribed thereto in the Agreement.

2. After the seventh paragraph in the Recitals of the Agreement the following paragraph shall be inserted:

"WHEREAS, the Investor and ICO Global Communications (Holdings) Limited have entered into that certain Restructuring Support Agreement, dated as of March 15, 2011 (as amended, supplemented or otherwise modified from time to time, the "<u>Support Agreement</u>"), and that certain Implementation Agreement dated as of March 15, 2011;"

3. Section 1.01 of the Agreement is hereby amended and restated in its entirety to read as follows:

"Purchase and Sale of Shares. On the terms and subject to the conditions set forth in this Agreement, at the Closing, the Reorganized Company will issue, sell and deliver to Investor, and Investor will purchase and receive from the Reorganized Company, 10,000 shares (the "Shares") of the common stock, par value $0.01 per share of the Reorganized Company (the "Common Stock") for an aggregate purchase price equal to (a) cash sufficient to (i) satisfy claims for all amounts due and owing (including principal and interest accrued and unpaid through Closing in accordance with the terms therein) under those 7.5% Convertible Senior Secured Notes due 2009 (the "Notes") not owned by Investor, issued under (and with such amounts determined in accordance with) that certain indenture dated August 15, 2005, as supplemented and amended, among the Company, the guarantors named therein, and The Bank of New York Mellon (f/k/a The Bank of New York), as trustee (the "Note Indenture"), (ii) repay in full all of the Company's outstanding obligations under the Replacement DIP Facility, (iii) pay in cash 100% of each allowed general unsecured claim, not owned by Investor, against Debtors, including the general unsecured claim held by Sprint Nextel Corporation ("Sprint") against Satellite Services as and when allowed, (iv) pay in cash 100% of each allowed administrative claim (including cure amounts on contracts previously assumed) that are not being paid on a current and regular basis, not owned by Investor, against the Debtors, and (v) the Net Equity Distribution (as defined below) (collectively, the "Cash Purchase Price") payable as set forth below in Section 1.03, plus (b) (i) the contribution to the Company of the allowed general unsecured claims and the allowed administrative claims against the Debtors owned by Investor, (ii) the contribution to the Company of the Notes owned by Investor and (iii) the contribution to the Company of the amount owed under the Prepetition Credit Agreement (collectively, the "Investor Contributions" and, together with the Cash Purchase Price, the "Purchase Price"). Following such contribution of the amounts owed under the Prepetition Credit Agreement and the other claims contributed pursuant to the Investor Contributions, none of the Debtors or any of their Affiliates party thereto shall have any further obligations under the Prepetition Credit Agreement or under any such claims. The purchase and sale of the Shares, and the Investor Contributions are collectively referred to in this Agreement as the "Transaction". For purposes of this Agreement, "Net Equity Distribution" shall mean $290 million minus the sum of all amounts paid on or prior to the Closing Date to ICO Global Communications (Holdings) Limited pursuant to Section 2.2(b) of that certain Implementation Agreement between ICO Global Communications (Holdings) Limited and Investor dated as of March 15, 2011 (as amended, supplemented or otherwise modified from time to time, the "Implementation Agreement").

4. Sections 4.02(d)(ii) and (iii) of the Agreement are hereby amended and restated in its entirety to read as follows:

"(ii) during the three (3) business day period following such notification described in clause (i), provide Investor a reasonable opportunity to make such adjustments in the terms and conditions of this Agreement as would permit the Company to accept Investor's proposal notwithstanding such Alternative Proposal and (iii) during the three (3) business day period following such notification described in clause (i), consider in good faith any changes to this Agreement proposed by Investor with respect to the Transaction."

5. Section 4.12(c) of the Agreement is hereby amended and restated in its entirety to read as follows:

"Prior to April 11, 2011, the Debtors will file in the Chapter 11 Cases (i) the Plan, which Plan will contain the terms contained in the Plan Term Sheet, will not contain terms that are inconsistent with those set forth in the Plan Term Sheet and will otherwise be in form and substance satisfactory to Investor and (ii) the Disclosure Statement. The Debtors will not amend, supplement or otherwise modify any provision of the Plan or the Disclosure Statement (each as filed with the Bankruptcy Court) without the prior consent of Investor which will not be unreasonably withheld."

6. Section 4.13(a) of the Agreement is hereby amended and restated in its entirety to read as follows:

"Investor shall commence, no later that five (5) business days after the entry by the Bankruptcy Court of the Investment Agreement Approval Order, a tender offer (the "Tender Offer") for any and all of (i) the outstanding Notes, (ii) allowed general unsecured claims of the Debtors (other than Satellite Services) as set forth in Sections 2.21(b)(ii) of the Company Disclosure Letter, but only to the extent of the "Total Amount to Be Tendered" (as such amount is reflected in such Section of the Company Disclosure Letter), (iii) allowed general unsecured claims of Satellite Services as set forth in Section 2.21(b)(i) of the Company Disclosure Letter, (iv) [Reserved] and (v) allowed non-ordinary course administrative claims of the Debtors relating to cure amounts for contracts previously assumed as set forth in Section 2.21(b)(vi) of the Company Disclosure Letter (collectively, the "Subject Claims"), in each case pursuant to the terms set forth in the term sheet attached as Exhibit D hereto (the "Tender Offer Term Sheet") and this Section 4.13."

7. Section 5.02(f) of the Agreement is hereby amended and restated in its entirety to read as follows:

"Filing of the Plan and the Disclosure Statement. Not later than April 11, 2011, the Company shall have filed in the Chapter 11 Cases, the Plan and the Disclosure Statement."

8. Section 5.02(h) of the Agreement is hereby amended and restated in its entirety to read as follows:

"Disclosure Statement Approval Order. Not later than May 23, 2011, the Bankruptcy Court shall have entered an order in the Chapter 11 Cases approving the Disclosure

Statement, in form and substance not inconsistent with the provisions of this Agreement and which otherwise shall be in form and substance reasonably satisfactory to Investor (the "Disclosure Statement Approval Order"), and the Company shall have complied with the Disclosure Statement Approval Order in all respects."

9. Section 5.02(j) of the Agreement is hereby amended and restated in its entirety to read as follows:

   "Confirmation Order. The Bankruptcy Court shall have entered the Confirmation Order in the Chapter 11 Cases not later than July 7, 2011."

10. Section 5.02(m) of the Agreement is hereby amended and restated in its entirety to read as follows:

    "Excluding allowed claims (x) owed to the Debtors' and the Creditors Committees' retained professionals, (y) owed in respect of fees of other professionals to the extent authorized to be paid on a current basis subsequent to the commencement of the Chapter 11 Cases and (z) relating to amounts owed under the Replacement DIP Facility, the total amount of (i) any allowed administrative claims owed pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code; (ii) any allowed priority tax claims owed pursuant to section 507(a)(8) of the Bankruptcy Code; (iii) any cure claims pursuant to section 365(b) of the Bankruptcy Code and (iv) any other allowed claims accorded priority in right of payment under section 507(a) of the Bankruptcy Code, shall not exceed $14 million."

11. Exhibit A to the Agreement is hereby amended by Exhibit 1 to this Amendment attached hereto.

12. Exhibit D to the Agreement is hereby amended by Exhibit 2 to this Amendment attached hereto.

13. Investor shall cause the Tender Offer Documents to reflect the amendments set forth herein.

14. Each individual executing this Amendment on behalf of an entity hereby represents and warrants to the other party or parties to this Amendment that (a) such individual has been duly and validly authorized to execute and deliver this Amendment on behalf of such entity; and (b) this Amendment is and will be duly authorized, executed and delivered by such entity.

15. This Amendment may be executed in any number of counterparts each of which shall be deemed an original and all of which shall constitute one and the same agreement. This Amendment shall be deemed executed upon each party's delivery of executed signature pages which may be delivered electronically or by facsimile with the same effect as originals.

IN WITNESS WHEREOF, the Company and Investor have duly executed this Amendment as of the date first written above.

DISH NETWORK CORPORATION

By: _____
Name: Robert Rihg
Title: SVP

DBSD NORTH AMERICA, INC.

By: _____
Name:
Title:

*[Signature Page to First Amendment to Amended and Restated Investment Agreement]*

IN WITNESS WHEREOF, the Company and Investor have duly executed this Amendment as of the date first written above.

        DISH NETWORK CORPORATION

        By: _____
            Name:
            Title:

        DBSD NORTH AMERICA, INC.

        By: _/s/ [signature]_____
            Name:
            Title:

Exhibit 1

*Revised Plan Term Sheet*

**DBSD NORTH AMERICA, INC., *ET AL*.**

**TERM SHEET FOR PROPOSED RESTRUCTURING OF DBSD NORTH AMERICA, INC.**

**March 15, 2011**

**THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, SHALL BE MADE ONLY IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY AND/OR OTHER APPLICABLE LAWS. THIS TERM SHEET DOES NOT ADDRESS ALL MATERIAL TERMS THAT WOULD BE REQUIRED IN CONNECTION WITH ANY POTENTIAL FINANCIAL RESTRUCTURING AND ANY AGREEMENT IS SUBJECT TO THE EXECUTION OF DEFINITIVE DOCUMENTATION IN FORM AND SUBSTANCE CONSISTENT WITH THIS TERM SHEET AND OTHERWISE ACCEPTABLE TO DISH (DEFINED BELOW) AND THE DEBTORS (DEFINED BELOW). THIS TERM SHEET HAS BEEN PRODUCED FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY AND IS SUBJECT TO THE PROVISIONS OF RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND OTHER SIMILAR APPLICABLE STATE AND FEDERAL RULES. THIS TERM SHEET AND THE INFORMATION CONTAINED HEREIN IS STRICTLY CONFIDENTIAL AND SHALL NOT BE SHARED WITH ANY OTHER PARTY ABSENT THE PRIOR WRITTEN CONSENT OF DISH.**

This term sheet ("Term Sheet") describes certain of the principal terms of a proposed restructuring (the "Restructuring") for the existing debt and other obligations of DBSD North America, Inc. ("DBSD" and once reorganized, "Reorganized DBSD") and certain of its affiliates (collectively, the "Debtors" and once reorganized, the "Reorganized Debtors"). DBSD is currently a 99.84% owned subsidiary of ICO Global Communications (Holdings) Limited ("ICO Global"). As described in greater detail herein, the Restructuring shall be consummated through either a modification to the Existing Plan[1] or a new plan of reorganization (with respect to either, the "Plan") based on an aggregate investment as set forth in section 1.1 of the Investment Agreement (as defined below) by DISH Network Corporation ("DISH"), as more fully described below. This Term Sheet has been produced for discussion and settlement purposes only.

---

[1] "Existing Plan" means the *Debtors' Second Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code* (the "Existing Plan") (Docket No. 500).

| | Overview |
|---|---|
| **The Restructuring** | Under the Plan, (A) DISH shall contribute (1) all of its Prepetition Facility Claims[2] under that certain Amended and Restated Revolving Credit Agreement, dated as of April 7, 2008 (the "Credit Agreement") and (2) cash in an aggregate amount as set forth in section 1.1 of the Investment Agreement, in exchange for 100% of the equity capital of Reorganized DBSD, (B) the holders of the 7.5% Convertible Senior Secured Notes due 2009 (the "Senior Notes") issued by DBSD under that certain indenture dated August 15, 2005 (as supplemented and amended, the "Indenture") shall be unimpaired and paid in full in cash in accordance with the terms of the Indenture, (C) general unsecured creditors shall receive a cash distribution as described below, and (D) holders of equity interests in DBSD shall receive a cash distribution from the Debtors in respect of their interests as described below. |
| **Implementation of the Restructuring** | The Debtors and DISH shall mutually agree upon the definitive documentation required for the Restructuring (the "Definitive Restructuring Documents"), which shall reflect the terms and conditions set forth herein and such other terms and conditions as shall be acceptable to the Debtors and DISH.<br><br>The Debtors shall seek confirmation of the Plan as provided in the Definitive Restructuring Documents. |
| **New DIP Facility** | The Debtors and DISH shall enter into a replacement DIP facility (the "New DIP Facility") of up to $87.5 million, the proceeds of which shall be used to (i) repay in full in cash the obligations under the existing DIP facility provided by certain holders of Senior Note Claims (the "Old DIP Facility"),[3] (ii) fund bankruptcy related costs, and (iii) provide working capital to the Debtors. Pursuant to Bankruptcy Code section 364(c), the obligations under the New DIP Facility shall be entitled to superpriority claim status and shall be secured by (A) senior liens on all unencumbered assets of the Debtors and (B) junior liens on all assets of the Debtors, subject to the prepetition and adequate protection liens of holders of secured claims under the Credit Agreement and the Indenture. The terms and conditions of the New DIP Facility are more fully set forth on the term sheet attached hereto as Exhibit 1. The New DIP Facility shall be paid in full in cash by the Debtors |

---

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in Existing Plan.

[3] That certain Secured Super-Priority Debtor-in-Possession Credit Agreement, dated as of January 8, 2010, as amended.

|  | with proceeds provided by DISH as contemplated in the Investment Agreement. |
| --- | --- |
| **Securities Contemplated by the Plan** ||
| **New Capital Stock** | Pursuant to that certain amended and restated investment agreement between DBSD and DISH (as amended, the "Investment Agreement"), the shares to be issued to DISH, when issued and delivered, will have been duly and validly authorized and will be duly and validly issued and delivered. Upon issuance, the shares will be fully paid and non-assessable, free of preemptive or similar rights. <br><br> As of the closing of the purchase and sale of such shares on the effective date of the Plan (the "Effective Date"), the authorized capital stock of Reorganized DBSD will consist solely of 10,000 shares of common stock, of which 10,000 shares will be issued and outstanding (the "New Common Stock"). As of the Effective Date, there will be no shares of capital stock or other equity interests of Reorganized DBSD issued, reserved for issuance or outstanding, other than the New Common Stock. |
| **Treatment of Claims and Equity Interests** ||
| **Administrative, Priority Tax and Other Priority Claims** | On or as soon as practicable after the Effective Date, each holder of an allowed administrative, priority tax or other priority claim shall receive cash equal to the full amount of its claim or otherwise be rendered unimpaired. |
| **Credit Agreement Claims** | On the Effective Date, the Credit Agreement claims shall be satisfied in full by issuance to DISH of equity interests in Reorganized DBSD. |
| **Other Secured Claims** | On the Effective Date, all secured claims other than Credit Agreement claims and New DIP Facility claims shall be reinstated and paid in full in cash in the ordinary course in accordance with their terms as such claims become due. |
| **Senior Notes** | The holders of Senior Notes shall be unimpaired and, on the Effective Date, shall be paid in full in cash, including accrued and unpaid interest, in accordance with the terms of the Indenture. |
| **General Unsecured Claims Against Debtors Other Than New DBSD Satellite Services G.P. ("Satellite Services")** | On or as soon as practicable after the Effective Date, each holder of an allowed general unsecured claim against Debtors other than Satellite Services, shall be unimpaired and paid in full in cash in accordance with the terms of the document, agreement or instrument giving rise to such claim. |
| **General Unsecured Claim Against Satellite Services** | Sprint Nextel Corporation ("Sprint") alleges to be the only holder of a general unsecured claim against Satellite Services pursuant to its claim which is asserted in the amount of $104,194,649 and which has been designated as Claim No. 138 by the court-appointed claims agent (the "Sprint Claim"). DISH at its option may join in the objection to the Sprint Claim previously filed by the Debtors (the "Sprint Objection"). |

|   |   |
|---|---|
|   | The Sprint Claim shall be unimpaired and paid in full and in cash if, as and when allowed. |
| **Existing Equity in DBSD** | On the Effective Date, all existing equity interests of DBSD shall be cancelled pursuant to the Plan and the holders thereof shall each receive its pro rata share of the Net Equity Distribution in full satisfaction of such interests.<br><br>For purposes of this Term Sheet, "Net Equity Distribution" shall mean $290 million minus the sum of all amounts paid on or prior to the Closing Date to ICO Global pursuant to Section 2.2(b) of that certain Implementation Agreement between ICO Global and DISH dated as of March 15, 2011 (as amended, supplemented or otherwise modified from time to time, the "Implementation Agreement") which shall be credited against ICO Global's distribution under the Plan. |
| **Existing Equity in Debtor-Subsidiaries of DBSD** | On the Effective Date, all equity interests in any Debtor-subsidiary of DBSD shall be reinstated and unaffected by the Plan. |
| **General Provisions** | |
| **Board of Directors of Reorganized DBSD** | The board of directors of Reorganized DBSD shall be comprised of five to ten members, with all members being designated by DISH in its sole discretion on terms to be determined by DISH.<br><br>Each new board member shall be entitled to execute a D&O Indemnification Agreement in form and substance reasonably acceptable to such member and Reorganized DBSD upon his or her appointment. |
| **Means for Implementation** | To the extent not explicitly set forth in the Definitive Restructuring Documents, the parties shall agree upon the precise mechanics for implementing each of the transactions contemplated by the Restructuring and the Plan. |
| **Documentation** | All documentation prepared in connection with the Restructuring, including without limitation, the Definitive Restructuring Documents, and any documents, motions, pleadings, orders or the like prepared or filed in connection with the chapter 11 cases shall be in form and substance reasonably satisfactory to DISH and the Debtors. |
| **Transition Services Agreement** | The provision of transition services by DBSD to ICO Global and vice versa shall be formalized in a transition services agreement on terms, including the fees to be earned by ICO Global, that are mutually agreeable to DBSD, ICO Global and DISH. The agreement shall provide for appropriate transition periods and that all third party services shall be passed through at cost. |
| **Employment Agreements and** | On the Effective Date, all employment agreements and employee |

| | |
|---|---|
| **Employee Compensation Programs** | compensation programs with certain of the Debtors' employees shall be effective and binding on the reorganized Debtors; <u>provided</u>, <u>however</u>, that the identity of such employees shall not differ from as set forth in the schedule provided to DISH prior to execution of the Investment Agreement and such employees' annual salaries, bonuses, potential severance payments and other compensation shall not exceed those amounts as set forth in the schedule provided to DISH prior to execution of the Investment Agreement. |
| **Releases** | DISH shall provide a release to the existing directors and officers of the Debtors and their respective affiliates and advisors. DBSD and its affiliates, including ICO Global, shall execute a release of any claims they may have against DISH, its respective officers and directors and its respective affiliates and advisors. |
| **Tax Issues** | The Plan shall contain provisions regarding tax matters that are acceptable to the Debtors and DISH. |
| **No Waiver** | Nothing herein shall affect in any way, nor be deemed a waiver of, any of the rights of the Debtors or DISH under the Credit Agreement or the Indenture or any other document or under applicable law. Nothing herein is intended to waive, limit, or restrict the ability of any of the foregoing parties, in whatever capacity, to protect and preserve their rights, remedies and interests against the Debtors or any third party, whether under the Credit Agreement, the Indenture or any other document or applicable law. |
| **Conditions to Confirmation/Effective Date of the Plan** ||
| **Conditions to Confirmation** | The following are conditions precedent to confirmation of the Plan, each of which must be satisfied or waived by the Debtors and DISH:<br><br>The Bankruptcy Court shall have approved the adequacy of the disclosure statement, provided the Debtors are required to solicit acceptances of the Plan.<br><br>The Plan shall not have been modified or amended without the prior written consent of DISH.<br><br>The Investment Agreement shall not have been terminated and there shall not be any default or event of default thereunder that has not been waived in accordance with the terms thereof.<br><br>There shall not be any default or event of default under the New DIP Facility that has not been waived in accordance with the terms thereof. |

| | |
|---|---|
| | The Bankruptcy Court shall have entered an order, in form and substance reasonably satisfactory to DISH, confirming the Plan. |
| **Conditions to Effective Date** | The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived by the Debtors and DISH:<br><br>The confirmation order, in form and substance reasonably satisfactory to the Debtors and DISH, shall have become a final order and shall be in full force and effect, not subject to any stay, and shall not have been amended or otherwise modified without the prior written consent of DISH. The confirmation order shall, among other things, provide that the Debtors and the Reorganized Debtors are authorized without further board or shareholder approval or consent to take all actions, including entering into agreements and documents, necessary to effectuate the Plan.<br><br>All conditions set forth in Article V of the Investment Agreement shall have been satisfied or waived in accordance with the terms thereof, including, without limitation, obtaining all authorizations, consents, and HSR, FCC and other regulatory approvals.<br><br>No event shall have occurred or condition shall exist which constitutes an event of default, or which upon notice, lapse of time, or both would become an event of default, under the New DIP Facility that has not been waived by DISH in accordance with the terms of the New DIP Facility. |
| **Proposed Sprint Settlement: Waivers (i) by Sprint of Claims Against Debtors, DISH, ICO Global and Their Assignees and Transferees; and (ii) by ICO Global, DISH and Debtors of Claims Against Sprint** | Up to $40 million of the amounts paid by DISH to DBSD may be used to fund a settlement with Sprint on terms described herein and otherwise acceptable to DISH, the Debtors and Sprint. If Sprint accepts such a settlement prior to the Effective Date then, effective upon consummation of the Plan, Sprint shall be deemed to have waived and released all rights to any distribution under the Plan and any and all claims and causes of action (including, without limitation, Administrative Claims, Secured Claims and Priority Claims) it has or may have, including any interest accrued on and fees and expenses resulting from such claims or causes of action, whether known or unknown, against, liabilities of, liens on, obligations of, rights against and interests in the Debtors, the Reorganized Debtors, DISH and ICO Global, and their respective shareholders, lenders, successors, assignees, transferees, assets and properties, with respect to (i) any and all cost incurred or to be incurred by Sprint in connection with the relocation of broadcast auxiliary service licensees from the 1990-2025 MHz spectrum band, and (ii) any and all claims asserted in the E.D.Va. Litigation (as defined below). For the avoidance of doubt, Sprint shall waive |

| | |
|---|---|
| | and release any and all claims and causes of action it has or may have against the Debtors, the Reorganized Debtors, DISH and ICO Global, and their respective shareholders, lenders, successors, assignees, transferees, assets and properties, under the Federal Communication Commissions' Fifth Report and Order, Eleventh Report and Order, Sixth Report and Order, and Declaratory Ruling, FCC No. 10-179, released September 29, 2010, 75 Fed. Reg. 67,227 (Nov. 2, 2010), 25 FCC Rcd 13874 (the "BAS Rulemaking"), and under any amendments to or modifications of the BAS Rulemaking, including any and all claims and causes of action in connection with or arising or resulting from or upon any assignment or transfer of the Debtors' spectrum licenses.<br><br>Effective upon consummation of the Plan, if Sprint has accepted such settlement, ICO Global, DISH and Debtors shall be deemed to have released and waived any and all claims and causes of action they individually and/or collectively have or may have, including any interest accrued on and fees and expenses resulting from such claims or causes of action, whether known or unknown, against, liabilities of, liens on, obligations of, and rights against Sprint, and its successors, assignees and transferees, and its assets and properties in connection with the relocation of broadcast auxiliary service licensees from the 1990-2025 MHz spectrum band. |
| **Waiver by ICO Global of Claims Against Debtors and Their Assignees and Transferees** | ICO Global shall fully release and waive any and all claims, except for the Prepetition ICO Claims (defined below), and causes of action its has or may have, including any interest accrued on and fees and expenses resulting from such claims or causes of action, whether known or unknown, against, liabilities of, liens on, obligations of, rights against and interests in the Debtors and the Reorganized Debtors, and their respective shareholders, lenders, successors, assignees, transferees, assets and properties.<br><br>"Prepetition ICO Claims" shall mean the two allowed prepetition unsecured claims against the Debtors held by ICO Global in the amount of $403,104.26 and $215,421.75, respectively. |
| **Release of ICO Global** | ICO Global shall be released by the Debtors and other parties in interest to the extent originally provided for in the plan that was confirmed by the Debtors on November 23, 2009. |
| **Withdrawal of Sprint's Actions Against ICO Global and the Debtors** | If Sprint has accepted the settlement described above, as soon as practicable following the Effective Date, Sprint shall file a notice of dismissal with prejudice of its civil actions against (i) ICO Global currently pending in the United States District Court for the Eastern District of Virginia [case no. 10-01404], and (ii) New DBSD Satellite Services, G.P. (f/k/a New ICO Satellite Services, G.P.) currently pending in the United States District Court for the |

|  | Eastern District of Virginia [case no. 08-00651] (collectively, the "E.D.Va. Litigation"). |
|---|---|
| **Withdrawal of Petition for Review by Debtors and ICO Global** | If Sprint has accepted the settlement described above, as soon as practicable following the Effective Date, each of the Debtors shall file a notice of dismissal with prejudice of any appeal or review sought with respect to the BAS Rulemaking, filed in the D.C. Circuit on November 29, 2010 (Case No. 10-1401). As soon as practicable following the Effective Date, ICO Global shall file a notice of dismissal with prejudice of any appeal or review sought with respect to the BAS Rulemaking, filed in the D.C. Circuit on October 12, 2010 (Case No. 10-1322). |
| **Transition Services and Amended License Agreements** | The Debtors and ICO Global shall implement the Transition Services Agreement and Amended and Restated License and Spectrum Coordination Agreement, each in the form attached to the Implementation Agreement, between ICO Global and DISH, dated as of March 15, 2011 . |

Exhibit 2

*Revised Tender Offer Term Sheet*

# TENDER OFFER FOR CONVERTIBLE DEBT SECURITIES AND CERTAIN OTHER CLAIMS OF THE DEBTORS

*Term Sheet*

This Term Sheet[1] summarizes certain material terms with regard to a proposed tender offer (the "**Tender Offer**") by Dish Network Corporation ("**DISH**"). Terms used and not defined herein shall have the meanings ascribed thereto in the Investment Agreement.

| **Offeror** | DISH |
|---|---|
| | |
| **Claims Tendered for by DISH and Purchase Price**[2] | • Any and all of the 7.5% Convertible Senior Secured Notes due 2009 (issued under that certain indenture dated August 15, 2005, as supplemented and amended, among DBSD North America, Inc. (the "**Company**"), the guarantors named therein, and The Bank of New York Mellon (f/k/a The Bank of New York), as trustee) outstanding (the "**Notes**") for all amounts in cash necessary to satisfy claims (including interest accrued and unpaid through (but not including) the Purchase Date) thereunder pursuant to the terms of the Note Indenture <br><br> • Any and all allowed general unsecured claims of the Company and 3421554 Canada Inc., DBSD Satellite Management, LLC, DBSD Satellite North America Limited, DBSD Satellite Services Limited, DBSD Services Limited, DBSD Satellite Services G.P., and SSG UK Limited for 100% of the allowed claim amount in cash <br><br> • General unsecured claim of New DBSD Satellite Services G.P. held by Sprint Nextel Corporation for $40 million in cash, subject to Sprint's agreement to deliver the releases and waivers contemplated by the Plan <br><br> • Any and all non-ordinary course allowed administrative claims relating to cure amounts on contracts previously assumed for 100% of the allowed claim amount in cash <br><br> All of the foregoing, other than the Notes, are referred to herein as the "**Claims**" |

---

[1] This term sheet will be replaced by copies of the Tender Offer Documents agreed to by Investor and the Company pursuant to Section 4.13 of the Investment Agreement.

[2] The Tender Offer Documents will include a schedule of the claims falling within this provision to be provided by the Company based on the representations contained in the Investment Agreement and this Exhibit D.

| | |
|---|---|
| **Expiration Date** | 11:59 pm, New York City time, 20 business days following commencement of the tender offer, *provided that*, the Expiration Date shall be subject to extension as set forth in Section 4.13 of the Investment Agreement |
| **Purchase Date** | Promptly, but in any event within three (3) business days, after the Expiration Date |
| **Conditions to Closing of Tender Offer** | DISH's obligation to purchase the Notes and the Claims tendered is conditioned on the satisfaction or written waiver by DISH of only the following conditions:<br><br>• no Restraints being in effect preventing the consummation of the tender offer<br><br>• the Investment Agreement or Replacement DIP Facility not having been terminated and Investment Agreement Approval Order being in full force and effect<br><br>• Restriction period relating to the purchase of certain claims set forth in the "Amended Order (A) Restricting The Purchase Of Certain Claims Against The Debtors And (B) Continuing Notification And Hearing Procedures For Relief From The Restrictions On The Purchase Of Certain Claims Against The Debtors" having expired by its terms or a subsequent order having been entered permitting the closing of the tender offer |
| **Withdrawal Rights** | Holders of Notes and Claims may withdraw their tenders on or before the Expiration Date |
| **Note Covenants** | Covenants in Notes shall remain in effect after the completion of the tender offer |